Robert V. Prongay (SBN 270796)
Pavithra Rajesh (SBN 323055)
**GLANCY PRONGAY & MURRAY LLP**
1925 Century Park East, Suite 2100
Los Angeles, California 90067
Telephone: (310) 201-9150
Facsimile: (310) 201-9160
Email:      rprongay@glancylaw.com
            prajesh@glancylaw.com

*Counsel for Lead Plaintiffs Ervin Derr and Peter Shoemaker and Lead Counsel for the Class*

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ERVIN DERR, and PETER SHOEMAKER, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>RA MEDICAL SYSTEMS, INC., DEAN IRWIN, ANDREW JACKSON, MELISSA BURSTEIN, MARTIN BURSTEIN, RICHARD HEYMANN, MAURICE BUCHBINDER, MARTIN COLOMBATTO, RICHARD MEJIA, JR., PIPER JAFFRAY & CO., CANTOR FITZGERALD & CO., SUNTRUST ROBINSON HUMPHREY, INC., NOMURA SECURITIES INTERNATIONAL, INC., and MAXIM GROUP LLC,<br><br>Defendants. | Case No. 3:19-cv-01079-LAB-AHG<br><br>**LEAD PLAINTIFFS' OMNIBUS OPPOSITION TO THE MOTIONS TO DISMISS BY DEAN IRWIN, MELISSA BURSTEIN AND MARTIN BURSTEIN [DKT. NO. 29] AND BY THE RA MEDICAL DEFENDANTS [DKT. NO. 30]**<br><br>The Hon. Larry Alan Burns<br><br><br>**<u>SPECIAL BRIEFING SCHEDULE ORDERED</u>** |

PLAINTIFFS' OMNIBUS OPPOSITION TO MOTIONS TO DISMISS THE FAC
Case No. 3:19-cv-01079-LAB-AHG

# **TABLE OF CONTENTS**

PRELIMINARY STATEMENT ................................................................................1

STATEMENT OF FACTS ......................................................................................3

I.    Background........................................................................................................3

II.   When Ra Medical Completed its IPO, Defendants Failed to Disclose A Host of Issues That Threatened the Company's Future ................................................4

      A.    Defendants Failed to Disclose that Ra Medical Engaged in a Covert Product Recall Because DABRA Failed to Calibrate.............................4

      B.    Defendants Failed to Disclose that Ra Medical Promoted DABRA for Off-Label Use...................................................................................5

      C.    Defendants Failed to Disclose that the Company Lacked Adequate Systems to Ensure Compliance with Applicable Regulations................6

III.  After the IPO, Ra Medical and the Exchange Act Individual Defendants Continue to Mislead Investors .........................................................................6

ARGUMENT..........................................................................................................8

I.    The Complaint Adequately Alleges a Section 11 Claim .................................8

      A.    Plaintiffs Face a Minimal Pleading Burden .............................................8

      B.    Plaintiffs Have Standing .......................................................................10

      C.    The FAC Sufficiently Pleads a Material Misstatement or Omission ...12

            1.    The Registration Statement Failed to Disclose That DABRA Failed to Calibrate and That, as a Result, The Company Was Recalling Product........................................................................13

            2.    The Registration Statement Failed to Disclose That The Company Engaged in Off-Label Marketing by Improperly Referring to Atherectomy.................................................................15

            3.    The Registration Statement Failed to Disclose that Ra Medical Lacked an Adequate System of Documenting and Reporting Payments to Physicians..............................................................18

            4.    The Registration Statement Failed to Disclose a Patient Injury in the Pivotal Study for DABRA ...............................................20

---

PLAINTIFFS' OMNIBUS OPPOSITION TO MOTIONS TO DISMISS THE FAC
Case No. 3:19-cv-01079-LAB-AHG                                              i

5.    The Confidential Witnesses Are Credible ................................... 20

D.    Statements Concerning Laws and Regulations Are Actionable .......... 21

E.    Defendants Had a Duty to Disclose Omitted Information Under Item 303 ................................................................................ 22

II.    The Complaint Adequately Alleges a Section 10(b) Claim ............................ 24

A.    Legal Standard ...................................................................................... 24

B.    Plaintiffs Adequately Allege False and/or Misleading Statements ...... 25

1.    The FAC Alleges False/Misleading Statements Regarding DABRA's Failure to Calibrate, Sales Training Problems, Off-Label Marketing, and SOX Certifications .................................. 25

2.    Risk Factors Are Actionable Because the Risks Had Materialized ...................................................................... 28

C.    Ra Medical and the Exchange Act Individual Defendants Issued False Statements with Scienter ............................................................... 29

1.    Irwin and Jackson Knew About the Product Defect and the Off-Label Marketing ..................................................................... 30

2.    Irwin's Termination Supports a Strong Inference of Scienter ... 30

3.    The SEC and DOJ Investigations Support a Strong Inference of Scienter ..................................................................... 31

4.    Stock Sales Support a Strong Inference of Scienter ................... 31

5.    The Confidential Witnesses Support a Strong Inference of Scienter ..................................................................... 32

6.    The Core Operations Doctrine Supports a Strong Inference of Scienter ..................................................................... 33

7.    SOX Certifications Support a Strong Inference of Scienter ....... 34

III.    The Complaint Adequately Alleges Control Person Liability ........................ 35

CONCLUSION ............................................................................................................ 35

# TABLE OF AUTHORITIES

**CASES**

*Batwin v. Occam Networks, Inc.*,
  2008 WL 2676364 (C.D. Cal. July 1, 2008) ........................................................34

*Berson v. Applied Signal Tech., Inc.*,
  527 F.3d 982 (9th Cir. 2008) ...............................................................................29

*Brody v. Transitional Hosp. Corp.*,
  280 F.3d 997 (9th Cir. 2002) ...............................................................................25

*Bruce v. Suntech Power Holdings Co. Ltd.*,
  64 F. Supp. 3d 1365 (N.D. Cal. 2014) .............................................................24, 29

*Cutler v. Kirchner*,
  696 F. App'x 809 (9th Cir. 2017)..........................................................................28

*Deora v. NantHealth, Inc. et al.*,
  2018 WL 4743494 (C.D. Cal. Mar. 27, 2018) ........................................................10

*Doherty v. Pivotal Software, Inc.*,
  2019 WL 5864581 (N.D. Cal. Nov. 8, 2019).........................................................11

*Eminence Capital, LLC v. Aspeon, Inc.*,
  316 F.3d 1048 (9th Cir. 2003).........................................................................29, 35

*Gilligan v. Jamco Dev. Corp.*,
  108 F.3d 246 (9th Cir. 1997)..................................................................................9

*Herman & MacLean v. Huddleston*,
  459 U.S. 375 (1983) ...............................................................................................8

*In re Amgen Inc. Sec. Litig.*,
  2014 WL 12585809 (C.D. Cal. Aug. 4, 2014)........................................................29

*In re Apple Computer Sec. Litig.*,
  886 F.2d 1109 (9th Cir. 1989)...............................................................................28

*In re Atossa Genetics, Inc. Sec. Litig.*,
  2014 WL 4983551 (W.D. Wash. Oct. 6, 2014) ......................................................11

*In re Cabletron Sys., Inc.*,
311 F.3d 11 (1st Cir. 2002) ......................................................................20

*In re Century Aluminum Co. Sec. Litig.*,
729 F.3d 1104 (9th Cir. 2013) ............................................................10, 11

*In re Charles Schwab Corp. Sec. Litig.*,
257 F.R.D. 535 (N.D. Cal. 2009) ...............................................................8

*In re China Educ. Alliance Sec. Litig.*,
2011 WL 4978483 (C.D. Cal. Oct. 11, 2011) ...........................................24

*In re Countrywide Fin. Corp. Sec. Litig.*,
588 F. Supp. 2d 1132 (C.D. Cal. 2008).......................................................9

*In re Daou Sys., Inc.*,
411 F.3d 1006 (9th Cir. 2005) ...........................................................20, 21

*In re Facebook, Inc. IPO Sec. & Deriv. Litig.*,
986 F. Supp. 2d 487 (S.D.N.Y. 2013).......................................................22

*In re Gilead Scis. Sec. Litig.*,
536 F.3d 1049 (9th Cir. 2008).................................................................24

*In re Immune Response Sec. Litig.*,
375 F. Supp. 2d 983 (S.D. Cal. 2005) ............................................12, 15, 30

*In re Infonet Svcs. Corp. Sec. Litig.*,
310 F. Supp. 2d 1080 (C.D. Cal. 2003).....................................................16

*In re Intuitive Surgical Sec. Litig.*,
65 F. Supp. 3d 821 (N.D. Cal. 2014) ...................................................25, 26

*In re NVIDIA Corp. Sec. Litig.*,
768 F.3d 1046 (9th Cir. 2014).................................................................33

*In re Oppenheimer Rochester Funds Grp. Sec. Litig.*,
838 F. Supp 2d 1148 (D. Colo. 2012) .......................................................19

*In re OSG Sec. Litig.*,
12 F. Supp. 3d 619 (S.D.N.Y. 2014).........................................................33

*In re PETCO Corp. Sec. Litig.*,
   2008 WL 8876554 (S.D. Cal. Apr. 29, 2008) ..........................................................31

*In re Petrobras Sec. Litig.*,
   116 F. Supp. 3d 368 (S.D.N.Y. 2015) ....................................................................28

*In re Portal Software, Inc. Sec. Litig.*,
   2006 WL 2385250 (N.D. Cal. Aug. 17, 2006).........................................................35

*In re Quality Sys., Inc. Sec. Litig.*,
   865 F.3d 1130 (9th Cir. 2017)................................................................................31

*In re Quarterdeck Office Sys., Inc. Sec. Litig.*,
   1993 WL 623310 (C.D. Cal. Sept. 30, 1993)..........................................................11

*In re Surebeam Corp. Sec. Litig.*,
   2005 WL 5036360 (S.D. Cal. Jan. 3, 2005).......................................................12, 24

*In re UTStarcom, Inc. Sec. Litig.*,
   617 F Supp. 2d 964 (N.D. Cal. 2009) ...............................................................30, 32

*In re Violin Memory Sec. Litig.*,
   2014 WL 5525946 (N.D. Cal. Oct. 31, 2014)...................................................8, 9, 22

*In re Zynga Inc. Sec. Litig.*,
   2014 WL 721948 (N.D. Cal. Feb. 25, 2014)............................................................11

*Jasin v. Vivus, Inc.*,
   2016 WL 1570164 (N.D. Cal. Apr 19, 2016) .........................................................28

*Johnson v. CBD Energy Ltd.*,
   2016 WL 3654657 (S.D. Tex. July 6, 2016)............................................................12

*Johnson v. Knapp*,
   2009 WL 764521 (C.D. Cal. Mar. 16, 2009) ..........................................................23

