Gregory L. Watts, State Bar No. 197126
Stephanie L. Jensen, WSBA No. 42042 (*pro hac vice*)
**WILSON SONSINI GOODRICH & ROSATI, P.C.**
701 Fifth Avenue, Suite 5100
Seattle, WA 98104-7036
Telephone:   (206) 883-2500
Facsimile:    (206) 883-2699
gwatts@wsgr.com
sjensen@wsgr.com

*Counsel for Defendants Ra Medical Systems, Inc., Andrew Jackson, Richard Heymann, Maurice Buchbinder, Martin Colombatto, Richard Mejia, Jr., Mark E. Saad, and William Enquist Jr.*

## UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ERVIN DERR, Individually and on Behalf of all Others Similarly Situated, <br><br> Plaintiff, <br><br> v. <br><br> RA MEDICAL SYSTEMS, INC., DEAN IRWIN, ANDREW JACKSON, MELISSA BURSTEIN, MARTIN BURSTEIN, RICHARD HEYMANN, MAURICE BUCHBINDER, MARTIN COLOMBATTO, RICHARD MEJIA, JR., PIPER JAFFREY & CO., CANTOR FITZGERALD & CO., SUNTRUST ROBINSON HUMPHREY, INC., NOMURA SECURITIES INTERNATIONAL, INC., and MAXIM GROUP, LLC, <br><br> Defendants. | Case No.:  3:19-cv-1079-LAB-AHG <br><br> **THE RA MEDICAL DEFENDANTS' REPLY IN FURTHER SUPPORT OF THEIR MOTION TO DISMISS THE AMENDED COMPLAINT** <br><br> CLASS ACTION <br><br> DATE:       JULY 20, 2020 <br> TIME:       11:30 a.m. <br> CTRM:      14A, 14th Floor <br> JUDGE:     Hon. Larry Alan Burns |

# TABLE OF CONTENTS

**Page**

INTRODUCTION ...................................................................................................... 1

I.   PLAINTIFFS FAIL TO STATE A SECTION 11 CLAIM ..................................... 1

    A.   Plaintiffs Lack Standing to Assert a Section 11 Claim................................... 1

    B.   Plaintiffs' Section 11 Claim Sounds in Fraud.................................................. 4

    C.   No Section 11 Claim for Statements Outside the Registration Statement .................................................................................................................5

    D.   No Section 11 Claim for Statement of Laws and Regulations ....................... 5

    E.   Plaintiffs Fail to Plausibly Plead Section 11 Falsity ....................................... 6

    F.   Plaintiffs Fail to Plausibly Plead a Violation of Item 303 ............................. 8

II.   PLAINTIFFS FAIL TO STATE A SECTION 10(B) CLAIM ............................... 9

    A.   Challenged Risk Factors Are Not Actionable.................................................. 9

    B.   Plaintiffs Fail to Plead an Actionable False or Misleading Statement.......... 10

    C.   Plaintiffs Have Not Pled a Strong Inference of Scienter .............................. 12

        1.   Fraud-by-Hindsight Undermines Inference of Scienter ..................... 12

        2.   CW Allegations Do Not Support Strong Inference of Scienter.......... 13

        3.   Stock Sales Do Not Support Scienter ................................................. 14

        4.   The Core Operations Doctrine is Not Applicable............................... 14

        5.   No Other Allegations Support Scienter ............................................... 15

        6.   The Nonculpable Inference is Far More Compelling ......................... 15

3:19-cv-1079-LAB-AHG

THE RA MEDICAL DEFENDANTS' REPLY IN SUPPORT OF MOTION TO DISMISS

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Abbey v. Comput. Memories, Inc.*,
634 F. Supp. 870 (N.D. Cal. 1986)................................................................. 1

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009).............................................................................2, 7

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007)..........................................................................2, 7, 8

*Daniels-Hall v. Nat'l Educ. Ass'n*,
629 F.3d 992 (9th Cir. 2010) ................................................................... 8

*Hertzberg v. Dignity Partners, Inc.*,
191 F.3d 1076 (9th Cir. 1999) ............................................................ 1, 3

*In re A-Power Energy Gen. Sys. Ltd. Sec. Litig.*,
2012 WL 1983341 (C.D. Cal. May 31, 2012)............................................... 2

*In re Apple Comput. Sec. Litig.*,
886 F.2d 1109 (9th Cir. 1989) ................................................................... 9

*In re Atossa Genetics, Inc. Sec. Litig.*,
2014 WL 4983551 (W.D. Wash. Oct. 6, 2014)............................................. 4

*In re Century Aluminum Co. Sec. Litig.*,
729 F.3d 1104 (9th Cir. 2013) ........................................................ 1, 2, 3, 4

*In re Countrywide Fin. Corp. Mortgage-Backed Sec. Litig.*,
2013 WL 8116709 (C.D. Cal. Jan. 10, 2013)............................................. 3

*In re Immune Response Sec. Litig.*,
375 F. Supp. 2d 983 (S.D. Cal. 2005) ....................................................... 2

*In re Infonet Sec. Litig.*,
310 F. Supp. 2d 1080 (C.D. Cal. 2003)....................................................... 8

*In re Initial Pub. Offering Sec. Litig.*,
227 F.R.D. 65 (S.D.N.Y. 2004)............................................................. 1, 4

*In re LendingClub Sec. Litig.*,
282 F. Supp. 3d 1171 (N.D. Cal. 2017)..................................................... 1

*In re Maxwell Techs., Inc. Sec. Litig.*,
18 F. Supp. 3d 1023 (S.D. Cal. 2014) ..................................................... 15

