1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ERVIN DERR and PETER SHOEMAKER, individually and on behalf of others similarly situated,<br><br>                                 Plaintiffs,<br><br>                vs.<br><br>RA MEDICAL SYSTEMS, INC., et al.<br><br>                          Defendants. | CASE NO. 19cv1079-LAB-AHG<br><br>**ORDER:**<br><br>**1) GRANTING IN PART REQUESTS FOR JUDICIAL NOTICE;**<br><br>**2) GRANTING IN PART MOTIONS TO DISMISS [Dkt. 29; Dkt. 30]; and**<br><br>**3) GRANTING MOTION FOR LEAVE TO FILE SUR-REPLY [Dkt. 40].** |

Plaintiffs Ervin Derr and Peter Shoemaker brought this action against Defendants Ra Medical Systems, Inc. ("Ra"), Andrew Jackson, Richard Heymann, Maurice Buchbinder, Martin Colombatto, Richard Mejia, Jr. (collectively, the "Ra Defendants"), Dean Irwin, Melissa Burstein, and Martin Burstein (collectively with the Ra Defendants, "Defendants"), alleging violations of the securities laws. Ra is a medical device manufacturer that sells the DABRA laser system and catheter, which is designed to dissolve plaque

in vascular blockages. Plaintiffs allege, generally, that Defendants made a series of false or misleading statements, beginning with the Registration Statement issued in connection with Ra's IPO, that tended to gloss over known problems with the DABRA system, Ra's internal financial reporting, and Ra's sales training programs. When the allegedly omitted problems came to light, the value of Ra's stock collapsed, harming shareholders who had purchased shares in Ra without knowing of the challenges the company faced. Based on these allegations, Plaintiffs seek to recover for violations of Section 11 of the Securities Exchange Act of 1933, 15 U.S.C. § 77k, and Sections 10(b), 15, and 20a(a) of the Securities Exchange Act of 1934.15 U.S.C. §§ 78j, 78o, 78t.

Irwin, Melissa Burstein, and Martin Burstein filed a motion to dismiss the Amended Complaint, and the Ra Defendants followed suit with a motion of their own. Plaintiffs, they argue, lack standing under Sections 11 and 15 because they can't trace their shares to the IPO and fail to allege any false or misleading statements as necessary to state claims under Sections 10(b) and 20(a). Plaintiffs sought leave to file a sur-reply.

The Court finds a valid reason for additional briefing, and so it **GRANTS** Plaintiffs leave to file the sur-reply. (Dkt. 40.) Because the Court finds that Plaintiffs haven't alleged facts to support standing under Sections 11 and 15, it **GRANTS IN PART** both motions to dismiss. (Dkt. 29; Dkt. 30.) The Amended Complaint alleges viable claims against Ra, Irwin, and Jackson under Section 10(b) and against Irwin and Jackson under Section 20, though, so the motions are **DENIED IN PART** as to those claims.

## BACKGROUND

The Court summarizes the Amended Complaint's allegations as follows. Ra's sole business is manufacturing and selling the DABRA system, which the FDA approved for use in ablating a channel in occlusive peripheral vascular

disease, a form of peripheral artery disease. That sort of procedure is commonly known as an atherectomy, but the FDA considers "atherectomy" to encompass a wider range of procedures. Accordingly, the DABRA system's approval for channel ablation in occlusive peripheral vascular disease not not translate to approval for use in atherectomies. (*See id.* ¶ 99.) Irwin, Ra's co-founder, served as its CEO, Chief Technology Officer, Co-President, and Board Chairman until August 12, 2019. Melissa Burstein, Irwin's wife, is Ra's other co-founder and served as an Executive Vice President and director until March 2019, then solely as Vice President from April 2019 through November 1, 2019. Martin Burstein, Jackson, Heymann, Buchbinder, Colombatto, Mejia, Saad, and Enquist are each directors of Ra.

