# EXHIBIT 1

**4**
**EXHIBIT 1**

## SWORN CERTIFICATION OF PLAINTIFF

Ra Medical Systems, Inc., **SECURITIES LITIGATION**

I, Ervin Derr, certify:

1.  I have reviewed the complaint and authorized its filing and/or adopted its allegations.

2.  I did not purchase Ra Medical Systems, Inc., the security that is the subject of this action at the direction of plaintiff's counsel or in order to participate in any private action arising under this title.

3.  I am willing to serve as a representative party on behalf of a class and will testify at deposition and trial, if necessary.

4.  My transactions in Ra Medical Systems, Inc., during the class period set forth in the Complaint are as follows:

    See Attached Transactions

5.  I have not served as a representative party on behalf of a class under this title during the last three years except as stated:

6.  I will not accept any payment for serving as a representative party, except to receive my pro rata share of any recovery or as ordered or approved by the court including the award to a representative plaintiff of reasonable costs and expenses (including lost wages) directly relating to the representation of the class.

    ___ Check here if you are a current employee or former employee of the defendant Company.

    I declare under penalty of perjury that the foregoing are true and correct statements.

Dated: 6/6/19

(Please Sign Your Name Above)

[REDACTED]

**5**

# EXHIBIT 1

**Ervin Derr's Transactions in**
**Ra Medical Systems, Inc. (RMED)**

| Date | Transaction Type | Quantity | Unit Price |
|------|------------------|----------|------------|
| 02/06/2019 | Bought | 500 | $7.3000 |

**6**

**EXHIBIT 1**

# EXHIBIT 2

**EXHIBIT 2**

Robert V. Prongay (#270796)
Pavithra Rajesh (#323055)
**GLANCY PRONGAY & MURRAY LLP**
1925 Century Park East, Suite 2100
Los Angeles, California 90067
Telephone:(310) 201-9150
Facsimile: (310) 201-9160
Email:      rprongay@glancylaw.com
              prajesh@glancylaw.com

*Attorneys for Lead Plaintiffs Ervin Derr and
Peter Shoemaker*

[Additional Counsel on Signature Page]

## UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ERVIN DERR, Individually and on Behalf of All Others Similarly Situated, <br><br> Plaintiff, <br><br> v. <br><br> RA MEDICAL SYSTEMS, INC., DEAN IRWIN, ANDREW JACKSON, MELISSA BURSTEIN, MARTIN BURSTEIN, RICHARD HEYMANN, MAURICE BUCHBINDER, MARTIN COLOMBATTO, RICHARD MEJIA, JR., PIPER JAFFRAY & CO., CANTOR FITZGERALD & CO., SUNTRUST ROBINSON HUMPHREY, INC., NOMURA SECURITIES INTERNATIONAL, INC., and MAXIM GROUP LLC, <br><br> Defendants. | Case No. 3:19-cv-01079-LAB-AHG <br><br> **CLASS ACTION** <br><br><br> **NOTICE OF LODGING** <br><br> The Hon. Larry Alan Burns |

**NOTICE OF LODGING**                       Case No. 3:19-cv-01079-LAB-AHG

**8**

**EXHIBIT 2**

**TO THE CLERK OF THE COURT AND ALL PARTIES AND THEIR ATTORNEYS OF RECORD:**

**PLEASE TAKE NOTICE** that on January 13, 2020, Lead Plaintiffs Ervin Derr and Peter Shoemaker ("Plaintiffs"), individually and on behalf of all others similarly situated, caused to be filed, via the CM/ECF system of the United States District Court for the Southern District of California, an amended complaint [Dkt. No. 21] ("Amended Complaint"). A copy of the PSLRA certification related to the Amended Complaint is attached hereto as Exhibit A.

DATED: January 13, 2020     **GLANCY PRONGAY & MURRAY LLP**

By:   *s/ Robert V. Prongay*
Robert V. Prongay
Pavithra Rajesh
1925 Century Park East, Suite 2100
Los Angeles, California 90067
Telephone: (310) 201-9150
Facsimile: (310) 201-9160
Email: rprongay@glancylaw.com
       prajesh@glancylaw.com

*Attorneys for Lead Plaintiffs Ervin Derr and Peter Shoemaker*

**LAW OFFICES OF HOWARD G. SMITH**
Howard G. Smith
3070 Bristol Pike, Suite 112
Bensalem, PA 19020
Telephone: (215) 638-4847
Facsimile: (215) 638-4867

*Additional Counsel*

1

**NOTICE OF LODGING**        Case No. 3:19-cv-01079-LAB-AHG

**9**

**EXHIBIT 2**

# EXHIBIT A

**EXHIBIT 2**

DocuSign Envelope ID: C788648A-956C-4602-A026-FFB6E755E5A8

**SWORN CERTIFICATION OF PLAINTIFF**

**RA MEDICAL SYSTEMS, INC. SECURITIES LITIGATION**

I, Peter Shoemaker, certify that:

1.      I have reviewed the Complaint and authorize its filing and/or the filing of a Lead Plaintiff motion on my behalf.

2.      I am duly authorized to institute legal action against Ra Medical Systems, Inc. and other defendants.

3.      I did not purchase the Ra Medical Systems, Inc. securities that are the subject of this action at the direction of plaintiff's counsel or in order to participate in any private action arising under this title.

4.      I am willing to serve as a representative party on behalf of a class and will testify at deposition and trial, if necessary.

5.      My transactions in Ra Medical Systems, Inc. securities during the Class Period set forth in the Complaint are as follows:

        (See attached transactions)

6.      I have not sought to serve, nor served, as a representative party on behalf of a class under this title during the last three years, except for the following:

7.      I will not accept any payment for serving as a representative party, except to receive my pro rata share of any recovery or as ordered or approved by the court, including the award to a representative plaintiff of reasonable costs and expenses (including lost wages) directly relating to the representation of the class.

I declare under penalty of perjury that the foregoing are true and correct statements.

1/7/2020
_____
Date

DocuSigned by:

*Peter Shoemaker*

EC845946DC64497...
_____
Peter Shoemaker

**11**

**EXHIBIT 2**

### Peter Shoemaker's Transactions in
### Ra Medical Systems, Inc. (RMED)

**Account 1**

| Date | Transaction Type | Quantity | Unit Price |
|------|------------------|----------|------------|
| 02/08/2019 | Bought | 100 | $7.2000 |
| 02/11/2019 | Bought | 400 | $7.2800 |
| 11/20/2019 | Bought | 150 | $1.5300 |

**Account 2**

| Date | Transaction Type | Quantity | Unit Price |
|------|------------------|----------|------------|
| 02/12/2019 | Bought | 20 | $7.0186 |
| 02/14/2019 | Bought | 20 | $6.9257 |
| 02/25/2019 | Bought | 75 | $7.2513 |

**12**

**EXHIBIT 2**

# EXHIBIT 3

13
**EXHIBIT 3**

**Table of Contents**

As filed with the Securities and Exchange Commission on September 24, 2018

Registration No. 333-226191

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
Washington, D.C. 20549

# AMENDMENT NO. 3
# TO
# FORM S-1
# REGISTRATION STATEMENT
*Under*
*The Securities Act of 1933*

# Ra Medical Systems, Inc.
(Exact name of Registrant as specified in its charter)

| Delaware | 3841 | 38-3661826 |
|---|---|---|
| (State or other jurisdiction of incorporation or organization) | (Primary Standard Industrial Classification Code Number) | (I.R.S. Employer Identification Number) |

2070 Las Palmas Drive
Carlsbad, California 92011
(760) 804-1648
(Address, including zip code, and telephone number, including area code, of Registrant's principal executive offices)

Dean Irwin
Chief Executive Officer, Chairman of the Board, Co-President, and Chief Technology Officer
Ra Medical Systems, Inc.
2070 Las Palmas Drive
Carlsbad, California 92011
(760) 804-1648
(Name, address, including zip code, and telephone number, including area code, of agent for service)

*Copies to:*

| | |
|---|---|
| Martin J. Waters | Joshua A. Kaufman |
| Wilson Sonsini Goodrich & Rosati, P.C. | Divakar Gupta |
| 12235 El Camino Real, | Charles Bair |
| San Diego, California 92130 | Cooley LLP |
| (858) 350-2300 | 1114 Avenue of the Americas |
| | New York, New York 10036 |
| | (212) 479-6000 |

**Approximate date of commencement of proposed sale to the public:** As soon as practicable after the effective date of this Registration Statement.

If any of the securities being registered on this Form are to be offered on a delayed or continuous basis pursuant to Rule 415 under the Securities Act of 1933, check the following box. ☐

If this Form is filed to register additional securities for an offering pursuant to Rule 462(b) under the Securities Act, please check the following box and list the Securities Act registration statement number of the earlier effective registration statement for the same offering. ☐

If this Form is a post-effective amendment filed pursuant to Rule 462(c) under the Securities Act, check the following box and list the Securities Act registration statement number of the earlier effective registration statement for the same offering. ☐

If this Form is a post-effective amendment filed pursuant to Rule 462(d) under the Securities Act, check the following box and list the Securities Act registration statement number of the earlier effective registration statement for the same offering. ☐

Indicate by check mark whether the Registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, a smaller reporting company or an emerging growth company. See the definitions of "large accelerated filer", "accelerated filer", "smaller reporting company" and "emerging growth company" in Rule 12b-2 of the Exchange Act.

| | | | |
|---|---|---|---|
| Large accelerated filer | ☐ | Accelerated filer | ☐ |
| Non-accelerated filer | ☒ | Smaller reporting company | ☐ |
| | | Emerging growth company | ☒ |

If an emerging growth company, indicate by check mark if the Registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided to Section 7(a)(2)(B) of the Securities Act. ☐

**The Registrant hereby amends this registration statement on such date or dates as may be necessary to delay its effective date until the Registrant shall file a further amendment which specifically states that this registration statement shall thereafter become effective in accordance with Section 8(a) of the Securities Act of 1933 or until the registration statement shall become effective on such date as the Securities and Exchange Commission, acting pursuant to said Section 8(a), may determine.**

**14**
**EXHIBIT 3**

**Table of Contents**

**The information in this preliminary prospectus is not complete and may be changed. These securities may not be sold until the registration statement filed with the Securities and Exchange Commission is effective. This preliminary prospectus is not an offer to sell nor does it seek an offer to buy these securities in any jurisdiction where the offer or sale is not permitted.**

PRELIMINARY PROSPECTUS                    (Subject to Completion, Dated September 24, 2018)

# 3,333,333 Shares



# Common Stock

This is the initial public offering of shares of common stock by Ra Medical Systems, Inc. No public market for our common stock currently exists. We are offering all of the 3,333,333 shares of common stock offered by this prospectus. We expect the initial public offering price to be between $14.00 and $16.00 per share.

Our common stock has been approved for listing on the NYSE American under the symbol "RMED." We have also applied to list our common stock on the New York Stock Exchange, or NYSE, under the symbol "RMED." In the event that we do not meet the listing requirements of the NYSE, we will list on the NYSE American.

We are an "emerging growth company" as that term is used in the Jumpstart Our Business Startups Act of 2012 and, as such, have elected to comply with certain reduced public company reporting requirements for this prospectus and may elect to do so in future filings.

**Investing in our common stock involves a high degree of risk. Before buying any shares, you should carefully read the discussion of material risks of investing in our common shares in "Risk factors" beginning on page 14 of this prospectus.**

**Neither the Securities and Exchange Commission nor any other state securities commission has approved or disapproved of these securities or passed upon the accuracy or adequacy of this prospectus. Any representation to the contrary is a criminal offense.**

|                                    | Per Share | Total |
|------------------------------------|-----------|-------|
| Initial public offering price      | $         | $     |
| Underwriting discounts[1]          | $         | $     |
| Proceeds, before expenses, to us   | $         | $     |

[1]We refer you to "Underwriting" beginning on page 159 for additional information regarding total underwriting compensation.

The underwriters may also purchase up to an additional 499,999 shares of common stock from us at the public offering price, less the underwriting discounts payable by us, to cover over-allotments, if any, within 30 days from the date of this prospectus.

The underwriters expect to deliver the shares of common stock to investors on or about , 2018.

# Piper Jaffray                                                                    Cantor

## SunTrust Robinson Humphrey

**Nomura**                                                                    **Maxim Group LLC**

, 2018

# EXHIBIT 3

**Table of Contents**

**TABLE OF CONTENTS**

| | Page |
|---|---|
| Prospectus summary | 1 |
| Risk factors | 14 |
| Special notes regarding forward looking statements | 63 |
| Market, industry and other data | 65 |
| Use of proceeds | 66 |
| Dividend policy | 67 |
| Capitalization | 68 |
| Dilution | 70 |
| Selected financial data | 73 |
| Management's discussion and analysis of financial condition and results of operations | 75 |
| Business | 95 |
| Management | 120 |
| Executive compensation | 130 |
| Certain relationships and related party transactions | 145 |
| Security ownership of certain beneficial owners and management | 147 |
| Description of capital stock | 149 |
| Shares eligible for future sale | 153 |
| Material U.S. federal income tax consequences to non-U.S. holders of ownership and disposition of our common stock | 155 |
| Underwriting | 159 |
| Legal matters | 166 |
| Experts | 166 |
| Where you can find more information | 166 |
| Index to financial statements | F-1 |

Neither we nor the underwriters have authorized anyone to provide any information or to make any representations other than those contained in this prospectus or in any free writing prospectuses we have prepared. We take no responsibility for, and can provide no assurance as to the reliability of, any other information that others may give you. This prospectus is an offer to sell only the shares offered hereby, but only under circumstances and in jurisdictions where it is lawful to do so. The information contained in this prospectus is current only as of its date.

i-i

**16**

**EXHIBIT 3**

Table of Contents

## RISK FACTORS

*Investing in our common stock involves a high degree of risk. You should carefully consider the risks described below, as well as all of the other information contained in this prospectus, including our financial statements and related notes, before investing in our common stock. While we believe that the risks and uncertainties described below are the material risks currently facing us, additional risks that we do not yet know of or that we currently think are immaterial may also arise and materially affect our business. If any of the following risks materialize, our business, financial condition and results of operations could be materially and adversely affected. In that case, the trading price of our common stock could decline, and you may lose some or all of your investment.*

**Risks Related to our Business and Products**

*We have incurred losses in each of the last two years and may be unable to achieve profitability in the future.*

We incurred net losses of $4.2 million and $17.8 million for the years ended December 31, 2016 and 2017, respectively, and $12.9 million and $11.1 million for the six months ended June 30, 2017 and 2018, respectively. As of June 30, 2018, we had an accumulated deficit of $40.5 million. We expect to continue to incur significant sales and marketing, product development, regulatory and other expenses as we continue to expand our marketing efforts to increase adoption of our products and expand existing relationships with our customers, to obtain regulatory clearances or approvals for our products in additional jurisdictions and for additional indications, and to develop new products or add new features to our existing products. In addition, we expect our general and administrative expenses to increase following this offering due to the additional costs associated with being a public company. The net losses that we incur may fluctuate significantly from period to period. We will need to generate significant additional revenues in order to achieve and sustain profitability and, even if we achieve profitability, we cannot be sure that we will remain profitable for any substantial period of time. Our failure to achieve or return to profitability would have a material adverse effect on our business, financial condition, and results of operations and could negatively impact the value of our common stock.

*We may be unable to achieve revenue growth.*

Our ability to grow our revenue in future periods will depend on our ability to successfully penetrate our target markets and increase sales of our products and any new product indications that we introduce, which will, in turn, depend in part on our success in growing our installed unit base and driving continued use of our systems. New product indications will also need to be approved or cleared by the FDA and comparable non-U.S. regulatory agencies to drive revenue growth. If we cannot achieve revenue growth, it could have a material adverse effect on our business, financial condition, and results of operations.

*Our success depends in large part on DABRA. If we are unable to successfully market and sell DABRA, our business prospects will be significantly harmed.*

Our future financial success will depend substantially on our ability to effectively and profitably market and sell DABRA. The commercial success of DABRA will depend on a number of factors, including the following:

- the effectiveness of our and our distributors' marketing and sales efforts in the U.S. and abroad, including our efforts to build out our sales team;
- the availability, perceived advantages, relative cost, relative safety, and relative efficacy of alternative and competing treatments;

14

**17**

**EXHIBIT 3**

**Table of Contents**

- the availability of coverage and adequate levels of reimbursement under private and governmental health insurance plans for DABRA-based procedures;
- our ability to obtain, maintain, and enforce our intellectual property rights in and to DABRA;
- our ability to achieve and maintain compliance with all regulatory requirements applicable to DABRA;
- our ability to continue to develop, validate and maintain a commercially viable manufacturing process that is compliant with current Good Manufacturing Practices, or cGMP; and
- whether we are required by the FDA, EMA or comparable non-U.S. regulatory authorities to conduct additional clinical trials for future or current indications.

If we fail to successfully market and sell DABRA, we will not be able to achieve profitability, which will have a material adverse effect on our business, financial condition, and results of operations.

*We will require substantial additional capital to finance our planned operations, which may not be available to us on acceptable terms or at all. As a result, we may not be able to continue our marketing efforts to increase the adoption of our products.*

Our operations have consumed substantial amounts of cash since inception, primarily due to our research and development and marketing efforts. We expect our sales and marketing expenses to increase substantially in connection with our plan to commercialize DABRA in the U.S. and internationally. These expenditures will also include costs associated with manufacturing and supply, sales and marketing costs, and general operations. In addition, other unanticipated costs may arise.

As of June 30, 2018, we had cash and cash equivalents of $9.8 million. We believe that the net proceeds from this offering, together with our existing cash and cash equivalents, will fund our projected operating expenses and capital expenditure requirements for at least the next 12 months.

The amount and timing of any expenditures needed to implement our sales and marketing programs will depend on numerous factors, including, but not limited to:

- our ability to achieve sufficient market acceptance, coverage and adequate reimbursement from third-party payors and acceptable market share for DABRA and Pharos;
- the cost to establish, maintain, expand, and defend the scope of our intellectual property portfolio, as well as any other action required in connection with licensing, preparing, filing, prosecuting, defending, and enforcing any patents or other intellectual property rights;
- the emergence of competing technologies and other adverse market developments;
- the costs associated with manufacturing, selling, and marketing DABRA and Pharos for their cleared or approved indications or any other indications for which we receive regulatory clearance or approval, including the cost and timing of expanding our manufacturing capabilities, as well as establishing our sales and marketing capabilities;
- our ability to establish and maintain strategic licensing or other arrangements and the financial terms of such agreements;
- the timing, receipt, and amount of license fees and sales of, or royalties on, our future products or future improvements on our existing products, if any;

15

**18**

**EXHIBIT 3**

Table of Contents

- the time and cost necessary to complete post-marketing studies that could be required by regulatory authorities or other studies required to obtain clearance for additional indications; and
- our need to implement additional internal systems and infrastructure, including financial and reporting systems, as we become a public company.