*Khoja v. Orexigen Therapeutics, Inc.*,
   899 F.3d 988 (9th Cir. 2018)..................................................................................12

*Knollenberg v. Harmonic, Inc.*,
   152 F. App'x 674 (9th Cir. 2005).....................................................................8, 9, 10

PLAINTIFFS' OMNIBUS OPPOSITION TO MOTIONS TO DISMISS THE FAC
Case No. 3:19-cv-01079-LAB-AHG

*Lilley v. Charren*,
  936 F. Supp. 708 (N.D. Cal. 1996) ............................................................11

*Limantour v. Cray Inc.*,
  432 F. Supp. 2d 1129 (W.D. Wash. 2006)..................................................27

*Livid Holdings Ltd. v. Salomon Smith Barney, Inc.*,
  416 F.3d 940 (9th Cir. 2005).....................................................................28

*Lloyd v. CVB Fin. Corp.*,
  811 F.3d 1200 (9th Cir. 2016)....................................................................32

*Mallen v. Alphatec Holdings, Inc.*,
  861 F. Supp. 2d 1111 (S.D. Cal. 2012) ......................................................23

*Matrixx Initiatives, Inc. v. Siracusano*,
  563 U.S. 27 (2011) ................................................................................8, 24

*Meyer v. Jinkosolar Holdings Co.*,
  761 F.3d 245 (2d Cir. 2014) ......................................................................21

*Miller v. Thane Int'l, Inc.*,
  519 F.3d 879 (9th Cir. 2008).....................................................................16

*Mosco v. Motricity, Inc.*,
  649 F. App'x 526 (9th Cir. 2016)...............................................................23

*Mulligan v. Impax Labs., Inc.*,
  36 F. Supp. 3d 942 (N.D. Cal. 2014) .........................................................15

*No. 84 Employer-Teamster Joint Council Pension Trust*
  *Fund v. Am. W. Holding Corp.*,
  320 F.3d 920 (9th Cir. 2003).....................................................................32

*Norfolk Cty. Ret. Sys. v. Solazyme, Inc.*,
  2016 WL 7475555 (N.D. Cal. Dec. 29, 2016) ...........................................11

*Novak v. Kasaks*,
  216 F.3d 300 (2d Cir. 2000) ......................................................................20

*Nursing Home Pension Fund, Local 144 v. Oracle Corp.*,
  380 F.3d 1226 (9th Cir. 2004)....................................................................................30

*Omnicare Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*,
  575 U.S. 175 (2015) ....................................................................................................8

*Oxford Asset Mgmt., Ltd. v. Jaharis*,
  297 F.3d 1182 (11th Cir. 2002)................................................................................23

*Patel v. Axesstel, Inc.*,
  2015 WL 631525 (S.D. Cal. Feb. 13, 2015) ............................................................33

*Plichta v. SunPower Corp.*,
  790 F. Supp. 2d 1012 (N.D. Cal. 2011) ...................................................................12

*Police Retirement Sys. of St. Louis v. Intuitive Surgical, Inc*,
  759 F.3d 1051 (9th Cir. 2014)...................................................................................34

*Provenz v. Miller*,
  102 F.3d 1478 (9th Cir. 1996)...................................................................................29

*Retail Wholesale & Dep't Store Union Local 338 Ret. Fund
   v. Hewlett-Packard Co.*,
  845 F.3d 1268 (9th Cir. 2017)...................................................................................28

*Rieckborn v. Jefferies LLC*,
  81 F. Supp. 3d 902 (N.D. Cal. 2015) ..........................................................................9

*S. Ferry LP, No. 2 v. Killinger*,
  542 F.3d 776 (9th Cir. 2008)....................................................................................34

*Salameh v. Tarsadia Hotel*,
  726 F.3d 1124 (9th Cir. 2013)...................................................................................24

*Shenwick v. Twitter, Inc.*,
  282 F. Supp. 3d 1115 (N.D. Cal. 2017) ..............................................................17, 18

*Steckman v. Hart Brewing Inc.*,
  143 F.3d 1293 (9th Cir. 1998)...................................................................................23

PLAINTIFFS' OMNIBUS OPPOSITION TO MOTIONS TO DISMISS THE FAC

*Stocke v. Shuffle Master, Inc.*,
615 F. Supp. 2d 1180 (D. Nev. 2009) ..................................................................32

*Tadros v. Celladon Corp.*,
2016 WL 58700002 (S.D. Cal. Oct. 7, 2016)........................................................34

*Tellabs v. Makor Issues & Rights, Ltd.*,
551 U.S. 308 (2007) .............................................................................9, 24, 29, 30

*Thomas v. Magnachip Semiconductor Corp.*,
167 F. Supp. 3d 1029 (N.D. Cal. 2016) ..........................................................11, 31

*Todd v. STAAR Surgical Co.*,
2016 WL 6699284 (C.D. Cal. Apr. 12, 2016)......................................................22

*Vigil v. General Nutrition Corp.*,
2015 WL 2338982 (S.D. Cal. May 13, 2015).......................................................12

*Viswanath v. Imperva, Inc.*,
2016 WL 2851859 (N.D. Cal. May 16, 2016) ......................................................29

*Warshaw v. Xoma Corp.*,
74 F.3d 955 (9th Cir. 1996)..................................................................................13

*Weiss v. Amkor Tech., Inc.*,
527 F. Supp. 2d 938 (D. Ariz. 2007)....................................................................34

*Zaghian v. Farrell*,
675 F. App'x  718 (9th Cir. 2017).........................................................................28

*Zucco Partners LLC v. Digimarc Corp.*,
552 F.3d 981 (9th Cir. 2009).................................................................................33

**STATUTES**
15 U.S.C. § 77k...................................................................................................8, 18

15 U.S.C. § 78u-4(b)(1).............................................................................................25

**RULES**
Fed. R. Civ. P. 15(a) ................................................................................................35

PLAINTIFFS' OMNIBUS OPPOSITION TO MOTIONS TO DISMISS THE FAC
Case No. 3:19-cv-01079-LAB-AHG                                                                    viii

**REGULATIONS**

17 C.F.R. § 229.303(a)(3)(ii).................................................................................22

17 C.F.R. § 240.10b-5(b).......................................................................................25

17 C.F.R. § 240.10b5-1(c)(1) ................................................................................32

Lead Plaintiffs Ervin Derr and Peter Shoemaker ("Plaintiffs"), by and through their attorneys, hereby submit an omnibus opposition to the Irwin/Burstein[1] Defendants' motion to dismiss (Dkt. No. 29, "Irwin Br.") and the Ra Medical Defendants' motion to dismiss (Dkt. No. 30, "RMED Br.").

**PRELIMINARY STATEMENT**

Ra Medical's core product is DABRA, a laser system and catheter approved by the FDA to treat certain vascular diseases. The DABRA system is offered for a nominal fee, and the Company recognizes revenue by selling its single-use disposable catheters. As such, Ra Medical operates on a classic model successfully used by other companies that sell, for example, razor and razorblades, Keurig machine and coffee pods, and printer and ink cartridges. For such companies, including Ra Medical, the disposable unit is the key source of revenue.

What Defendants failed to disclose is that these catheters did not calibrate. Because DABRA operates without the use of a guidewire, the failure to calibrate renders the device useless: physicians cannot control DABRA with the precision required to navigate miniscule blood vessels and thus risk rupturing delicate veins and arteries.

Instead of revealing this to the investing public before the IPO (from which the Company received proceeds of nearly $68 million), Defendants replaced product for customers, which required the Company to produce more and more (still defective) catheters, further depressing Ra Medical's financial results. They also marketed

---

[1] Unless otherwise defined, capitalized terms herein have the same meaning as set forth in the First Amended Complaint (Dkt. No. 21, the "FAC") and all "¶__" citations refer to the FAC. The "Irwin/Burstein Defendants" includes Dean Irwin, Melissa Burstein, and Martin Burstein. The "Ra Medical Defendants" includes Ra Medical Systems, Inc. ("Ra Medical" or the "Company"), Andrew Jackson, Richard Heymann, Maurice Buchbinder, Martin Colombatto, Richard Mejia, Jr., Mark E. Saad, and William Enquist Jr. "Defendants" refers collectively to the Irwin/Burstein Defendants and the Ra Medical Defendants.

DABRA for atherectomy, which is not the FDA-approved use, thereby exposing the Company to regulatory penalties for off-label marketing.[2]

Defendants have already admitted that they made false statements regarding DABRA, recall efforts, off-label marketing, and payments to physicians, when they reported the findings of its Audit Committee's investigation. Not only has Defendants' conduct led to a 93% decrease in the Company's share price, decimating investors' and Plaintiffs' investments in Ra Medical, but it has also led to a criminal investigation by the Department of Justice and a civil investigation by the Securities Commission.

In the face of these well-pled allegations, Defendants quibble over the reliability of witnesses and offer alternative theories of the facts. But the confidential witnesses' testimony is reliable and sufficiently pled.  In fact, one of the witnesses is the whistleblower whose complaint the Company found sufficiently credible to launch the Audit Committee investigation and to fire Ra Medical's CEO, Irwin. Moreover, Plaintiffs allege the most plausible theory that is actually supported by the facts here. And as to statutory standing, Defendants fail to actually allege that unregistered shares entered the market, and claim that the possibility that unregistered shares could have entered the market after the IPO requires a finding of lack of standing.  Such speculation is wholly insufficient to defeat the well-pled allegations that Plaintiffs' purchases are traceable to the IPO.

Therefore, the FAC adequately pleads claims under the Securities Act and the Exchange Act. Defendants' motions to dismiss should be denied.

---

[2] The Irwin/Burstein Defendants' argument that "DABRA performs atherectomy" is much ado about nothing. Irwin Br. at 1-2. What DABRA purports to do has no bearing on what it has been approved by the FDA to treat; the latter is dispositive as how Ra Medical can market the product, and DABRA is not FDA-approved for atherectomy. ¶ 73.

PLAINTIFFS' OMNIBUS OPPOSITION TO MOTIONS TO DISMISS THE FAC
Case No. 3:19-cv-01079-LAB-AHG                                                        2

**STATEMENT OF FACTS**

This class action is brought on behalf of persons and entities that purchased or otherwise acquired Ra Medical securities: (a) pursuant and/or traceable to the Registration Statement issued in connection with the Company's IPO; and/or (b) between September 28, 2018 and November 27, 2019, inclusive (the "Class Period"). ¶ 1.

## I. Background

When Ra Medical completed its IPO in September 2018, its DABRA laser system and catheter positioned the Company for a steady stream of recurring revenue: by offering the laser system for a nominal fee, Ra Medical recognized revenue by selling its single-use disposable catheter for $1,200 apiece. ¶¶ 63-65. As a medical device manufacturer, the Company must comply with strict requirements not only when seeking approval for the device's use, but also continued regulations related to defects and safety reports, product recalls, and promotion of DABRA. *See* ¶¶ 69-79. Specifically, in May 2017, the FDA granted 510(k) marketing clearance for DABRA for a limited use: for crossing chronic total occlusions in patients with symptomatic infrainguinal lower extremity vascular disease and with an intended use in ablating a channel in a form of peripheral artery disease. ¶¶ 71-72.