*In re Orange 21 Inc. Sec. Litig.*,
2006 WL 8455352 (S.D. Cal. Mar. 30, 2006)........................................... 9

ii

THE RA MEDICAL DEFENDANTS' REPLY IN SUPPORT OF MOTION TO DISMISS

*In re Quarterdeck Office Sys., Inc. Sec. Litig.*,
     1993 WL 623310 (C.D. Cal. Sept. 30, 1993) ............................................................. 1, 4

*In re Surebeam,*
     2005 WL 5036360 (S.D. Cal. Jan. 3, 2005) ...................................................................... 9

*Inchen Huang v. Higgins,*
     2019 WL 1245136 (N.D. Cal. Mar. 18, 2019) ................................................................. 15

*Johnson v. Knapp,*
     2009 WL 764521 (C.D. Cal. Mar 16, 2009) ...................................................................... 9

*Lifschitz v. NextWave Wireless Inc.*,
     2011 WL 5839682 (S.D. Cal. Nov. 21, 2011) ............................................................ 12, 13

*Lilley v. Charren*,
     936 F. Supp. 708 (N.D. Cal. 1996) ..................................................................................... 4

*McFarland v. Memorex Corp.*,
     493 F. Supp. 631 (N.D. Cal. 1980) ..................................................................................... 4

*Meyer v. JinkoSolar Holdings Co.*,
     761 F.3d 245 (2d. Cir. 2014) .............................................................................................. 5

*Mulligan v. Impax Labs., Inc.*,
     36 F. Supp. 3d 942 (N.D. Cal. 2014) .................................................................................. 7

*S. Ferry LP, No. 2 v. Killinger*,
     542 F.3d 776 (9th Cir. 2008) ............................................................................................ 14

*Schneider v. Cal. Dep't of Corr.*,
     151 F.3d 1194 (9th Cir. 1998) ........................................................................................ 2, 3

*Todd v. STAAR Surgical Co.*,
     2016 WL 6699284 (C.D. Cal. Apr. 12, 2016) .................................................................... 5

*Zeid v. Kimberley*,
     930 F. Supp. 431 (N.D. Cal. 1996) ................................................................................... 10

**STATUTES**

15 U.S.C. § 77k (2018) ..................................................................................................... 1, 3, 4, 5, 10

15 U.S.C. § 77o (2018) ........................................................................................................... 1, 4

15 U.S.C. § 77t (2018) ................................................................................................................. 1

15 U.S.C. § 78j(b) (2018) ............................................................................................... 1, 4, 5, 9, 10

DEFENDANTS' REPLY IN SUPPORT OF MOTION TO DISMISS

# RULES AND REGULATIONS

17 C.F.R. § 230.144(a)(1) ................................................................................................ 2

17 C.F.R. § 230.144(b)(1)(ii) .......................................................................................... 2

FED. RULE CIV. PROC. 8(a) ........................................................................................ 5, 10

FED. RULE CIV. PROC. 9(b) ........................................................................................ 5, 10

FED. RULE CIV. PROC. 12(b)(6) ...................................................................................... 4

3:19-cv-1079-LAB-AHG

DEFENDANTS' REPLY IN SUPPORT OF MOTION TO DISMISS

**INTRODUCTION**

Plaintiffs fail to state a Section 11 claim because their Complaint alleges nothing more than bare, conclusory assertions that their shares are traceable to Ra Medical's IPO. Plaintiffs cannot proceed with a case in which they lack statutory standing. Plaintiffs' attempts to shift their pleading burden onto Defendants and create a presumption of traceability should be rejected. Even if they had standing, the Complaint fails to adequately allege that any statement made in the IPO registration statement was false or misleading. Accordingly, Plaintiffs' Sections 11 and 15 claims should be dismissed.

Plaintiffs fail to state a Section 10(b) claim. Plaintiffs fail to plead a misstatement, particularly in the IPO offering documents. Plaintiffs also fail to plead a strong inference of scienter as to any post-IPO statement. The Ra Medical Defendants concede that the Company encountered issues as it transitioned from development to commercialization of DABRA. But the fact that this transition has not been seamless does not equate to securities fraud. Accordingly, Plaintiffs' Sections 10(b) and 20(a) claims should be dismissed. The Complaint must be dismissed in its entirety.

**I.    PLAINTIFFS FAIL TO STATE A SECTION 11 CLAIM**

**A.    Plaintiffs Lack Standing to Assert a Section 11 Claim**

Plaintiffs argue that their shares should be "presumed traceable" to the Company's IPO. Opp. at 11. But "plaintiffs are not entitled to a presumption of traceability." *In re Initial Pub. Offering Sec. Litig.*, 227 F.R.D. 65, 118 (S.D.N.Y. 2004). It is Plaintiffs' burden to plead and prove the traceability of their shares. *See In re Century Aluminum Co. Sec. Litig.*, 729 F.3d 1104, 1106 (9th Cir. 2013); *Hertzberg v. Dignity Partners, Inc.*, 191 F.3d 1076, 1080 n.4 (9th Cir. 1999); *In re Quarterdeck Office Sys., Inc. Sec. Litig.*, 1993 WL 623310, at *3 (C.D. Cal. Sept. 30, 1993); *Abbey v. Comput. Memories, Inc.*, 634 F. Supp. 870, 874 (N.D. Cal. 1986); *see also In re LendingClub Sec. Litig.*, 282 F. Supp. 3d 1171, 1179 (N.D. Cal. 2017) (on class certification, "[t]he burden of tracing shares to a particular public offering rests with plaintiffs"). Plaintiffs invite the Court to improperly flip the

1

THE RA MEDICAL DEFENDANTS' REPLY IN SUPPORT OF MOTION TO DISMISS

burden and require Defendants to prove the untraceability of Plaintiffs' shares. The Court should reject this invitation.[1]