Ra initiated a device recall in February 2018. It explained to the FDA, "Lasers/Catheters did not calibrate during set-up prior to use." (Dkt. 29-23 at 1.) Ra stated that it addressed the issue by sending service technicians to customer facilities to service affected lasers beginning on February 15, 2018.

Five months later, on July 16, 2018, Ra filed an S-1 Registration Statement with the SEC in preparation for its initial public offering. It made its final amendment to that Statement on September 24, 2018. Ra then went public on September 27, 2018, at a price of $17.00 per share. Derr purchased 500 shares of Ra stock at $7.30 on February 6, 2019. Beginning on February 8, 2019, Shoemaker purchased 615 shares of Ra stock in February 2019, paying between $6.93 and $7.28 per share.[1]

In August 2019, Ra made a series of announcements that had a deleterious effect on its stock price. It announced that it had terminated Irwin and that its Audit Committee was investigating allegations made in an anonymous complaint. (Dkt. 21 ¶ 133.) It announced, too, that "[i]n the fourth

---

[1] Shoemaker purchased another 150 shares in November 2019, after joining this lawsuit, at $1.53 per share.

quarter of 2018 and first quarter of 2019, [it] experienced inconsistencies in its DABRA catheter manufacturing process." (*Id.* ¶ 133.) Following equipment upgrades and process modifications, it stated that it believed the problem had been solved, but "[t]he percentage of catheters that fail to calibrate at customer sites . . . began to increase after decreasing during April and May 2019." (*Id.*)

Ra reported in September 2019 that it had initiated a voluntary recall of the catheters in the DABRA system "due to a change in product labeling." (*Id.* ¶ 141.) The catheters, which had been labeled with expiration dates twelve months after manufacturing, were now being labeled with a two-month expiration period. (*Id.*)

A month after that, on October 31, 2019, the Audit Committee issued a report. It found that: (1) the DABRA system frequently failed to calibrate and occasionally overheated; (2) Ra's explanations regarding fourth quarter 2018 and first quarter 2019 sales "created a risk of confusion" because they didn't explicitly disclose these issues; (3) Ra had failed to make timely Medical Device Reports concerning issues with the DABRA system to the FDA; (4) Ra had "engaged in systematic efforts to replace product held by customers," but failed to document these efforts as a recall; (5) Ra had failed to properly document "certain payments to physicians," including $300,000 paid to three individuals; and (6) Ra had instructed its salespeople to "characterize DABRA as performing atherectomy and to encourage doctors to seek reimbursement using atherectomy codes." (*Id.* ¶ 144.) That failure to document payments to physicians was subsequently revealed to arise from a series of deficiencies in its internal controls aggregating to a material weakness. (*Id.* ¶ 151.)

## STANDARD OF REVIEW

A Rule 12(b)(6) motion to dismiss is a preliminary evaluation of a party's pleading, intended to "test[] the legal sufficiency of [the] claim." *Navarro v. Block*, 250 F.3d 729, 732 (9th Cir. 2001). Parties don't need to prove their

claims at such an early stage, only state them sufficiently. *See, e.g., Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 563 n. 8 (complaint "may not be dismissed based on . . . assessment that the plaintiff will fail to . . . prove his claim").

A Rule 12(b)(6) motion to dismiss calls for a preliminary evaluation of a party's pleading and tests only whether the pleading provides "a short and plain statement of the claim showing that the pleader is entitled to relief, in order to give the defendant fair notice of what the claim is and the grounds upon which it rests." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (internal marks and citation omitted). The required short and plain statement "does not need detailed factual allegations," only "factual allegations . . . enough to raise a right to relief above the speculative level . . . on the assumption that all the allegations in the complaint are true." *Id.* (internal marks and citations omitted). The Court must make all reasonable inferences that can be made in the plaintiff's favor. *Dahlia v. Rodriguez*, 735 F.3d 1060, 1066 (9th Cir. 2013). Reasonable inferences are those with "plausible grounds"—the complaint's factual allegations must "raise a reasonable expectation that discovery will reveal evidence" supporting that inference. *Twombly*, 550 U.S. at 556.