If we raise additional capital through marketing and distribution arrangements or other collaborations, strategic alliances or licensing arrangements with third parties, we may have to relinquish certain valuable rights to our products, technologies, future revenue streams or research programs or grant licenses on terms that may not be favorable to us. If we raise additional capital through public or private equity offerings, the ownership interest of our existing stockholders will be diluted, and the terms of these securities may include liquidation or other preferences that adversely affect our stockholders' rights. If we raise additional capital through debt financing, we may be subject to covenants limiting or restricting our ability to take specific actions, such as incurring additional debt, making capital expenditures or declaring dividends. If we are unable to obtain adequate financing when needed, we may have to delay, reduce the scope of or suspend our sales and marketing efforts, which would have a material adverse effect on our business, financial condition, and results of operations.

*Our products may not gain or maintain market acceptance among physicians and patients and others in the medical community.*

Our success will depend, in part, on the acceptance of our products as safe, useful and, with respect to physicians, cost effective. We cannot predict how quickly, if at all, catheterization laboratories and physicians will accept our products or, if accepted, how frequently they will be used. Patients and their care providers must believe our products offer benefits over alternative treatment methods. Additional factors that will influence whether our products gain and maintain market acceptance, include:

- whether physicians, catheterization laboratory owners and operators, patients, and others in the medical community consider our products safe, effective, and cost effective treatment methods;
- the potential and perceived advantages of our products over alternative treatment methods;
- the prevalence and severity of any side effects associated with using our products;
- product labeling or product insert requirements of the FDA, EMA or other regulatory authorities;
- limitations or warnings contained in the labeling cleared or approved by the FDA, EMA or other authorities;
- the cost of treatment in relation to alternative treatments methods;
- the convenience and ease of use of DABRA and Pharos relative to alternative treatment methods;
- pricing pressure, including from group purchasing organizations, or GPOs, seeking to obtain discounts on DABRA and Pharos based on the collective buying power of the GPO members;
- the availability of adequate coverage, reimbursement and pricing by third-party payors, including government authorities;
- the willingness of patients to pay out-of-pocket in the absence of coverage by third-party payors, including government authorities;

16

**19**

**EXHIBIT 3**

Table of Contents

- our ability to provide incremental clinical and economic data that shows the safety and clinical efficacy and cost effectiveness of, and patient benefits from, our products; and
- the effectiveness of our sales and marketing efforts for DABRA and Pharos.

If we do not educate physicians about PAD and the existence of our products, DABRA may not gain market acceptance, as many physicians do not routinely screen for PAD while screening for CAD. Additionally, even if our products achieve market acceptance, they may not maintain that market acceptance over time if competing products or technologies are introduced that are received more favorably or are more cost effective. Failure to achieve or maintain market acceptance and/or market share would limit our ability to generate revenue and would have a material adverse effect on our business, financial condition, and results of operations.

*The continuing development of our products depends upon our maintaining strong working relationships with physicians.*

The research, development, marketing and sale of our current products and any potential new and improved products or future product indications for which we receive regulatory clearance or approval depend upon our maintaining working relationships with physicians. We rely on these professionals to provide us with considerable knowledge and experience regarding the development, marketing and sale of our products. Physicians assist us as researchers, marketing and product consultants and public speakers. If we cannot maintain our strong working relationships with these professionals and continue to receive their advice and input, the development and marketing of our products could suffer, which could have a material adverse effect on our business, financial condition, and results of operations. At the same time, the medical device industry's relationship with physicians is under increasing scrutiny by the U.S. Department of Health and Human Services Office of Inspector General, or OIG, and the U.S. Department of Justice, or DOJ. Our failure to comply with requirements governing the industry's relationships with physicians, including the reporting of certain payments to physicians under the National Physician Payment Transparency Program (Open Payments) or an investigation into our compliance by the OIG or the DOJ, could have a material adverse effect on our business, financial condition, and results of operations. Additional information regarding the laws impacting our relationships with physicians and other healthcare professionals can be found below in the Risk Factor captioned *"Our operations and relationships with customers and third-party payors are subject to applicable anti-kickback, fraud and abuse and other healthcare laws and regulations, which could expose us to penalties including criminal sanctions, civil penalties, contractual damages, reputational harm and diminished profits and future earnings."*

*Physicians and staff may not commit enough time to sufficiently learn how to use our products.*

In order for physicians and staff to learn to use our products, we encourage physicians to attend structured training sessions in order to familiarize themselves with our technology. There are many nuances to using our products as intended. For example, the DABRA catheter is fragile and may be prone to bending at the entry of the artery, a problem known as kinking. Further, physicians and their staff must utilize the technology on a regular basis to ensure they maintain the skill set necessary to use our products. Market acceptance of DABRA could be delayed by lack of physician or staff willingness to attend training sessions or familiarize themselves with DABRA. An inability to train a sufficient number of physicians to generate adequate demand for our products could have a material adverse effect on our business, financial condition, and results of operations.

17

**20**

**EXHIBIT 3**

Table of Contents

*If our sole manufacturing facility becomes damaged or inoperable, or we are required to vacate the facility, our ability to manufacture and sell our products and to pursue our research and development efforts may be jeopardized.*

We currently manufacture and assemble our products in our sole manufacturing facility in Carlsbad, California. Our products consist of components sourced from a variety of suppliers, with final assembly completed at our facility. Our facility and equipment, or those of our suppliers, could be harmed or rendered inoperable by natural or man-made disasters, including earthquakes, fires, power shortages, telecommunications failures, water shortages, floods, hurricanes, typhoons, extreme weather conditions, medical epidemics, and other natural or man-made disasters or other business interruptions, for which we are predominantly self-insured. Any of these may render it difficult or impossible for us to manufacture products for an extended period of time. If our facility is inoperable for even a short period of time, the inability to manufacture our current products, and the interruption in research and development of any future products, may result in harm to our reputation, increased costs, lower revenues and the loss of customers, which would have a material adverse effect on our business, financial condition, and results of operations. Furthermore, it could be costly and time-consuming to repair or replace our facilities and the equipment we use to perform our research and development work and manufacture our products. We also rely on third-party component suppliers, and our ability to obtain commercial supplies of our products could be disrupted if the operations of these suppliers are affected by a man-made or natural disaster or other business interruption, which would have a material adverse effect on our business, financial condition, and results of operations.

*If product liability lawsuits are brought against us, we may incur substantial liabilities and may be required to limit or halt the marketing and sale of our products.*

We face an inherent risk of product liability as a result of the marketing and sale of our products. For example, we may be sued if our products cause or are perceived to cause injury or are found to be otherwise unsuitable during manufacturing, marketing or sale. Any such product liability claim may include allegations of defects in manufacturing, defects in design, a failure to warn of dangers inherent in the product, negligence, strict liability or a breach of warranties. In addition, we may be subject to claims against us even if the apparent injury is due to the actions of others or the pre-existing health of the patient. For example, we rely on physicians in connection with the use of our products on patients. If these physicians are not properly trained or are negligent, the capabilities of our products may be diminished or the patient may suffer critical injury. We may also be subject to claims that are caused by the activities of our suppliers, such as those who provide us with components and sub-assemblies.

If we cannot successfully defend ourselves against product liability claims, we may incur substantial liabilities or be required to limit or halt commercialization of our products. Even successful defense would require significant financial and management resources. Regardless of the merits or eventual outcome, liability claims may result in:

- decreased demand for our products;
- injury to our reputation;
- initiation of investigations by regulators;
- costs to defend the related litigation;
- a diversion of management's time and our resources;
- substantial monetary awards to trial participants or patients;
- product recalls, withdrawals or labeling, marketing or promotional restrictions;
- loss of revenue;

**21**
**EXHIBIT 3**

Table of Contents

- exhaustion of any available insurance and our capital resources;
- the inability to market and sell our products; and
- a decline in the price of our common stock.

We believe our product liability insurance is customary for similarly situated companies, but it may not be adequate to cover all liabilities that we may incur. Insurance coverage is increasingly expensive. We may not be able to maintain or obtain insurance at a reasonable cost or in an amount adequate to satisfy any liability that may arise, if at all. Our insurance policy contains various exclusions, and we may be subject to a product liability claim for which we have no coverage. The potential inability to obtain sufficient product liability insurance at an acceptable cost to protect against product liability claims could prevent or inhibit the marketing and sale of products we develop. We may have to pay any amounts awarded by a court or negotiated in a settlement that exceed our coverage limitations or that are not covered by our insurance, and we may not have, or be able to obtain, sufficient capital to pay such amounts, which would have a material adverse effect on our business, financial condition, and results of operations.

*We face substantial competition, which may result in others discovering, developing or commercializing products more successfully than us.*

The medical device industry is intensely competitive and subject to rapid and significant technological change. Many of our competitors have significantly greater financial, technical and human resources. Smaller and early-stage companies may also prove to be significant competitors, particularly through collaborative arrangements with large and established companies.

Our competitors may also develop products that are more effective, more convenient, more widely used, less costly, or have a better safety profile than our products and these competitors may also be more successful than us in manufacturing and marketing their products.

Our competitors also compete with us in recruiting and retaining qualified scientific, management and commercial personnel, as well as in acquiring technologies complementary to, or necessary for, our programs. Because of the complex and technical nature of our systems and the dynamic market in which we compete, any failure to attract and retain a sufficient number of qualified employees could materially harm our ability to develop and commercialize our technology, which would have a material adverse effect on our business, financial condition, and results of operations.

*We may be unable to compete successfully with larger companies in our highly competitive industry.*

The healthcare industry is highly competitive. There are numerous approved products for treating vascular and dermatological diseases in the indications in which we have received clearance or approval and those that we may pursue in the future. Many of these cleared or approved products are well-established and are widely accepted by physicians, patients and third-party payors. Insurers and other third-party payors may encourage the use of competitors' products. In addition, many companies are developing products, and we cannot predict what the standard of care will be in the future.

Our primary competitors for DABRA include Medtronic plc, Cardiovascular Systems Inc., Boston Scientific Corp., Avinger, Inc., Koninklijke Philips N.V., or Philips, including Volcano Corporation and Spectranetics Corporation, including products from the C.R. Bard acquisition, and Abbott Laboratories. These companies are manufacturers of products used in competing therapies within the peripheral and coronary atherectomy markets such as:

- atherectomy, using mechanical methods to remove vascular blockages;
- balloon angioplasty and stents;

19

**22**

**EXHIBIT 3**

Table of Contents

- specialty balloon angioplasty, such as scoring balloons, pillowing balloons, cutting balloons and drug-coated balloons;
- bypass surgery; and
- amputation.

We are also subject to competition from pharmaceutical companies that produce drugs which aim to destroy plaque or remove blockages in the bloodstream.

Our primary competitors for Pharos are Daavlin, National Biological, STRATA Skin Sciences and large pharmaceutical companies producing biologicals used in the treatment of chronic skin conditions.

Many of our competitors have substantially greater financial, manufacturing, commercial, and technical resources than we do. There has been consolidation in the industry, and we expect that to continue. Larger competitors may have substantially larger sales and marketing operations than we do. This may allow those competitors to spend more time with current and potential customers and to focus on a larger number of current and potential customers, which gives them a significant advantage over our sales and marketing team and our international distributors in making sales. In addition, we are often selling to customers who already utilize our competitors' products and who have established relationships with our competitors' sales representatives and familiarity with our competitors' products.

Larger competitors may also have broader product lines, which enables them to offer customers bundled purchase contracts and quantity discounts. These competitors may have more experience than we have in research and development, marketing, manufacturing, preclinical testing, conducting clinical trials, obtaining FDA and non-U.S. regulatory clearances or approvals and marketing cleared or approved products. Our competitors may discover technologies and techniques, or enter into partnerships and collaborations, to develop competing products that are more effective or less costly than our products or the products we may develop. This may render our technology or products obsolete or noncompetitive. Our competitors may also be better equipped than we are to respond to competitive pressures. If we are unable to compete successfully in our industry, it would have a material adverse effect on our business, financial condition, and results of operations.

*If DABRA and Pharos are not approved for new indications, our commercial opportunity will be limited.*

We market and sell DABRA for use in the treatment of vascular blockages resulting from lower extremity vascular disease and Pharos for use in the treatment of psoriasis, vitiligo, atopic dermatitis and leukoderma. Although physicians, in the practice of medicine, may prescribe or use marketed products for unapproved indications, manufacturers may promote their products only for the approved indications and in accordance with the provisions of the approved label. However, one of our strategies in the future is to pursue additional vascular indications for DABRA and additional dermatological indications for Pharos. Submitting the required applications for additional indications may require substantial additional funding beyond the net proceeds of this offering. We cannot assure you that we will be able to successfully obtain approval for any of these additional product indications through the application process.

Even if we obtain FDA clearance or approval to market our products for additional indications in the U.S., we cannot assure you that any such indications will be successfully commercialized, widely accepted in the marketplace or more effective than other commercially available alternatives. If we are unable to successfully develop our products for additional indications, our commercial opportunity will be limited, which would have a material adverse effect on our business, financial condition, and results of operations.

**23**

**EXHIBIT 3**

**Table of Contents**

*We may experience development or manufacturing problems or delays that could limit the potential growth of our revenue or increase our losses.*

We may encounter unforeseen situations in the manufacturing and assembly of our products that would result in delays or shortfalls in our production. For example, our production processes and assembly methods may have to change to accommodate any significant future expansion of our manufacturing capacity, which may increase our manufacturing costs, delay production of our products, reduce our product margin, and adversely impact our business. Conversely, if demand for our products shifts such that a manufacturing facility is operated below its capacity for an extended period, we may adjust our manufacturing operations to reduce fixed costs, which could lead to uncertainty and delays in manufacturing times and quality during any transition period.

Additionally, since all of our products are manufactured at our facility in Carlsbad, any contamination of the controlled environment, equipment malfunction, or failure to strictly follow procedures can significantly reduce our yield. A drop in yield can increase our cost to manufacture our products or, in more severe cases, require us to halt the manufacture of our products until the problem is resolved. Identifying and resolving the cause of a drop in yield can require substantial time and resources.

If our manufacturing activities are adversely impacted, or if we are otherwise unable to keep up with demand for our products by successfully manufacturing, assembling, testing, and shipping our products in a timely manner, our revenue could be impaired, market acceptance for our products could be adversely affected and our customers might instead purchase our competitors' products, which would have a material adverse effect on our business, financial condition, and results of operations.

*If we make acquisitions or divestitures, we could encounter difficulties that harm our business.*

To date, the growth of our business has been organic, and we have no experience in acquiring other businesses, products or technologies. We may acquire companies, products or technologies that we believe to be complementary to the present or future direction of our business. If we engage in such acquisitions, we may have difficulty integrating the acquired personnel, financials, operations, products or technologies. Acquisitions may dilute our earnings per share, disrupt our ongoing business, distract our management and employees, increase our expenses, subject us to liabilities, and increase our risk of litigation, all of which could harm our business. If we use cash to acquire companies, products or technologies, it may divert resources otherwise available for other purposes. If we use our common stock to acquire companies, products or technologies, our stockholders may experience substantial dilution.

*Technological change may adversely affect sales of our products and may cause our products to become obsolete.*

The medical device market is characterized by extensive research and development and rapid technological change. Technological progress or new developments in our industry could adversely affect sales of our products. Our products could be rendered obsolete because of future innovations by our competitors or others in the treatment of vascular diseases and dermatological diseases, which would have a material adverse effect on our business, financial condition, and results of operations.

*Consolidation in the medical device industry could have an adverse effect on our revenue and results of operations.*

Many medical device industry companies are consolidating to create new companies with greater market power. For example, Spectranetics was acquired by Philips in August 2017. As the medical device industry consolidates, competition to provide goods and services to industry participants will become more intense. These industry participants may try to use their market power to negotiate price concessions or reductions for medical devices that incorporate components produced by us. If we reduce our prices because of consolidation in the healthcare industry, our revenue would decrease and our

**24**
**EXHIBIT 3**

**Table of Contents**

earnings, financial condition, or cash flows would suffer, which would have a material adverse effect on our business, financial condition, and results of operations.

*We may be subject to enforcement actions, competitor lawsuits, or other claims if we engage in the off-label promotion of our products.*

Our promotional materials and training methods must comply with FDA regulations and other applicable laws, including restraints and prohibitions on the promotion of off-label, or uncleared use, of our products. Physicians may use our products for off-label use without regard to these prohibitions, as FDA regulations do not restrict or regulate a physician's choice of treatment within the practice of medicine. Although our policy is to follow published FDA guidance in order to avoid promoting our products improperly, the FDA or other regulatory agencies or third-parties could disagree and conclude that we have engaged in off-label promotion. For example, our DABRA Laser System has been cleared by the FDA for crossing chronic total occlusions in patients with symptomatic infrainguinal lower extremity vascular disease and has an intended use for ablating a channel in occlusive peripheral vascular disease. We have not received FDA clearance or approval to market DABRA for an atherectomy indication. While our pivotal clinical study of the DABRA Laser System would not be sufficient to expand our FDA-cleared indication for use to an atherectomy indication for use, which the FDA currently defines to include a prespecified improvement in luminal patency, or prespecified increase in the openness of the artery at a pre-defined time point, such as six months following a DABRA procedure, using a consistent assessment tool, we believe that we can promote the device using the truthful and not misleading information from this study that is not inconsistent with our cleared indication.

We recently received correspondence from a competitor claiming our promotion for DABRA as an atherectomy tool used by surgeons to treat peripheral vascular disease is off-label promotion for the product. We disagree with our competitors' claims and believe FDA's regulations and judicial case law allow companies to engage in certain forms of truthful, non-misleading and non-promotional speech concerning the off-label use of products, and we believe that we comply with these restrictions. We operate in an industry characterized by extensive litigation. However, the scope of potential liability with respect to any such claims, enforcement actions, or lawsuits is uncertain, and we cannot assure you that we will not receive claims from competitors or other third parties or be subject to enforcement actions in the future from regulatory agencies. For example, the FDA, FTC, the Office of the Inspector General of the Department of Health and Human Services ("HHS"), the DOJ and various state Attorneys General actively enforce laws and regulations that prohibit the promotion of off-label uses. If we are found to have improperly promoted off-label uses, we may be subject to significant liability, including civil fines, criminal fines and penalties, civil damages, exclusion from federal funded healthcare programs and potential liability under the federal False Claims Act and any applicable state false claims act. In addition, if the FDA determines that our promotional materials or training constitutes promotion of an off-label use, it could request that we modify our training or promotional materials, which could negatively impact our marketing and decrease demand for our products. Conduct giving rise to such liability could also form the basis for private civil litigation by third-party payers, competitors, or other persons claiming to be harmed by such conduct. Notwithstanding the regulatory restrictions on off-label promotion, the FDA's regulations, guidance and judicial case law allow companies to engage in certain forms of truthful, non-misleading and non-promotional speech concerning the off-label use of products, for example FDA's June 2018 guidance document, "Medical Product Communications That Are Consistent With the FDA-Required Labeling — Questions and Answers." Nonetheless, the FDA, HHS, DOJ, and/or state Attorneys General, competitors, and other third parties may take the position that we are not in compliance with such requirements, and if such non-compliance is proven, it could harm our reputation, financial condition or divert financial and management resources from our core business, and would have a material adverse effect on our business, financial condition and results of operations. Moreover, any threatened or actual government enforcement actions or lawsuits by third parties could

22

**25**

**EXHIBIT 3**

Table of Contents

also generate adverse publicity, which could decrease demand for our products and require that we devote substantial resources that could be used productively on other aspects of our business.