Though the approved indication involves the breakdown of plaque, which physicians refer to colloquially as atherectomy, the FDA definition of atherectomy is more precise and requires a predetermined increase in the openness of the artery at a pre-defined time point. ¶ 75. Due to this difference, the Company must seek FDA approval for an expanded indication for atherectomy before it can market DABRA as an atherectomy device. ¶¶ 74-75. Promoting DABRA for atherectomy, including encouraging physicians to seek reimbursement from payors by characterizing the procedure as atherectomy, is off-label marketing. ¶¶ 73-75. At all relevant times, DABRA was not FDA-approved for an atherectomy indication. ¶ 73.

Moreover, Ra Medical and DABRA are heavily regulated in the interest of public safety. If Ra Medical repairs, modifies, or relabels its products due to a defect that poses a risk to public health, the Company must file a report with the FDA. ¶¶ 76-77. Because DABRA operates without the use of a guidewire, any issue preventing calibration jeopardizes the precision with which a physician can perform the procedure, thereby presenting a risk of injury. *See* ¶ 64.

## II.   When Ra Medical Completed its IPO, Defendants Failed to Disclose A Host of Issues That Threatened the Company's Future

The FAC plausibly alleges that, when the IPO was completed, the following adverse facts and trends existed but were not disclosed in the Registration Statement: (i) that DABRA failed to calibrate; (ii) that, as a result, the Company replaced product for customers; (iii) that the product recall was an unsustainable solution and that the Company's revenue would be adversely impacted until Ra Medical resolved the calibration issue; (iv) that an injury during the 2017 pivotal study for DABRA had not been reported to the FDA; (v) that Ra Medical marketed DABRA as an atherectomy device, even though the FDA had not approved the device for such a broad indication; and (vi) that the Company lacked an adequate system for documenting expenses, including payments to physicians, thereby violating the anti-kickback statute.

### A.   Defendants Failed to Disclose that Ra Medical Engaged in a Covert Product Recall Because DABRA Failed to Calibrate

The Company filed a recall notice with the FDA on or about August 8, 2019 (the "Recall Notice") stating that since February 2018, DABRA "failed to calibrate." *See* ¶ 103. Defendants have since admitted that, due to the calibration issue, the Company had "engaged in systematic efforts to replace the product held by customers, which constituted product recalls, but were not documented as such." ¶ 103. The Registration Statement omitted to disclose that Ra Medical was already experiencing

---

PLAINTIFFS' OMNIBUS OPPOSITION TO MOTIONS TO DISMISS THE FAC
Case No. 3:19-cv-01079-LAB-AHG                                                          4

manufacturing problems such that catheters failed to calibrate and that, as a result, the Company was replacing product for customers. ¶¶ 97-98.

### B.    Defendants Failed to Disclose that Ra Medical Promoted DABRA for Off-Label Use

Prior to the IPO, Ra Medical denied allegations that the Company was promoting DABRA "as an atherectomy device (and physicians are collecting reimbursement from payer as such)." ¶¶ 80-81. Uri Geiger, the Chairman of a medical device company, claimed that he was "aware that Ra [Medical] was promoting the product as a device broadly and generally for atherectomy procedures, notwithstanding that the FDA had cleared the product only for chronic total occlusions ('CTO'), which constitute a small portion of atherectomy procedures." ¶ 84. The Company vehemently denied these allegations and suggested that any reimbursement for atherectomy was solely because physicians had determined it was an appropriate use. ¶ 85. In connection with litigation stemming from these accusations, Ra Medical stated: "Mr. Geiger falsely implied that Ra Medical was encouraging physicians to improperly seek and receive reimbursements for procedures using the DABRA device." ¶¶ 83, 85.

But these well-grounded charges were in fact correct, as Defendants admitted on October 31, 2019 when they stated that "the Company's salespeople were instructed to characterize DABRA as performing atherectomy and to encourage doctors to see reimbursement using atherectomy codes." ¶ 104. Indeed, at a tradeshow held September 21-25, 2018, Ra Medical had used marketing materials for DABRA that mentioned atherectomy and was instructed by the FDA not to mention atherectomy in marketing materials any longer, according to CW2. ¶ 105. Though the reference to atherectomy was removed from written literature, Ra Medical continued to direct sales representatives to market DABRA for atherectomy, and the Registration Statement omitted to disclose these improper sales tactics. ¶¶ 99, 105.

### C.    Defendants Failed to Disclose that the Company Lacked Adequate Systems to Ensure Compliance with Applicable Regulations

Ra Medical acknowledged that it was subject to regulations prohibiting the use of kickbacks to physicians to increase sales, but the Registration Statement failed to disclose that Ra Medical lacked a system to ensure proper documentation of expenses and payments to physicians. ¶ 100. At the time of the IPO, CW 2, who submitted expense reports for Melissa Burstein, a senior executive, used spreadsheets to track expenses and recalled that these expenses were typically not reviewed until several months later, when it was difficult to confirm expenses or obtain additional documentation. ¶ 107.

### III.    After the IPO, Ra Medical and the Exchange Act Individual Defendants Continue to Mislead Investors

The failure of DABRA to calibrate, Ra Medical's off-label marketing for DABRA, and the Company's inadequate control systems—all of which existed at the time of the IPO—worsened during the Class Period.

On November 13, 2018, Irwin claimed that the Company hired "very experienced reps" who were "hitting the ground right away." ¶114. Similarly, on January 8, 2019, Jackson claimed that the Company "learned what type of sales rep to hire and how to train them" after it had obtained FDA approval in May 2017. ¶ 117. But, as defendants admitted on March 14, 2019, "the hiring and training of qualified sales personnel was dependent on the onboarding of our CCO." ¶ 119. Hiring a Chief Commercial Officer ("CCO") was critical because sales training had been conducted solely by Melissa Burstein, cofounder and then-Executive Vice President of the Company, who could be "confusing" and "jumped around" when presenting information to sales representatives, according to confidential witnesses. ¶¶ 37, 55, 171-173, 176-177. After the CCO joined the Company, Melissa Burstein resigned as director and was no longer an executive by April 2019. ¶ 128. By May 2019, Ra Medical had commenced a "new commercial strategy." ¶ 130.

On March 14, 2019, Irwin claimed that "production limitations in [the Company's] manufacturing process as [it] scaled up catheter production" in response to increased demand had negatively impacted fourth quarter 2018 financial results, but apparently these "issues were related to a very specific piece of equipment that [Ra Medical] now upgraded and [had] completed the validation on that process." ¶¶ 120, 122-125. Even in May 2019, Jackson claimed that "the scale of issues [it had] experienced" were "a one-off." ¶ 131.

Then, on August 8, 2019, Ra Medical quietly filed the Recall Notice stating that the recall was "initiated by the firm" on February 15, 2018 when "service technicians started visiting customer facilities to service affected lasers" because "lasers/catheters did not calibrate." ¶ 183.

On August 12, 2019, Ra Medical's Audit Committee commenced an investigation "in connection with an anonymous complaint" and fired Irwin from his positions as CEO, Co-President, Chief Technology Officer, and Chairman of the Board. ¶ 133. In the same press release, the Company reported that the "production limitations" were related to "inconsistencies in its DABRA catheter manufacturing process" which caused "catheters to fail to calibrate at customer sites." ¶ 133.

Then on September 27, 2019, Ra Medical disclosed a recall of its DABRA catheters to relabel them with a two-month expiration because "catheters that were more than two months from sterilization had a significantly higher rate of non-calibration." ¶¶ 141, 328.

Finally, on October 31, 2019, the Audit Committee reported its findings, among other things: (i) that DABRA catheter frequently failed to calibrate; (ii) that this inconsistent catheter performance had adversely impacted fourth quarter 2018 ("4Q18") and first quarter 2019 ("1Q19"), rather than the given explanation of "production limitations"; (iii) that, due to the inconsistent catheter performance, Ra Medical had replaced product for customers without accurately documenting these efforts as a product recall; (iv) that Ra Medical had made payments and directed

valuable benefits to physicians for a business advantage; and (v) that salespeople were instructed to market DABRA for atherectomy, which is not the FDA-approved use for the device. ¶ 144. As a result, Ra Medical was subject to a criminal investigation by the Department of Justice for potential violations of the Anti-Kickback Statute and to determine whether the Company fraudulently obtained 510(k) clearance for DABRA, as well as an SEC investigation related to these findings. ¶¶ 145, 150.

## ARGUMENT

### I.    The Complaint Adequately Alleges a Section 11 Claim

#### A.    Plaintiffs Face a Minimal Pleading Burden

To state a *prima facie* claim under § 11, a plaintiff need only plead that he acquired a security pursuant to a registration statement that: (1) contained an untrue statement of fact; (2) omitted a material fact required to be stated therein; *or* (3) omitted a material fact necessary to make the statements made not misleading. 15 U.S.C. § 77k; *In re Charles Schwab Corp. Sec. Litig.*, 257 F.R.D. 535, 544 (N.D. Cal. 2009). A fact is material when a "reasonable investor would have viewed the nondisclosed information as having significantly altered the 'total mix' of information made available." *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 28 (2011). When a material misstatement or omission is shown, "[l]iability against the issuer of a security is virtually absolute, even for innocent misstatements." *Herman & MacLean v. Huddleston*, 459 U.S. 375, 382 (1983). Thus, a "buyer need not prove (as he must to establish certain other securities offenses) that the defendant acted with any intent to deceive or defraud." *Omnicare Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175, 179 (2015).

Since fraud is not an element of claims brought under Section 11 of the Securities Act of 1933, the heightened pleading standard of Rule 9(b) does not apply. *Knollenberg v. Harmonic, Inc.*, 152 F. App'x 674, 683 (9th Cir. 2005); *In re Violin Memory Sec. Litig.*, 2014 WL 5525946, at *7 (N.D. Cal. Oct. 31, 2014) (Rule 9(b) did not apply, in part, because "Section 11 claims are not inherently fraud-based").

Accordingly, Section 11 claims are subject to the permissive notice pleading standards of Rule 8(a), unless the claims necessarily "sound in fraud." *See Knollenberg*, 152 F. App'x at 684.

Under the permissive notice pleading standards of Rule 8(a), a plaintiff need only "provide a short and plain statement of the claim showing that [he] is entitled to relief. . . . Specific facts are not necessary; the statement need only give the defendant[s] fair notice of what . . . the claim is and the grounds upon which it rests." *Violin Memory*, 2014 WL 5525946, at *8. (noting that "[t]his is not an onerous burden"). Additionally, there is a strong presumption against dismissing an action for failure to state a claim. *See Gilligan v. Jamco Dev. Corp.*, 108 F.3d 246, 249 (9th Cir. 1997). Moreover, at this stage, the Court must accept such factual allegations as true and construe them in the light most favorable to Plaintiffs. *Tellabs v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007).