The Complaint provides no details to support its repeated conclusory assertion that Plaintiffs' shares were acquired "pursuant and/or traceable to" the IPO Registration Statement. ¶¶ 31, 32, 108, 382. Since *Twombly* and *Iqbal*, courts in this Circuit have routinely dismissed such meager allegations for failure to plead the traceability of the plaintiff's shares. *See Century Aluminum*, 729 F.3d at 1107; MTD at 6 (citing authority). The Court could grant Defendants' motion on this basis alone. Plaintiffs' attempt to supplement the Complaint's grossly deficient tracing allegations with new allegations in their Opposition, Opp. at 11 n.5, is improper.[2] Plaintiffs "may not amend through an opposition brief." *In re A-Power Energy Gen. Sys. Ltd. Sec. Litig.*, 2012 WL 1983341, at *12 n.16 (C.D. Cal. May 31, 2012); *see also Schneider v. Cal. Dep't of Corr.*, 151 F.3d

---

[1] Plaintiffs' reliance on *In re Immune Response Sec. Litig.*, 375 F. Supp. 2d 983, 1039 (S.D. Cal. 2005), is misplaced. The court's decision that a conclusory and undetailed allegation that plaintiff's shares were "issued in connection with" the offering pre-dated the U.S. Supreme Court's decisions in *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), and *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007), and the Ninth Circuit's decision in *Century Aluminum*. As the Supreme Court noted in *Twombly*, a complaint should not withstand a motion to dismiss based on the "possibility that a plaintiff might later establish some 'set of [undisclosed] facts' to support recovery." 550 U.S. at 561.

[2] Plaintiffs' argument—that an absence of filed Forms 144 before their purchases somehow shows the traceability of their shares—is wrong as a matter of law. Plaintiffs mistakenly posit that a Form 144 must be filed with the SEC when any unregistered, *i.e.*, non-IPO shares, are sold into the market. Opp. at 11 n.5. This is only true for "affiliates" of the company, defined as "a person that directly, or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with, such issuer." 17 C.F.R. § 230.144(a)(1). This essentially means that insiders, like Mr. Irwin at Ra Medical, must file a Form 144 (and Form 4) before selling their non-IPO shares. Non-insiders, those persons who were not affiliates of the company during the three months preceding their sale and owned the shares to be sold for at least six months, may sell their shares without filing a Form 144. *See* 17 C.F.R. § 230.144(b)(1)(ii); https://www.sec.gov/reportspubs/investor-publications/investorpubsrule144htm.html. Here, as the Registration Statement discloses, there were 316,431 shares held by non-affiliates eligible for sale in the market upon completion of the IPO without the need to file a Form 144 (or Form 4). Ex. 1 at 153.

2

DEFENDANTS' REPLY IN SUPPORT OF MOTION TO DISMISS

1194, 1197 n.1 (9th Cir. 1998); *In re Countrywide Fin. Corp. Mortgage-Backed Sec. Litig.*, 2013 WL 8116709, at *3 (C.D. Cal. Jan. 10, 2013).

The law is clear that if the market for an issuer's stock is comprised of both (a) registered shares issued pursuant to the allegedly misleading registration statement and (b) unregistered shares, *e.g.*, shares entering the market due to the expiration of lock-up restrictions or Rule 144 holding requirements, or shares issued pursuant to other offerings and registration statements, the market is mixed or polluted, making traceability "impossible" unless plaintiffs can "trace the chain of title for their shares back" to the allegedly misleading registration statement. *Century Aluminum*, 729 F.3d at 1106-07; *see Hertzberg*, 191 F.3d at 180 n.4. Plaintiffs cannot satisfy Section 11 by pleading that their shares "might have been" or were even "highly probable" to have been purchased pursuant to the IPO registration statement. MTD at 6-9 (citing authority). While the clearest indication of polluting shares entering the market is another public offering of the issuer's stock before or after the offering at issue, it is not a requirement. Numerous courts have dismissed or refused to certify Section 11 cases where there was only one public offering, and the polluting non-offering shares entered the market through the expiration of lock-ups or Rule 144 restrictions. MTD at 9-10 (citing authority).

Here, Plaintiffs concede that they did not purchase their shares in Ra Medical's IPO and that the earliest date either of them purchased their shares was February 6, 2019, over four months after the IPO. Plaintiffs concede that at the time of their purchases 65 percent of the Company's total outstanding shares were pre-existing, non-IPO shares that were not sold pursuant to the Registration Statement. Plaintiffs also tacitly concede that at the time of their purchases 316,431 shares—nearly 7 percent of the Company's shares eligible for trading on the NYSE—were non-IPO shares. MTD at 6-7.

Plaintiffs' only argument is that Defendants have the burden of proving that non-IPO shares were not merely eligible for sale but actually sold in the open market before Plaintiffs' purchases. Opp. at 11. Again, this argument attempts to saddle Defendants with Plaintiffs' pleading burden. *See supra* at 1-2. Requiring Defendants to disprove Section 11

3:19-cv-1079-LAB-AHG

DEFENDANTS' REPLY IN SUPPORT OF MOTION TO DISMISS

tracing on a motion to dismiss, instead of Plaintiffs pleading it with sufficient particularity, puts Defendants in a Catch-22—requiring them to prove untraceability (something Defendants could easily do here) while preventing them from doing so because Rule 12(b)(6) precludes the Court from relying on extraneous evidence not incorporated by reference in the complaint. Opp. at 12. Such a scheme would preclude the dismissal of any Section 11 claims, no matter how poorly pled. Because it is a plaintiff's burden to plead and prove tracing and therefore his statutory standing, courts do not rely on this eligible vs. actual distinction in ruling on motions to dismiss. For example, in *In re Atossa Genetics, Inc. Sec. Litig*., Chief Judge Martinez granted the defendants' motion to dismiss a Section 11 claim because the plaintiff bought his shares "after 50,122 unregistered shares <u>became available</u> for sale." 2014 WL 4983551, at *5 (W.D. Wash. Oct. 6, 2014) (emphasis added); *see also Initial Pub. Offering*, 227 F.R.D. at 119 ("section 11 class periods must end when unregistered shares <u>became tradeable</u>") (emphasis added).[3]