On the other hand, if the necessary facts are merely *possible* on the facts alleged, rather than plausible, the complaint fails to state a claim. *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009) (plausibility standard "asks for more than a sheer possibility that a defendant has acted unlawfully"). Competing inferences consistent with the alleged facts can undermine a claim's plausibility. But a movant has to offer more than just another version of events to carry its burden on a motion to dismiss. The proposed alternative must be "so convincing that plaintiff's explanation is *im*plausible." *Starr v. Baca*, 652 F.3d 1202, 1216 (9th Cir. 2011) (emphasis in original); *see also*

*Iqbal*, 556 U.S. at 681 (allegations don't support inference of unlawful behavior "given more likely explanations" of facts alleged); *cf. In re Century Aluminum Co. Securities Litig.*, 729 F.3d 1104, 1108 (9th Cir. 2013) (upholding dismissal where inferential steps to claim were "merely *possible* rather than plausible"). Allegations that "tend to exclude the possibility" of a explanation are enough to avoid dismissal, even if those allegations can't foreclose such explanations conclusively. *Id.* Ultimately, a court must "draw on its judicial experience and common sense" to evaluate whether the inference supporting a claim is plausible despite the availability of other inferences. *Iqbal*, 556 U.S. at 679; *see also Starr*, 652 F.3d at 1216.

In the securities context, however, plaintiffs must also satisfy the heightened pleading requirements of the Private Securities Litigation Reform Act ("PSLRA"). Under the PSLRA, a claim for securities fraud must raise a "strong inference" of scienter. 15 U.S.C. § 78u-4(b)(2). "[W]hen determining whether plaintiffs have shown a strong inference of scienter, the court must consider all reasonable inferences to be drawn from the allegations, including inferences unfavorable to the plaintiffs." *Gompper v. VISX, Inc.*, 298 F.3d 893, 897 (9th Cir. 2002).

The PSLRA also requires that a claim "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1). "By requiring specificity, § 78u-4(b)(1) prevents a plaintiff from skirting dismissal by filing a complaint laden with vague allegations of deception unaccompanied by a particularized explanation stating why the defendant's alleged statements or omissions are deceitful." *Metzler Inv. GMBH v. Corinthian Colleges, Inc.*, 540 F.3d 1049, 1061 (9th Cir. 2008).

**DISCUSSION**

**I.   Judicial Notice and Incorporation by Reference**

Because Rule 12(b)(6) focuses on whether the challenged pleading fails to state a claim, courts generally can't consider materials outside the pleadings. *See Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 998 (2018). This is less restrictive than it sounds—the pleading's contents incorporate materials not explicitly quoted or attached by reference, so long as the materials' authenticity is not contested and the pleading "necessarily relies" on them. *Parrino v. FHP, Inc.*, 146 F.3d 699, 706 (9th Cir. 1998), *superseded by statute on other grounds as stated in Abrego Abrego v. Dow Chemical Co.*, 443 F.3d 676, 681 (9th Cir. 2006). Courts may consider, too, matters susceptible to judicial notice. *Khoja*, 899 F.3d at 998.

The Ninth Circuit has cautioned, though, that "[t]he overuse and improper application of judicial notice and the incorporation-by-reference doctrine . . . can lead to unintended and harmful results," particularly in the securities fraud context, "where there is already a heightened pleading standard, and the defendants possess materials to which the plaintiffs do not yet have access." *Id.* 998. The Court thus must take care to avoid taking notice of disputed facts contained in public records, even if the existence and contents of those records aren't subject to reasonable dispute. *Id.* at 999.

Between the two motions to dismiss, Defendants ask the Court to take judicial notice of 25 documents. Irwin, Melissa Burstein, and Martin Burstein, who propound 22 of these, refer to only 11 of them in their brief. Because the remaining 11 aren't used to support any briefed argument, the Court **DENIES** the request to take judicial notice of those documents.