*Litigation and other legal proceedings may adversely affect our business.*

From time to time we are involved in and may become involved in legal proceedings relating to patent and other intellectual property matters, product liability claims, employee claims, tort or contract claims, federal regulatory investigations, securities class action, and other legal proceedings or investigations, which could have an adverse impact on our reputation, business and financial condition and divert the attention of our management from the operation of our business. Litigation is inherently unpredictable and can result in excessive or unanticipated verdicts and/or injunctive relief that affect how we operate our business. We could incur judgments or enter into settlements of claims for monetary damages or for agreements to change the way we operate our business, or both. There may be an increase in the scope of these matters or there may be additional lawsuits, claims, proceedings or investigations in the future, which could have a material adverse effect on our business, financial condition, and results of operations. Adverse publicity about regulatory or legal action against us could damage our reputation and brand image, undermine our customers' confidence and reduce long-term demand for our products, even if the regulatory or legal action is unfounded or not material to our operations.

We must indemnify officers and directors, including, in certain circumstances, former employees and directors, against all losses, including expenses, incurred by them in legal proceedings and advance their reasonable legal defense expenses, unless certain conditions apply. A prolonged uninsured expense and indemnification obligation could have a material adverse effect on our business, financial condition, and results of operations.

*We are subject to numerous laws and regulations related to health care fraud and abuse, false claims, anti-bribery and anti-corruption laws, such as the U.S. Anti-Kickback Statute and Foreign Corrupt Practices Act of 1977, in which violations of these laws could result in substantial penalties and prosecution.*

In the United States, we are subject to various state and federal fraud and abuse laws, including, without limitation, the federal Anti-Kickback Statute and federal False Claims Act. There are similar laws in other countries. These laws may impact, among other things, the sales, marketing and education programs for our products. The federal Anti-Kickback Statute prohibits persons from knowingly and willingly soliciting, offering, receiving or providing remuneration, directly or indirectly, in exchange for or to induce either the referral of an individual, or the furnishing or arranging for a good or service, for which payment may be made under a federal health care program. The federal False Claims Act prohibits persons from knowingly filing, or causing to be filed, a false claim to, or the knowing use of false statements to obtain payment from the federal government. Any allegation, investigation, or violation of these domestic health care fraud and abuse laws could result in government or internal investigations, significant diversion of resources, exclusion from government health care reimbursement programs and the curtailment or restructuring of our operations, significant fines, penalties, or other financial consequences, any of which may ultimately have a material adverse effect on our business, financial condition, and results of operations.

For our sales and operations outside the United States, we are similarly subject to various heavily-enforced anti-bribery and anti-corruption laws, such as the U.S. Foreign Corrupt Practices Act of 1977, as amended, or FCPA, U.K. Bribery Act, and similar laws around the world. These laws generally prohibit U.S. companies and their employees and intermediaries from offering, promising, authorizing or making improper payments to foreign government officials for the purpose of obtaining or retaining business or gaining any advantage. We face significant risks if we, which includes our third parties, fail to comply with the FCPA and other anti-corruption and anti-bribery laws.

23

**26**

**EXHIBIT 3**

**Table of Contents**

We leverage various third parties to sell our products and conduct our business abroad, including to government owned universities and hospitals. We, our distributors and channel partners, and our other third-party intermediaries may have direct or indirect interactions with officials and employees of government agencies or state-owned or affiliated entities (such as in the context of obtaining government approvals, registrations, or licenses or sales to government owned or controlled health care facilities, universities, institutes, clinics, etc.) and may be held liable for the corrupt or other illegal activities of these third-party business partners and intermediaries, our employees, representatives, contractors, partners, and agents, even if we do not explicitly authorize such activities. In many foreign countries, particularly in countries with developing economies, it may be a local custom that businesses engage in practices that are prohibited by the FCPA or other applicable laws and regulations. To that end, while we have adopted and implemented internal control policies and procedures and employee training and compliance programs to deter prohibited practices, such compliance measures ultimately may not be effective in prohibiting our employees, contractors, third parties, intermediaries or agents from violating or circumventing our policies and/or the law.

Responding to any enforcement action or related investigation may result in a materially significant diversion of management's attention and resources and significant defense costs and other professional fees. Any violation of the FCPA, other applicable anti-bribery, anti-corruption laws, and anti-money laundering laws could result in whistleblower complaints, adverse media coverage, investigations, loss of export privileges, severe criminal or civil sanctions and, in the case of the FCPA, suspension or debarment from U.S. government contracts, which could have a material and adverse effect on our reputation, business, financial condition, and results of operations.

*Governmental export or import controls could limit our ability to compete in foreign markets and subject us to liability if we violate them.*

Our products may be subject to U.S. export controls. Governmental regulation of the import or export of our products, or our failure to obtain any required import or export authorization for our products, when applicable, could harm our international sales and adversely affect our revenue. Compliance with applicable regulatory requirements regarding the export of our products may create delays in the introduction of our products in international markets or, in some cases, prevent the export of our products to some countries altogether. Furthermore, U.S. export control laws and economic sanctions prohibit the shipment of certain products and services to countries, governments, and persons targeted by U.S. sanctions. If we fail to comply with export and import regulations and such economic sanctions, we may be fined or other penalties could be imposed, including a denial of certain export privileges. Moreover, any new export or import restrictions, new legislation or shifting approaches in the enforcement or scope of existing regulations, or in the countries, persons, or technologies targeted by such regulations, could result in decreased use of our products by, or in our decreased ability to export our products to existing or potential customers with international operations. Any decreased use of our products or limitation on our ability to export or sell access to our products would likely materially and adversely affect our business, financial condition, and results of operations.

*A variety of risks associated with marketing our products internationally could materially adversely affect our business.*

In addition to selling our products in the U.S., we sell Pharos and DABRA outside of the U.S. We are subject to additional risks related to operating in foreign countries, including:

- differing regulatory requirements in foreign countries;
- differing reimbursement regimes in foreign countries, including price controls and lower payment;

24

**27**
**EXHIBIT 3**

Table of Contents

- unexpected changes in tariffs, trade barriers, price and exchange controls and other regulatory requirements;
- economic weakness, including inflation, or political instability in particular foreign economies and markets;
- compliance with tax, employment, immigration and labor laws for employees living or traveling abroad;
- foreign taxes, including withholding of payroll taxes;
- foreign currency fluctuations, which could result in increased operating expenses and reduced revenue, and other obligations incident to doing business in another country;
- difficulties staffing and managing foreign operations;
- workforce uncertainty in countries where labor unrest is more common than in the U.S.;
- potential liability under the FCPA or comparable foreign regulations;
- challenges enforcing our contractual and intellectual property rights, especially in those foreign countries that do not respect and protect intellectual property rights to the same extent as the U.S.;
- product shortages resulting from any events affecting raw material or finished good supply or distribution or manufacturing capabilities abroad; and
- business interruptions resulting from geo-political actions, including war and terrorism.

These and other risks associated with our international operations may materially adversely affect our ability to attain or maintain profitable operations, which would have a material adverse effect on our business, financial condition, and results of operations.

*We face additional credit and compliance risks related to our international sales using foreign distributors.*

We partner with distributors for DABRA and Pharos in select geographies outside of the U.S. Specifically, in 2017 we sold to distributors located in the Netherlands, China, Thailand, United Arab Emirates, and Italy. In 2017, approximately 10% of our sales were outside of the U.S. We may not be able to collect all of the funds owed to us by our foreign distributors. Some foreign distributors may experience financial difficulties, including bankruptcy, which may hinder our collection of accounts receivable. Where we extend credit terms to distributors, we periodically review the collectability and creditworthiness when determining the payment terms for such distributors. If our uncollectible accounts exceed our expectations, this could adversely impact our operating results. In addition, failure by our foreign distributors to comply with the Foreign Corrupt Practices Act or similar laws, insurance requirements, or other contract terms could have a negative impact on our business. Failure to manage the risks related to our foreign distributors would have a material adverse effect on our business, financial condition, and results of operations.

*We are highly dependent on our key personnel, and if we are not successful in attracting and retaining highly qualified personnel, we may not be able to successfully implement our business strategy.*

Our ability to compete in the highly competitive medical devices industry depends upon our ability to attract and retain highly qualified managerial, scientific and medical personnel. We are highly dependent on our senior management team. The loss of the services of any of our executive officers and other key employees, and our inability to find suitable replacements could result in delays in product development and harm our business.

**28**
**EXHIBIT 3**

**Table of Contents**

Competition for skilled personnel in our market is intense and may limit our ability to hire and retain highly qualified personnel on acceptable terms or at all. To induce valuable employees to remain at our company, in addition to salary and cash incentives, we have issued stock options and restricted stock units that vest over time. The value to employees of stock options and restricted stock units that vest over time may be significantly affected by movements in our stock price that are beyond our control, and may at any time be insufficient to counteract more lucrative offers from other companies. Despite our efforts to retain valuable employees, members of our management, scientific and development teams may terminate their employment with us on short notice. Although we have employment agreements with our key employees, these employment agreements provide for at-will employment, which means that any of our employees could leave our employment at any time, with or without notice. We do not maintain "key man" insurance policies on the lives of these individuals or the lives of any of our other employees, with the exception of the "key man" insurance policy for our Chief Executive Officer, Dean Irwin. Our success also depends on our ability to continue to attract, retain and motivate highly skilled junior, mid-level and senior managers as well as junior, mid-level and senior scientific and medical personnel. If we are not successful in attracting and retaining highly qualified personnel, it would have a material adverse effect on our business, financial condition, and results of operations

*If we experience significant disruptions in our information technology systems, our business may be adversely affected.*

We depend on our information technology systems for the efficient functioning of our business, including the manufacture, distribution and maintenance of DABRA and Pharos, as well as for accounting, data storage, compliance, purchasing and inventory management. We do not have redundant information technology systems at this time. Our information technology systems may be subject to computer viruses, ransomware or other malware, attacks by computer hackers, failures during the process of upgrading or replacing software, databases or components thereof, power outages, hardware failures, telecommunication failures and user errors, among other malfunctions. In addition, a variety of our software systems are cloud-based data management applications hosted by third-party service providers whose security and information technology systems are subject to similar risks. Technological interruptions would impact our business operations would disrupt our operations, including our ability to timely ship and track product orders, project inventory requirements, manage our supply chain and otherwise adequately service our customers or disrupt our customers' ability use our products for treatments. In the event we experience significant disruptions, we may be unable to repair our systems in an efficient and timely manner. Accordingly, such events may disrupt or reduce the efficiency of our entire operation and have a material adverse effect on our business, financial condition, and results of operations. Currently, we carry business interruption coverage to mitigate certain potential losses, but this insurance is limited in amount and we cannot be certain that such potential losses will not exceed our policy limits. We are increasingly dependent on complex information technology to manage our infrastructure. Our information systems require an ongoing commitment of significant resources to maintain, protect and enhance our existing systems. Failure to maintain or protect our information systems and data integrity effectively could have a material adverse effect on our business, financial condition, and results of operations

*We have identified a material weakness in our internal control over financial reporting. Failure to maintain effective internal controls could cause our investors to lose confidence in us and adversely affect the market price of our common stock. If our internal controls are not effective, we may not be able to accurately report our financial results or prevent fraud.*

Section 404 of the Sarbanes-Oxley Act of 2002, or Section 404, requires that we maintain internal control over financial reporting that meets applicable standards. We may err in the design or operation of our controls, and all internal control systems, no matter how well designed and operated, can provide only reasonable assurance that the objectives of the control system are met. Because there are inherent limitations in all control systems, there can be no assurance that all control issues have been or will be

26

**29**

**EXHIBIT 3**

Table of Contents

detected. If we are unable, or are perceived as unable, to produce reliable financial reports due to internal control deficiencies, investors could lose confidence in our reported financial information and operating results, which could result in a negative market reaction and a decrease in our stock price.

Following our initial public offering, we will be required, pursuant to Section 404, to furnish a report by management on, among other things, the effectiveness of our internal control over financial reporting. Such report will not be required until our second annual report filed on Form 10-K. We will need to disclose any material weaknesses identified by our management in our internal control over financial reporting. As an "emerging growth company," we will avail ourselves of the exemption from the requirement that our independent registered public accounting firm attest to the effectiveness of our internal control over financial reporting under Section 404. However, we may no longer avail ourselves of this exemption when we cease to be an "emerging growth company." When our independent registered public accounting firm is required to undertake an assessment of our internal control over financial reporting, the cost of our compliance with Section 404 will correspondingly increase. Our compliance with applicable provisions of Section 404 will require that we incur substantial accounting expense and expend significant management time on compliance-related issues as we implement additional corporate governance practices and comply with reporting requirements. Moreover, if we are not able to comply with the requirements of Section 404 applicable to us in a timely manner, or if we or our independent registered public accounting firm identifies deficiencies in our internal control over financial reporting that are deemed to be material weaknesses, the market price of our stock could decline and we could be subject to sanctions or investigations by the U.S. Securities and Exchange Commission, or SEC, or other regulatory authorities, which would require additional financial and management resources.

In prior periods we identified certain material weaknesses in our internal controls related to revenue recognition and lack of staffing in the accounting and finance organization. In connection with these prior material weaknesses we implemented remediation measures including training of accounting personnel as well as hiring additional personnel with experience in the ongoing identification, design and implementation of internal control over financial reporting.

In connection with our 2017 audit, as part of the restatement to the 2016 financial statements described in Note 3 to the financial statements, we identified a material weakness in the design of our internal controls related to the administration of capital stock transactions, including stock issuances and a reverse stock split which were not effected in accordance with the requirements of applicable law and the communication of stock option awards which were not validly authorized. While we have designed and implemented, or expect to implement, measures that we believe address this material weakness, we continue to develop our internal controls, processes and reporting systems by, among other things, hiring qualified personnel with expertise to perform specific functions, including our Chief Financial Officer, the engagement of third party legal counsel to assist in the administration of capital stock transactions, and designing and implementing improved processes and internal controls, including ongoing senior management review and board of directors oversight. We expect to continue to build a more experienced administrative organization with expertise to perform specific functions and to design and implement improved processes and internal controls. We have incurred significant costs to remediate these weaknesses, primarily personnel costs, external consulting and legal fees, system implementation costs, and related indirect costs including the use of facilities and technology, and we expect to incur additional costs to remediate these weaknesses. We may not be successful in implementing these remediation efforts or in developing other internal controls, which may undermine our ability to provide accurate, timely and reliable reports on our financial and operating results. Further, we will not be able to fully assess whether the steps we are taking will remediate the material weakness in our internal control over financial reporting until we have completed our implementation efforts and sufficient time passes in order to evaluate their effectiveness. In addition, if we identify additional errors that result in material weaknesses in our internal control over financial reporting, we may not detect errors on a timely basis

**30**

**EXHIBIT 3**

Table of Contents

and our financial statements may be materially misstated. Moreover, in the future we may engage in business transactions, such as acquisitions, reorganizations or implementation of new information systems that could negatively affect our internal control over financial reporting and result in material weaknesses.

If we identify new material weaknesses in our internal control over financial reporting, if we are unable to comply with the requirements of Section 404 in a timely manner, if we are unable to assert that our internal control over financial reporting is effective, or if our independent registered public accounting firm is unable to express an opinion as to the effectiveness of our internal control over financial reporting, we may be late with the filing of our periodic reports, investors may lose confidence in the accuracy and completeness of our financial reports and the market price of our common stock could be negatively affected. As a result of such failures, we could also become subject to investigations by the stock exchange on which our securities are listed, the SEC, or other regulatory authorities, and become subject to litigation from investors and stockholders, which could harm our reputation, financial condition or divert financial and management resources from our core business, and would have a material adverse effect on our business, financial condition and results of operations.

*We could be subject to claims based on defects with respect to certain corporate transactions that were not authorized in accordance with applicable law.*

We have determined that due to the material weakness in our internal controls related to the administration of capital stock transactions, there have been defects with respect to certain corporate transactions, including (i) stock issuances that were not or may not have been properly approved by our board of directors and/or adequately documented, (ii) a reverse stock split for which we failed to file the amendment to our articles of incorporation, and (iii) the communication of option awards that were not validly authorized by our board of directors as a result of non-existent or defective board approvals, in each case in accordance with applicable law.

To remediate these defects, we have taken a number of actions. Our board of directors has ratified the defective stock issuances; we obtained agreements from holders of the vast majority of our common stock which include a confirmation of the securities each stockholder holds, a release of potential claims with respect to issuance of securities to such stockholders, and a surrender specifically of any claims to the equity of the Delaware corporation except for the shares of the Delaware corporation that such stockholder has received in the reincorporation merger pursuant to the merger agreement; we confirmed with the vast majority of the applicable stockholders that the appropriate number of shares of common stock outstanding immediately prior to the time of the intended reverse stock split were contributed to the capital of the Company effective as of the intended time of, and to give effect to, the intended reverse stock split; and we have approved compensation to and obtained releases from our impacted employees and other service providers to resolve potential claims, if any, related to the communicated grants of option awards and to promote retention and align their interests with the long-term interests of our stockholders. While we have attempted to narrow potential future claims by taking certain remedial corporate actions, the scope of liability with respect to such defects is uncertain and we cannot assure that these actions will entirely remediate these defects or that we will not receive claims in the future from other persons asserting rights to shares of our capital stock or to stock options or other equity. To the extent any such claims are successful, they could have a material adverse effect on our business, financial condition and results of operations.

Under certain authority, common law ratification by our board of directors of prior stock issuances may have caused such issuances to be valid stock issuances by us at the time of the respective issuances. However, there is uncertainty under applicable law as to whether such common law ratification may be effective under all circumstances. There can be no assurance that stockholders will not assert claims that a defective corporate act or putative stock issuance ratified by us is void or voidable due to the identified

28

**31**

**EXHIBIT 3**

**Table of Contents**

failure of proper authorization by our board of directors, as well as other claims related thereto, and, if asserted, that any such claims will not be successful. If such ratification is deemed not to be effective, then the issuances of certain shares of our stock and other attempted corporate actions would be invalid and we could have liability to grantees of our common stock, which may have a material adverse effect on our business and results of operations.

We have also confirmed that the vast majority of the applicable stockholders as of the time of the intended reverse stock split contributed a number of shares of common stock sufficient to give effect to the recapitalization intended by the reverse stock split. However, a holder of our common stock could argue that this process does not represent an adequate remedy for a potential failure to properly implement the reverse stock split. If the contribution of shares to the capital of the Company was not effective, then we could have liability to certain holders of our common stock, which may have a material adverse effect on our business and results of operations.

Additionally, we may have potential liability to certain of our employees, directors, consultants, and other service providers for communicated grants of option awards that were not authorized in compliance with applicable law. With respect to the communicated grants of option awards that were not validly authorized, we approved compensation and obtained a release of potential claims from such persons. We approved compensation to our impacted employees, directors, consultants, and other service providers to mitigate potential claims related to the communicated grants of option awards, if any. However, an impacted individual could argue that such compensation is not an adequate remedy for prior invalid option awards and, if a court were to impose a greater remedy, our financial exposure could be greater and have a material adverse effect on our business and results of operations. The foregoing could also result in tax withholding, employment taxes or other tax liabilities, including penalties and interest, all of which could have a material adverse effect on our business, financial condition and results of operations.