But Defendants argue that the FAC's Section 11 claims "sound in fraud" because Plaintiffs challenge statements before and after the IPO with respect to the same issues "regarding product safety and performance, manufacturing issues, marketing, and inadequate internal controls" and, therefore, are governed by Rule 9(b). RMED Br. at 5; Irwin Br. at 6. At best, Defendants' argument only applies to the Exchange Act Individual Defendants and Ra Medical, as there are no fraud allegations against the remaining defendants anywhere in the FAC. *Compare* ¶¶ 34-35, 37-45 (defining the "Securities Act Defendants") *with* ¶¶ 34-36 (defining the "Exchange Act Defendants") *and* FAC at 26 n.2 (limiting "Defendants" to Ra Medical, Irwin, and Jackson when summarizing the Exchange Act violations); *see In re Countrywide Fin. Corp. Sec. Litig.*, 588 F. Supp. 2d 1132, 1163 (C.D. Cal. 2008) (finding that it would "eviscerate § 11" to give Rule 9(b) protection to defendants against whom no fraud claims had been alleged); *Rieckborn v. Jefferies LLC*, 81 F. Supp. 3d 902, 918 n.5 (N.D. Cal. 2015) (noting that courts "regularly apply Rule 8(a)" where "Section 11 defendants are not accused of violating Section 10(b)").

Moreover, Plaintiffs' Securities Act claims do not "sound in fraud" because they concern the omission of facts and trends that existed at the time of the IPO, whereas the Exchange Act claims challenge misleading statements regarding post-IPO events. For example, the Section 10(b) claim alleges that Ra Medical and the Exchange Act Individual Defendants misleadingly asserted that a calibration issue with DABRA was caused by "production limitations" and falsely asserted that these manufacturing problems ***had been resolved*** after the IPO; in contrast, the Section 11 claim arises from Defendants' failure to disclose that this calibration issue ***existed at all***. *See Deora v. NantHealth, Inc. et al.*, 2018 WL 4743494, at \*4 (C.D. Cal. Mar. 27, 2018) (declining to find that Section 11 claim sounds in fraud even where the statements before and after the IPO "relayed the same information" regarding a material relationship); *Knollenberg*, 152 F. App'x at 684 (Rule 9(b) does not apply where "Plaintiffs allege[d] a basis for Section 11 liability other than fraud; i.e., the omission of a material fact from the Registration Statement").[3] The FAC also clearly segregates the fraud claims under Section 10(b) from the negligence claims under the Securities Act. *See, e.g.*, ¶¶ 88-109; *Deora*, 2018 WL 4743494, at \*4 (recognizing that Plaintiffs are clear that fraud is alleged only as to post-IPO statements). Even if any of Plaintiffs' Securities Act claims sound in fraud (they do not), the FAC alleges material misrepresentations or omissions sufficient to meet Rule 9(b).

## B.    Plaintiffs Have Standing

Plaintiffs have adequately alleged standing because all of Ra Medical's publicly traded shares were issued in the IPO. *In re Century Aluminum Co. Sec. Litig.*, 729 F.3d 1104, 1107 (9th Cir. 2013) (alleging that shares are "traceable" suffices "when all of the company's shares were issued in a single offering").

---

[3] Thus, Plaintiffs "have made an effort to plead a non-fraudulent basis for Section 11 liability," *Knollenberg*, 152 F. App'x at 684, which is more than a mere disclaimer of fraud that the Ra Medical Defendants argue is insufficient to insulate the FAC from Rule 9(b), RMED Br. at 5 n.2.

---

Defendants rely on a false premise to argue that mixed-market circumstances preclude Plaintiffs from tracing their shares to the IPO. Defendants claim that some shares "became *eligible for sale* in the open market" after the IPO was completed (RMED Br. at 7; Irwin Br. at 7, 11),[4] but they do not argue that such shares were *actually sold*.[5] As such, all of Ra Medical's shares are presumed traceable to the Company's only offering, i.e. the IPO. *See Century Aluminum*, 729 F.3d at 1107.

Thus, Defendants' cases, in which unregistered shares were actually sold after an offering, are inapplicable. *See, e.g., Doherty v. Pivotal Software, Inc.*, 2019 WL 5864581, at *8 (N.D. Cal. Nov. 8, 2019) (after the lock-up expired, "GE sold 9,836,521 unregistered shares"); *In re Atossa Genetics, Inc. Sec. Litig.*, 2014 WL 4983551, at *5 (W.D. Wash. Oct. 6, 2014) ("one million unregistered shares came onto the market"); *Lilley v. Charren*, 936 F. Supp. 708, 716 (N.D. Cal. 1996) ("80,000 unregistered shares of common stock entered the market"); *In re Quarterdeck Office Sys., Inc. Sec. Litig.*, 1993 WL 623310, at *2 n.1 (C.D. Cal. Sept. 30, 1993) ("thousands of unregistered shares were on the market"). Similarly, Defendants' cases, in which the Company's stock was publicly traded before the secondary offering at issue, are inapposite. *See Century Aluminum Co.*, 729 F.3d at 1106 (over 49 million shares already trading before secondary offering); *see also Norfolk Cty. Ret. Sys. v. Solazyme, Inc.*, 2016 WL 7475555, at *4 (N.D. Cal. Dec. 29, 2016) (secondary offering); *Thomas v. Magnachip Semiconductor Corp.*, 167 F. Supp. 3d 1029, 1036, 1055 (N.D. Cal. 2016) (cited by Irwin Br. at 7, 10); *In re Zynga Inc. Sec.*

[4] Unless otherwise specified, all emphasis is added, and all internal citations and internal quotation marks are omitted.

[5] Notably missing from the twenty-seven exhibits submitted with Defendants' motions is a Form 144, which is required when unregistered shares are sold to the market. A review of Form 4s (reflecting insider sales) and Form 144s suggests that the earliest instance where unregistered shares could have entered the market is on April 11, 2019, i.e. after Plaintiffs purchased shares in Febuary 2019. *See generally* www.sec.gov/reportspubs/investor-publications/investorpubsrule144htm.html

*Litig.*, 2014 WL 721948, at *3 (N.D. Cal. Feb. 25, 2014); *Plichta v. SunPower Corp.*, 790 F. Supp. 2d 1012, 1022-23 (N.D. Cal. 2011).[6]

Moreover, insofar as Defendants argue this is a "mixed market," they raise a factual dispute improper for resolution at the motion to dismiss stage. *See In re Immune Response Sec. Litig.*, 375 F. Supp. 2d 983, 1039 (S.D. Cal. 2005) (holding that Plaintiffs were entitled to "presumption of standing at this stage of the action" based on express allegation of traceability and that "further proof may later be required"). Defendants may not submit evidence in their reply briefs purporting to show that unregistered shares were actually sold. *Vigil v. General Nutrition Corp.*, 2015 WL 2338982, at *10 n.8 (S.D. Cal. May 13, 2015) (refusing to consider arguments raised for the first time on reply); *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 988 (9th Cir. 2018) ("When matters outside the pleading are presented to and not excluded by the court, the 12(b)(6) motion converts into a motion for summary judgment" and both parties must have the opportunity to present relevant material.). As the Ninth Circuit recognized, defendants in securities fraud cases use the judicial notice procedures "improperly to defeat what would otherwise constitute adequately stated claims at the pleading stage." *Khoja*, 899 F.3d at 988; *see also In re Surebeam Corp. Sec. Litig.*, 2005 WL 5036360, at *14 (S.D. Cal. Jan. 3, 2005) (standing sufficiently alleged by detailing transactions and asserting the shares were purchased directly from or traceable to the IPO).

**C.    The FAC Sufficiently Pleads a Material Misstatement or Omission**

"Whether a statement is misleading and whether adverse facts are adequately disclosed are generally questions that should be left to the trier of fact." *In re Immune Response*, 375 F. Supp. 2d at 1017. "[O]nly if 'reasonable minds' could not disagree

---

[6] Defendants' out-of-Circuit cases are similarly unavailing. *E.g., Johnson v. CBD Energy Ltd.*, 2016 WL 3654657, at *5 (S.D. Tex. July 6, 2016) ("[T]here were already millions of shares outstanding when additional shares were issued under the challenged offering.").

PLAINTIFFS' OMNIBUS OPPOSITION TO MOTIONS TO DISMISS THE FAC
Case No. 3:19-cv-01079-LAB-AHG                                                          12

that the challenged statements were not misleading should the district court dismiss under 12(b)(6)." *Warshaw v. Xoma Corp.*, 74 F.3d 955, 959 (9th Cir. 1996).

### 1. The Registration Statement Failed to Disclose That DABRA Failed to Calibrate and That, as a Result, The Company Was Recalling Product

On its face, the Recall Notice states that a calibration issue existed before the IPO, but the Registration Statement did not disclose this issue. *See* ¶ 103. The Recall Notice states that since February 2018, "lasers/catheters did not calibrate during set-up prior to use" and that "service technicians started visiting customer facilities to service affected lasers." ¶ 103. Seemingly referring to the Recall Notice, the Irwin/Burstein Defendants claim that "At best, these statements evidence a disclosed problem with the DABRA laser before the IPO." Irwin Br. at 15. But this is illogical – the Recall Notice was not filed until *after* the IPO.

To undermine this irrefutable fact, Defendants attempt to cast the February 2018 calibration issue as separate from the purported manufacturing problem in 4Q18/1Q19 and from the recall disclosed in September 2019. RMED Br. at 18; Irwin Br. at 15. But the Company's own actions suggest that, in fact, the Recall Notice, manufacturing problem, and voluntary recall relate to the same calibration issue with DABRA. DABRA operates without the use of a guidewire, so any issue preventing calibration jeopardizes the precision with which a physician can perform the procedure, thereby presenting a risk of injury. *See* ¶ 64.

Plaintiffs do not need to quantify the percentage of failing catheters or allege any of the other details that Defendants seek (RMED Br. at 16; Irwin Br. at 15) because this risk to public health *alone* requires Ra Medical to file a report with the FDA for any remedial efforts, namely when technicians were sent to repair the calibration issue at customer sites in February 2018. ¶¶ 76-77. The Company belatedly filed the Recall Notice on or about August 8, 2019, nearly a year after the IPO. ¶ 103. Just four days later, on August 12, 2019, the Company admitted that the ***same***

*calibration issue* described in the Recall Notice, which had purportedly been caused by "inconsistencies in its DABRA catheter manufacturing process," adversely impacted 4Q18/1Q19 results. ¶ 133. Shortly thereafter, on September 27, 2019, Ra Medical disclosed a voluntary recall of DABRA catheters because of the *same calibration issue*—"catheters that were more than two months from sterilization had a significantly higher rate of non-calibration than catheters that were within th[e] two months from sterilization." ¶ 328.