Granting Defendants' motion to dismiss Plaintiffs' Section 11 (and thus Section 15) claim would not deprive Plaintiffs of a remedy. It merely precludes them from taking advantage of the "relaxed liability requirements" of Section 11. *Century Aluminum*, 729 F.3d at 1107. The "tracing requirement is the condition Congress has imposed for granting access" to Section 11. *Id*. If Plaintiffs can plead a Section 10(b) claim—a claim that does not require traceability—Plaintiffs can proceed on that claim.

## B.    Plaintiffs' Section 11 Claim Sounds in Fraud

Plaintiffs insist that pre-IPO events are distinct from post-IPO events when it comes to their pleading standards. Opp. at 9-10. But the Complaint and the Opposition repeatedly

---

[3] Numerous courts have dismissed or refused to certify Section 11 claims without determining whether the unregistered shares were eligible or actually sold into the open market. *See, e.g., Lilley v. Charren*, 936 F. Supp. 708, 716 (N.D. Cal. 1996) (court dismissed Section 11 claim without determining whether the 80,000 unregistered shares were actually sold into the market); *Quarterdeck*, 1993 WL 623310, at *7 n.1 (unclear if plaintiffs' concession that unregistered shares "were on the market" refers to shares being eligible or sold); *McFarland v. Memorex Corp*., 493 F. Supp. 631, 641-42 (N.D. Cal. 1980) (no mention of unregistered shares actually being sold into the market).

3:19-cv-1079-LAB-AHG

DEFENDANTS' REPLY IN SUPPORT OF MOTION TO DISMISS

allege that the same material omissions of a pre-IPO calibration issue, a pre-IPO silent recall, and a pre-IPO manufacturing problem form the basis of both their Section 11 and Section 10(b) claims. ¶¶ 94, 118, 133, 151; Opp. at 13, 25-26. Plaintiffs also allege in both their Section 11 and Section 10(b) claims that Defendants engaged in the same off-label promotion before and after the IPO. *E.g.*, ¶¶ 80-87, 99, 105, 115; Opp. at 5, 15-18, 27, 30. While Plaintiffs play word games with their descriptions of the conduct as either negligent or fraudulent as it suits them, a fair reading of the Complaint reveals Plaintiffs' attempt to plead a continuous fraud as to these subjects from well before the IPO through the end of the class period. Indeed, Plaintiffs' allegation of an Item 303 violation implicitly admits that their Section 11 claims sound in fraud because a trend or uncertainty is only actionable under Item 303 if it was <u>known</u> and <u>expected</u> to have a material impact, but was not disclosed. Plaintiffs' Section 11 claim is governed by Rule 9(b). And even if it is not, it nonetheless fails to satisfy Rule 8(a)'s requirements. MTD at 5.

**C.     No Section 11 Claim for Statements Outside the Registration Statement**

The Opposition does not address the fact that roadshow materials cannot form the basis of a Section 11 claim, and only addresses the Code of Ethics in the Section 10(b) context. Opp. at 27, 28 n.9, 31, 34. The claims must be dismissed. MTD at 10.

**D.     No Section 11 Claim for Statement of Laws and Regulations**

Plaintiffs fail to respond to Defendants' argument that the Company's statements about laws and regulations were (i) literally true and (ii) not misleading because Plaintiffs fail to plead any violations of such laws or regulations at the time of the IPO. MTD at 11-12. While the Opposition baldly suggests legal violations at the time of the IPO, it fails to cite where such allegations can actually be found in the Complaint.[4]

---

[4] Plaintiffs' authority does not remedy this fatal flaw: *Todd v. STAAR Surgical Co.*, 2016 WL 6699284, at *10 (C.D. Cal. Apr. 12, 2016), concerns a safe harbor argument, and, unlike here, the complaint in *Meyer v. JinkoSolar Holdings Co.*, 761 F.3d 245, 251 (2d. Cir. 2014), actually alleged the company was violating the relevant laws and regulations at the time of the IPO.

5

DEFENDANTS' REPLY IN SUPPORT OF MOTION TO DISMISS

### E.   Plaintiffs Fail to Plausibly Plead Section 11 Falsity

***Serious Adverse Event.*** With respect to the alleged misstatement that no SAEs were reported in the 2017 pivotal study, the Opposition ignores that: the statement was true; the Complaint fails to allege a single, reportable SAE (rather than a non-reportable injury) during the study; and the only medical device reports identified in the Complaint involved procedures conducted two years after the pivotal trial and nearly a year after the IPO. MTD at 12-13. Plaintiffs' attempts to resuscitate this claim fail. Opp. at 20.

First, Plaintiffs claim that the mere presence of a DOJ investigation means the Registration Statement must have failed to disclose that an injury occurred during the pivotal study, that such injury was reportable, and that the Company will be found liable for fraudulently obtaining 510(k) marketing clearance for DABRA. *Id*. But the Complaint contains <u>no</u> allegations regarding <u>any</u> findings from the investigation (nor could it, as the investigation is still under way).