Of the 11 that Irwin and the Bursteins reference, Plaintiffs oppose judicial notice of eight: Exhibits I, J, K, L, Q, R, S, and T. Exhibits I, J, K, L , and Q are Statements of Changes in Beneficial Ownership filed with the SEC. These

documents run afoul of *Khoja*'s warning against taking notice of disputed facts contained in judicially noticeable documents. While the Court could take judicial notice that, by these documents, Irwin represented to the SEC that his stock sales were "mandated by [his] award agreement," the fact of that representation isn't relevant to the motion to dismiss. (*See, e.g.,* Dkt. 29-12 at 2.) The Court can't accept as uncontroverted fact the contents of Irwin's representations, *see Khoja*, 899 F.3d at 999, so the Request for Judicial Notice as to these documents is **DENIED**.

Exhibits R and S provide definitions of "atherectomy," but these definitions aren't relevant. The Amended Complaint alleges that the FDA has approved DABRA for "ablating a channel in occlusive peripheral vascular disease," but not for "atherectomy," and that the FDA has insisted on enforcing the distinction between the two indications. (*See, e.g.,* Dkt. 21 ¶¶ 4, 11, 73, 169-70.) It alleges, too, that "the FDA definition of atherectomy [is] narrower than the colloquial one." These exhibits provide only that colloquial definition, and to the extent that the Individual Defendants argue that the FDA is drawing a distinction without a difference, that argument is irrelevant to claims that the Defendants violated the FDA's regulations using the FDA's definitions. The Request for Judicial Notice as to Exhibits R and S is **DENIED**.

Exhibit T purports to be a recall notice available through an FDA website, https://www.accessdata.fda.gov. Plaintiffs contend that, because it isn't an SEC filing, Defendants haven't shown that it's a public record that is "generally known" or "can be accurately and readily determined from [a] source[] whose accuracy cannot reasonably be questioned." (Dkt. 36, quoting Fed. R. Evid. 201.) But there are many sources whose accuracy can't reasonably be questioned, and if the SEC is one (it is), then the FDA is, too. Accordingly, the Request for Judicial Notice as to Exhibit T is **GRANTED IN PART**—the Court takes judicial notice of its existence and contents, but not the truth of the

assertions therein.

The Ra Defendants seek judicial notice of their Exhibits 1, 4, and 5. Plaintiffs oppose as to Exhibits 4 and 5, which are Statements of Changes in Beneficial Ownership filed with the SEC. The Ra Defendants ask the Court to accept the representations in those documents as true, but as discussed with respect to Exhibits I, J, K, L, and Q, the Court can't do that. (Dkt. 30 at 32.) The Ra Defendants' Request for Judicial Notice is **DENIED** as to Exhibits 4 and 5.

The Requests for Judicial Notice as to the remaining documents— Individual Defendants' Exhibits A, U, and V and Ra Defendants' Exhibit 1— are **GRANTED**.

## II. Plaintiffs Allege False or Misleading Statements under Sections 10(b) and 20(a).

The basic elements of a Section 10(b) claim are: (1) a material misrepresentation or omission; (2) made with scienter; (3) in connection with the purchase or sale of a security; (4) inducing reliance by plaintiffs; (5) plaintiffs' economic loss; and (6) a causal nexus between the misrepresentation or omission and the loss. *Dura Pharms. v. Broudo*, 544 U.S. 336, 341-42 (2005). "Section 20(a) extends liability for violations of other provisions of the 1934 Act, including § 10(b), to certain so-called 'controlling persons,'" *Desai v. Deutsche Bank Sec. Ltd.*, 573 F.3d 931, 938 (9th Cir. 2009). In other words, without liability under Section 10(b), there can be no liability under Sections 20(a).