*We will need to grow the size of our organization, and we may experience difficulties in managing this growth.*

At June 30, 2018, we had 75 full-time employees. As our sales and marketing strategies develop, and as we transition into operating as a public company, we expect to need additional managerial, operational, sales, marketing, financial, and other personnel. Future growth would impose significant added responsibilities on members of management, including:

- identifying, recruiting, integrating, maintaining, and motivating additional employees;
- managing our internal development efforts effectively, while complying with our contractual obligations to contractors and other third parties; and
- improving our operational, financial and management controls, reporting systems and procedures.

Our future financial performance and our ability to successfully market and sell our products will depend, in part, on our ability to effectively manage any future growth, and our management may also have to divert a disproportionate amount of its attention away from day-to-day activities in order to devote a substantial amount of time to managing these growth activities.

If we are not able to effectively expand our organization by hiring new employees and expanding our groups of consultants and contractors, we may not be able to successfully implement the tasks necessary to further develop and commercialize our products and, accordingly, may not achieve our research, sales and marketing goals, which would have a material adverse effect on our business, financial condition, and results of operations.

29

**32**

**EXHIBIT 3**

**Table of Contents**

*We actively employ social media as part of our marketing strategy, which could give rise to regulatory violations, liability, breaches of data security or reputational damage.*

Despite our efforts to monitor evolving social media communication guidelines and comply with applicable rules, there is risk that the use of social media by us, our employees or our customers to communicate about our products or business may cause us to be found in violation of applicable requirements, including requirements of regulatory bodies such as the FDA and Federal Trade Commission. For example, promotional communications and endorsements on social media that, among other things, promote our products for uses or in patient populations that are not described in the product's approved labeling (known as "off-label uses"), do not contain a fair balance of information about risks associated with using our products, make comparative or other claims about our products that are not supported by sufficient evidence, and/or do not contain required disclosures could result in an enforcement actions against us. In addition, adverse events, product complaints, off-label usage by physicians, unapproved marketing or other unintended messages posted on social media could require an active response from us, which may not be completed in a timely manner and could result in regulatory action by a governing body. Further, our employees may knowingly or inadvertently make use of social media in ways that may not comply with our corporate policies or other legal or contractual requirements, which may give rise to liability, lead to the loss of trade secrets or other intellectual property, or result in public exposure of personal information of our employees, clinical trial patients, customers and others. Furthermore, negative posts or comments about us or our products in social media could seriously damage our reputation, brand image and goodwill, which would have a material adverse effect on our business, financial condition, and results of operations.

**Risks Related to Regulatory Approval and our Industry**

*Regulatory compliance is expensive, complex and uncertain, and a failure to comply could lead to enforcement actions against us and other negative consequences for our business.*

The FDA, EMA and similar agencies regulate our products as medical devices. Complying with these regulations is costly, time consuming, complex and uncertain. FDA and EMA regulations and regulations of similar agencies are wide-ranging and include, among other things, oversight of:

- product design, development, manufacture (including suppliers) and testing;
- pre-clinical and clinical studies;
- product safety and effectiveness;
- product labeling;
- product storage and shipping;
- record keeping;
- pre-market clearance or approval;
- marketing, advertising and promotion;
- product sales and distribution;
- product changes;
- product recalls; and
- post-market surveillance and reporting of deaths or serious injuries and certain malfunctions.

Our current products are subject to extensive regulation by the FDA and non-U.S. regulatory agencies. Further, all of our potential products and improvements of our current products will be subject to extensive

**33**

**EXHIBIT 3**

**Table of Contents**

### SHARES ELIGIBLE FOR FUTURE SALE

Prior to the completion of this offering, there has been no public market for our common stock, and we cannot assure you that a liquid trading market for our common stock will develop or be sustained after this offering. Future sales of substantial amounts of shares of common stock, including shares issued upon the exercise of outstanding options and upon the vesting of outstanding restricted stock units, in the public market after this offering, or the possibility of these sales occurring, could adversely affect the prevailing market price for our common stock or impair our ability to raise equity capital in the future. The effect of sales of our common stock in the public market may be exacerbated by the relatively small public float of our common stock following this offering. As described below, only a limited number of shares will be available for sale shortly after this offering due to contractual and legal restrictions on resale. Nevertheless, sales of our common stock in the public market after such restrictions lapse, or the perception that those sales may occur, could adversely affect the prevailing market price at such time and our ability to raise equity capital in the future.

Based on the number of shares of common stock outstanding as of the date of this prospectus, and assuming the sale of all shares offered, upon completion of this offering, 11,537,584 shares of common stock will be outstanding. All of the securities sold by us in this offering will be freely tradable without restrictions or further registration under the Securities Act of 1933, as amended, unless held by our "affiliates," as that term is defined under Rule 144 under the Securities Act.

The remaining 8,204,251 shares of common stock outstanding upon the closing of this offering will be "restricted securities," as defined under Rule 144 of the Securities Act. Restricted securities may be sold in the U.S. public market only if registered or if they qualify for an exemption from registration, including by reason of Rule 144 or 701 under the Securities Act, which rules are summarized below. All of our executive officers, directors and holders of approximately 96% of our outstanding voting common stock have entered into market standoff agreements with us or into lock-up agreements with the underwriters under which they have agreed, subject to specific exceptions, not to sell any of our stock for at least 180 days following the date of this prospectus. Subject to the lock-up agreements described below, the applicable conditions of Rule 144 or Rule 701 and our insider trading policy, these remaining restricted securities will generally become available for sale in the public market as follows:

- 316,431 restricted shares will be eligible for sale in the public market upon the completion of this offering under Rule 144; and
- beginning 181 days after the date of this prospectus, 7,887,820 restricted shares of our common stock will be eligible for sale in the public market from time to time thereafter, subject in some cases to the volume and other restrictions of Rule 144, as described below.

#### Lock-Up Agreements

We, our officers and directors and holders of approximately 96% of our outstanding voting of our common stock, have agreed that, subject to certain exceptions and under certain conditions, for a period of 180 days after the date of this prospectus, we and they will not, without the prior written consent of Piper Jaffray & Co. and Cantor Fitzgerald & Co., dispose of or hedge any shares or any securities convertible into or exchangeable for shares of our capital stock. These agreements are described in the section captioned "*Underwriters*" located elsewhere in this prospectus.

#### Rule 144

In general, under Rule 144 under the Securities Act, as in effect on the date of this prospectus, beginning 90 days after the date of this prospectus, a person who is not one of our affiliates at any time during the three months preceding a sale, and who has beneficially owned shares of our common stock to be sold for at least six months, would be entitled to sell an unlimited number of shares of our common stock,

**34**

**EXHIBIT 3**

**Table of Contents**

provided current public information about us is available. In addition, under Rule 144, a person who is not one of our affiliates at any time during the three months preceding a sale, and who has beneficially owned the shares of our common stock to be sold for at least one year, would be entitled to sell an unlimited number of shares immediately upon the closing of this offering without regard to whether current public information about us is available. Beginning 90 days after the date of this prospectus, our affiliates who have beneficially owned shares of our common stock for at least six months are entitled to sell within any three-month period a number of shares that does not exceed the greater of:

- 1% of the number of shares of our common stock then outstanding, which will equal approximately 115,375 shares immediately after this offering; and
- the average weekly trading volume of our common stock on the NYSE or the NYSE American, as applicable, during the four calendar weeks preceding the filing of a notice on Form 144 with respect to the sale, or if no such notice is required, the date of receipt of the order to execute the sale.

Sales of restricted shares under Rule 144 by our affiliates are also subject to requirements regarding the manner of sale, notice and the availability of current public information about us. Rule 144 also provides that affiliates relying on Rule 144 to sell shares of our common stock that are not restricted shares must nonetheless comply with the same restrictions applicable to restricted shares, other than the holding period requirement.

**Rule 701**

Rule 701 generally allows a stockholder who purchased shares of our common stock pursuant to a written compensatory plan or contract and who is not deemed to have been an affiliate of our company during the immediately preceding 90 days to sell these shares in reliance upon Rule 144, but without being required to comply with the public information, holding period, volume limitation or notice provisions of Rule 144. Rule 701 also permits affiliates of our company to sell their Rule 701 shares under Rule 144 without complying with the holding period requirements of Rule 144. All holders of Rule 701 shares are required to wait until ninety (90) days after the date of this prospectus before selling their shares under Rule 701.

**Registration Statement on Form S-8**

As of June 30, 2018, options to purchase an aggregate of 1,898,000 shares of our common stock were outstanding, and restricted stock units covering 1,340,301 shares of our common stock were outstanding. Following the completion of this offering, we intend to file a registration statement on Form S-8 under the Securities Act to register shares of our common stock issued or reserved for issuance under our equity compensation plans. The registration statement on Form S-8 will become effective immediately upon filing, and shares covered by such registration statement will thereupon be eligible for sale in the public markets, subject to vesting restrictions, the lock-up agreements described above and Rule 144 limitations applicable to affiliates. See the section captioned "*Executive compensation—Employee benefit and stock plans*" for additional information.

**Registration Rights**

We have not granted any registration rights.

154

**35**

**EXHIBIT 3**

Table of Contents

### SIGNATURES

Pursuant to the requirements of the Securities Act of 1933, the Registrant has duly caused this registration statement to be signed on its behalf by the undersigned, thereunto duly authorized, in the City of Carlsbad, State of California, on September 24, 2018.

**RA MEDICAL SYSTEMS, INC.**

By:     /s/ Dean Irwin

**Dean Irwin**
**Chief Executive Officer, Co-President, Chief Technology Officer,**
**Chairman of the Board of Directors**
(Principal Executive Officer)

Pursuant to the requirements of the Securities Act of 1933, this Amendment No. 3 to the registration statement on Form S-1 has been signed by the following persons in the capacities and on the dates indicated below:

| Signature | Title | Date |
|---|---|---|
| /s/ Dean Irwin<br>**Dean Irwin** | Chief Executive Officer, Co-President, Chief Technology Officer, and Chairman of the Board of Directors (Principal Executive Officer) | September 24, 2018 |
| /s/ Andrew Jackson<br>**Andrew Jackson** | Chief Financial Officer and Secretary (Principal Financial and Accounting Officer) | September 24, 2018 |
| *<br>**Melissa Burstein, M.B.A.** | Executive Vice President and Director | September 24, 2018 |
| *<br>**Martin Burstein, M.B.A.** | Director | September 24, 2018 |
| *<br>**Richard Heymann** | Director of Corporate Strategy and Business Development, and Director | September 24, 2018 |
| *<br>**Maurice Buchbinder, M.D.** | Director | September 24, 2018 |
| *<br>**Martin Colombatto** | Director | September 24, 2018 |
| *<br>**Richard Mejia, Jr.** | Director | September 24, 2018 |
| *<br>**Mark E. Saad** | Director | September 24, 2018 |

II-6

**36**

# EXHIBIT 3

**Table of Contents**

| Signature | Title | Date |
|---|---|---|
| \* | Director | September 24, 2018 |
| **William R. Enquist, Jr.** | | |

\*   Pursuant to power of attorney

By:            /s/ Dean Irwin
              **Dean Irwin**
              **Attorney-in-fact**

II-7

| Signature | Title | Date |
|---|---|---|
| \* | Director | September 24, 2018 |
| **William R. Enquist, Jr.** | | |

\*   Pursuant to power of attorney

By:            /s/ Dean Irwin
              **Dean Irwin**
              **Attorney-in-fact**

**37**

**EXHIBIT 3**

# EXHIBIT 4

**EXHIBIT 4**

# UNITED STATES
## SECURITIES AND EXCHANGE COMMISSION
**Washington, DC 20549**

## FORM 8-K

**CURRENT REPORT**
**Pursuant to Section 13 or 15(d)**
**of The Securities Exchange Act of 1934**

**Date of Report (Date of earliest event reported): October 29, 2019**

# Ra Medical Systems, Inc.
**(Exact name of registrant as specified in its charter)**

| Delaware | 001-38677 | 38-3661826 |
|---|---|---|
| **(State or other jurisdiction of incorporation)** | **(Commission File Number)** | **(IRS Employer Identification No.)** |

**2070 Las Palmas Drive**
**Carlsbad, California 92011**
**(Address of principal executive offices, including zip code)**

**(760) 804-1648**
**(Registrant's telephone number, including area code)**

**Not Applicable**
**(Former name or former address, if changed since last report.)**

Check the appropriate box below if the Form 8-K filing is intended to simultaneously satisfy the filing obligation of the registrant under any of the following provisions (see General Instruction A.2. below):

☐   Written communications pursuant to Rule 425 under the Securities Act (17 CFR 230.425)
☐   Soliciting material pursuant to Rule 14a-12 under the Exchange Act (17 CFR 240.14a-12)
☐   Pre-commencement communications pursuant to Rule 14d-2(b) under the Exchange Act (17 CFR 240.14d-2(b))
☐   Pre-commencement communications pursuant to Rule 13e-4(c) under the Exchange Act (17 CFR 240.13e-4(c))

Securities registered pursuant to Section 12(b) of the Act:

| Title of each class | Trading Symbol(s) | Name of each exchange on which registered |
|---|---|---|
| Common Stock, par value $0.0001 per share | RMED | New York Stock Exchange |

Indicate by check mark whether the registrant is an emerging growth company as defined in Rule 405 of the Securities Act of 1933 (§230.405 of this chapter) or Rule 12b-2 of the Securities Exchange Act of 1934 (§240.12b-2 of this chapter).

Emerging growth company ☒

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. ☐

**39**
**EXHIBIT 4**

**Item 5.02 Departure of Directors or Certain Officers; Election of Directors; Appointment of Certain Officers; Compensatory Arrangements of Certain Officers.**

*Separation of Vice President*

On October 29, 2019, Ra Medical Systems, Inc. (the "Company"), terminated Melissa Burstein as Vice President and as an employee of the Company, effective November 1, 2019. Ms. Burstein's termination by the Company was without "Cause," as defined in her Change in Control and Severance Agreement (the "Severance Agreement") which has been filed as Exhibit 10.9 to the Company's Registration Statement on Form S-1 (File No. 333-226191) with the Securities and Exchange Commission on July 16, 2018. Ms. Burstein is also eligible to receive the severance compensation benefits set forth and in accordance with the terms of the Severance Agreement. Additionally, Ms. Burstein's equity incentive awards will remain subject to the terms of her existing equity award agreements with the Company.

**Item 8.01 Other Events.**

*Press Release*

On October 31, 2019, the Company issued a press release announcing the substantial completion of its previously announced Audit Committee investigation. A copy of the press release is attached as Exhibit 99.1 to this current report on Form 8-K and is incorporated by reference herein.

**Item 9.01. Financial Statements and Exhibits.**

*(d) Exhibits*

| Exhibit No. | Description |
| --- | --- |
| 99.1 | Press release dated October 31, 2019. |

**Cautionary Note Regarding Forward Looking Statements**

This communication contains forward-looking statements within the meaning of the Private Securities Litigation Reform Act of 1995 and Section 21E of the Securities Exchange Act of 1934 (the "Exchange Act"). In some cases, you can identify forward-looking statements because they contain words such as "may," "will," "should," "expects," "plans," "anticipates," "could," "intends," "target," "projects," "contemplates," "believes," "estimates," "predicts," "potential" or "continue" or the negative of these words or other similar terms or expressions that concern Ra Medical's future expectations, strategy, plans or intentions. Forward-looking statements in this communication include, but are not limited to, statements regarding Ra Medical's implementation of remedial measures recommended by the Audit Committee, expectations with respect to future actions regarding the Company's employees, the results of management's review of its previously issued or announced financial statements and internal control over financial reporting and disclosure controls, the Company's expectations with respect to the impact of its recently announced change in shelf life, the timing of the Company's atherectomy trial, and expectations regarding the timing of Ra Medical's periodic reports. These forward-looking statements involve risks and uncertainties, and actual results could vary materially from these forward-looking statements. Factors that may cause future results to differ materially from management's current expectations include, among other things: how promptly and thoroughly the recommendations of the Audit Committee can be implemented, potential legal or regulatory action related to the matters under investigation, the results of further review by the Company or others of certain matters that came to the Audit Committee's attention during the course of its investigation, any matters arising out of the review and audit of Ra Medical's financial statements by the Company's independent registered public accounting firm, and other factors detailed from time to time in Ra Medical's SEC reports, including its most recent annual report on Form 10-K, subsequent quarterly reports on Form 10-Q, and in its other filings with the Securities and Exchange Commission. The forward-looking statements in this communication are based on information available to Ra Medical as of the date hereof. Ra Medical disclaims any obligation to update information contained in these forward-looking statements whether as a result of new information, future events, or otherwise.

**EXHIBIT 4**

**SIGNATURES**

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned hereunto duly authorized.

**RA MEDICAL SYSTEMS, INC.**

Date: October 31, 2019                By:   /s/ Daniel Horwood

Daniel Horwood
General Counsel and Secretary

3

**41**

**EXHIBIT 4**

Exhibit 99.1



**Ra Medical Systems Announces Substantial Completion of Audit Committee Investigation**

**CARLSBAD, Calif. (October 31, 2019)** – Ra Medical Systems, Inc. (NYSE: RMED), a medical device company focusing on commercializing excimer laser systems to treat vascular and dermatological diseases, today announced that the Audit Committee of the Board of Directors (the "Audit Committee") has substantially completed its internal investigation, which was originally announced in August. The Audit Committee, assisted by independent legal counsel, Morrison & Foerster LLP, conducted a thorough investigation of allegations raised by an employee, as well as additional matters discovered during the course of the investigation.

The Audit Committee's primary investigative findings are: (i) the DABRA catheter frequently failed to calibrate and occasionally overheated, posing a risk of injury to physicians and patients; (ii) the Company's explanations regarding the Company's fourth quarter 2018 and first quarter 2019 sales created a risk of confusion because they did not explicitly reference inconsistent DABRA catheter performance and catheter failures; (iii) the Company failed to timely make at least two Medical Device Reports, or MDRs, to the FDA; (iv) the Company, out of a concern for the DABRA catheters' performance, engaged in systematic efforts to replace product held by customers, which constituted product recalls, but were not documented as such, (v) the Company lacks documentation of sufficient detail and specificity to support certain payments to physicians, ostensibly for training and consulting services, and as to three physicians did not accurately reflect the purpose and nature of approximately $300,000 of payments, which could be perceived as an improper attempt to obtain business or to gain special advantage, (vi) while the indication for use in the 510(k) clearance the Company obtained for the DABRA system is not for atherectomy, the Company's salespeople were instructed to characterize DABRA as performing atherectomy and to encourage doctors to seek reimbursement using atherectomy codes, (vii) Company determinations to direct potentially valuable benefits and opportunities to doctors were informed in part by sales prospects, and (viii) the Company received complaints regarding regulatory or compliance concerns that, because they implicated executive officers, should have been brought to the attention of the Board or the Audit Committee, but were not.

The Audit Committee, in reviewing the allegations, identified certain behavior inconsistent with the Company's Code of Ethics and Conduct and related policies involving certain current and former executive officers and employees of the Company. With respect to current Company executives and employees, the Audit Committee referred these matters to the Board or the Company for appropriate action and discipline.