The Ra Medical Defendants' proffered explanation—that the February 2018 calibration issue could have been resolved prior to the IPO—raises a factual dispute that cannot be resolved at this stage. RMED Br. at 16. There is reason to doubt whether the calibration issue was resolved prior to the IPO because, according to CW3, not only was the calibration issue still unresolved when Ra Medical conducted its national sales training months after the IPO, but also sales representatives were blamed because DABRA was purportedly "perfect," suggesting that Defendants had not made any attempt to resolve the issue. ¶ 165. Indeed, an engineer to fix the calibration issue was not hired until March 2019, months after the IPO, according to CW2. ¶ 168.

In any event, even if the calibration issue was resolved when technicians serviced affected lasers, Ra Medical is required to disclose such repairs by filing a report with the FDA; the eventual filing of this report in August 2019 is an acknowledgement that the Company was required to do so. The belated filing suggests that in the interim, including at the IPO, Defendants replaced catheters for customers as Defendants scrambled to find a solution to the calibration issue. This reasonable inference is further supported by the fact that financial results for 4Q18 and 1Q19 were negatively impacted by "production limitations in [the Company's] manufacturing process as [it] scaled up catheter production." ¶¶ 262, 304. If Ra Medical had not found a solution to the underlying problem of catheters that failed to calibrate, then simply replacing product for customers would offer little reprieve and

would only increase costs (as the Company was forced to produce more and more catheters to replace product for customers), thus adversely impacting 4Q18 and 1Q19.

Multiple CWs corroborate that the calibration issue was a pervasive issue at the time of the IPO. The whistleblower, CW1, stated that the calibration issues were known as early as 2017. ¶ 160. According to CW2, the failure to calibrate was the "number one" issue experienced with DABRA, it was consistently discussed at sales training sessions, and sales representatives replaced product for physicians as a remedy for the calibration issue. ¶¶ 161, 167.

As such, the FAC adequately alleges that, at the IPO, DABRA failed to calibrate and, as a result, the Company was engaged or was reasonably likely to engage in a product recall. Therefore, the Registration Statement was misleading with respect to the risks regarding manufacturing issues and product recalls. *See e.g.*, ¶¶ 94, 96-97, 188-89, 194-95; *see also* RMED Br. at 15 (challenging only whether these problems existed at the IPO); Irwin Br. at 15 (same).

Similarly, statements that Ra Medical could "increase [its] manufacturing scale in a cost-effective manner," which the Ra Medical Defendants argue is mere puffery (RMED Br. at 14-15), are actionable because they failed to disclose that increasing production would magnify an existing calibration issue. *Mulligan v. Impax Labs., Inc.*, 36 F. Supp. 3d 942, 967 (N.D. Cal. 2014) ("[R]eferences to 'significant' manufacturing and quality control improvements" not puffery where they "contain[ed] factual representations at their core."); *see also In re Immune Response*, 375 F. Supp. 2d at 1020 ("[A]llegations of specific problems undermining a defendant's optimistic claims suffice to explain how the claims are false.").

### 2. The Registration Statement Failed to Disclose That The Company Engaged in Off-Label Marketing by Improperly Referring to Atherectomy

The Registration Statement failed to disclose that Ra Medical marketed DABRA for atherectomy, when it was not FDA-approved for atherectomy, thereby

engaging in off-label marketing. The Company received 510(k) clearance to market DABRA for a narrow indication: crossing chronic total occlusions in patients with symptomatic infrainguinal lower extremity vascular disease and with an intended use in ablated a channel in a form of peripheral artery disease. ¶ 72. At all relevant times, DABRA was not FDA-approved for atherectomy, which requires a predetermined increase in the openness of the artery at a pre-defined time point. ¶¶ 73-75. The Registration Statement stated that Ra Medical "market[s] and sell[s] DABRA for use in the treatment of vascular blockages resulting from lower extremity vascular disease," i.e. the approved use, but failed to disclose that the Company also promoted DABRA for atherectomy. *See e.g.,* ¶¶ 99, 105 (sales representatives were directed to market for atherectomy).

Defendants claim that the Registration Statement included disclosures that were "substantive and tailored" to the specific issues, but even when read with the context of a competitor's accusations and the Company's purported belief of compliance with applicable regulations, the Registration Statement was misleading. RMED Br. at 19; Irwin Br. at 18. Defendants rely on a case concerning projections in connection with a material transaction. *See In re Infonet Svcs. Corp. Sec. Litig.*, 310 F. Supp. 2d 1080, 1090-92 (C.D. Cal. 2003) (holding that the "Registration Statement, read as a whole, contained ample specific cautionary language . . . that the AUCS transaction would not necessarily result in the transition of AUCS users") (RMED Br. at 19; Irwin Br. at 18). But here, the alleged statements failed to disclose then-existing sales practices. *Id.* at 1091 (recognizing that "statements based on current facts are actionable").

Here, given the strict FDA definition and the potential for perceived off-label marketing by referring to DABRA as performing atherectomy, an ordinary investor would have understood the disclosures in the Registration Statement to mean that Ra Medical was not marketing for atherectomy. *Miller v. Thane Int'l, Inc.*, 519 F.3d 879, 886 (9th Cir. 2008) (explaining that courts must assess the accuracy and completeness

of registration statement considering "[t]he fair and reasonable implication an *ordinary* investor would derive from the disclosures"). At best, an investor could have understood these disclosures as meaning that Ra Medical described DABRA using the physicians' understanding of atherectomy (the breakdown of plaque) while making clear that the FDA had only approved DABRA for a limited indication. *See* ¶ 75.

These disclosures were misleading because, as Defendants admitted, "the Company's salespeople were instructed to characterize DABRA as performing atherectomy and to encourage doctors to seek reimbursement using atherectomy codes," i.e. off-label marketing.[7]  ¶ 104; *see Shenwick v. Twitter, Inc.*, 282 F. Supp. 3d 1115, 1133 (N.D. Cal. 2017) (Risk warnings must be clear enough that "reasonable minds could not disagree that the challenged statements were not misleading."). When a competitor accused Ra Medical of characterizing DABRA as an atherectomy device, thereby leading physicians to seek reimbursement for atherectomy, Defendants denied the allegations before the IPO. ¶¶ 80-81, 85. Defendants have since admitted that these allegations were, in fact, true because sales representatives had indeed marketed DABRA as an atherectomy device and encouraged physicians to seek reimbursement for atherectomy. ¶¶ 87, 104. The competitor had a reasonable belief for its allegations, suggesting that Ra Medical was engaged in off-label marketing before the IPO. ¶ 84.

Further indicating that the Company engaged in off-label marketing, the FDA instructed Ra Medical to remove references to atherectomy from its marketing

---

[7] The Irwin/Burstein Defendants claim that "[i]nforming doctors that a particular Medicare code should be used to bill for DABRA is not marketing DABRA as atherectomy." Irwin Br. at 2. Because DABRA is not FDA-approved for atherectomy, it is difficult to see how encouraging physicians to use atherectomy reimbursement codes is anything *but* off-label marketing. To be sure, physicians may determine that DABRA is appropriate for an off-label use such as atherectomy, but the Company cannot encourage, market, or promote DABRA for any off-label use.

PLAINTIFFS' OMNIBUS OPPOSITION TO MOTIONS TO DISMISS THE FAC
Case No. 3:19-cv-01079-LAB-AHG                                                          17

materials before the IPO. According to CW2, in connection with marketing materials presented at a tradeshow held September 21-25, 2018 (i.e., before the IPO), the FDA instructed the Company not to mention atherectomy in marketing materials any longer because "the 510(k) clearance the Company obtained for the DABRA system is not for atherectomy." ¶¶ 89, 105. CW3 corroborates that the Company had received a "verbal warning from the FDA to remove *any* mention of atherectomy from marketing literature prior to the IPO." *Id.* Defendants dispute the significance of this event by arguing that CW2 does not describe what was mentioned with respect to atherectomy. RMED Br. at 19; Irwin Br. at 18. It is irrelevant how it was mentioned. It is reasonable to infer that if the FDA, the relevant regulatory authority, instructed "not to mention atherectomy in marketing materials any longer," then the Company had engaged in off-label marketing.

Defendants argue that the tradeshow materials are unavailing because the Company resolved the issue once alerted to it by the FDA, but that is beside the point. Critically, Section 11 liability does not require knowledge that a statement is misleading; mere negligence suffices. *See* 15 U.S.C. § 77k. Therefore, the FAC plausibly alleges that, before the IPO, Ra Medical distributed materials promoting DABRA for a use not approved by the FDA, rendering the Registration Statement misleading with respect to off-label marketing.

**3.    The Registration Statement Failed to Disclose that Ra Medical Lacked an Adequate System of Documenting and Reporting Payments to Physicians**

Ra Medical is under criminal investigation for potential violations of the anti-kickback statute in connection with payments to physicians, and the Registration Statement failed to disclose that the Company lacked an adequate system for reporting expenses to physicians. ¶¶ 106, 145, 150.

Defendants argue that the Registration Statement disclosed the Company had a "material weakness in [its] internal control over financial reporting," RMED Br. at

20-21; Irwin Br. at 16-17, but this broad statement does not provide sufficient information for investors to appreciate the risk of the material weakness. *See, e.g.*, *In re Oppenheimer Rochester Funds Grp. Sec. Litig.*, 838 F. Supp 2d 1148, 1167 (D. Colo. 2012) (to be effective, disclosures must be "so substantive, tailored to the risk, and prominent as to negate any plausible inference that they were misleading or rendered other Prospectus statements materially so."). Specifically, investors could not have known that Ra Medical lacked a comprehensive system of recording and reporting payments to physicians, such that more than $300,000 in payments to physicians would lack sufficient documentation and thereby subject the Company to a criminal investigation by the DOJ for violations of the Anti-Kickback Statute. ¶¶ 106, 145, 150.

Defendants attempt to undermine a confidential witness's account, claiming that CW2 did not interact with the finance team or handle reimbursements. RMED Br. at 21; Irwin Br. at 16. According to CW2, who worked for Ra Medical from several months prior to the IPO, expense reports for Melissa Burstein were tracked on spreadsheets and not reviewed until six months later, when not much could be done to confirm expenses or obtain additional documentation. ¶ 107. If Ra Medical had an adequate reimbursement method or software, then CW2 would have used it to report Melissa Burstein's expenses. The fact that CW2 did not adopt a new expense accounting system until months after the IPO, ¶ 107, suggests that there was little oversight for expenses, including payments to physicians, either because no adequate reimbursement system existed or because such a system failed to detect that a key executive's expenses were not reported using the method. As a result, the Registration Statement failed to disclose that Ra Medical paid and/or directed benefits to physicians without adequate documentation, thus exposing the Company to regulatory scrutiny for violations of anti-kickback laws.