Second, Plaintiffs claim that CW1 is reliable because s/he claims to be the whistleblower who led to the Audit Committee investigation. But the Company made no credibility finding as to CW1. In fact, the Company said the investigation covered "allegations raised by an employee, as well as additional matters discovered throughout the investigation." ¶ 154. The Company did not say which issues stemmed from which source, and its investigation cannot be a stand-in for establishing CW1's credibility.[5]

Third, Plaintiffs hypothesize that "<u>if</u> the injury should have been reported to the FDA but was not, Ra Medical <u>could</u> be found liable for fraudulently obtaining 510(k) marketing

---

[5] The Opposition also fails to rehabilitate CW2's and CW3's reliability. MTD at 13-14, 16-21, 31. That CW2 attended sales trainings says nothing of the extent, nature, or substance of CW2's interactions with sales representatives, or when these interactions took place. That CW2 "shipp[ed] materials and supplies" for and "set up" at tradeshows and events says nothing about CW2's familiarity with the content and substance of marketing materials, nor does it suggest that CW2 understood the nuances of company-wide "marketing practices." As to CW3, it does not follow that, simply because "sales training[s] [were] conducted at the corporate headquarters," CW3 "would know about the sales training practices, problems reported by physicians regarding DABRA, and any remedial efforts undertaken by the Company in response." Opp. at 21; *see generally* MTD at 16-21.

6

DEFENDANTS' REPLY IN SUPPORT OF MOTION TO DISMISS

clearance for DABRA." Opp. at 20 (emphasis added). Yet Plaintiffs do not plausibly plead that the injury should have been reported to the FDA in the first place.

*Self-Manufacturing.* Plaintiffs misleadingly abbreviate the challenged statement to make it appear more concrete, saying: "Ra Medical could 'increase [its] manufacturing scale in a cost-effective manner[.]'" Opp. at 15. The full quote is: "We believe that by controlling the manufacturing and assembly of our products we are able to innovate more quickly, produce higher quality products, and increase our manufacturing scale in a cost-effective manner." ¶ 186; MTD at 14-15. Viewed in context, as Plaintiffs' own authority requires, *Mulligan v. Impax Labs., Inc.*, 36 F. Supp. 3d 942, 966 (N.D. Cal. 2014), this statement of corporate optimism is classic inactionable puffery. MTD at 14-15; Opp. at 15.

*Risk of Recall.* Just because the Company serviced lasers in February 2018 does not plausibly plead that this service was unsuccessful. A problem with the laser in February 2018 is not plausibly the same problem as that with the catheters following the IPO in 2019. Plaintiffs claim this is a "factual dispute." Opp. at 14. To the contrary, Defendants have simply pointed out the inadequacy of Plaintiffs' allegations. MTD at 14-18. The Opposition cites allegations from various points in time, but none of them plausibly allege that the respective issues existed <u>at the time of the IPO</u>. Opp. at 13-15.

In an attempt to project the September 2019 catheter recall back in time, *infra* at 11, Plaintiffs claim all problems relating to DABRA (including laser servicing, catheter oven inconsistencies, and catheter shelf-life) were a single, ongoing "issue." But the fact that separate issues all touch upon one product (DABRA) does not make them one issue. Adopting Plaintiffs' logic would mean that problems with battery life, screen resolution, and Wi-Fi connectivity must necessarily be considered one problem simply because they all relate to a computer. Plaintiffs' tenuous connection fails the plausibility requirement of *Twombly*, 550 U.S. at 557, 570, and *Iqbal*, 556 U.S. at 678.

*Alleged Off-Label Promotion.* Despite calling the Registration Statement's disclosure regarding potential off-label promotion misleading, Opp. at 16-17, Plaintiffs fail to show what more the Company could have possibly said on this subject. MTD at 18-20;

7

3:19-cv-1079-LAB-AHG

Ex. 1 at 22. Plaintiffs' claim ignores the robust language of the disclosure itself, which is precisely the type of "substantive and tailored" disclosure found sufficient in *In re Infonet Sec. Litig.*, 310 F. Supp. 2d 1080, 1091 (C.D. Cal. 2003). The Registration Statement even described in great detail the very competitor accusation Plaintiffs rely on in claiming the Company should have disclosed more.

Plaintiffs also stretch the CWs' statements on this subject to an illogical extreme, claiming it is "irrelevant" how atherectomy was mentioned in marketing materials because "[i]t is reasonable to infer that if the FDA… instructed [the Company] 'not to mention atherectomy in marketing materials any longer,' then the Company had engaged in off-label marketing." Opp. at 18. The court need not accept "speculative" allegations, *Twombly*, 550 U.S. at 555–57, nor "unwarranted deductions of fact[]" or "unreasonable inferences" like those Plaintiffs put forward here. *Daniels-Hall v. Nat'l Educ. Ass'n*, 629 F.3d 992, 998 (9th Cir. 2010). Similarly, calling the Company's quick resolution of any issues raised by the FDA "beside the point" is wrong since it actually undercuts the plausibility of off-label promotion as of the time of the IPO. MTD at 18-20.

***Financial Reporting.*** The claim that the September 2018 Registration Statement's disclosure of a material weakness in the Company's internal control over financial reporting was insufficient because it did not alert investors to certain issues referenced in the October 2019 Release fails for the same reason: failure to allege the issue existed at the time of the IPO. MTD at 20-21. Plaintiffs rely on CW2 to make the monumental inferential leap from using Excel for expense report tracking to "exposing the Company to regulatory scrutiny for violations of anti-kickback laws." Opp. at 19. CW2's allegations say nothing about payments to physicians, and fall far short of showing violation of anti-kickback laws.