Plaintiffs assert the Section 10(b) and 20(a) claims against Ra, Irwin, and Jackson only. Those Defendants challenge the existence of an actionable false or misleading statement, but they don't contest materiality, reliance, or economic loss.

The SEC has promulgated Rule 10b-5 to implement Section 10(b)—that

rule makes it "unlawful to . . . make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading." *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 37 (2011). "Silence, absent a duty to disclose, is not misleading under Rule 10b-5." *Basic Inc. v. Levinson*, 485 U.S. 224, 239 n.17 (1988). And, as discussed above, a plaintiff must identify with specificity each false or misleading statement and explain why it is false or misleading—it's not enough to "fil[e] a complaint laden with vague allegations of deception unaccompanied by a particularized explanation stating why the defendant's alleged statements or omissions are deceitful." *Metzler Inv. GMBH v. Corinthian Colleges, Inc.*, 540 F.3d 1049, 1061 (9th Cir. 2008); 15 U.S.C. § 78u-4(b)(1).

"Rule 10b-5 prohibits only misleading and untrue statements, not statements that are incomplete. Often, a statement will not mislead even if it is incomplete or does not include all relevant facts." *In re Cutera Securities Litig.*, 610 F.3d 1103, 1109 (9th Cir. 2010). Statements are misleading only if they "would give a reasonable investor the impression of a state of affairs that differs in a material way from the one that actually exists." *Id.*, quoting *Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982, 985 (9th Cir. 2010).

Plaintiffs here allege a plethora of information that they contend Ra, Irwin, and Jackson should have disclosed. They don't identify any statement that was actually false, though, and they plausibly allege that only one category of statements was rendered misleading by the missing information.

*A. Risk Factors Are Actionable under Section 10(b)*

Plaintiffs seek to establish Section 10(b) liability first by pointing to Ra's identification of risk factors in connection with its Registration Statement. Hoping to take these bases for liability out in one fell swoop, Ra, Irwin, and Jackson argue that a reasonable investor couldn't read a disclosure of a risk

as an assurance that the risk hasn't already materialized. But the Ninth Circuit has held Section 10(b) liability can be premised on a risk disclosure that fails to "alert[] the reader that some of [the disclosed] risks may already have come to fruition." *Siracusano v. Matrixx Initiatives, Inc.*, 585 F.3d 1167, 1181 (2009), *aff'd*, 563 U.S. 27 (2011); *cf. also In re Apple Computer Sec. Litig.*, 886 F.2d 1109, 1115 (9th Cir. 1989) (investors put on notice of generic risks of doing business aren't put on notice, too, of risks that have matured into problems).

### B. The Amended Complaint Sufficiently Alleges False or Misleading Statements

Plaintiffs first contend that Ra, Irwin, and Jackson should have disclosed the DABRA system's calibration issues. In its Registration Statement, Ra disclosed risks of "*unforeseen* situations in the manufacturing and assembly of [Ra's] products" and "a voluntary product recall by [Ra] that *could occur* because of, for example, component failures, device malfunctions . . . or quality-related issues such as manufacturing errors or design or labeling defects." (Dkt. 21 ¶¶ 242, 244 (emphasis added).) It also stated in March 2019 that "production limitations in [Ra's] manufacturing process" negatively impacted its fourth quarter 2018 revenue "as [Ra] scaled up catheter production." (Dkt. 21 ¶ 120.) Both sets of statements may have been technically true, but both would mislead a reasonable investor.

As to the Registration Statement risk disclosures, Ra allegedly knew of the DABRA system's calibration issues and conducted a recall from February 2018 through August 2019, a period encompassing the issuance of the Registration Statement and the IPO. Disclosing "unforeseen" manufacturing issues and the risk that a recall "could occur" is misleading when failing to mention that manufacturing issues had arisen and a recall was already underway. *Siracusano*, 585 F.3d at 1181.