The Audit Committee made a number of recommendations which the Board of Directors has adopted, including: separation of certain employees, implementing additional and enhanced policies and training, strengthening the Company's quality regulatory systems, and adopting certain enhanced controls related to the matters investigated.

In addition, the Company has continued to take steps in an effort to improve the performance and reliability of the Company's DABRA laser system, including hiring a VP, Quality, Regulatory and Clinical, conducting extensive internal and external audits of its quality systems, clinical trial data and manufacturing process, as well as initiating the previously announced voluntary recall of DABRA catheters.

Based on the results of the investigation, the Company is in the process of evaluating the impact of the results of the investigation on its previously issued or announced financial statements, and its internal controls over financial reporting and compliance procedures.

**42**

**EXHIBIT 4**

As previously disclosed, due to the Audit Committee investigation the Company has not filed its Quarterly Report on Form 10-Q for the quarter ended June 30, 2019 (the "Form 10- Q") with the SEC. The Company is working diligently to evaluate the Audit Committee investigation findings, including the assessment of the impact on the Company's financial statements, if any, and its internal controls over financial reporting. After the conclusion of the Audit Committee investigation and the Company's evaluation, the Company will file its Form 10-Q as soon as practicable thereafter.

The Company notes that its physician customers continue to use the DABRA laser system with success, and the Company believes that the previously announced change in shelf life will significantly reduce the number of catheters that fail to calibrate and thereby improve customer satisfaction with the product. The Company is focusing its efforts on improving the manufacturing process, with the goals of improving product consistency and extending the shelf life.

In addition, in order to more effectively market DABRA, the Company currently is pursuing expanded indications for use of DABRA to include an atherectomy indication for use, which the FDA currently defines to include a prespecified improvement in luminal patency, or a prespecified increase in the openness of the artery at a pre-defined time point. To satisfy the FDA's data requirements to support an atherectomy indication, the Company submitted an investigational device exemption, or IDE, designed to gather the clinical data necessary to determine substantial equivalence in support of the atherectomy indication. This IDE was approved in July 2019. However, as a result of the DABRA catheter recall to change the shelf life, the Company plans to submit updates to the IDE and enroll the first patient in the first quarter of 2020.

As also previously announced, the Company voluntarily contacted the SEC regarding the Audit Committee's investigation. In October 2019, the Department of Justice provided the Company with a Civil Investigative Demand seeking information with respect to a False Claims Act investigation concerning whether the Company fraudulently obtained 510(k) marketing clearance for its ablation devices marketed under the trade name DABRA (which is not an item that has been investigated by the Audit Committee), whether the Company marketed and promoted DABRA devices for unapproved uses that were not covered by federal healthcare programs, and whether the Company paid improper remuneration to physicians and other healthcare providers in violation of the Anti-Kickback Statute, 42 U.S.C. §1320a-7b. The Company intends to cooperate with the SEC and the Department of Justice's inquiries or investigations.

**About Ra Medical Systems**

Ra Medical Systems commercializes excimer lasers and catheters for the treatment of vascular and dermatological diseases. In May 2017, the DABRA laser system and single-use DABRA catheter received FDA 510(k) clearance in the U.S. as a device for crossing chronic total occlusions, or CTOs, in patients with symptomatic infrainguinal lower extremity vascular disease with an intended use for ablating a channel in occlusive peripheral vascular disease. Pharos excimer laser system is FDA-cleared and is used as a tool in the treatment of psoriasis, vitiligo, atopic dermatitis, and leukoderma. DABRA and Pharos are both based on Ra Medical's core excimer laser technology platform and deploy similar mechanisms of action. Ra Medical manufactures DABRA and Pharos excimer lasers and catheters in a 32,000-square-foot facility located in Carlsbad, California. The vertically integrated facility is ISO 13485 certified and is licensed by the state of California to manufacture sterile, single-use catheters in controlled environments.

2

**43**

**EXHIBIT 4**

**Cautionary Note Regarding Forward Looking Statements**

This communication contains forward-looking statements within the meaning of the Private Securities Litigation Reform Act of 1995 and Section 21E of the Securities Exchange Act of 1934 (the "Exchange Act"). In some cases, you can identify forward-looking statements because they contain words such as "may," "will," "should," "expects," "plans," "anticipates," "could," "intends," "target," "projects," "contemplates," "believes," "estimates," "predicts," "potential" or "continue" or the negative of these words or other similar terms or expressions that concern Ra Medical's future expectations, strategy, plans or intentions. Forward-looking statements in this communication include, but are not limited to, statements regarding Ra Medical's implementation of remedial measures recommended by the Audit Committee, expectations with respect to future actions regarding the Company's employees, the results of management's review of its previously issued or announced financial statements and internal control over financial reporting and disclosure controls, the Company's expectations with respect to the impact of its recently announced change in shelf life, the timing of the Company's atherectomy trial, and expectations regarding the timing of Ra Medical's periodic reports. These forward-looking statements involve risks and uncertainties, and actual results could vary materially from these forward-looking statements. Factors that may cause future results to differ materially from management's current expectations include, among other things: how promptly and thoroughly the recommendations of the Audit Committee can be implemented, potential legal or regulatory action related to the matters under investigation, the results of further review by the Company or others of certain matters that came to the Audit Committee's attention during the course of its investigation, any matters arising out of the review and audit of Ra Medical's financial statements by the Company's independent registered public accounting firm, and other factors detailed from time to time in Ra Medical's SEC reports, including its most recent annual report on Form 10-K, subsequent quarterly reports on Form 10-Q, and in its other filings with the Securities and Exchange Commission. The forward-looking statements in this communication are based on information available to Ra Medical as of the date hereof. Ra Medical disclaims any obligation to update information contained in these forward-looking statements whether as a result of new information, future events, or otherwise.

Ra Medical investors and others should note that we announce material information to the public about the company through a variety of means, including our website (www.ramed.com), our investor relations website (https://ir.ramed.com/), press releases, SEC filings, and public conference calls in order to achieve broad, non-exclusionary distribution of information to the public and to comply with our disclosure obligations under Regulation FD. We encourage our investors and others to monitor and review the information we make public in these locations as such information could be deemed to be material information. Please note that this list may be updated from time to time.

**Contacts**

**At the Company:**
**Jeffrey Kraws**
**President, Ra Medical Systems**
**760-707-7516**
**jkraws@ramed.com**

**Investors and Media:**
**LHA Investor Relations**
**Jody Cain / Kevin McCabe**
**310-691-7100**
**jcain@lhai.com / kmccabe@lhai.com**

3

**44**
**EXHIBIT 4**

# EXHIBIT 5

**45**
**EXHIBIT 5**

**UNITED STATES**

**SECURITIES AND EXCHANGE COMMISSION**

Washington, D.C. 20549

## FORM 10-K

☒     **ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

For the Fiscal Year Ended December 31, 2018

OR

☐     **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

For the Transition Period From to

Commission file number: 001-38677

# Ra Medical Systems, Inc.

(Exact name of Registrant as specified in its charter)

| | |
|---|---|
| **Delaware** | **38-3661826** |
| (State or other jurisdiction of incorporation or organization) | (I.R.S. Employer Identification No.) |
| **2070 Las Palmas Drive** <br> **Carlsbad, California** | **92011** |
| (Address of principal executive offices) | (Zip Code) |

**(760) 804-1648**

(Registrant's telephone number, including area code)

Securities registered pursuant to Section 12(b) of the Act:

| Title of each class | Name of the exchange on which registered |
|---|---|
| **Common Stock, $0.0001 par value** | **New York Stock Exchange** |

Securities registered pursuant to Section 12(g) of the Act: None

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act. Yes ☐ No ☒

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or Section 15(d) of the Act. Yes ☐ No ☒

Indicate by check mark whether the Registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the Registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. Yes ☒ No ☐

Indicate by check mark whether the registrant has submitted electronically every Interactive Data File required to be submitted pursuant to Rule 405 of Regulation S-T (§232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit such files). Yes ☒ No ☐

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K (§229.405 of this chapter) is not contained herein, and will not be contained, to the best of the Registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendment to this Form 10-K. ☒

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, a smaller reporting company, or emerging growth company. See the definitions of "large accelerated filer," "accelerated filer", "smaller reporting company," and "emerging growth company" in Rule 12b-2 of the Exchange Act.

| | | | | |
|---|---|---|---|---|
| Large accelerated filer | ☐ | Accelerated filer | | ☐ |
| Non-accelerated filer | ☒ | Smaller reporting company | | ☒ |
| | | Emerging growth company | | ☒ |

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. ☐

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act). Yes ☐ No ☒

The aggregate market value of the common stock held by non-affiliates of the registrant, based on the closing price of a share of common stock on September 27, 2018 as reported by the New York Stock Exchange on such date was approximately $157.8 million. The registrant has elected to use September 27, 2018, which was the initial trading date on the New York Stock Exchange, as the calculation date because on June 30, 2018 (the last business day of the registrant's most recently completed second fiscal quarter), the registrant was a privately held company. Shares of the registrant's common stock held by each executive officer, director and other persons who may be deemed an affiliate of the registrant have been excluded in that such persons may be deemed to be affiliates. This calculation does not reflect a determination that certain persons are affiliates of the registrant for any other purpose.

As of March 13, 2019, the registrant has 12,689,251 shares of common stock, par value $0.0001, outstanding.

**DOCUMENTS INCORPORATED BY REFERENCE**

Information required by Part III of this Form 10-K is incorporated by reference to the registrant's proxy statement (the "Proxy Statement") for the 2019 annual meeting of stockholders, which proxy statement will be filed with the Securities and Exchange Commission within 120 days after the end of the fiscal year covered by this Form 10-K.

**EXHIBIT 5**

**RA MEDICAL SYSTEMS, INC.**

TABLE OF CONTENTS

Part I

| | | Page |
|---|---|---|
| Item 1. | Business | 4 |
| Item 1A. | Risk Factors | 27 |
| Item 1B. | Unresolved Staff Comments | 67 |
| Item 2. | Properties | 67 |
| Item 3. | Legal Proceedings | 67 |
| Item 4. | Mine Safety Disclosures | 68 |

Part II

| | | |
|---|---|---|
| Item 5. | Market for Registrant's Common Equity, Related Stockholder Matters and Issuer Purchases of Equity Securities | 69 |
| Item 6. | Selected Financial Data | 70 |
| Item 7. | Management's Discussion and Analysis of Financial Condition and Results of Operations | 71 |
| Item 7A. | Quantitative and Qualitative Disclosures About Market Risk | 83 |
| Item 8. | Financial Statements and Supplementary Data | 83 |
| Item 9. | Changes in and Disagreements with Accountants on Accounting and Financial Disclosure | 84 |
| Item 9A. | Controls and Procedures | 84 |
| Item 9B. | Other Information | 85 |

Part III

| | | |
|---|---|---|
| Item 10. | Directors, Executive Officers and Corporate Governance | 87 |
| Item 11. | Executive Compensation | 87 |
| Item 12. | Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters | 87 |
| Item 13. | Certain Relationships and Related Transactions, and Director Independence | 87 |
| Item 14. | Principal Accounting Fees and Services | 87 |

Part IV

| | | |
|---|---|---|
| Item 15. | Exhibits, Financial Statement Schedules | 88 |

**47**

**EXHIBIT 5**

**ITEM 1A.**          **RISK FACTORS**

*Investing in our common stock involves a high degree of risk. You should carefully consider the risks and uncertainties described below, together with all of the other information in this Annual Report on Form 10-K, before making an investment decision. The risks and uncertainties described below may not be the only ones we face. If any of the risks actually occur, our business, financial condition, operating results, cash flows and prospects could be materially and adversely affected. In that event, the market price of our common stock could decline, and you could lose part or all of your investment.*

**Risks Related to Our Business and Products**

*We may be unable to achieve revenue growth.*

Our ability to grow our revenue in future periods will depend on our ability to successfully penetrate our target markets and increase sales of our products and any new product indications that we introduce, which will, in turn, depend in part on our success in growing our installed unit base and driving continued use of our systems, including long-term adoption by physicians. In addition, new product indications will also need to be approved or cleared by the FDA and comparable non-U.S. regulatory agencies to help drive revenue growth. If we cannot achieve revenue growth, it would have a material adverse effect on our business, financial condition, and results of operations.

*Our success depends in large part on DABRA. If we are unable to successfully market and sell DABRA, our business prospects will be significantly harmed.*

Our future financial success will depend substantially on our ability to effectively and profitably market and sell DABRA. The commercial success of DABRA will depend on a number of factors, including the following:

- the effectiveness of our and our distributors' marketing and sales efforts in the U.S. and abroad, including our efforts to build out and properly train our sales team under our new sales leadership;

- the availability, perceived advantages, relative cost, relative safety, and relative efficacy of alternative and competing treatments, including the time and expertise needed for training to effectively use the DABRA system as compared to competing treatments;

- our ability to properly support DABRA usage with our own qualified personnel or our ability to properly train and support our customers to use the DABRA system effectively on their own;

- the availability of coverage and adequate levels of reimbursement under private and governmental health insurance plans for DABRA-based procedures;

- our ability to obtain, maintain, and enforce our intellectual property rights in and to DABRA;

- our ability to achieve and maintain compliance with regulatory requirements applicable to DABRA;

- our ability to continue to develop, validate and maintain a commercially viable manufacturing process that is compliant with current Good Manufacturing Practices, or cGMP; and

- whether we are required by the FDA or comparable non-U.S. regulatory authorities to conduct additional clinical trials for future or current indications.

If we fail to successfully market and sell DABRA, we will not be able to achieve or maintain profitability, which will have a material adverse effect on our business, financial condition, and results of operations.

*Physicians and staff may not commit enough time to sufficiently learn how to use our products.*

In order for physicians and staff to learn to use our products, we encourage physicians to attend structured training sessions in order to familiarize themselves with our technology. There are many nuances to successfully using our products. For example, the DABRA catheter is fragile and may be prone to bending at the entry of the artery, a problem known as kinking. In addition, the DABRA laser needs to be calibrated correctly for each use. Further, physicians and their staff must utilize the technology on a regular basis to ensure they maintain the skill set necessary to use our products. Market acceptance of DABRA could be delayed by lack of physician or staff willingness to attend training sessions or sufficiently familiarize themselves with DABRA. An inability to train a sufficient number of physicians to generate adequate demand for our products could have a material adverse effect on our business, financial condition, and results of operations.

**48**

**EXHIBIT 5**

*Our products may not gain or maintain market acceptance among physicians and patients and others in the medical community.*

Our success will depend, in part, on the acceptance of our products as safe, useful and, with respect to physicians, cost effective and easy to use. We cannot predict how quickly, if at all, catheterization laboratories and physicians will accept our products or, if accepted, how frequently they will be used. Patients and their care providers must believe our products offer benefits over alternative treatment methods. Additional factors that will influence whether our products gain and maintain market acceptance, include:

- whether physicians, catheterization laboratory owners and operators, patients, and others in the medical community consider our products safe, effective, and cost-effective treatment methods;

- the potential and perceived advantages of our products over alternative treatment methods;

- the convenience, amount of training required, and ease of use of DABRA and Pharos relative to alternative treatment methods;

- the prevalence and severity of any side effects associated with using our products;

- product labeling or product insert requirements of the FDA or other regulatory authorities;

- limitations or warnings contained in the labeling cleared or approved by the FDA or other authorities;

- the cost of treatment in relation to alternative treatments methods;

- pricing pressure, including from group purchasing organizations, or GPOs, seeking to obtain discounts on DABRA and Pharos based on the collective buying power of the GPO members;

- the availability of adequate coverage, reimbursement and pricing by third-party payors, including government authorities;

- the willingness of patients to pay out-of-pocket in the absence of coverage by third-party payors, including government authorities;

- our ability to provide incremental clinical and economic data that shows the safety and clinical efficacy and cost effectiveness of, and patient benefits from, our products; and

- the effectiveness of our sales and marketing efforts for DABRA and Pharos.

If we do not adequately educate physicians about PAD and the existence and proper use of our products, DABRA may not gain market acceptance, as many physicians do not routinely screen for PAD while screening for CAD. Additionally, even if our products achieve market acceptance, they may not maintain that market acceptance over time if competing products or technologies are introduced that are received more favorably or are more cost effective. Failure to achieve or maintain market acceptance and/or market share would limit our ability to generate revenue and would have a material adverse effect on our business, financial condition, and results of operations.

*The continuing development of our products depends upon our developing and maintaining strong working relationships with physicians.*

The research, development, marketing and sale of our current products and any potential new and improved products or future product indications for which we receive regulatory clearance or approval depend upon our maintaining working relationships with physicians. We rely on these professionals to provide us with considerable knowledge and experience regarding the development, marketing and sale of our products. Physicians assist us as researchers, marketing and product consultants and public speakers. If we cannot maintain our strong working relationships with these professionals and continue to receive their advice and input, the development and marketing of our products could suffer, which could have a material adverse effect on our business, financial condition, and results of operations. At the same time, companies in the medical device industry are under increasing scrutiny by the U.S. Department of Health and Human Services Office of Inspector General, or OIG, and the U.S. Department of Justice, or DOJ for improper relationships with physicians. Our failure to comply with requirements governing the industry's relationships with physicians, including the reporting of certain payments to physicians under the National Physician Payment Transparency Program (Open Payments) or an investigation into our compliance by the OIG or the DOJ, could have a material adverse effect on our business, financial condition, and results of operations.

28

**49**

**EXHIBIT 5**

*We may experience development or manufacturing problems or delays that could limit the potential growth of our revenue or increase our losses.*

We have only recently begun manufacturing at scale, and may encounter unforeseen situations in the manufacturing and assembly of our products that would result in delays or shortfalls in our production. For example, in the fourth quarter of 2018, we experienced production limitations as we were scaling up our catheter production, which had an adverse impact on our revenue. In response, we made changes in our production flow and we are now in the final stages of validating our manufacturing process. In addition, our production processes and assembly methods may have to change to accommodate any significant future expansion of our manufacturing capacity, which may increase our manufacturing costs, delay production of our products, reduce our product margin, and adversely impact our business. Conversely, if demand for our products shifts such that a manufacturing facility is operated below its capacity for an extended period, we may adjust our manufacturing operations to reduce fixed costs, which could lead to uncertainty and delays in manufacturing times and quality during any transition period.

Additionally, since all of our products are manufactured at our manufacturing facility in Carlsbad, any contamination of the controlled environment, equipment malfunction, or failure to strictly follow procedures can significantly reduce our yield. A drop in yield can increase our cost to manufacture our products or, in more severe cases, require us to halt the manufacture of our products until the problem is resolved. Identifying and resolving the cause of a drop in yield can require substantial time and resources.

If our manufacturing activities are adversely impacted, or if we are otherwise unable to keep up with demand for our products by successfully manufacturing, assembling, testing, and shipping our products in a timely manner, our revenue could be impaired, market acceptance for our products could be adversely affected and our customers might instead purchase our competitors' products, which would have a material adverse effect on our business, financial condition, and results of operations.