#### 4. The Registration Statement Failed to Disclose a Patient Injury in the Pivotal Study for DABRA

Ra Medical is subject to a DOJ investigation "concerning whether the Company fraudulently obtained 510(k) marketing clearance for its ablation devices marketed under the trade name DABRA." ¶ 145. According to CW1, the whistleblower, Irwin was informed of an injury caused to a patient during the pivotal study that was not reported to the FDA. ¶ 182. Defendants essentially argue that the failure to report an injury from the DABRA pivotal study is not itself misleading, RMED Br. at 12-14; Irwin Br. at 12-13, but if the injury should have been reported to the FDA but was not, Ra Medical could be found liable for fraudulently obtaining 510(k) marketing clearance for DABRA. The Registration Statement failed to disclose that an injury in the DABRA pivotal study was not reported to the FDA.

#### 5. The Confidential Witnesses Are Credible

In the face of unfavorable factual allegations, Defendants resort to attacking the credibility of witnesses whose allegations support falsity. Even under the heightened pleading standard of the PSLRA, a complaint need only describe confidential witnesses "to support the probability that a person in the position occupied by the source would possess the information alleged." *Novak v. Kasaks*, 216 F.3d 300, 314 (2d Cir. 2000). "[W]here plaintiffs rely on confidential personal sources but also on other facts, they need not name their sources as long as the latter facts provide an adequate basis for believing that the defendants' statements were false." *Id.* This approach "involves an evaluation, inter alia, of the level of detail provided by the confidential sources, the corroborative nature of the other facts alleged (including from other sources), the coherence and plausibility of the allegations, the number of sources, the reliability of the sources, and similar indicia." *In re Cabletron Sys., Inc.*, 311 F.3d 11, 29-30 (1st Cir. 2002); *see also In re Daou Sys., Inc.*, 411 F.3d 1006, 1015 (9th Cir. 2005) (adopting the Second Circuit's standard "augmented by the First Circuit's suggested criteria").

Defendants' attacks on CW1 are disingenuous because CW1 is the whistleblower who the Company found sufficiently credible to launch the Audit Committee investigation. ¶ 54. CW1 is reliable as to matters concerning the DABRA calibration issue, its impact on financial results, payments to physicians, and off-label marketing (all of which were investigated by the Audit Committee). *Id*.

The remaining CWs are also adequately described. As Marketing Coordinator from before the IPO, CW2 attended all sales training sessions and as such would have interacted with sales representatives regularly; CW2 organized and set up at tradeshows, including shipping materials and supplies for the events, so CW2 would know about the Company's marketing practices; and, CW2 was Executive Assistant to Melissa Burstein and responsible for submitting her expense reports, so CW2 would know about the Company's reimbursement system, if any. ¶ 55. CW3 sold DABRA catheters from the time of the IPO and, as sales training was conducted at the corporate headquarters, CW3 would know about the sales training practices, problems reported by physicians regarding DABRA, and any remedial efforts undertaken by the Company in response. ¶¶ 56, 173; *see In re Daou*, 411 F.3d at 1016 (concluding that confidential witnesses were sufficiently identified based on job description, responsibilities, and in some cases "exact title and to which Daou executive the witness reported"). As demonstrated *supra*, the confidential witnesses corroborate each other's accounts and other facts regarding the DABRA calibration issue, the product recall, inadequacy of the Company's internal controls, and off-label marketing. *See generally* ¶¶ 159-182.

### D. Statements Concerning Laws and Regulations Are Actionable

Statements about laws and regulations were false because Ra Medical was already violating applicable regulations by engaging in off-label marketing. *See* Section C.2., *supra*; *Meyer v. Jinkosolar Holdings Co.*, 761 F.3d 245, 251 (2d Cir. 2014) (generic warnings about financial risks from environmental regulations were rendered misleading by failure to disclose "then-ongoing and serious pollution

violations"). Similarly, Ra Medical was making improper payments to physicians or failing to accurately report payments to physicians, resulting in regulatory scrutiny for possible violations of Anti-Kickback statute. *See* Section C.3., *supra*. Contrary to the Ra Medical Defendants' argument that the FAC seeks to impose liability for failing to predict the future, RMED Br. at 12, Plaintiffs allege that Defendants failed to disclose *then-existing* facts concerning compliance with regulations. *E.g., Todd v. STAAR Surgical Co.*, 2016 WL 6699284, at *11 (C.D. Cal. Apr. 12, 2016) (noting that statement regarding "'compliance with the FDA's [regulations]' is not concerned with future projections or predictions but is stating a belief regarding a then-existing fact").

### E.    Defendants Had a Duty to Disclose Omitted Information Under Item 303

"Item 303 requires disclosure of 'any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues for income from continuing operations.'" *Violin Memory*, 2014 WL 5525946, at *15 (quoting 17 C.F.R. § 229.303(a)(3)(ii)); *see also In re Facebook, Inc. IPO Sec. & Deriv. Litig.*, 986 F. Supp. 2d 487, 509 (S.D.N.Y. 2013) ("[A]ll Item 303 requires in order to trigger a disclosure obligation [is] a known trend that [defendant] reasonably expected would materially affect its investments and revenues."). "[B]ecause Section 11 imposes liability if a registrant omits to state a material fact required to be stated in the registration statement, any omission of facts required to be stated under Item 303 will produce liability under Section 11." *Violin Memory*, 2014 WL 5525946, at *15.

According to the Recall Notice, since February 2018, the Company experienced problems with DABRA because it failed to calibrate. ¶ 183 ("lasers/catheters did not calibrate during set-up prior to use"). Until this calibration issue was resolved, the Company's revenue would be adversely impacted. *See* ¶ 111 (at the IPO, analysts expected DABRA catheters to drive revenue growth). The

omission of a fact that would have a material unfavorable impact on revenue renders the Registration Statement misleading.

Therefore, this case is distinguishable from those cited by the Ra Medical Defendants, in which the alleged omission did not render the reported results less indicative of the company's prospects. RMED Br. at 23; *Oxford Asset Mgmt., Ltd. v. Jaharis*, 297 F.3d 1182, 1190-92 (11th Cir. 2002) (first six weeks of prescription data for Niaspan not indicative of sales miss where Company did not historically rely on Niaspan's revenue); *Steckman v. Hart Brewing Inc.*, 143 F.3d 1293, 1298 (9th Cir. 1998) (fourth quarter slowdown was not indicative of declining sales overall where Company historically experienced lower sales in fourth quarter); *see also Mosco v. Motricity, Inc.*, 649 F. App'x 526, 528 (9th Cir. 2016) (alleged trend was adequately disclosed); *Mallen v. Alphatec Holdings, Inc.*, 861 F. Supp. 2d 1111, 1128 (S.D. Cal. 2012) (allegations failed "to show that the distributors' unwillingness to accept the company's products *in the second quarter*, which began on April 1, 2010, was known to Defendants on April 16, 2010, or could reasonably be expected to have a material impact at that time") (emphasis in original).

To the extent the Ra Medical Defendants argue that the calibration issue was resolved before the IPO, yet the same calibration issue arose when Ra Medical purportedly scaled production, they raise a factual dispute that cannot be decided at this stage. RMED Br. at 22; *Johnson v. Knapp*, 2009 WL 764521, at *2 (C.D. Cal. Mar. 16, 2009) ("[T]he Court ignores Defendants' version of the facts and relies, instead, on Plaintiff's version."). Defendants seek to separate the various disclosures into discrete events, but Plaintiffs adequately allege that they are related. *See* Section C.1., *supra*. Drawing all reasonable inferences in Plaintiffs' favor, the calibration issue existed in February 2018 (i.e. before the IPO), was exacerbated when Ra Medical increased production after the IPO, and became so pervasive that the Company was forced to disclose it. Moreover, "[a]dequacy of disclosure under Item 303 is a factual question," and the FAC alleges sufficient facts "from which a

reasonable jury could conclude that the [Registration Statement] violated Section 303." *In re Surebeam*, 2005 WL 5036360, at *13 (refusing to dismiss Item 303 allegations).

## II.   The Complaint Adequately Alleges a Section 10(b) Claim

### A.   Legal Standard

To state a claim under § 10(b) of the Securities Exchange Act of 1934, a plaintiff must allege: (1) a material misrepresentation or omission (*i.e.*, "falsity"); (2) scienter; (3) the purchase or sale of a security; (4) reliance; (5) economic loss; and (6) loss causation. *Matrixx Initiatives*, 563 U.S. at 37-38.[8] When ruling on a "Rule 12(b)(6) motion to dismiss a § 10(b) action, courts must . . . accept all factual allegations in the complaint as true[,]" *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007), and "construe them in the light most favorable to the nonmoving party," *Bruce v. Suntech Power Holdings Co. Ltd.*, 64 F. Supp. 3d 1365, 1369-70 (N.D. Cal. 2014). To satisfy Rule 9(b)'s heightened pleading requirement for a securities fraud claim, Plaintiffs must identify the who, what, when, where, and how of the misconduct alleged, as well as what was false or misleading about the allegedly fraudulent statement, and why it was false. *See Salameh v. Tarsadia Hotel*, 726 F.3d 1124, 1133 (9th Cir. 2013).

While Plaintiffs must meet a heightened pleading standard under Rule 9(b) and the PSLRA, "it is only under extraordinary circumstances that dismissal is proper under Rule 12(b)(6)." *In re China Educ. Alliance Sec. Litig.*, 2011 WL 4978483, at *3 (C.D. Cal. Oct. 11, 2011). "[S]o long as the plaintiff alleges facts to support a theory that is not facially implausible, the court's skepticism is best reserved for later stages of the proceedings." *In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049, 1057 (9th Cir. 2008).

---

[8] Defendants challenge only falsity and scienter, conceding the remaining factors.

**B.     Plaintiffs Adequately Allege False and/or Misleading Statements**

Pursuant to the PSLRA, a plaintiff must "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief . . . state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1). The plaintiff must allege that the statement or omission "create[d] an impression of a state of affairs that differ[ed] in a material way from the one that actually existe[d]." *Brody v. Transitional Hosp. Corp.*, 280 F.3d 997, 1006 (9th Cir. 2002). A duty to disclose arises when it is "necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading." 17 C.F.R. § 240.10b-5(b). The allegations need only "raise a plausible inference" that a statement was misleading. *See In re Intuitive Surgical Sec. Litig.*, 65 F. Supp. 3d 821, 834 (N.D. Cal. 2014).