**F.      Plaintiffs Fail to Plausibly Plead a Violation of Item 303**

Defendants have shown there is zero support in the Complaint to plausibly suggest that the February 2018 issue with the lasers that required their servicing is linked to a post-IPO calibration issue. MTD at 21-23. Plaintiffs argue that Defendants' argument somehow creates a "factual dispute." Opp. at 23. Not so. Defendants are simply highlighting pleading

3:19-cv-1079-LAB-AHG

DEFENDANTS' REPLY IN SUPPORT OF MOTION TO DISMISS

gaps or inconsistencies that undermine Plaintiffs' allegation of a known catheter non-calibration "trend" at the time of the IPO, rather than a one-off laser issue that occurred seven months earlier. An issue that occurs once, seven months before the IPO, is hardly a "trend." Rather, the February 2018 service issue is far more akin to a "routine business detail[]" that an issuer is under no duty to disclose under Item 303. *See In re Orange 21 Inc. Sec. Litig.*, 2006 WL 8455352, at *3 (S.D. Cal. Mar. 30, 2006).

Plaintiffs try to distinguish Defendants' cited authority by claiming that the alleged omissions in those cases did not render the reported results less indicative of the company's prospects, while Ra Medical's February 2018 laser servicing did. Opp. at 23. But again, as in Defendants' cited cases, Plaintiffs fail to plead that the issue that required the servicing of lasers has any linkage with the post-IPO catheter non-calibration issue or rendered Ra Medical's financial results published in the IPO less indicative of its prospects.[6]

## II.  PLAINTIFFS FAIL TO STATE A SECTION 10(B) CLAIM

### A.  Challenged Risk Factors Are Not Actionable

Contrary to Plaintiffs' claim (Opp. at 28), risks do not cease to be risks simply because they materialize to some degree or another, and a reasonable investor would not take a <u>warning</u> about the most significant risks faced by the Company and interpret it as a <u>guarantee</u> that each risk listed had not yet materialized in any way. MTD at 24-25. Plaintiffs' reliance on *In re Apple Comput. Sec. Litig.*, 886 F.2d 1109, 1118 (9th Cir. 1989), a pre-PSLRA opinion on summary judgment, is inapposite. There, the court found triable issues of material fact regarding whether the company knew of "significant technical problems" with a product that it did not disclose. *Id*. In contrast, here, Ra Medical disclosed <u>twenty-seven pages</u> comprehensively addressing the specific risks it faced. *See* Ex. 1 at 14-41. Plaintiffs fail to sufficiently allege that the Company's risks were "without basis" or

---

[6] Plaintiffs' authority is inapposite. *Surebeam* addressed the adequacy of a disclosure under Item 303, not whether an Item 303 disclosure was necessary in the first place. 2005 WL 5036360, at *13 (S.D. Cal. Jan. 3, 2005). And *Johnson v. Knapp* is a wholly inapplicable *pro se* civil rights case. 2009 WL 764521, at *2 (C.D. Cal. Mar 16, 2009).

3:19-cv-1079-LAB-AHG

"wrong" when made. *Zeid v. Kimberley*, 930 F. Supp. 431, 437 (N.D. Cal. 1996) (dismissing "absurd" claim that risk factors specifying events that may affect the company should have been described as presently affecting the company).

## B.   Plaintiffs Fail to Plead an Actionable False or Misleading Statement

Just as Plaintiffs' Section 11 falsity allegations fail to clear Rule 8(a) or 9(b) pleading hurdles, their Section 10(b) falsity allegations fail to clear the even higher pleading standards of the PSLRA.

***Manufacturing Issues and Recalls.*** Plaintiffs alternatively add language to or omit language from the March 14, 2019 challenged statements as they see fit: adding "apparently due to increased demand" to the statement regarding "production limitations[,]" and omitting "We believe" from the statement that "we will begin to see the positive impact on revenue beginning in the second quarter of 2019." *Compare* Opp. at 25 *with* ¶¶ 268, 270. But it is the statements themselves that must be analyzed, not Plaintiffs' characterizations of them. And here, neither statement was materially false or misleading.

In respect of the "production limitations" statement, Plaintiffs' reliance on the Audit Committee findings is misplaced because the findings merely reflect with the benefit of hindsight that it could have created a risk of confusion because it did not explicitly reference inconsistent DABRA catheter performance and catheter failures. The findings are not bounded by time and cannot show that the March 14 statement was materially misleading on the date it was made.

In respect of the "positive impact on revenue" statement, Plaintiffs ignore the Complaint's failure to allege that this opinion statement was not genuinely held, that it was not identified as a forward-looking statement, or that it was not accompanied by adequate cautionary language. MTD at 26. Plaintiffs also ignore that on that same March 14, 2019 quarterly investor call the Company gave guidance for 1Q19 of $1.0–1.4 million in total revenue and $0.3–0.4 million in vascular revenue, ¶ 270, and then exceeded that guidance by the end of the quarter a few weeks later, bringing in $1.7 million in total revenue and $500,000 in vascular revenue for 1Q19, ¶ 132. This end-of-quarter upswing supports the

DEFENDANTS' REPLY IN SUPPORT OF MOTION TO DISMISS

notion that Defendants honestly believed the issue was behind them on March 14, 2019 and were looking with optimism at 2Q19.

Plaintiffs claim through CW2 that the calibration issue could not have been resolved by March 14, 2019, because the Company did not hire someone to fix the issue until March 2019. Opp. at 26. Plaintiffs fail to explain how CW2, a Marketing Coordinator and Executive Assistant to Ms. Burstein (who by March 2019 had nothing to do with DABRA and no longer even reported to Irwin), is a reliable source regarding manufacturing issues, their fixes, or the roles and responsibilities of those in manufacturing.