The March 2019 statements suggest to a reasonable investor that Ra

simply couldn't keep up with demand "as [it] scaled up catheter production." (Dkt. 21 ¶ 120.) In fact, the "production limitations" weren't just limiting the number of catheters Ra could produce—the catheters Ra did produce were defective, too. And the defect in question wasn't a temporary setback, affecting only a single quarter's results, that could be remedied by increasing capacity—the catheters' failure to calibrate had persisted for over a year. (*Id.* ¶ 125 (Ra stated in March 2019 in connection with "production limitations" that "[it had] only recently begun manufacturing at scale").)

Ra, Irwin, and Jackson argue that the statements regarding the calibration problems merely reflect an evolving understanding of the issue. (Dkt. 29 at 20; Dkt. 30 at 26.) But Plaintiffs plausibly allege that Ra was aware of the calibration issue in February 2018 and understood the issue to be the same one that caused problems through March 2019, while Ra's statements to investors in March 2019 suggested that the problem dated only to the fourth quarter of 2018 and was a question of production capacity, rather than a product flaw that Ra had been trying but failing to solve for over a year. (*See* Dkt. 23-3 (recall began in February 2018); Dkt. 21 ¶ 144 (March 2019 statements "created a risk of confusion" because they failed to reference "DABRA catheter['s] frequent[] fail[ure] to calibrate").) Whether Ra, Irwin, and Jackson learned more about the issue over time, they failed to disclose it as it turned into a persistent one, obscuring it instead behind vague risk warnings and insinuations that "production issues" were merely a question of insufficient capacity to meet demand. These statements would mislead a reasonable investor as to the nature and severity of the DABRA system's problems and Ra's overall business outlook.

The remaining theories, though, don't manage to identify any misleading statements. Plaintiffs contend that Ra's statements that its strategy "include[d] continuing to hire experienced medical device sales personnel," (*Id.* ¶ 224),

and that some representatives '[were] hitting the ground right away," (*id.* ¶ 226), were misleading because Ra failed to mention that its sales training program was inadequate. But Plaintiffs don't explain how a reasonable investor would infer from these strategy statements that Ra's sales training programs were of any particular quality. Nor would a reasonable investor have relied on such an inference—even an explicit statement that Ra believed it had adequate training programs would have been a non-actionable statement of optimism. *See Cutera*, 610 F.3d at 1111.

Ra's omission that it was marketing DABRA systems for the non-indicated use of atherectomy didn't render any statement misleading, either. To the contrary, a reasonable investor would infer from Ra's statements that it believed it could legally encourage physicians to use the DABRA system for atherectomy without marketing DABRA for that purpose. In Ra's November 2018 10-Q, it stated "the FDA or other regulatory agencies . . . could . . . conclude that we have engaged in off-label promotion . . . [but] we believe that we can promote the device [for atherectomy] using the truthful and not misleading information." (Dkt. 21 ¶ 240.) And in its 2018 10-K, filed in March 2019, Ra stated that it "received correspondence from a competitor claiming [its] promotion for DABRA as an atherectomy tool . . . is off-label promotion," but it "disagree[d] . . . and believe[d] FDA's regulations and judicial case law allow companies to engage in certain forms of truthful, non-misleading and non-promotional speech concerning the of-label use of products, and we believe that we comply with these restrictions." (*Id.* ¶ 290.) A reasonable investor would have understood from this statement that Ra was encouraging physicians to use DABRA for atherectomy and risking regulatory scrutiny as a result.

Lastly, Plaintiffs contend that Irwin and Jackson's Sarbanes-Oxley ("SOX") Certifications were misleading for failure to disclose deficiencies in

internal controls. But those certifications attest, in relevant part, only that the certifier has evaluated Ra's disclosure controls and procedures and presented his conclusions. (*Id.* ¶¶ 252, 254.) Notably absent is an unqualified certification that the controls and procedures are effective. Just as notable is the absence from the Amended Complaint of any allegation that Irwin and Jackson were aware of a material weakness in Ra's controls and procedures at the time of the SOX certifications. Under these circumstances, the SOX Certifications can't form a basis for Section 10(b) liability. *See Wanca v. Super Micro Computer, Inc.,* No. 5:15-cv-4049-EJD, 2018 WL 3145649 (N.D. Cal. Jun. 27, 2018) (no 10(b) liability for SOX certification where plaintiff failed to allege why certification "[b]ased on [declarant's] knowledge" was false).