*We have incurred losses in recent periods and may be unable to achieve profitability in the future.*

We incurred net losses of $30.8 million and $17.8 million for the years ended December 31, 2018 and 2017, respectively. As of December 31, 2018, we had an accumulated deficit of $60.2 million. We expect to continue to incur significant sales and marketing, product development, regulatory and other expenses as we continue to expand our marketing efforts to increase adoption of our products and expand existing relationships with our customers, to obtain regulatory clearances or approvals for our products in additional jurisdictions and for additional indications, and to develop new products or add new features to our existing products. In addition, our general and administrative expenses have increased following our initial public offering and we expect these costs to continue to increase due to the additional costs associated with being a public company. The net losses that we incur may fluctuate significantly from period to period. We will need to generate significant additional revenue in order to achieve and sustain profitability and, even if we achieve profitability, we cannot be sure that we will remain profitable for any substantial period of time. Our failure to achieve or maintain profitability would have a material adverse effect on our business, financial condition, and results of operations and could negatively impact the value of our common stock.

*If our sole manufacturing facility becomes damaged or inoperable, or we are required to vacate the facility, our ability to manufacture and sell our products and to pursue our research and development efforts may be jeopardized.*

We currently manufacture and assemble our products in our sole manufacturing facility in Carlsbad, California. Our products consist of components sourced from a variety of suppliers, with final assembly completed at our facility. Our facility and equipment, or those of our suppliers, could be harmed or rendered inoperable by natural or man-made disasters, including earthquakes, fires, power shortages, telecommunications failures, water shortages, floods, hurricanes, typhoons, extreme weather conditions, medical epidemics, and other natural or man-made disasters or other business interruptions, for which we are predominantly self-insured. Any of these may render it difficult or impossible for us to manufacture products for an extended period of time. If our facility is inoperable for even a short period of time, the inability to manufacture our current products, and the interruption in research and development of any future products, may result in harm to our reputation, increased costs, lower revenue and the loss of customers, which would have a material adverse effect on our business, financial condition, and results of operations. Furthermore, it could be costly and time-consuming to repair or replace our facilities and the equipment we use to perform our research and development work and manufacture our products. We also rely on third-party component suppliers, and our ability to obtain commercial supplies of our products could be disrupted if

29

**50**

**EXHIBIT 5**

the operations of these suppliers are affected by a man-made or natural disaster or other business interruption, which would have a material adverse effect on our business, financial condition, and results of operations.

*If product liability lawsuits are brought against us, we may incur substantial liabilities and may be required to limit or halt the marketing and sale of our products.*

We face an inherent risk of product liability as a result of the marketing and sale of our products. For example, we may be sued if our products cause or are perceived to cause injury or are found to be otherwise unsuitable during manufacturing, marketing or sale. Any such product liability claim may include allegations of defects in manufacturing, defects in design, a failure to warn of dangers inherent in the product, negligence, strict liability or breach of warranty. In addition, we may be subject to claims against us even if the apparent injury is due to the actions of others or the pre-existing health of the patient. For example, we rely on physicians in connection with the use of our products on patients. If these physicians are not properly trained or are negligent, the capabilities of our products may be diminished or the patient may suffer critical injury. We may also be subject to claims that are caused by the activities of our suppliers, such as those who provide us with components and sub-assemblies.

If we cannot successfully defend ourselves against product liability claims, we may incur substantial liabilities or be required to limit, delay or halt commercialization of our products. Even successful defense would require significant financial and management resources. Regardless of the merits or eventual outcome, liability claims may result in:

- decreased demand for our products;
- harm to our reputation;
- initiation of investigations by regulators;
- costs to defend the related litigation;
- diversion of management's time and our resources;
- monetary awards to trial participants or patients;
- product recalls, withdrawals or labeling, marketing or promotional restrictions;
- loss of revenue;
- exhaustion of any available insurance and our capital resources;
- inability to market and sell our products; and
- a resulting decline in the price of our common stock.

We believe our product liability insurance is customary for similarly situated companies, but it may not be adequate to cover all liabilities that we may incur. Insurance coverage is increasingly expensive. We may not be able to maintain or obtain insurance at a reasonable cost or in an amount adequate to satisfy any liability that may arise, if at all. Our insurance policy contains various exclusions, and we may be subject to a product liability claim for which we have no coverage. The potential inability to obtain sufficient product liability insurance at an acceptable cost to protect against product liability claims could prevent or inhibit the marketing and sale of products we develop. We may have to pay any amounts awarded by a court or negotiated in a settlement that exceed our coverage limitations or that are not covered by our insurance, and we may not have, or be able to obtain, sufficient capital to pay such amounts, which would have a material adverse effect on our business, financial condition, and results of operations.

*We face substantial competition, which may result in others discovering, developing or commercializing products more successfully than us.*

The medical device industry is intensely competitive and subject to rapid and significant technological change. Many of our competitors have significantly greater financial, technical and human resources. Smaller and early-stage companies may also prove to be significant competitors, particularly through collaborative arrangements with large and established companies.

Our competitors may also develop products that are more effective, more convenient, more widely used, less costly, or have a better safety profile than our products and these competitors may also be more successful than us in manufacturing and marketing their products.

**51**

**EXHIBIT 5**

Our competitors also compete with us in recruiting and retaining qualified scientific, management and commercial personnel, as well as in acquiring technologies complementary to, or necessary for, our programs. Competition for these people in the medical device industry is intense and we may face challenges in retaining and recruiting such individuals if, for example, other companies may provide more generous compensation and benefits, more diverse opportunities, and better chances for career advancement than we do. Some of these advantages may be more appealing to high-quality candidates and employees than those we have to offer. In addition, the decline in our stock price has created additional challenges by reducing the retention value of our equity awards. Because of the complex and technical nature of our systems and the dynamic market in which we compete, any failure to attract and retain a sufficient number of qualified employees could materially harm our ability to develop and commercialize our technology, which would have a material adverse effect on our business, financial condition, and results of operations.

*We may be unable to compete successfully with companies in our highly competitive industry, many of whom have substantially greater resources than we do.*

The healthcare industry is highly competitive. There are numerous approved products for treating vascular and dermatological diseases in the indications in which we have received clearance or approval and those that we may pursue in the future. Many of these cleared or approved products are well-established and are widely accepted by physicians, patients and third-party payors. Insurers and other third-party payors may encourage the use of competitors' products. In addition, many companies are developing products, and we cannot predict what the standard of care will be in the future.

Our primary competitors for DABRA include Medtronic plc, Cardiovascular Systems Inc., Boston Scientific Corp., Avinger, Inc., Koninklijke Philips N.V., or Philips, including Volcano Corporation and Spectranetics Corporation, including products from the C.R. Bard acquisition, and Abbott Laboratories. These companies are manufacturers of products used in competing therapies within the peripheral and coronary atherectomy markets such as:

- atherectomy, using mechanical methods to remove vascular blockages;
- balloon angioplasty and stents;
- specialty balloon angioplasty, such as scoring balloons, pillowing balloons, cutting balloons and drug-coated balloons;
- bypass surgery; and
- amputation.

We also face competition from pharmaceutical companies that produce drugs which aim to destroy plaque or remove blockages in the bloodstream.

Our primary competitors for Pharos are Daavlin, National Biological, STRATA Skin Sciences and large pharmaceutical companies producing biologicals used in the treatment of chronic skin conditions.

Many of our competitors have substantially greater financial, manufacturing, commercial, and technical resources than we do. There has been consolidation in the industry, and we expect that to continue. Larger competitors may have substantially larger sales and marketing operations than we do. This may allow those competitors to spend more time with current and potential customers and to focus on a larger number of current and potential customers, which gives them a significant advantage over our sales and marketing team and our international distributors in making sales. In addition, we are often selling to customers who already utilize our competitors' products and who have established relationships with our competitors' sales representatives and familiarity with our competitors' products.

We are also aware that some of our competitors have been giving false and misleading information to our customers regarding reimbursement for procedures using DABRA, alleging without any factual basis that procedures performed using DABRA are not reimbursable under atherectomy coding. While we believe that these allegations are without merit, they may be successful in dissuading physicians from using the DABRA system out of concerns regarding reimbursement.

Larger competitors may also have broader product lines, which enables them to offer customers bundled purchase contracts and quantity discounts. These competitors may have more experience than we have in research

**52**
**EXHIBIT 5**

and development, marketing, manufacturing, preclinical testing, conducting clinical trials, obtaining FDA and non-U.S. regulatory clearances or approvals and marketing cleared or approved products. Our competitors may discover technologies and techniques, or enter into partnerships and collaborations, to develop competing products that are more effective or less costly than our products or the products we may develop. This may render our technology or products obsolete or noncompetitive. Our competitors may also be better equipped than we are to respond to competitive pressures. If we are unable to compete successfully in our industry, it would have a material adverse effect on our business, financial condition, and results of operations.

*If DABRA and Pharos are not approved for new indications, our commercial opportunity will be limited.*

We market and sell DABRA for use as a tool in the treatment of vascular blockages resulting from lower extremity vascular disease and Pharos for use in the treatment of psoriasis, vitiligo, atopic dermatitis and leukoderma. Although physicians, in the practice of medicine, may prescribe or use marketed products for unapproved indications, manufacturers may promote their products only for the approved indications and in accordance with the provisions of the approved label. However, one of our strategies in the future is to pursue additional vascular indications for DABRA and additional dermatological indications for Pharos. Submitting the required applications for additional indications may require substantial additional funding beyond our cash and cash equivalents as of December 31, 2018. We cannot assure you that we will be able to successfully obtain approval for any of these additional product indications through the application process.

Even if we obtain FDA clearance or approval to market our products for additional indications in the U.S., we cannot assure you that any such indications will be successfully commercialized, widely accepted in the marketplace or more effective than other commercially available alternatives. If we are unable to successfully develop our products for additional indications, our commercial opportunity will be limited, which would have a material adverse effect on our business, financial condition, and results of operations.

*We may require additional capital to finance our planned operations, which may not be available to us on acceptable terms or at all. As a result, we may not be able to continue our marketing efforts to increase the adoption of our products.*

Our operations have consumed substantial amounts of cash since inception, primarily due to our research and development and marketing efforts. We expect our sales and marketing expenses to increase substantially in connection with our plan to continue our commercialization efforts of the DABRA system in the U.S. and internationally. These expenditures will also include costs associated with manufacturing and supply, sales and marketing costs, and general operations. In addition, other unanticipated costs may arise.

As of December 31, 2018, we had cash and cash equivalents of $64.3 million. On October 1, 2018, we completed our initial public offering, selling 4,485,000 shares of our common stock at $17.00 per share. Proceeds from our initial public offering, net of underwriting discounts and commissions and offering expenses, were $67.3 million. We believe that our existing cash and cash equivalents, will fund our projected operating expenses and capital expenditure requirements for at least the next 12 months.

The amount and timing of any expenditures needed to implement our sales and marketing programs will depend on numerous factors, including:

- our ability to achieve sufficient market acceptance, coverage and adequate reimbursement from third-party payors and acceptable market share for DABRA and Pharos;

- the cost to establish, maintain, expand, and defend the scope of our intellectual property portfolio, as well as any other action required in connection with licensing, preparing, filing, prosecuting, defending, and enforcing any patents or other intellectual property rights;

- the emergence of competing technologies and other adverse market developments;

- the costs associated with manufacturing, selling, and marketing DABRA and Pharos for their cleared or approved indications or any other indications for which we receive regulatory clearance or approval, including the cost and timing of expanding our manufacturing capabilities, as well as establishing our sales and marketing capabilities;

32

**53**

**EXHIBIT 5**

- our ability to establish and maintain strategic licensing or other arrangements and the financial terms of such agreements;

- the timing, receipt, and amount of license fees and sales of, or royalties on, our future products or future improvements on our existing products, if any;

- the time and cost necessary to complete post-marketing studies that could be required by regulatory authorities or other studies required to obtain clearance for additional indications; and

- our need to implement additional internal systems and infrastructure, including financial and reporting systems, as a public company.

If we raise additional capital through marketing and distribution arrangements or other collaborations, strategic alliances or licensing arrangements with third parties, we may have to relinquish certain valuable rights to our products, technologies, future revenue streams or research programs or grant licenses on terms that may not be favorable to us. If we raise additional capital through public or private equity offerings, the ownership interest of our existing stockholders will be diluted, and the terms of these securities may include liquidation or other preferences that adversely affect our stockholders' rights. If we raise additional capital through debt financing, we may be subject to covenants limiting or restricting our ability to take specific actions, such as incurring additional debt or making capital expenditures. If we are unable to obtain adequate financing on commercially reasonable terms when needed, we may have to delay, reduce the scope of or suspend our sales and marketing efforts, which would have a material adverse effect on our business, financial condition, and results of operations.

*If we make acquisitions or divestitures, we could encounter difficulties that harm our business.*

To date, the growth of our business has been organic, and we have no experience in acquiring other businesses, products or technologies. We may acquire companies, products or technologies that we believe to be complementary to the present or future direction of our business. If we engage in such acquisitions, we may have difficulty integrating the acquired personnel, financials, operations, products or technologies. Acquisitions may dilute our earnings per share, disrupt our ongoing business, distract our management and employees, increase our expenses, subject us to liabilities, and increase our risk of litigation, all of which could harm our business. If we use cash to acquire companies, products or technologies, it may divert resources otherwise available for other purposes. If we use our common stock to acquire companies, products or technologies, our stockholders may experience substantial dilution.

*Technological change may adversely affect sales of our products and may cause our products to become obsolete.*

The medical device market is characterized by extensive research and development and rapid technological change. Technological progress or new developments in our industry could adversely affect sales of our products. Our products could be rendered obsolete because of future innovations by our competitors or others in the treatment of vascular diseases and dermatological diseases, which would have a material adverse effect on our business, financial condition, and results of operations.

*Consolidation in the medical device industry could have an adverse effect on our revenue and results of operations.*

Many medical device industry companies are consolidating to create new companies with greater market power. For example, the Spectranetics Corporation was acquired by Koninklijke Philips N.V in 2017. As the medical device industry consolidates, competition to provide goods and services to industry participants will become more intense. These industry participants may try to use their market power to negotiate price concessions or reductions for medical devices that incorporate components produced by us. If we reduce our prices because of consolidation in the healthcare industry, our revenue would decrease and our earnings, financial condition, or cash flows would suffer, which would have a material adverse effect on our business, financial condition, and results of operations.

33

**54**

# EXHIBIT 5

*We may be subject to enforcement actions, competitor lawsuits, or other claims if we engage in the off-label promotion of our products.*

Our promotional materials and training methods must comply with FDA regulations and other applicable laws, including restraints and prohibitions on the promotion of off-label, or uncleared use, of our products. Physicians may use our products for off-label use without regard to these prohibitions, as FDA regulations do not restrict or regulate a physician's choice of treatment within the practice of medicine. Although our policy is to follow published FDA guidance in order to avoid promoting our products improperly, the FDA or other regulatory agencies or third parties could disagree and conclude that we have engaged in off-label promotion. For example, our DABRA Laser System has been cleared by the FDA for crossing chronic total occlusions in patients with symptomatic infrainguinal lower extremity vascular disease and has an intended use for ablating a channel in occlusive peripheral vascular disease. We have not received FDA clearance or approval to market DABRA for an atherectomy indication. While our pivotal clinical study of the DABRA Laser System would not be sufficient to expand our FDA-cleared indication for use to an atherectomy indication for use, which the FDA currently defines to include a prespecified improvement in luminal patency, or prespecified increase in the openness of the artery at a pre-defined time point, such as six months following a DABRA procedure, using a consistent assessment tool, we believe that we can promote the device using the truthful and not misleading information from this study that is not inconsistent with our cleared indication.

During our initial public offering process, we received correspondence from a competitor claiming our promotion for DABRA as an atherectomy tool used by surgeons to treat peripheral vascular disease is off-label promotion for the product. We are also aware of similar claims being made to physicians by our competitors. We disagree with our competitors' claims and believe FDA's regulations and judicial case law allow companies to engage in certain forms of truthful, non-misleading and non-promotional speech concerning the off-label use of products, and we believe that we comply with these restrictions. We cannot predict the extent to which our competitors may be successful in dissuading physicians from using the DABRA system out of concerns regarding reimbursement. In addition, we operate in an industry characterized by extensive litigation. However, the scope of potential liability with respect to any such claims, enforcement actions, or lawsuits is uncertain, and we cannot assure you that we will not receive claims from competitors or other third parties or be subject to enforcement actions in the future from regulatory agencies. For example, the FDA, FTC, the Office of the Inspector General of the Department of Health and Human Services ("HHS"), the DOJ and various state Attorneys General actively enforce laws and regulations that prohibit the promotion of off-label uses. If we are found to have improperly promoted off-label uses, we may be subject to significant liability, including civil fines, criminal fines and penalties, civil damages, exclusion from federal funded healthcare programs and potential liability under the federal False Claims Act and any applicable state false claims act. In addition, if the FDA determines that our promotional materials or training constitutes promotion of an off-label use, it could request that we modify our training or promotional materials, which could negatively impact our marketing and decrease demand for our products. Conduct giving rise to such liability could also form the basis for private civil litigation by third-party payers, competitors, or other persons claiming to be harmed by such conduct. Notwithstanding the regulatory restrictions on off-label promotion, the FDA's regulations, guidance and judicial case law allow companies to engage in certain forms of truthful, non-misleading and non-promotional speech concerning the off-label use of products, for example FDA's June 2018 guidance document, "Medical Product Communications That Are Consistent With the FDA-Required Labeling - Questions and Answers." Nonetheless, the FDA, HHS, DOJ, and/or state Attorneys General, competitors, and other third parties may take the position that we are not in compliance with such requirements, and if such non-compliance is proven, it could harm our reputation, financial condition or divert financial and management resources from our core business, and would have a material adverse effect on our business, financial condition and results of operations. Moreover, any threatened or actual government enforcement actions or lawsuits by third parties could also generate adverse publicity, which could decrease demand for our products and require that we devote substantial resources that could be used productively on other aspects of our business.

**55**

**EXHIBIT 5**

*Litigation and other legal proceedings may adversely affect our business.*

From time to time we are involved in and may become involved in legal proceedings relating to patent and other intellectual property matters, product liability claims, employee claims, tort or contract claims, federal regulatory investigations, securities class action, and other legal proceedings or investigations, which could have an adverse impact on our reputation, business and financial condition and divert the attention of our management from the operation of our business. Litigation is inherently unpredictable and can result in excessive or unanticipated verdicts and/or injunctive relief that affect how we operate our business. We could incur judgments or enter into settlements of claims for monetary damages or for agreements to change the way we operate our business, or both. There may be an increase in the scope of these matters or there may be additional lawsuits, claims, proceedings or investigations in the future, which could have a material adverse effect on our business, financial condition, and results of operations. Adverse publicity about regulatory or legal action against us could damage our reputation and brand image, undermine our customers' confidence and reduce long-term demand for our products, even if the regulatory or legal action is unfounded or not material to our operations.

We must indemnify officers and directors, including, in certain circumstances, former employees and directors, against all losses, including expenses, incurred by them in legal proceedings and advance their reasonable legal defense expenses, unless certain conditions apply. A prolonged uninsured expense and indemnification obligation could have a material adverse effect on our business, financial condition, and results of operations.