**1.     The FAC Alleges False/Misleading Statements Regarding DABRA's Failure to Calibrate, Sales Training Problems, Off-Label Marketing, and SOX Certifications**

The FAC adequately alleges that the undisclosed problems in the Registration Statement also existed during the Class Period and that Ra Medical and the Exchange Act Individual Defendants misleadingly attributed the problems to "production limitations" and a "new commercial strategy."

***DABRA Failed to Calibrate and The Company Recalled Product*** As discussed above, Section C.1., *supra*, at the IPO, DABRA failed to calibrate. After the IPO, Irwin and Jackson claimed that "production limitations" in the Company's manufacturing process for catheters, apparently due to increased demand, had negatively impacted results but that the limitations had been "solved" and that the Company would "begin to see the positive impact on revenue beginning in the second quarter of 2019." *E.g.*, ¶¶ 120, 122-23, 131. As the Audit Committee found, these explanations "created a risk of confusion because they did not explicitly reference

inconsistent DABRA catheter performance and catheter failures." ¶ 144. Moreover, according to CW3, physicians continued to experience calibration issues as of January/February 2019. ¶ 165. The calibration issue could not have been resolved when Irwin made these statements because, according to CW3, representatives' concerns about a possible defect were dismissed by the Company, claiming the device is "perfect." *Id.* Additionally, according to CW2, Ra Medical did not even hire someone to fix the calibration issues until March 2019, i.e. the end of the first quarter 2019. ¶ 168. Irwin's and Jackson's statements in May 2019, claiming that Ra Medical's manufacturing process had been upgraded, are misleading because the Company continued to recall catheters for failure to calibrate: the Recall Notice suggests, at the very least, that technicians were servicing DABRA because it failed to calibrate as late as August 2019, and by September 2019 the Company was forced to disclose a voluntary product recall. *See* ¶¶ 103, 133, 300, 304, 306, 328.

***Ra Medical Lacked an Adequate Sales Training Program*** When Irwin and Jackson made statements in November 2018 that Ra Medical hired "experienced sales reps" who were "hitting the ground right away," they failed to disclose that they lacked an adequate sales training program. *E.g.*, ¶¶ 224, 226. At the time these statements were made, Melissa Burstein conducted the sales training sessions, and she was ineffective at training sales representatives because, according to CW 2, she was disorganized and "jumped around" during presentations and could not answer representatives' questions. ¶¶ 173, 176. For example, CW2 and CW3 confirm that Melissa Burstein attempted to teach sales representatives how to mention atherectomies to doctors by distinguishing between "indication" and "intended use" but neither witness could explain this distinction. ¶¶ 171-172. Thus, even if Ra Medical hired sales representatives with significant experience in medical device sales, the Exchange Act Defendants failed to disclose that the Company lacked an adequate training program for these representatives to sell DABRA. Indeed, when Ra Medical hired a Chief Commercial Officer, Melissa Burstein was no longer

responsible for training sessions, suggesting that the "new commercial strategy" was in part an adequate training program. *See* ¶¶ 53, 176-177. As such, contrary to Defendants' assertion, Plaintiffs do not seek to hold Ra Medical and the Exchange Act Individual Defendants liable for a mere change in sales strategy. RMED Br. at 26-27; Irwin Br. at 21-22.

*Ra Medical Improperly Characterized DABRA as an Atherectomy Device* Irwin and Jackson suggested that physicians had determined DABRA was appropriate for treatment and reimbursement for atherectomy when, in reality, physicians' decisions had been influenced by Ra Medical's improper promotion of DABRA as an atherectomy device, which is beyond the FDA label. ¶¶ 278-281. As CWs recount, sales representatives were instructed to characterize DABRA as performing atherectomy, "how to 'walk around' the fact that the device did not have an atherectomy indication," and to "tell doctors to use atherectomy reimbursement codes for the DABRA laser." ¶¶ 169-174. Plaintiffs' allegations do not relate to *whether* physicians were actually reimbursed for DABRA, RMED Br. at 28; Irwin Br. at 21, but Plaintiffs allege that these defendants misleadingly suggested Ra Medical had not engaged in off-label marketing.

*SOX Certifications* were misleading because, as the Company has since disclosed that "certain deficiencies in [its] internal controls . . . aggregated to a material weakness." ¶ 151; *Limantour v. Cray Inc.*, 432 F. Supp. 2d 1129, 1160 (W.D. Wash. 2006) (SOX certifications from 2002 through 2004 misleading "based on the disclosure in 2005 that there were material weaknesses in Cray's internal controls"). This material weakness resulted from "an inappropriate 'tone at the top' set by certain members of senior management, including a failure to promote adherence to [its] Code of Ethics and Conduct," and led to materially misleading statements "regarding

the issues that had an impact on [Ra Medical's] fourth quarter 2018 and first quarter 2019 sales." ¶ 151.[9]

### 2. Risk Factors Are Actionable Because the Risks Had Materialized

Contrary to the Ra Medical Defendants' assertion, courts have held consistently that risk warnings that caution against events that have already occurred are ineffective. RMED Br. at 24-25; *see In re Apple Computer Sec. Litig.*, 886 F.2d 1109, 1115 (9th Cir. 1989) ("There is a difference between knowing that any product-in-development may run into a few snags, and knowing that a particular product has already developed problems so significant as to require months of delay."). The Ninth Circuit requires a "stringent showing" before dismissal on the pleadings is warranted under the cautionary language prong of the safe-harbor provision. *See Livid Holdings Ltd. v. Salomon Smith Barney, Inc.*, 416 F.3d 940, 947-48 (9th Cir. 2005). To constitute meaningful cautionary language, a disclaimer must "sufficiently address the harm that resulted." *Zaghian v. Farrell*, 675 F. App'x 718, 720 (9th Cir. 2017). Here, Ra Medical's disclaimers are ineffective because "they disclosed a risk in the abstract but omitted the fact that it had already come to fruition." *See Cutler v. Kirchner*, 696 F. App'x 809, 813 (9th Cir. 2017). The Ra Medical Defendants cite cases where risk factors were not actionable because plaintiffs had not adequately alleged that the risk had materialized. RMED Br. at 24-25; *E.g., Jasin v. Vivus, Inc.*,

_____

[9] As such, the Code of Ethics are not "inherently aspirational" or "mere puffery" because, in the context in which they were made, "a reasonable investor [would have] rel[ied] on them as reflective of the true state of affairs at the Company." *See In re Petrobras Sec. Litig.*, 116 F. Supp. 3d 368, 381 (S.D.N.Y. 2015) (declining to find that "statements of general integrity and ethical soundness were immaterial as a matter of law"). This is not a case where in which plaintiffs seek to impose liability for general corporate misconduct. *Retail Wholesale & Dep't Store Union Local 338 Ret. Fund v. Hewlett-Packard Co.*, 845 F.3d 1268 (9th Cir. 2017) (alleging securities fraud where CEO's sexual harassment conduct violated ethical code) (cited by RMED Br. at 11).

2016 WL 1570164, at *18 (N.D. Cal. Apr 19, 2016) (no allegations "to suggest that the EMA's concerns were more serious than Defendants made them out to be").

Here, warnings presented then-existing facts as hypothetical. All the while, Ra Medical *knew* that DABRA failed to calibrate, which limited revenue growth; that the Company engaged in off-label marketing, which increased market acceptance but subjected Ra Medical to increased regulatory scrutiny; and that it lacked an adequate system of accurately documenting expenses to physicians, increasing the likelihood that it violated the anti-kickback laws. *Viswanath v. Imperva, Inc.*, 2016 WL 2851859 at *8 (N.D. Cal. May 16, 2016) (statement misleading in part because "nothing alerts the reader that some of these risks may already have come to fruition").

### C.   Ra Medical and the Exchange Act Individual Defendants Issued False Statements with Scienter

To plead scienter, a plaintiff must allege facts that defendants acted with the intent to deceive, knowledge of falsity, or "deliberate recklessness." *Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982, 987 (9th Cir. 2008). A defendant is reckless if "he had reasonable grounds to believe material facts existed that were misstated or omitted, but nonetheless failed to obtain and disclose such facts although he could have done so without extraordinary effort." *Suntech*, 64 F. Supp. 3d at 1371. Scienter "can be established by direct or circumstantial evidence." *Provenz v. Miller*, 102 F.3d 1478, 1490 (9th Cir. 1996).

"There is no bright-line rule" as to when "an inference of deliberate recklessness is *sufficiently strong*." *Eminence Capital, LLC v. Aspeon, Inc.*, 316 F.3d 1048, 1052 (9th Cir. 2003). An inference of scienter is "strong" when it is "cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Tellabs*, 551 U.S. at 324. Under this standard, a "tie goes to the Plaintiff." *In re Amgen Inc. Sec. Litig.*, 2014 WL 12585809, at *8 (C.D. Cal. Aug. 4, 2014). The inference "need not be irrefutable . . . or even the most plausible of competing inferences." *Tellabs*, 551 U.S. at 324. Further a court must review "all the allegations

holistically." *Id.* at 326. Courts routinely find a strong inference of scienter where, as here, defendants omit material negative information that they knew, or should have known, rendered favorable statements misleading, *see Nursing Home Pension Fund, Local 144 v. Oracle Corp.*, 380 F.3d 1226, 1230 (9th Cir. 2004), since knowledge of facts suggesting that statements were "inaccurate or misleadingly incomplete" is "classic evidence to scienter," *In re Immune Response*, 375 F. Supp. 2d at 1022.

### 1.    Irwin and Jackson Knew About the Product Defect and the Off-Label Marketing

Irwin and Jackson knew that the statements in the Class Period were false and misleading. The Recall Notice states that the Company sent service technicians because "lasers/catheters did not calibrate during set-up prior to use."  ¶ 183. Given these efforts, Irwin and Jackson knew or were reckless in not knowing that DABRA failed to calibrate.

Similarly, Irwin and Jackson knew or should have known that Ra Medical's sales representatives were instructed to market DABRA for off-label use because they were present at the trainings. According to CW 3, sales training was held at the corporate headquarters and conducted by Melissa Burstein, Irwin's wife. ¶ 360. CW2 attended sales trainings and stated that Melissa Burstein would stop sessions to ask questions to Irwin, who was present at the sales training. *Id.* CW 3 also stated that Irwin discussed marketing for atherectomy. *Id.* Therefore, Irwin and Jackson knew that sales representatives were instructed to market DABRA for atherectomy, and Irwin even did so himself.

### 2.    Irwin's Termination Supports a Strong Inference of Scienter

In connection with the investigation that revealed the wide-ranging issues at the Company, Ra Medical fired Irwin and his wife Melissa Burstein (who had conducted sales trainings). ¶¶ 134, 147; *see, e.g., In re UTStarcom, Inc. Sec. Litig.*, 617 F Supp. 2d 964, 975-76 (N.D. Cal. 2009) (defendants' terminations, contemporaneous with initiation of internal and SEC investigations, "add one more

piece to the scienter puzzle"). The Audit Committee specifically found that the "ineffective control environment" was due in part to "behavior that was inconsistent with [its] Code of Ethics and Conduct and related policies involving **certain former executive officers and employees**." ¶ 151.