Plaintiffs claim the statement in May 2019 regarding the manufacturing process upgrade was misleading because of the servicing of lasers over a year earlier in February 2018 and a subsequent September 2019 recall of catheters for a change to shelf-life labeling. Opp. at 26. But all the laser servicing recall notice shows is that, based on an August 8, 2019 hindsight evaluation, the Company then considered the servicing of lasers in February 2018 to be a recall. The notion that this was a significant recall is belied by the recall notice itself, which states that the quantity of the lasers in commerce was a mere <u>four</u> devices. Irwin Ex. T at 1 (four serial numbers). Plaintiffs fail to allege how either the servicing of lasers over a year earlier in February 2018 or the subsequent September 2019 change in labeling for shorter shelf-life shows that the Company had not upgraded its manufacturing process in May 2019, or that these opinion statements were not genuinely held. MTD at 26. Indeed, that the issue was solved as of March 14, 2019 and the manufacturing process upgraded as of May 2019 is consistent with the Company's August 2019 Press Release saying the issue occurred in 4Q18 and 1Q19, and that the Company "validated the changes that Ra Medical believed corrected the production limitations[,]" afterwards "manufacturing several well-performing lots" before non-calibrations "began to increase after decreasing during April and May 2019." ¶ 133.

*Sales.* Plaintiffs claim "Irwin and Jackson made statements in November 2018 that Ra Medical hired 'experienced sales reps' who were 'hitting the ground right away[.]'"

3:19-cv-1079-LAB-AHG

DEFENDANTS' REPLY IN SUPPORT OF MOTION TO DISMISS

Opp. at 26. Plaintiffs frame the statements as more bullish than they actually were. During the 3Q18 earnings call, when asked directly about sales representatives, Jackson stated:

> Some reps are hitting the ground right away. They're all very experienced reps when we hire them. At the end of Q2, the number of 15, we had just hired a bunch of them at the end of Q2. So, they were only getting trained and launching in Q3, ending with 24 reps[.]

¶ 226 (emphasis added and omitted). Plaintiffs fail to plead the need to disclose more.

**Off-Label Promotion.** The Opposition cites Paragraphs 169-174 of the Complaint to support its off-label promotion claim. But the only date referenced therein is a September 21-25, 2018 tradeshow, when the Company allegedly used marketing materials mentioning atherectomy. ¶ 169. The Opposition omits that "CW2 was instructed to destroy the marketing materials," *id.*, and "Ra Medical removed mention of atherectomy from marketing materials[.]" ¶ 170. Plaintiffs do not allege that marketing materials mentioning atherectomy were in use as of either November 13, 2018 or March 14, 2019 (the dates the challenged statements were made). CW2's allegations of what s/he was purportedly told to tell doctors lacks credibility as her role was administrative in nature and CW2 is not alleged to have communicated with physicians.

**SOX Certifications.** Plaintiffs ignore the Ra Medical Defendants' authority showing Plaintiffs failed to state a claim as to any of the certifications because they merely attest that the certifier is not aware of material misstatements. MTD at 29.

**C.   Plaintiffs Have Not Pled a Strong Inference of Scienter**

**1.   Fraud-by-Hindsight Undermines Inference of Scienter**

Plaintiffs' scienter allegations are based entirely on (i) a summary of the Audit Committee's investigative findings that does not state who knew what and when, (ii) allegations of poorly positioned employees, and (iii) the mere existence of post-hoc regulatory inquiries. Such reliance constitutes impermissible fraud-by-hindsight. MTD at 29-30. As this Court has held, Plaintiffs "must not masquerade a bad outcome in corporate management as fraud by hindsight, and must overcome the presumption of mistake in order to plead fraud" given "[t]he rationale [] that punishing mistakes as if they were fraud

DEFENDANTS' REPLY IN SUPPORT OF MOTION TO DISMISS

undermines the deterrent function of securities regulation." *Lifschitz v. NextWave Wireless Inc.*, 2011 WL 5839682, at *1 (S.D. Cal. Nov. 21, 2011).

2.    CW Allegations Do Not Support Strong Inference of Scienter

Plaintiffs argue that the Complaint's inadequately described CWs "corroborate each other[]." Opp. at 21. This argument—that several CWs, each unreliable on their own and each making unparticularized allegations, somehow combine to create a reliable whole— is both illogical and unsupported by case law (Plaintiffs cite none). For CWs' statements to support an inference of scienter, both the CW descriptions and their statements must be sufficiently particularized to establish or reflect reliability and personal knowledge. None of the CWs or CW statements satisfy this requirement. MTD at 30.

**CW1.** As addressed *supra* at 6, CW1's claim of being the whistleblower is not a substitute for well-pled indicia of reliability. But neither the Complaint nor the Opposition suggest that CW1 has firsthand knowledge of the issues about which s/he opines. For example, Plaintiffs regurgitate that CW1 stated that "calibration issues were known as early as 2017," Opp. at 15, but CW1 is not alleged to have been employed at any point in 2017. The other defects Defendants identified also remain unaddressed. MTD at 13, 16, 30-31.

**CW2 and CW3.** In their Opposition, Plaintiffs fail to resolve the numerous deficiencies identified by Defendants that plague CW2's and CW3's allegations. MTD at 16-21, 30-31. CW2's statements to support that calibration was the "number one" issue at the Company (Opp. 15) are internally inconsistent: on the one hand, CW2 claims that "the failure to calibrate…was consistently discussed at sales training sessions" (*id*.), but on the other hand alleges that "Ra Medical wanted to keep [calibration issues] quiet, so the covert product recall was not discussed during sales training." ¶ 167.[7] CW3's statements also lack the who, what, when, where, why, and how that Plaintiffs concede are necessary. Opp. at 24. For example, CW3 claims unidentified "representatives" shared undescribed "concerns

---

[7] That CW2 was unable to "explain this distinction" (*i.e.*, between "indication" and "intended use") is not proof of allegedly inadequate training because CW2 is not a "sales representative." Opp. at 26. Instead, it further confirms that CW2 lacked the education and skillset to evaluate the substance of marketing materials. MTD at 16-17, 19-20.

about a possible defect" that were dismissed by an unidentified Company representative. Opp. at 26. Assuming Mr. Irwin was the person who said the device was "perfect," this statement actually reflects an absence of scienter, since it indicates he did not believe DABRA had a serious problem.