### C. Scienter

Under the PSLRA, a claim for securities fraud must raise a "strong inference" of scienter. 15 U.S.C. § 78u-4(b)(2). Scienter is the "mental state embracing intent to deceive, manipulate, or defraud." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 319 (2007). "The inference that the defendant acted with scienter need not be irrefutable, . . . or even the most plausible of competing inferences." *Id.* To avoid dismissal, the plaintiff must allege enough facts that "a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Id.* The requirement to allege specific facts is stringent—courts require, for example, that allegations based on witness statements that an executive referenced or had access to a report also "detail the actual contents of [those] reports." *Police Retirement System of St. Louis v. Intuitive Surgical, Inc.*, 759 F.3d 1051, 1063 (9th Cir. 2014). Nevertheless, in "rare circumstances where the nature of the relevant fact is of such prominence that it would be 'absurd' to suggest that management was without knowledge of the matter," a plaintiff may rely on inference rather than

particularized allegations. *South Ferry LP, No. 2 v. Killinger*, 542 F.3d 776, 786 (9th Cit. 2008).

The Amended Complaint establishes such circumstances as to Ra and Irwin. Irwin was, among other roles, CEO, Chairman of the Board of Directors, and (most critically) Chief Technology Officer of Ra, a 118-employee company that sold two products. (Dkt. 21 ¶¶ 34, 63, 359.) Jackson was the company's Chief Financial Officer. (*Id.* ¶ 35.) One of Ra's two products, the DABRA system, began experiencing calibration issues necessitating initiation of a voluntary recall shortly before the company's IPO, and Ra submitted a recall notice to the FDA identifying Irwin as the contact person for information on the recall. (Dkt. 21 ¶¶ 91, 183; Dkt. 29-23.) It's unclear whether these issues would be of greater interest to Ra's CFO, CEO, and Board Chairman or to its Chief Technology Officer and point person for recall inquiries, but it would be absurd to suggest that any of those officers was ignorant of the situation. Between them, Irwin and Jackson held all five roles, and so the Amended Complaint's allegations establish a strong inference that they possessed the required mental state for a Section 10(b) violation.[2]

Ra, Irwin, and Jackson argue that the Court shouldn't infer scienter because Ra and its Board investigated and disclosed the issues, behavior "inconsistent with an intent to deceive." (Dkt. 29-1 at 23, quoting *In re PETCO Corp. Sec. Litig.*, No. 05-CV-0823 H(RBB), 2008 WL 8876554, at *6 (S.D. Cal. Apr. 29, 2008); Dkt. 30 at 30 (same)). But the court in *PETCO* used this

---

[2] Defendants contend that the Court can't rely on stock sales by Irwin, Melissa Burstein, and Jackson nor on Plaintiffs' confidential witnesses to establish scienter. Because the Court doesn't rely on any of these, it need not reach these questions, but it notes that nothing properly considered on a motion to dismiss establishes that the stock sales were non-voluntary. *See infra*, Section I (improper to take judicial notice of Irwin and Jackson's statements to the SEC regarding the nature of their sales).

rationale not to wash the company's hands of all its officers' scienter, but to separate culpable officers from innocent ones on a motion for summary judgment. *See PETCO*, 2008 WL 8876554, at *6. The court then followed Ninth Circuit precedent concluding that the company would be assigned the scienter of any corporate officer who "made or substantially contributed to the drafting of a false statement." *Id.*