*We are subject to numerous laws and regulations related to health care fraud and abuse, false claims, anti-bribery and anti-corruption laws, such as the U.S. Anti-Kickback Statute and Foreign Corrupt Practices Act of 1977, in which violations of these laws could result in substantial penalties and prosecution.*

In the United States, we are subject to various state and federal fraud and abuse laws, including, without limitation, the federal Anti-Kickback Statute and federal False Claims Act. There are similar laws in other countries. These laws may impact, among other things, the sales, marketing and education programs for our products. The federal Anti-Kickback Statute prohibits persons from knowingly and willingly soliciting, offering, receiving or providing remuneration, directly or indirectly, in exchange for or to induce either the referral of an individual, or the furnishing or arranging for a good or service, for which payment may be made under a federal health care program. The federal False Claims Act prohibits persons from knowingly filing, or causing to be filed, a false claim to, or the knowing use of false statements to obtain payment from the federal government. Any allegation, investigation, or violation of these domestic health care fraud and abuse laws could result in government or internal investigations, significant diversion of resources, exclusion from government health care reimbursement programs and the curtailment or restructuring of our operations, significant fines, penalties, or other financial consequences, any of which may ultimately have a material adverse effect on our business, financial condition, and results of operations.

For our sales and operations outside the United States, we are similarly subject to various heavily-enforced anti-bribery and anti-corruption laws, such as the U.S. Foreign Corrupt Practices Act of 1977, as amended, or FCPA, U.K. Bribery Act, and similar laws around the world. These laws generally prohibit U.S. companies and their employees and intermediaries from offering, promising, authorizing or making improper payments to foreign government officials for the purpose of obtaining or retaining business or gaining any advantage. We face significant risks if we, which includes our third parties, fail to comply with the FCPA and other anti-corruption and anti-bribery laws.

We leverage various third parties to sell our products and conduct our business abroad, including to government owned universities and hospitals. We, our distributors and channel partners, and our other third-party intermediaries may have direct or indirect interactions with officials and employees of government agencies or state-owned or affiliated entities (such as in the context of obtaining government approvals, registrations, or licenses or sales to government owned or controlled health care facilities, universities, institutes, clinics, etc.) and may be held liable for the corrupt or other illegal activities of these third-party business partners and intermediaries, our employees, representatives, contractors, partners, and agents, even if we do not explicitly authorize such activities. In many foreign countries, particularly in countries with developing economies, it may be a local custom that businesses engage in practices that are prohibited by the FCPA or other applicable laws and regulations. To that end, while we have adopted and implemented internal control policies and procedures and employee training and compliance programs to deter prohibited practices, such compliance measures ultimately may not be effective in prohibiting our employees, contractors, third parties, intermediaries or agents from violating or circumventing our policies and/or the law.

35

**56**

**EXHIBIT 5**

Responding to any enforcement action or related investigation may result in a materially significant diversion of management's attention and resources and significant defense costs and other professional fees. Any violation of the FCPA, other applicable anti-bribery, anti-corruption laws, and anti-money laundering laws could result in whistleblower complaints, adverse media coverage, investigations, loss of export privileges, severe criminal or civil sanctions and, in the case of the FCPA, suspension or debarment from U.S. government contracts, which could have a material and adverse effect on our reputation, business, financial condition, and results of operations.

*Governmental export or import controls could limit our ability to compete in foreign markets and subject us to liability if we violate them.*

Our products may be subject to U.S. export controls. Governmental regulation of the import or export of our products, or our failure to obtain any required import or export authorization for our products, when applicable, could harm our international sales and adversely affect our revenue. Compliance with applicable regulatory requirements regarding the export of our products may create delays in the introduction of our products in international markets or, in some cases, prevent the export of our products to some countries altogether. Furthermore, U.S. export control laws and economic sanctions prohibit the shipment of certain products and services to countries, governments, and persons targeted by U.S. sanctions. If we fail to comply with export and import regulations and such economic sanctions, we may be fined or other penalties could be imposed, including a denial of certain export privileges. Moreover, any new export or import restrictions, new legislation or shifting approaches in the enforcement or scope of existing regulations, or in the countries, persons, or technologies targeted by such regulations, could result in decreased use of our products by, or in our decreased ability to export our products to existing or potential customers with international operations. Any decreased use of our products or limitation on our ability to export or sell access to our products would likely materially and adversely affect our business, financial condition, and results of operations.

*A variety of risks associated with marketing our products internationally could materially adversely affect our business.*

In addition to selling our products in the U.S., we sell DABRA and Pharos outside of the U.S. We are subject to additional risks related to operating in foreign countries, including:

- differing regulatory requirements in foreign countries;
- differing reimbursement regimes in foreign countries, including price controls and lower payment;
- unexpected changes in tariffs, trade barriers, price and exchange controls and other regulatory requirements;
- economic weakness, including inflation, or political instability in particular foreign economies and markets;
- compliance with tax, employment, immigration and labor laws for employees living or traveling abroad;
- foreign taxes, including withholding of payroll taxes;
- foreign currency fluctuations, which could result in increased operating expenses and reduced revenue, and other obligations incident to doing business in another country;
- difficulties staffing and managing foreign operations;
- workforce uncertainty in countries where labor unrest is more common than in the U.S.;
- potential liability under the FCPA or comparable foreign regulations;
- challenges enforcing our contractual and intellectual property rights, especially in those foreign countries that do not respect and protect intellectual property rights to the same extent as the U.S.;
- product shortages resulting from any events affecting raw material or finished good supply or distribution or manufacturing capabilities abroad; and
- business interruptions resulting from geo-political actions, including war and terrorism.

These and other risks associated with our international operations may materially adversely affect our ability to attain or maintain profitable operations, which would have a material adverse effect on our business, financial condition, and results of operations.

36

**57**

**EXHIBIT 5**

*We face additional credit and compliance risks related to our international sales using foreign distributors.*

We partner with distributors for DABRA and Pharos in select geographies outside of the U.S. including the Netherlands, China, Thailand, United Arab Emirates, Italy, United Kingdom, Japan and Saudi Arabia. For fiscal year 2018, approximately 7% of our sales were outside of the U.S. We may not be able to collect all of the funds owed to us by our foreign distributors. Some foreign distributors may experience financial difficulties, including bankruptcy, which may hinder our collection of accounts receivable. Where we extend credit terms to distributors, we periodically review the collectability and creditworthiness when determining the payment terms for such distributors. If our uncollectible accounts exceed our expectations, this could adversely impact our operating results. In addition, failure by our foreign distributors to comply with the Foreign Corrupt Practices Act or similar laws, insurance requirements, or other contract terms could have a negative impact on our business. Failure to manage the risks related to our foreign distributors would have a material adverse effect on our business, financial condition, and results of operations.

*We are highly dependent on our key personnel, and if we are not successful in attracting and retaining highly qualified personnel, we may not be able to successfully implement our business strategy.*

Our ability to compete in the highly competitive medical devices industry depends upon our ability to attract and retain highly qualified managerial, scientific and medical personnel. We are highly dependent on our senior management team. The loss of the services of any of our executive officers and other key employees, and our inability to find suitable replacements could result in delays in product development and harm our business.

Competition for skilled personnel in our market is intense and may limit our ability to hire and retain highly qualified personnel on acceptable terms or at all. To induce valuable employees to remain at our company, in addition to salary and cash incentives, we have issued stock options and restricted stock units that vest over time. The value to employees of stock options and restricted stock units that vest over time may be significantly affected by movements in our stock price that are beyond our control, and may at any time be insufficient to counteract more lucrative offers from other companies. Despite our efforts to retain valuable employees, members of our management, scientific and development teams may terminate their employment with us on short notice. Although we have employment agreements with our key employees, these employment agreements provide for at-will employment, which means that any of our employees could leave our employment at any time, with or without notice. We do not maintain "key man" insurance policies on the lives of these individuals or the lives of any of our other employees, with the exception of the "key man" insurance policy for our Chief Executive Officer, Dean Irwin. Our success also depends on our ability to continue to attract, retain and motivate highly skilled junior, mid-level and senior managers as well as junior, mid-level and senior scientific and medical personnel. If we are not successful in attracting and retaining highly qualified personnel, it would have a material adverse effect on our business, financial condition, and results of operations.

*If we experience significant disruptions in our information technology systems, our business may be adversely affected.*

We depend on our information technology systems for the efficient functioning of our business, including the manufacture, distribution and maintenance of DABRA and Pharos, as well as for accounting, data storage, compliance, purchasing and inventory management. We do not have redundant information technology systems at this time. Our information technology systems may be subject to computer viruses, ransomware or other malware, attacks by computer hackers, failures during the process of upgrading or replacing software, databases or components thereof, power outages, hardware failures, telecommunication failures and user errors, among other malfunctions. In addition, a variety of our software systems are cloud-based data management applications hosted by third-party service providers whose security and information technology systems are subject to similar risks. Technological interruptions would impact our business operations would disrupt our operations, including our ability to timely ship and track product orders, project inventory requirements, manage our supply chain and otherwise adequately service our customers or disrupt our customers' ability use our products for treatments. In the event we experience significant disruptions, we may be unable to repair our systems in an efficient and timely manner. Accordingly, such events may disrupt or reduce the efficiency of our entire operation and have a material adverse effect on our business, financial condition, and results of operations. Currently, we carry business interruption coverage to mitigate certain potential losses, but this insurance is limited in amount, subject to deductibles, and we cannot be certain that such potential losses will not exceed our policy limits. We are increasingly dependent on complex information technology to manage our infrastructure. Our information systems require an ongoing commitment of significant resources to maintain, protect and enhance our existing systems. Failure to maintain or protect our information systems and data integrity effectively could have a material adverse effect on our business, financial condition, and results of operations.

**58**

**EXHIBIT 5**

*Failure to maintain effective internal controls could cause our investors to lose confidence in us and adversely affect the market price of our common stock. If our internal controls are not effective, we may not be able to accurately report our financial results or prevent fraud.*

Section 404 of the Sarbanes-Oxley Act of 2002, or Section 404, requires that we maintain internal control over financial reporting that meets applicable standards. We may err in the design or operation of our controls, and all internal control systems, no matter how well designed and operated, can provide only reasonable assurance that the objectives of the control system are met. Because there are inherent limitations in all control systems, there can be no assurance that all control issues have been or will be detected. If we are unable, or are perceived as unable, to produce reliable financial reports due to internal control deficiencies, investors could lose confidence in our reported financial information and operating results, which could result in a negative market reaction and a decrease in our stock price.

We will be required, pursuant to Section 404, to furnish a report by management on, among other things, the effectiveness of our internal control over financial reporting. Such report will not be required until our annual report filed on Form 10-K for the year ended December 31, 2019. We will need to disclose any material weaknesses identified by our management in our internal control over financial reporting. As an "emerging growth company," we will avail ourselves of the exemption from the requirement that our independent registered public accounting firm attest to the effectiveness of our internal control over financial reporting under Section 404. However, we may no longer avail ourselves of this exemption when we cease to be an "emerging growth company." When our independent registered public accounting firm is required to undertake an assessment of our internal control over financial reporting, the cost of our compliance with Section 404 will correspondingly increase. Our compliance with applicable provisions of Section 404 will require that we incur substantial accounting expense and expend significant management time on compliance-related issues as we implement additional corporate governance practices and comply with reporting requirements. Moreover, if we are not able to comply with the requirements of Section 404 applicable to us in a timely manner, or if we or our independent registered public accounting firm identifies deficiencies in our internal control over financial reporting that are deemed to be material weaknesses, the market price of our stock could decline and we could be subject to sanctions or investigations by the U.S. Securities and Exchange Commission, or SEC, or other regulatory authorities, which would require additional financial and management resources.

In prior periods we identified certain material weaknesses in our internal controls related to revenue recognition and lack of staffing in the accounting and finance organization. In connection with these prior material weaknesses we implemented remediation measures including training of accounting personnel as well as hiring additional personnel with experience in the ongoing identification, design and implementation of internal control over financial reporting. In connection with our 2017 audit, as part of the restatement to the 2016 financial statements, we identified a material weakness in the design of our internal controls related to the administration of capital stock transactions, including stock issuances and a reverse stock split which were not effected in accordance with the requirements of applicable law and the communication of stock option awards which were not validly authorized.

Efforts to remediate the control deficiencies that led to the material weakness discussed above have been completed as of December 31, 2018. We have incurred significant costs to remediate these weaknesses, primarily personnel costs, external consulting and legal fees, system implementation costs, and related indirect costs including the use of facilities and technology. We may not be successful in implementing these remediation efforts or in developing other internal controls, which may undermine our ability to provide accurate, timely and reliable reports on our financial and operating results. Further, to the extent we identify additional material weaknesses, we will not be able to fully assess whether corrective measures will remediate the material weakness in our internal control over financial reporting until we have completed our implementation efforts and sufficient time passes in order to evaluate their effectiveness. In addition, if we identify additional errors that result in material weaknesses in our internal control over financial reporting, we may not detect errors on a timely basis and our financial statements may be materially misstated. Moreover, in the future we may engage in business transactions, such as acquisitions, reorganizations or implementation of new information systems that could negatively affect our internal control over financial reporting and result in material weaknesses.

# 59

# EXHIBIT 5

If we identify new material weaknesses in our internal control over financial reporting, if we are unable to comply with the requirements of Section 404 in a timely manner, if we are unable to assert that our internal control over financial reporting is effective, or if our independent registered public accounting firm is unable to express an opinion as to the effectiveness of our internal control over financial reporting, we may be late with the filing of our periodic reports, investors may lose confidence in the accuracy and completeness of our financial reports and the market price of our common stock could be negatively affected. As a result of such failures, we could also become subject to investigations by the stock exchange on which our securities are listed, the SEC, or other regulatory authorities, and become subject to litigation from investors and stockholders, which could harm our reputation, financial condition or divert financial and management resources from our core business, and would have a material adverse effect on our business, financial condition and results of operations.

*We could be subject to claims based on defects with respect to certain corporate transactions that were not authorized in accordance with applicable law.*

We have determined that due to the material weakness in our internal controls related to the administration of capital stock transactions, there have been defects with respect to certain corporate transactions, including (i) stock issuances that were not or may not have been properly approved by our board of directors and/or adequately documented, (ii) a reverse stock split for which we failed to file the amendment to our articles of incorporation, and (iii) the communication of option awards that were not validly authorized by our board of directors as a result of non-existent or defective board approvals, in each case in accordance with applicable law.

To remediate these defects, we have taken a number of actions. Our board of directors has ratified the defective stock issuances; we obtained agreements from holders of the vast majority of our common stock which include a confirmation of the securities each stockholder holds, a release of potential claims with respect to issuance of securities to such stockholders, and a surrender specifically of any claims to the equity of the Delaware corporation except for the shares of the Delaware corporation that such stockholder has received in the reincorporation merger pursuant to the merger agreement; we confirmed with the vast majority of the applicable stockholders that the appropriate number of shares of common stock outstanding immediately prior to the time of the intended reverse stock split were contributed to the capital of the Company effective as of the intended time of, and to give effect to, the intended reverse stock split; and we have approved compensation to and obtained releases from our impacted employees and other service providers to resolve potential claims, if any, related to the communicated grants of option awards and to promote retention and align their interests with the long-term interests of our stockholders. While we have attempted to narrow potential future claims by taking certain remedial corporate actions, the scope of liability with respect to such defects is uncertain and we cannot assure that these actions will entirely remediate these defects or that we will not receive claims in the future from other persons asserting rights to shares of our capital stock or to stock options or other equity. To the extent any such claims are successful, they could have a material adverse effect on our business, financial condition and results of operations.

Under certain authority, common law ratification by our board of directors of prior stock issuances may have caused such issuances to be valid stock issuances by us at the time of the respective issuances. However, there is uncertainty under applicable law as to whether such common law ratification may be effective under all circumstances. There can be no assurance that stockholders will not assert claims that a defective corporate act or putative stock issuance ratified by us is void or voidable due to the identified failure of proper authorization by our board of directors, as well as other claims related thereto, and, if asserted, that any such claims will not be successful. If such ratification is deemed not to be effective, then the issuances of certain shares of our stock and other attempted corporate actions would be invalid and we could have liability to grantees of our common stock, which may have a material adverse effect on our business and results of operations.

We have also confirmed that the vast majority of the applicable stockholders as of the time of the intended reverse stock split contributed a number of shares of common stock sufficient to give effect to the recapitalization intended by the reverse stock split. However, a holder of our common stock could argue that this process does not represent an adequate remedy for a potential failure to properly implement the reverse stock split. If the contribution of shares to the capital of the Company was not effective, then we could have liability to certain holders of our common stock, which may have a material adverse effect on our business and results of operations.

39

**60**

**EXHIBIT 5**

Additionally, we may have potential liability to certain of our employees, directors, consultants, and other service providers for communicated grants of option awards that were not authorized in compliance with applicable law. With respect to the communicated grants of option awards that were not validly authorized, we approved compensation and obtained a release of potential claims from such persons. We approved compensation to our impacted employees, directors, consultants, and other service providers to mitigate potential claims related to the communicated grants of option awards, if any. However, an impacted individual could argue that such compensation is not an adequate remedy for prior invalid option awards and, if a court were to impose a greater remedy, our financial exposure could be greater and have a material adverse effect on our business and results of operations. The foregoing could also result in tax withholding, employment taxes or other tax liabilities, including penalties and interest, all of which could have a material adverse effect on our business, financial condition and results of operations.

*We will need to grow the size of our organization, and we may experience difficulties in managing this growth.*

At December 31, 2018, we had 118 full-time employees. As our sales and marketing strategies develop, we expect to need additional managerial, operational, sales, marketing, financial, and other personnel. Future growth would impose significant added responsibilities on members of management, including:

- identifying, recruiting, integrating, maintaining, and motivating additional employees;
- managing our internal development efforts effectively, while complying with our contractual obligations to contractors and other third parties; and
- improving our operational, financial and management controls, reporting systems and procedures.

Our future financial performance and our ability to successfully market and sell our products will depend, in part, on our ability to effectively manage any future growth, and our management may also have to divert a disproportionate amount of its attention away from day-to-day activities in order to devote a substantial amount of time to managing these growth activities.

If we are not able to effectively expand our organization by hiring new employees and expanding our groups of consultants and contractors, we may not be able to successfully implement the tasks necessary to further develop and commercialize our products and, accordingly, may not achieve our research, sales and marketing goals, which would have a material adverse effect on our business, financial condition, and results of operations.

*We actively employ social media as part of our marketing strategy, which could give rise to regulatory violations, liability, breaches of data security or reputational damage.*

Despite our efforts to monitor evolving social media communication guidelines and comply with applicable rules, there is risk that the use of social media by us, our employees or our customers to communicate about our products or business may cause us to be found in violation of applicable requirements, including requirements of regulatory bodies such as the FDA and Federal Trade Commission. For example, promotional communications and endorsements on social media that, among other things, promote our products for uses or in patient populations that are not described in the product's approved labeling (known as "off-label uses"), do not contain a fair balance of information about risks associated with using our products, make comparative or other claims about our products that are not supported by sufficient evidence, and/or do not contain required disclosures could result in an enforcement actions against us. In addition, adverse events, product complaints, off-label usage by physicians, unapproved marketing or other unintended messages posted on social media could require an active response from us, which may not be completed in a timely manner and could result in regulatory action by a governing body. Further, our employees may knowingly or inadvertently make use of social media in ways that may not comply with our corporate policies or other legal or contractual requirements, which may give rise to liability, lead to the loss of trade secrets or other intellectual property, or result in public exposure of personal information of our employees, clinical trial patients, customers and others. Furthermore, negative posts or comments about us or our products in social media could seriously damage our reputation, brand image and goodwill, which would have a material adverse effect on our business, financial condition, and results of operations.