This is not a case of fraud by hindsight, as Defendants claim. RMED Br. at 29-30; Irwin Br. at 23. Not only do the alleged facts demonstrate that Irwin's and Jackson's statements conflicted with then-existing issues as to manufacturing and sales, among other things, but also the Company launched the investigation at the behest of a whistleblower and contemporaneously fired Irwin who had the intent to deceive. ¶ 134; *cf. In re PETCO Corp. Sec. Litig.*, 2008 WL 8876554, at \*6 (S.D. Cal. Apr. 29, 2008) (concluding, at the summary judgment stage, that executive who initiated internal investigation lacked intent to deceive) (cited by RMED Br. at 30).

### 3. The SEC and DOJ Investigations Support a Strong Inference of Scienter

The SEC's ongoing investigation into the matters raised by Ra Medical's internal investigation, as well as the DOJ's criminal investigation into the same and additional matters, further contributes to an inference of scienter. *See, e.g.*, *Magnachip*, 167 F. Supp. 3d at 1043 ("SEC's ongoing investigation" provided "one more piece of the scienter puzzle").

### 4. Stock Sales Support a Strong Inference of Scienter

Irwin's and Jackson's stock sales add to the strong inference of scienter. *In re Quality Sys., Inc. Sec. Litig.*, 865 F.3d 1130, 1146 (9th Cir. 2017) ("Unusual or suspicious stock sales by corporate insiders may constitute circumstantial evidence of scienter"). Nearly all of Irwin's and Jackson's stock sales were executed after these defendants misleadingly asserted that financial results were adversely impacted by "production limitations" but before the DABRA calibration issue was revealed. *Compare* ¶¶ 364-65 (detailing stock sales) *with* ¶¶ 122-24, 130-31, 133 (explaining interim disclosures).

Defendants do not agree about how many of Irwin's trades are nondiscretionary, which itself raises a factual dispute. *Compare* Irwin Br. at 24 ("***three*** were made under his Rule 10b5-1 trading plan") *with* RMED Br. at 32 ("For Mr. Irwin, ***two*** were made under a Rule 10b5-1 trading plan[.]"). Moreover, Irwin's Rule 10b5-1 trading plan does not negate the inference of scienter because the existence of such a plan is an affirmative defense that is inappropriate to adjudicate at the pleading stage. 17 C.F.R. § 240.10b5-1(c)(1); *see also In re UTStarcom*, 617 F. Supp. 2d at 976 n.16 ("[I]t suffices that, at the pleading stage, Plaintiffs have alleged significant and suspiciously timed securities sales."). Consideration of a trading plan "requires an additional factual finding of good faith," an improper determination at the motion to dismiss stage, thus the Exchange Act Individual Defendants' reliance on a trading plan at the pleading stage is misplaced.[10] *Stocke v. Shuffle Master, Inc.*, 615 F. Supp. 2d 1180, 1193 (D. Nev. 2009).

Notably, "[s]cienter can be established even if the officers who made the misleading statements did not sell stock during the class period." *No. 84 Employer-Teamster Joint Council Pension Trust Fund v. Am. W. Holding Corp.*, 320 F.3d 920, 944 (9th Cir. 2003). Therefore, even if Irwin and Jackson retained significant holdings in the Company (which Defendants claim undermines an inference of scienter, RMED Br. at 32-33; Irwin Br. at 25), at best this factor is neutral.

### 5. The Confidential Witnesses Support a Strong Inference of Scienter

Defendants attack the reliability of confidential witnesses purportedly because they lack firsthand knowledge of what defendants knew, but a securities fraud complaint need not predicate its allegations on admissible evidence. *See, e.g.*, *Lloyd v. CVB Fin. Corp.*, 811 F.3d 1200, 1208 (9th Cir. 2016) (that confidential witness reported hearsay "does not automatically disqualify his statement from consideration

---

[10] Defendants have provided no information publicly or in response to the FAC indicating when Irwin's trading plan was adopted or when/if it was amended.

in the scienter calculus"); *In re OSG Sec. Litig.*, 12 F. Supp. 3d 619, 622 (S.D.N.Y. 2014) (unproven third party allegations may be inadmissible, but a plaintiff can base allegations on such sources of information and belief and "find admissible evidence to support these allegations at a later stage"). This is especially unconvincing as to CW1, the whistleblower whose allegations were sufficiently credible for the Company to launch an investigation and simultaneously fire its CEO, Irwin. ¶¶ 55, 134. The investigation's findings also led the Company to admit that statements regarding 4Q18 and 1Q19 sales were misleading and to fire Melissa Burstein as Vice President. ¶¶ 144, 147. Moreover, CW2 and CW3 attended the sales training at the corporate headquarters during which Irwin became aware that representatives were instructed to market DABRA for atherectomy. ¶¶ 171, 173, 176. Thus, the confidential witnesses provide reliable accounts that support a strong inference of scienter.

### 6. The Core Operations Doctrine Supports a Strong Inference of Scienter

Under the "core operations" doctrine, allegations regarding management defendants' "role in the company" and "actual access" to relevant information support an inference of scienter if the information is of "such prominence that it would be absurd to suggest that management was without knowledge" of it. *Zucco Partners LLC v. Digimarc Corp.*, 552 F.3d 981, 1000 (9th Cir. 2009); *accord In re NVIDIA Corp. Sec. Litig.*, 768 F.3d 1046, 1064 (9th Cir. 2014).

Here, Ra Medical is a small company with its manufacturing operations housed and sales trainings held in the corporate headquarters such that "it would be absurd" to suggest that Irwin and Jackson were unaware of the calibration issue and of the off-label marketing for the Company's key product. *See, e.g.*, *Patel v. Axesstel, Inc.*, 2015 WL 631525, at *11 (S.D. Cal. Feb. 13, 2015) (finding scienter as to product shipments absent signed contracts where management was among thirty-five employees, "of whom only ten are involved in sales, general or administration"). The manufacturing

facility is in the same building as the Company's corporate headquarters, which is 32,000 square feet, and is relatively small, occupying only about 2,000 square feet. ¶ 359. DABRA catheters are Ra Medical's key revenue driver, *see* ¶ 111, thus it is reasonable to infer that Irwin and Jackson knew or recklessly disregarded the pervasive calibration issue affecting DABRA. *S. Ferry LP, No. 2 v. Killinger*, 542 F.3d 776, 781 (9th Cir. 2008) ("[I]t may be inferred that facts critical to a business's 'core operations' or important transactions are known to key company officers."); *cf. Police Retirement Sys. of St. Louis v. Intuitive Surgical, Inc*, 759 F.3d 1051, 1062-63 (9th Cir. 2014) (requiring involvement in "minutia . . . such as data monitoring" where plaintiff merely alleged management had access to software-generated reports about system placement) (cited by RMED Br. at 33); *Tadros v. Celladon Corp.*, 2016 WL 58700002, at *12 (S.D. Cal. Oct. 7, 2016) (finding allegation that Defendants were "deeply involved in all aspects of both clinical trials" conclusory) (cited by RMED Br. at 33). Additionally, Ra Medical only had 118 full-time employees as of December 31, 2018. ¶ 359; *see Batwin v. Occam Networks, Inc.*, 2008 WL 2676364, at *12 (C.D. Cal. July 1, 2008) (considering company's small size of 80-100 employees persuasive of scienter).

### 7.    SOX Certifications Support a Strong Inference of Scienter

Irwin and Jackson signed false SOX certifications, and the Company since disclosed that the material weakness resulted from "an inappropriate 'tone at the top' set by certain members of senior management [i.e. Irwin and Jackson], including a failure to promote adherence to [its] Code of Ethics and Conduct." ¶ 151; *Weiss v. Amkor Tech., Inc.*, 527 F. Supp. 2d 938, 950 (D. Ariz. 2007) (SOX certifications support scienter where plaintiff alleges defendants had actual knowledge or were deliberately reckless in issuing such statements).

Holistically, the termination of Irwin, the pending SEC and DOJ investigations into the matters at issue herein, Irwin's and Jackson's stock sales, the testimony of

---

credible confidential witnesses, the core operations doctrine, and the SOX certifications support a strong inference of scienter.

### III.    The Complaint Adequately Alleges Control Person Liability

To establish control person liability under Section 15 of the Securities Act and Section 20(a) of the Exchange Act, a plaintiff need prove (a) a primary violation of the federal securities laws, and (b) that the defendant exercised actual power or control over the primary violator. *See In re Portal Software, Inc. Sec. Litig.*, 2006 WL 2385250, at *5 (N.D. Cal. Aug. 17, 2006). Defendants do not dispute that the Securities Act Individual Defendants were control persons for purposes of Section 15 of the Securities Act or that the Exchange Act Individual Defendants were control persons for purposes of Section 20(a) of the Exchange Act. RMED Br. at 34; Irwin Br. at 25. Thus, having adequately pled a primary violation under Sections 11 and 10(b), Plaintiffs have also established control person liability under Sections 15 and 20(a), respectively.

### CONCLUSION

For the foregoing reasons, Plaintiffs request that the Court deny Defendants' motions to dismiss in its entirety. Alternatively, if the Court grants any part of Defendants' motions, Plaintiffs request leave to amend. *See* Fed. R. Civ. P. 15(a) ("The Court should freely give leave to amend when justice so requires."); *Eminence Capital*, 316 F.3d at 1053 (leave to amend appropriate where allegations were not frivolous and plaintiffs could have successfully stated a claim if given an opportunity).

DATED:  April 27, 2020          **GLANCY PRONGAY & MURRAY LLP**

By:   *s/ Robert V. Prongay*

Robert V. Prongay
Pavithra Rajesh
1925 Century Park East, Suite 2100
Los Angeles, California 90067
Telephone:  (310) 201-9150
Facsimile:  (310) 201-9160
Email:  rprongay@glancylaw.com

*Counsel for Lead Plaintiffs Ervin Derr and Peter Shoemaker and Lead Counsel for the Class*

**LAW OFFICES OF HOWARD G. SMITH**
Howard G. Smith
3070 Bristol Pike, Suite 112
Bensalem, PA 19020
Telephone: (215) 638-4847
Facsimile: (215) 638-4867

*Additional Counsel*

## PROOF OF SERVICE BY ELECTRONIC POSTING

I, the undersigned, say:

I am not a party to the above case and am over eighteen years old. On April 27, 2020, I served true and correct copies of the foregoing document, by posting the document electronically to the ECF website of the United States District Court for the Southern District of California, for receipt electronically by the parties listed on the Court's Service List.

I affirm under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  Executed on April 27, 2020, at Los Angeles, California.

*s/Robert V. Prongay*
Robert V. Prongay