### 3.   Stock Sales Do Not Support Scienter

Plaintiffs downplay the fact that Mr. Irwin sold a portion of his stock through a 10b5-1 trading plan which precludes the trades from being found suspiciously timed, and that all other challenged sales were nondiscretionary sales to cover tax withholdings. Plaintiffs also avoid the fact that Messrs. Irwin and Jackson sold insignificant fractions of their substantial total holdings, thus suffering the same financial losses as every other investor. MTD at 31-33. Messrs. Irwin and Jackson sold just 2.2 and 2.9 percent of their respective total holdings. Plaintiffs argue "at best this factor is neutral." Opp. at 32. To the contrary, such paltry insider sales by management during what Plaintiffs' characterize as a time period in which negative information was being hidden from the market and the Company's stock was massively inflated undermine an inference of scienter. MTD at 32-33.

### 4.   The Core Operations Doctrine is Not Applicable

Plaintiffs acknowledge that, for the core operations doctrine to apply, the Complaint must allege with specificity that Messrs. Irwin and Jackson had "actual access" to the disputed information. Opp. at 33. Yet no such allegations are asserted in the Complaint. The Opposition instead relies on their titles, the size of the Company, the square footage of its facilities, and the location of sales trainings. This is insufficient even under Plaintiffs' own authority. *See S. Ferry LP, No. 2 v. Killinger*, 542 F.3d 776, 784–85 (9th Cir. 2008) ("corporate management's general awareness of the day-to-day workings of the company's business does not establish scienter—at least absent some additional allegation of specific information conveyed to management and related to the fraud"). Plaintiffs claim "Irwin and Jackson knew…representatives were instructed to market DABRA for off-label use because they were present at the trainings." Opp. at 30. But the CWs do not claim Mr. Jackson attended the sales trainings, that such instructions occurred at the sales trainings

3:19-cv-1079-LAB-AHG

DEFENDANTS' REPLY IN SUPPORT OF MOTION TO DISMISS

where Mr. Irwin was present, or that Mr. Irwin gave the instruction. ¶¶ 171-73. Indeed, the CWs do not say <u>who</u> gave the directive, <u>when</u> it was given, <u>what</u> was stated, or <u>whether</u> it was even implemented. Plaintiffs' contentions disregard the weight of authority in this Circuit that discourages applying the doctrine here. *See* MTD at 33.

### 5. No Other Allegations Support Scienter

***Investigations.*** Plaintiffs' reliance on the investigations of and by the Company as support for an inference of scienter runs counter to the case law in this District. *See In re Maxwell Techs., Inc. Sec. Litig.*, 18 F. Supp. 3d 1023, 1042–43 (S.D. Cal. 2014).

***Termination.*** Plaintiffs' termination argument is premised on the assumption that Mr. Irwin was "fired" as a result of, or "[i]n connection with the [Audit Committee] investigation." Opp. at 30-31. But this is insufficient to support a finding of scienter in this Circuit. *See, e.g.*, *Inchen Huang v. Higgins*, 2019 WL 1245136, at *14 (N.D. Cal. Mar. 18, 2019) ("[t]he proximity between [defendant's] resignation and [ ] announcement…is not enough to support an inference of [ ] scienter" where plaintiffs "point to no particularized allegation refuting the reasonable assumption" that defendant was forced out "simply because the errors…occurred on his watch or because he failed adequately to supervise his [employees].") (citation omitted). Indeed, the Company disclosed that it terminated Irwin "without cause" before completion of the investigation. ¶ 335.

***SOX Certifications.*** The SOX certifications also fail to support scienter. Plaintiffs make no effort to distinguish Defendants' cases, let alone cure the dearth of particularized allegations to support such a finding. *See* MTD at 29.

### 6. The Nonculpable Inference is Far More Compelling

Plaintiffs proffer nothing to rebut Defendants' nonculpable inference, sidestepping the *Tellabs* standard altogether. Opp. at 34-35; MTD at 33-34. The nonculpable inference is the most compelling: Ra Medical encountered certain issues during the often harried and difficult process of bringing a novel medical innovation to market and, as those issues arose, the Company disclosed them and endeavored to fix them. *See id*.

The Complaint should be dismissed in its entirety.

DEFENDANTS' REPLY IN SUPPORT OF MOTION TO DISMISS

Dated: May 27, 2020

**WILSON SONSINI GOODRICH & ROSATI, P.C.**

/s/ Gregory L. Watts
Gregory L. Watts, State Bar No. 197126
Stephanie L. Jensen, WSBA No. 42042 (*pro hac vice*)
701 Fifth Avenue, Suite 5100
Seattle, WA 98104-7036
Telephone:  (206) 883-2500
Facsimile:  (206) 883-2699
Email:  gwatts@wsgr.com
Email:  sjensen@wsgr.com

*Counsel for Defendants Ra Medical Systems, Inc., Andrew Jackson, Richard Heymann, Maurice Buchbinder, Martin Colombatto, Richard Mejia, Jr., Mark E. Saad, and William Enquist Jr.*

DEFENDANTS' REPLY IN SUPPORT OF MOTION TO DISMISS