Irwin wasn't part of the investigation, having been terminated as the investigation was beginning, and Plaintiffs don't allege any particular role for Jackson in the Audit Committee's investigation. Absent such allegations, the Court can't find that the investigation is inconsistent with either one's alleged intent to deceive. And since the Amended Complaint alleges that Ra's misleading statements were made or substantially contributed to by both Irwin and Jackson, their scienter can be ascribed to Ra. (*See, e.g.,* Dkt. 21 ¶ 234 (3Q18 10-Q containing misleading statements was signed by Irwin and Jackson); *id.* ¶ 120 (Irwin made statements regarding "production limitations . . . as we scaled up catheter production" in press release issued on Ra's behalf).)

### D. Section 20(a)

Irwin and Jackson argue only that "control person" liability is inappropriate because Plaintiffs fail to allege any primary violation of Section 15(b). (Dkt. 29-1 at 25; Dkt. 30 at 14.) Plaintiffs do allege a primary violation of Section 15(b), though, so their Section 20(a) claim survives, too.

## III.   Plaintiffs Fail to Allege Standing Under Sections 11 and 15.

Section 11 "provides a cause of action to any person who buys a security issued under a materially false or misleading registration statement." *In re Century Aluminum Co. Securities Litigation*, 729 F.3d 1104, 1106 (9th Cir. 2013). And unlike Section 10(b), a claim under Section 11 doesn't require either a false statement or a statement rendered misleading by the omission

of material information. *See Steckman v. Hart Brewing Co.*, 143 F.3d 1293, 1296 (9th Cir. 1998). The "false or misleading statement" prong element can be met by the omission of a material fact required to be stated in the registration statement. *Id.* But plaintiffs face a different hurdle: a plaintiff pleading a claim under Section 11 must allege "that the shares they purchased came from the pool of shares issued" in connection with the registration statement at issue.

In some instances, clearing this bar is simple: where the only shares in the market are those issued in connection with the registration statement, plaintiffs can satisfy their burden of pleading standing by alleging that fact. *Century Aluminum*, 729 F.3d at 1106. "[I]n such a situation, "by definition *all* of the company's shares will be directly traceable to the offering in question." *Id.* at 1107. But this won't suffice if there are shares in the market that weren't issued in connection with the registration statement. *Id.* In that situation, plaintiffs must trace the chain of title for their shares to the challenged offering.

In their briefing, Plaintiffs contend that "all of [Ra]'s publicly traded shares were issued in the IPO." (Dkt. 35 at 10.) Defendants disagree, but make the more salient point, too: Plaintiffs don't *allege* that all of Ra's shares were issued under the Registration Statement, they simply assert it in their briefing. And they allege no other facts in support of the conclusory allegations that Derr and Shoemaker purchased their shares "pursuant and/or traceable to the Registration Statement in connection with the Company's IPO." (Dkt. 21 ¶¶ 31-32.)

Plaintiffs protest that Defendants don't show that other shares were actually sold. But whether Defendants offer something persuasive in place of missing allegations is beside the point. Plaintiffs bear the burden of pleading facts supporting the inference of standing, and they haven't carried that burden. *See Century Aluminum*, 729 F.3d at 1107. Without factual allegations

to support an inference that their shares can be traced to the IPO, Plaintiffs can't maintain a claim under Section 11. And without an adequately alleged Section 11 claim, they can't state a claim under Section 15, either. *See Rigel Pharmaceuticals, Inc. Securities Litig.*, 697 F.3d 869, 886 (2012); 15 U.S.C. § 78t(a).

## CONCLUSION

Defendants Motions to Dismiss are **GRANTED IN PART**. Plaintiffs' claims under Sections 11 and 15 of the Exchange Act are **DISMISSED WITHOUT PREJUDICE**. The Motions are **DENIED IN PART** as to Plaintiffs' claims under Exchange Act Sections 10(b) and 20(a).

**IT IS SO ORDERED**.

Dated: March 24, 2021

**HON. LARRY ALAN BURNS**
United States District Judge