**61**

**EXHIBIT 5**

**SIGNATURES**

Pursuant to the requirements of Section 13 or 15 (d) of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned, thereunto duly authorized.

|  |  |  |
|---|---|---|
|  | RA MEDICAL SYSTEMS, INC. | |
|  | (Registrant) | |
| Date:    March 14, 2019 | By:    /s/ Dean Irwin | |
|  | Dean Irwin | |
|  | Chief Executive Officer, Chairman of the Board, Co-President, and Chief Technology Officer | |

92

**62**

**EXHIBIT 5**

**POWER OF ATTORNEY**

KNOW ALL PERSONS BY THESE PRESENTS, that each person whose signature appears below constitutes and appoints Dean Irwin and Andrew Jackson, and each of them, his true and lawful attorneys-in-fact and agents, with full power of substitution and resubstitution, to sign any and all amendments (including post-effective amendments) to this Annual Report on Form 10-K and to file the same, with all exhibits thereto and other documents in connection therewith, with the Securities and Exchange Commission, granting unto each of said attorneys-in-fact and agents, full power and authority to do and perform each and every act and thing requisite and necessary to be done in connection therewith, as fully to all intents and purposes as he or she might or could do in person, hereby ratifying and confirming all that each of said attorneys-in-facts and agents, or his substitute or substitutes, or any of them, shall do or cause to be done by virtue hereof.

Pursuant to the requirements of the Securities Exchange Act of 1934, this report has been signed below by the following persons on behalf of the registrant and in the capacities and on the dates indicated:

| Signature | Title | Date |
|---|---|---|
| /s/ Dean Irwin<br>Dean Irwin | Chief Executive Officer, Chairman of the Board, Co-President, and Chief Technology Officer (Principal Executive Officer) | March 14, 2019 |
| /s/ Andrew Jackson<br>Andrew Jackson | Chief Financial Officer<br>(Principal Financial and Accounting Officer) | March 14, 2019 |
| /s/ Maurice Buchbinder, M.D.<br>Maurice Buchbinder, M.D. | Director | March 14, 2019 |
| /s/ Martin Colombatto<br>Martin Colombatto | Director | March 14, 2019 |
| /s/ Richard Mejia, Jr.<br>Richard Mejia, Jr. | Director | March 14, 2019 |
| /s/ Mark E. Saad<br>Mark E. Saad | Director | March 14, 2019 |
| /s/ William R. Enquist, Jr.<br>William R. Enquist, Jr. | Director | March 14, 2019 |

93

**63**

**EXHIBIT 5**

# EXHIBIT 6

**EXHIBIT 6**

**UNITED STATES**
**SECURITIES AND EXCHANGE COMMISSION**
Washington, D.C. 20549

**FORM 10-Q**

☒ **QUARTERLY REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

For the Quarterly Period Ended March 31, 2019

OR

☐ **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

For the Transition Period From to
Commission file number: 001-38677

# Ra Medical Systems, Inc.

(Exact name of Registrant as specified in its charter)

| | |
|---|---|
| Delaware | 38-3661826 |
| (State or other jurisdiction of incorporation or organization) | (I.R.S. Employer Identification No.) |
| 2070 Las Palmas Drive Carlsbad, California | 92011 |
| (Address of principal executive offices) | (Zip Code) |

(760) 804-1648
(Registrant's telephone number, including area code)

N/A
(Former name, former address and former fiscal year, if changed since last report)

Indicate by check mark whether the Registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the Registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. Yes ☒ No ☐

Indicate by check mark whether the registrant has submitted electronically every Interactive Data File required to be submitted pursuant to Rule 405 of Regulation S-T (§232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit such files). Yes ☒ No ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, a smaller reporting company, or an emerging growth company. See the definitions of "large accelerated filer," "accelerated filer," "smaller reporting company," and "emerging growth company" in Rule 12b-2 of the Exchange Act.

| | | | |
|---|---|---|---|
| Large accelerated filer | ☐ | Accelerated filer | ☐ |
| Non-accelerated filer | ☒ | Smaller reporting company | ☒ |
| | | Emerging growth company | ☒ |

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. ☐

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act). Yes ☐ No ☒

Securities registered pursuant to Section 12(b) of the Act:

| Title of each class | Trading Symbol(s) | Name of each exchange on which registered |
|---|---|---|
| Common Stock, par value $0.0001 per share | RMED | New York Stock Exchange |

As of May 10, 2019, the registrant had 12,928,773 shares of common stock, par value $0.0001, outstanding.

**65**

**EXHIBIT 6**

**RA MEDICAL SYSTEMS, INC.**
**QUARTERLY REPORT ON FORM 10-Q**

TABLE OF CONTENTS

| | | | Page |
|---|---|---|---|
| **PART I. FINANCIAL INFORMATION** | | | |
| Item 1. | Financial Statements: | | 3 |
| | Condensed Balance Sheets (unaudited) | | 3 |
| | Condensed Statements of Operations (unaudited) | | 4 |
| | Condensed Statements of Cash Flows (unaudited) | | 5 |
| | Condensed Statements of Stockholders' Equity (Deficit) (unaudited) | | 6 |
| | Notes to Condensed Financial Statements (Unaudited) | | 7 |
| Item 2. | Management's Discussion and Analysis of Financial Condition and Results of Operations | | 17 |
| Item 3. | Quantitative and Qualitative Disclosures about Market Risk | | 25 |
| Item 4. | Controls and Procedures | | 26 |
| **PART II. OTHER INFORMATION** | | | 27 |
| Item 1. | Legal Proceedings | | 27 |
| Item 1A. | Risk Factors | | 27 |
| Item 2. | Unregistered Sales of Equity Securities and Use of Proceeds | | 63 |
| Item 3. | Defaults Upon Senior Securities | | 63 |
| Item 4. | Mine Safety Disclosures | | 63 |
| Item 5. | Other Information | | 63 |
| Item 6. | Exhibits | | 64 |
| **SIGNATURES** | | | 65 |

2

**66**

**EXHIBIT 6**

success also depends on our ability to continue to attract, retain and motivate highly skilled junior, mid-level and senior managers as well as junior, mid-level and senior scientific and medical personnel. If we are not successful in attracting and retaining highly qualified personnel, it would have a material adverse effect on our business, financial condition, and results of operations.

*If we experience significant disruptions in our information technology systems, our business may be adversely affected.*

We depend on our information technology systems for the efficient functioning of our business, including the manufacture, distribution and maintenance of DABRA and Pharos, as well as for accounting, data storage, compliance, purchasing and inventory management. We do not have redundant information technology systems at this time. Our information technology systems may be subject to computer viruses, ransomware or other malware, attacks by computer hackers, failures during the process of upgrading or replacing software, databases or components thereof, power outages, hardware failures, telecommunication failures and user errors, among other malfunctions. In addition, a variety of our software systems are cloud-based data management applications hosted by third-party service providers whose security and information technology systems are subject to similar risks. Technological interruptions would impact our business operations would disrupt our operations, including our ability to timely ship and track product orders, project inventory requirements, manage our supply chain and otherwise adequately service our customers or disrupt our customers' ability use our products for treatments. In the event we experience significant disruptions, we may be unable to repair our systems in an efficient and timely manner. Accordingly, such events may disrupt or reduce the efficiency of our entire operation and have a material adverse effect on our business, financial condition, and results of operations. Currently, we carry business interruption coverage to mitigate certain potential losses, but this insurance is limited in amount, subject to deductibles, and we cannot be certain that such potential losses will not exceed our policy limits. We are increasingly dependent on complex information technology to manage our infrastructure. Our information systems require an ongoing commitment of significant resources to maintain, protect and enhance our existing systems. Failure to maintain or protect our information systems and data integrity effectively could have a material adverse effect on our business, financial condition, and results of operations.

*Failure to maintain effective internal controls could cause our investors to lose confidence in us and adversely affect the market price of our common stock. If our internal controls are not effective, we may not be able to accurately report our financial results or prevent fraud.*

Section 404 of the Sarbanes-Oxley Act of 2002, or Section 404, requires that we maintain internal control over financial reporting that meets applicable standards. We may err in the design or operation of our controls, and all internal control systems, no matter how well designed and operated, can provide only reasonable assurance that the objectives of the control system are met. Because there are inherent limitations in all control systems, there can be no assurance that all control issues have been or will be detected. If we are unable, or are perceived as unable, to produce reliable financial reports due to internal control deficiencies, investors could lose confidence in our reported financial information and operating results, which could result in a negative market reaction and a decrease in our stock price.

We will be required, pursuant to Section 404, to furnish a report by management on, among other things, the effectiveness of our internal control over financial reporting. Such report will not be required until our annual report filed on Form 10-K for the year ending December 31, 2019. We will need to disclose any material weaknesses identified by our management in our internal control over financial reporting. As an "emerging growth company," we will avail ourselves of the exemption from the requirement that our independent registered public accounting firm attest to the effectiveness of our internal control over financial reporting under Section 404. However, we may no longer avail ourselves of this exemption when we cease to be an "emerging growth company." When our independent registered public accounting firm is required to undertake an assessment of our internal control over financial reporting, the cost of our compliance with Section 404 will correspondingly increase. Our compliance with applicable provisions of Section 404 will require that we incur substantial accounting expense and expend significant management time on compliance-related issues as we implement additional corporate governance practices and comply with reporting requirements. Moreover, if we are not able to comply with the requirements of Section 404 applicable to us in a timely manner, or if we or our independent registered public accounting firm identifies deficiencies in our internal control over financial reporting that are deemed to be material weaknesses, the market price of our stock could decline and we could be subject to sanctions or investigations by the U.S. Securities and Exchange Commission, or SEC, or other regulatory authorities, which would require additional financial and management resources.

In prior periods we identified certain material weaknesses in our internal controls related to revenue recognition and lack of staffing in the accounting and finance organization. In connection with these prior material weaknesses we implemented remediation measures including training of accounting personnel as well as hiring additional personnel with experience in the ongoing identification, design and implementation of internal control over financial reporting. In connection with our 2017 audit, as part of the restatement to the 2016 financial statements, we identified a material weakness in the design of our internal controls related to the administration of capital stock transactions, including stock issuances and a reverse stock split which were not effected in accordance with the requirements of applicable law and the communication of stock option awards which were not validly authorized.

Efforts to remediate the control deficiencies that led to the material weakness discussed above have been completed as of December 31, 2018 and there was no material weakness at December 31, 2018. We have incurred significant costs to remediate

**67**

**EXHIBIT 6**

these weaknesses, primarily personnel costs, external consulting and legal fees, system implementation costs, and related indirect costs including the use of facilities and technology. However, completion of remediation does not provide assurance that our controls will operate properly or that our financial statements will be free from error, which may undermine our ability to provide accurate, timely and reliable reports on our financial and operating results. There may be undetected material weaknesses in our internal control over financial reporting, as a result of which we may not detect financial statement errors on a timely basis. Further, to the extent we identify additional material weaknesses, we will not be able to fully assess whether corrective measures will remediate the material weakness in our internal control over financial reporting until we have completed our implementation efforts and sufficient time passes in order to evaluate their effectiveness. In addition, if we identify additional errors that result in material weaknesses in our internal control over financial reporting, we may not detect errors on a timely basis and our financial statements may be materially misstated. Moreover, in the future we may engage in business transactions, such as acquisitions, reorganizations or implementation of new information systems that could negatively affect our internal control over financial reporting and result in material weaknesses.

If we identify new material weaknesses in our internal control over financial reporting, if we are unable to comply with the requirements of Section 404 in a timely manner, if we are unable to assert that our internal control over financial reporting is effective, or if our independent registered public accounting firm is unable to express an opinion as to the effectiveness of our internal control over financial reporting, we may be late with the filing of our periodic reports, investors may lose confidence in the accuracy and completeness of our financial reports and the market price of our common stock could be negatively affected. As a result of such failures, we could also become subject to investigations by the stock exchange on which our securities are listed, the SEC, or other regulatory authorities, and become subject to litigation from investors and stockholders, which could harm our reputation, financial condition or divert financial and management resources from our core business, and would have a material adverse effect on our business, financial condition and results of operations.

*We could be subject to claims based on defects with respect to certain corporate transactions that were not authorized in accordance with applicable law.*

We have determined that due to the material weakness in our internal controls related to the administration of capital stock transactions, there have been defects with respect to certain corporate transactions, including (i) stock issuances that were not or may not have been properly approved by our board of directors and/or adequately documented, (ii) a reverse stock split for which we failed to file the amendment to our articles of incorporation, and (iii) the communication of option awards that were not validly authorized by our board of directors as a result of non-existent or defective board approvals, in each case in accordance with applicable law.

To remediate these defects, we have taken a number of actions. Our board of directors has ratified the defective stock issuances; we obtained agreements from holders of the vast majority of our common stock which include a confirmation of the securities each stockholder holds, a release of potential claims with respect to issuance of securities to such stockholders, and a surrender specifically of any claims to the equity of the Delaware corporation except for the shares of the Delaware corporation that such stockholder has received in the reincorporation merger pursuant to the merger agreement; we confirmed with the vast majority of the applicable stockholders that the appropriate number of shares of common stock outstanding immediately prior to the time of the intended reverse stock split were contributed to the capital of the Company effective as of the intended time of, and to give effect to, the intended reverse stock split; and we have approved compensation to and obtained releases from our impacted employees and other service providers to resolve potential claims, if any, related to the communicated grants of option awards and to promote retention and align their interests with the long-term interests of our stockholders. While we have attempted to narrow potential future claims by taking certain remedial corporate actions, the scope of liability with respect to such defects is uncertain and we cannot assure that these actions will entirely remediate these defects or that we will not receive claims in the future from other persons asserting rights to shares of our capital stock or to stock options or other equity. To the extent any such claims are successful, they could have a material adverse effect on our business, financial condition and results of operations.

Under certain authority, common law ratification by our board of directors of prior stock issuances may have caused such issuances to be valid stock issuances by us at the time of the respective issuances. However, there is uncertainty under applicable law as to whether such common law ratification may be effective under all circumstances. There can be no assurance that stockholders will not assert claims that a defective corporate act or putative stock issuance ratified by us is void or voidable due to the identified failure of proper authorization by our board of directors, as well as other claims related thereto, and, if asserted, that any such claims will not be successful. If such ratification is deemed not to be effective, then the issuances of certain shares of our stock and other attempted corporate actions would be invalid and we could have liability to grantees of our common stock, which may have a material adverse effect on our business and results of operations.

We have also confirmed that the vast majority of the applicable stockholders as of the time of the intended reverse stock split contributed a number of shares of common stock sufficient to give effect to the recapitalization intended by the reverse stock split. However, a holder of our common stock could argue that this process does not represent an adequate remedy for a

38

**68**

**EXHIBIT 6**

potential failure to properly implement the reverse stock split. If the contribution of shares to the capital of the Company was not effective, then we could have liability to certain holders of our common stock, which may have a material adverse effect on our business and results of operations.

Additionally, we may have potential liability to certain of our employees, directors, consultants, and other service providers for communicated grants of option awards that were not authorized in compliance with applicable law. With respect to the communicated grants of option awards that were not validly authorized, we approved compensation and obtained a release of potential claims from such persons. We approved compensation to our impacted employees, directors, consultants, and other service providers to mitigate potential claims related to the communicated grants of option awards, if any. However, an impacted individual could argue that such compensation is not an adequate remedy for prior invalid option awards and, if a court were to impose a greater remedy, our financial exposure could be greater and have a material adverse effect on our business and results of operations. The foregoing could also result in tax withholding, employment taxes or other tax liabilities, including penalties and interest, all of which could have a material adverse effect on our business, financial condition and results of operations.

*We will need to grow the size of our organization, and we may experience difficulties in managing this growth.*

At March 31, 2019, we had 114 full-time employees. As our sales and marketing strategies develop, we expect to need additional managerial, operational, sales, marketing, financial, and other personnel. Future growth would impose significant added responsibilities on members of management, including:

- identifying, recruiting, integrating, maintaining, and motivating additional employees;
- managing our internal development efforts effectively, while complying with our contractual obligations to contractors and other third parties; and
- improving our operational, financial and management controls, reporting systems and procedures.

Our future financial performance and our ability to successfully market and sell our products will depend, in part, on our ability to effectively manage any future growth, and our management may also have to divert a disproportionate amount of its attention away from day-to-day activities in order to devote a substantial amount of time to managing these growth activities.

If we are not able to effectively expand our organization by hiring new employees and expanding our groups of consultants and contractors, we may not be able to successfully implement the tasks necessary to further develop and commercialize our products and, accordingly, may not achieve our research, sales and marketing goals, which would have a material adverse effect on our business, financial condition, and results of operations.

*We actively employ social media as part of our marketing strategy, which could give rise to regulatory violations, liability, breaches of data security or reputational damage.*

Despite our efforts to monitor evolving social media communication guidelines and comply with applicable rules, there is risk that the use of social media by us, our employees or our customers to communicate about our products or business may cause us to be found in violation of applicable requirements, including requirements of regulatory bodies such as the FDA and Federal Trade Commission. For example, promotional communications and endorsements on social media that, among other things, promote our products for uses or in patient populations that are not described in the product's approved labeling (known as "off-label uses"), do not contain a fair balance of information about risks associated with using our products, make comparative or other claims about our products that are not supported by sufficient evidence, and/or do not contain required disclosures could result in an enforcement actions against us. In addition, adverse events, product complaints, off-label usage by physicians, unapproved marketing or other unintended messages posted on social media could require an active response from us, which may not be completed in a timely manner and could result in regulatory action by a governing body. Further, our employees may knowingly or inadvertently make use of social media in ways that may not comply with our corporate policies or other legal or contractual requirements, which may give rise to liability, lead to the loss of trade secrets or other intellectual property, or result in public exposure of personal information of our employees, clinical trial patients, customers and others. Furthermore, negative posts or comments about us or our products in social media could seriously damage our reputation, brand image and goodwill, which would have a material adverse effect on our business, financial condition, and results of operations.

39

**69**

# EXHIBIT 6

**SIGNATURES**

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned thereunto duly authorized.

|                        | RA MEDICAL SYSTEMS, INC. |
|------------------------|--------------------------|
|                        | (Registrant)             |
| Date: May 13, 2019     | By:   /s/ Dean Irwin     |
|                        | Dean Irwin               |
|                        | Chief Executive Officer, Chairman of the Board, Co-President, and Chief Technology Officer (Principal Executive Officer) |
| Date: May 13, 2019     | By:   /s/ Andrew Jackson |
|                        | Andrew Jackson           |
|                        | Chief Financial Officer  |
|                        | (Principal Financial and Accounting Officer) |

65

**70**

**EXHIBIT 6**