Robert V. Prongay (SBN 270796)
  rprongay@glancylaw.com
Pavithra Rajesh (SBN 323055)
  prajesh@glancylaw.com
**GLANCY PRONGAY & MURRAY LLP**
1925 Century Park East, Suite 2100
Los Angeles, California 90067
Telephone: (310) 201-9150
Facsimile: (310) 201-9160

*Counsel for Lead Plaintiffs Ervin Derr and
Peter Shoemaker and Lead Counsel for the
Class*

[Additional Counsel on Signature Page]

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ERVIN DERR, and PETER SHOEMAKER, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>RA MEDICAL SYSTEMS, INC., DEAN IRWIN, ANDREW JACKSON, MELISSA BURSTEIN, MARTIN BURSTEIN, RICHARD HEYMANN, MAURICE BUCHBINDER, MARTIN COLOMBATTO, RICHARD MEJIA, JR., MARK E. SAAD, and WILLIAM ENQUIST, JR.,<br><br>Defendants. | Case No. 3:19-cv-01079-LAB-AHG<br><br>**LEAD PLAINTIFFS' OPPOSITION TO THE RA MEDICAL DEFENDANTS' MOTION TO DISMISS SECOND AMENDED COMPLAINT [DKT. NO. 60] AND TO THE IRWIN DEFENDANTS' JOINDER THEREOF [DKT. NO. 62]**<br><br>Judge: Larry Alan Burns<br><br>**SPECIAL BRIEFING SCHEDULE ORDERED** |

LEAD PLAINTIFFS' OPPOSITION TO MOTION TO DISMISS SAC
Case No. 3:19-cv-01079-LAB-AHG

713293.6

# TABLE OF CONTENTS

I.   The SAC Adequately Alleges A Section 11 Claim ..........................................4

    A.   Plaintiffs Face A Minimal Pleading Burden...........................................4

    B.   Plaintiffs Adequately Allege They Purchased Shares Pursuant Or Traceable To The IPO..................................................................................5

        1.   The SAC Cures The Deficiencies Identified By The Order.........5

        2.   Defendants' Unsubstantiated Assertion That Non-IPO Shares Entered The Market Must Be Rejected ........................................6

        3.   If Plaintiffs Must Prove That The 165,360 Shares Did Not Enter The Market Prior To Plaintiffs' Purchases, The PSLRA Discovery Stay Must Be Lifted................................................................8

    C.   The Court Already Found That The Registration Statement Was Misleading And Omitted To Disclose Material Facts ..........................11

    D.   The Registration Statement Failed To Disclose Additional Material Facts ......................................................................................................11

        1.   The Registration Statement Failed To Disclose That The FDA Warned Ra Medical That Its Practices Constituted Off-Label Marketing....................................................................................11

        2.   The Registration Statement Failed To Disclose That Ra Medical Tracked Physicians To Target With Improper Renumeration ...15

        3.   Item 303 Violations ................................................................18

    E.   Control Person Liability.......................................................................18

II.   There Are Additional Misleading Statements During The Class Period........19

    A.   The Applicable Legal Standard ...........................................................19

    B.   The Court Already Found That The Exchange Act Defendants Knowingly Issued Materially Misleading Statements .........................20

    C.   Defendants Ra Medical, Irwin, And Jackson Issued Additional Materially Misleading Statements .......................................................20

1.  Despite The FDA's Warning, The Company Continued To Engage In Off-Label Marketing Surreptitiously ..........................20

2.  The Company Continued To Target Physicians With Improper Renumeration...................................................................................22

3.  SOX Certifications Were Materially Misleading........................23

4.  Voluntary Recall Notice Was Materially Misleading ................25

III.   CONCLUSION .........................................................................................25

# **TABLE OF AUTHORITIES**

<u>CASES</u>

*Abbey v. Computer Memories, Inc.*,
   634 F. Supp. 870 (N.D. Cal. 1986)...........................................................................8

*Alberici v. Recro Pharma, Inc.*,
   2021 WL 798299 (E.D. Penn. Mar. 1, 2021) .........................................................23

*Bruce v. Suntech Power Holdings Co. Ltd.*,
   64 F. Supp. 3d 1365 (N.D. Cal. 2014)....................................................................19

*City of Roseville Emps.' Ret. Sys. v. Horizon Lines, Inc.*,
   686 F. Supp. 2d 404 (D. Del. 2009) .......................................................................23

*Eminence Capital, LLC v. Aspeon, Inc.*,
   316 F.3d 1048 (9th Cir. 2003) ................................................................................25

*Gordon v. Vanda Pharm. Inc.*,
   2021 WL 911755 (E.D.N.Y. Mar. 10, 2021) .........................................................12

*Herman & MacLean v. Huddleston*,
   459 U.S. 375 (1983)..................................................................................................4

*In re Atossa Genetics Inc. Sec. Litig.*,
   868 F.3d 784 (9th Cir. 2017) ............................................................................12, 13

*In re Atossa Genetics, Inc. Sec. Litig.*,
   2014 WL 4983551 (W.D. Wash. Oct. 6, 2014)......................................................10

*In re Century Aluminum Co. Sec. Litig.*,
   729 F.3d 1104 (9th Cir. 2013) ..................................................................................5

*In re China Educ. Alliance Sec. Litig.*,
   2011 WL 4978483 (C.D. Cal. Oct. 11, 2011) ........................................................19

*In re Gilead Scis. Sec. Litig.*,
   536 F.3d 1049 (9th Cir. 2008) ................................................................................19

*In re Infonet Servs. Corp. Sec. Litig.*,
310 F. Supp. 2d 1080 (C.D. Cal. 2003) ..................................................................... 14

*In re Portal Software, Inc. Sec. Litig.*,
2006 WL 2385250 (N.D. Cal. Aug. 17, 2006) ......................................................... 18

*In re Quarterdeck Office Sys., Inc. Sec. Litig.*,
1993 WL 623310 (C.D. Cal. Sept. 30, 1993) ..................................................... 10, 11

*In re Sipex Corp. Sec. Litig.*,
2005 WL 3096178 (N.D. Cal. Nov. 17, 2005) ......................................................... 17

*In re Tibco Software Inc.*,
2006 WL 1469654 (N.D. Cal. May 25, 2006) .......................................................... 24

*In re Ubiquiti Networks, Inc. Sec. Litig.*,
33 F. Supp. 3d 1107 (N.D. Cal. 2014) .................................................................. 8, 10

*In re Violin Memory Sec. Litig.*,
2014 WL 5525946 (N.D. Cal. Oct. 31, 2014) ...................................................... 4, 18

*Khoja v. Orexigen Therapeutics, Inc.*,
899 F.3d 988 (9th Cir. 2018) ..................................................................................... 9

*Knollenberg v. Harmonic, Inc.*,
152 F. App'x 674 (9th Cir. 2005) ............................................................................... 4

*Lilley v. Charren*,
936 F. Supp. 708 (N.D. Cal. 1996) .......................................................................... 10

*Limantour v. Cray Inc.*,
432 F. Supp. 2d 1129 (W.D. Wash. 2006) .............................................................. 24

*Livid Holdings Ltd. v. Salomon Smith Barney, Inc.*,
416 F.3d 940 (9th Cir. 2005) ................................................................................... 13

*Lovallo v. Pacira Pharm., Inc.*,
2015 WL 7300492 (D.N.J. Nov. 18, 2015) ............................................................. 13

*Luna v. Marvell Tech. Grp.*,
2017 WL 2171273 (N.D. Cal. May 17, 2017) ......................................................... 17

*Matrixx Initiatives, Inc. v. Siracusano*,
  563 U.S. 27 (2011)........................................................................................4, 19

*Mauss v. NuVasive, Inc.*,
  2016 WL 3681831 (S.D. Cal. July 12, 2016)......................................................16

*Mild v. PPG Indus., Inc.*,
  2018 WL 6787351 (C.D. Cal. Dec. 21, 2018)....................................................17

*Mulderrig v. Amyris, Inc.*,
  492 F. Supp. 3d 999 (N.D. Cal. Oct. 5, 2020)................................................17, 24

*Napoto v. DHL Exp. (USA), Inc.*,
  2009 WL 1974412 (N.D. Cal. July 2, 2009) ......................................................10

*Omnicare Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*,
  575 U.S. 175 (2015)...........................................................................................4

*Retail Wholesale & Dep't Store Union Local 338 Ret. Fund v. Hewlett-Packard Co.*,
  845 F.3d 1268 (9th Cir. 2017) ...........................................................................22

*Rok v. Identiv, Inc.*,
  2017 WL 35496 (N.D. Cal. Jan. 4, 2017)...........................................................24

*Rosi v. Aclaris Therapeutics, Inc.*,
  2021 WL 1177505 (S.D.N.Y. Mar. 29, 2021)..........................................12, 14, 15

*Salameh v. Tarsadia Hotel*,
  726 F.3d 1124 (9th Cir. 2013) ...........................................................................19

*SEC & Exch. Comm'n v. Hurgin*,
  484 F. Supp. 3d 98 (S.D.N.Y. 2020) ...................................................................20

*Simon v. Abiomed, Inc.*,
  37 F. Supp. 3d 499 (D. Mass. 2014)..............................................................13, 18

*Siracusano v. Matrixx Initiatives, Inc.*,
  585 F.3d 1167 (9th Cir. 2009) ...........................................................................16

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
   551 U.S. 308 (2007)................................................................................19

*Viswanath v. Imperva, Inc.*,
   2016 WL 2851859 (N.D. Cal. May 16, 2016)......................................21

*Wanca v. Super Micro Computer, Inc.*,
   2018 WL 3145649 (N.D. Cal. June 27, 2018)......................................25

*Welgus v. TriNet Grp., Inc.*,
   2017 WL 6466264 (N.D. Cal. Dec. 17, 2017) .......................................6

*Zhengyu He v. China Zenix Auto Int'l Ltd.*,
   2020 WL 3169506 (D.N.J. June 12, 2020)............................................23

STATUTES

15 U.S.C. § 77k...............................................................................................4

15 U.S.C. § 77z-1(b)(1) ..................................................................................9

RULES

Fed. R. Civ. P. 12(d) .......................................................................................9

Fed. R. Civ. P. 15(a) ......................................................................................25

REGULATIONS

17 C.F.R. § 229.303(a)(3)(ii).........................................................................18

Lead Plaintiffs Ervin Derr and Peter Shoemaker ("Plaintiffs"), by and through their attorneys, hereby submit their opposition to the Ra Medical Defendants' motion to dismiss the second amended complaint (Dkt. No. 60, "Def. Br.") and the Irwin/Burstein[1] Defendants' joinder thereof (Dkt. No. 62).

## PRELIMINARY STATEMENT

Ra Medical recently settled claims by the DOJ that the Company engaged in off-label marketing, made improper payments to physicians, and failed to disclose product defects during a period encompassing the IPO and much of the Class Period. In addition to penalties, the Company is required to implement controls and procedures to ensure compliance with regulations related to the marketing of FDA-approved products and anti-kickback laws. Plaintiffs bring civil claims because Defendants failed to disclose to investors that the Company engaged in the foregoing conduct and risked regulatory scrutiny as a result.

The Court already sustained certain of Plaintiffs' claims in its prior order denying Defendants' motion to dismiss. Specifically, the Court held that the Registration Statement was misleading because it failed to disclose that manufacturing issues led to catheters that failed to calibrate and that the Company recalled products as a result. It also found that Defendants Ra Medical, Irwin, and Jackson knowingly issued statements during the Class Period that were misleading for the same reasons.

---

[1] Unless otherwise defined, capitalized terms herein have the same meaning as set forth in the Second Amended Complaint (Dkt. No. 53, the "SAC") and all "¶__" citations refer to the SAC. The "Irwin/Burstein Defendants" includes Dean Irwin, Melissa Burstein, and Martin Burstein. The "Ra Medical Defendants" includes Ra Medical Systems, Inc. ("Ra Medical" or the "Company"), Andrew Jackson, Richard Heymann, Maurice Buchbinder, Martin Colombatto, Richard Mejia, Jr., Mark E. Saad, and William Enquist Jr. "Defendants" refers collectively to the Irwin/Burstein Defendants and the Ra Medical Defendants.

---

Regarding standing for Section 11 claims, the Court held that Plaintiffs had not met their pleading burden because they offered nothing more than conclusory allegations that they had purchased "pursuant and/or traceable to the Registration Statement in connection with the IPO." Plaintiffs Derr and Shoemaker had previously alleged that they first purchased shares on February 6 and 8, 2019, respectively.

The SAC cures this deficiency because it further alleges: (i) that nearly 8 million non-IPO shares *could not* have entered the market prior to these purchases because they were subject to lock-up agreements preventing their sale prior to March 2019; (ii) that the remaining 316,431 non-IPO shares are restricted and the holder(s) must seek permission from the Company to remove the restrictive legends before they can be sold; (iii) that more than half of them (151,071 shares) were held by a single shareholder who received permission to remove the restrictive legends in January 2019 but *did not* in fact sell them prior to February 8, 2019; and (iv) that, as to the remaining 165,360 shares, publicly available information indicates that the shares could have entered the market on April 11, 2019 at the earliest, well after Plaintiffs' first purchases.

Defendants counter that these 165,360 non-IPO shares polluted the aftermarket and prevent traceability, but they rely on purported facts that are outside the complaint. Nothing before the Court indicates that the 165,360 shares entered the market before Plaintiffs' purchases. However, Defendants know if and when these shares could have entered the market because Ra Medical must grant permission to remove the restrictive legends from these 165,360 shares. When pressed for the basis of their claim, such as a letter from Ra Medical directing the transfer agent to remove the restrictive legends, Defendants refused and disputed that they made any factual representations at all. Ignoring that this is simply untrue, the failure of Defendants to provide any factual support for this claim makes clear that they raise a speculative argument that should be ignored until discovery, when Defendants will have to produce the identities of the shareholder(s) of the 165,360 shares as well as whether

LEAD PLAINTIFFS' OPPOSITION TO MOTION TO DISMISS SAC
Case No. 3:19-cv-01079-LAB-AHG

and when Ra Medical permitted them to sell their shares. Plaintiffs will then have the opportunity to determine whether these shareholders even sold their shares or, like in the case of the 151,071 shares, the restrictive legends were removed but the shares were not sold prior to Plaintiffs' purchases. Therefore, Plaintiffs have met their pleading burden to allege standing for Section 11 claims and Defendants have failed to rebut these well-pled allegations.

The Court also held that Defendants' omissions that the Company marketed DABRA systems for the non-indicated use of atherectomy did not render any statements misleading because Defendants believed they legally encouraged physicians to use DABRA for atherectomy but that the FDA *could* disagree. Defendant Irwin's and Jackson's SOX certifications were not found to be misleading because they are not an unqualified certification that the Company's controls and procedures are effective. The SAC adds further detail as to these issues, based on the settlement with the DOJ and additional former employees' accounts, that cure the identified deficiencies.

Defendants attempt to undermine the significance of the DOJ settlement because Ra Medical did not admit liability therein. Defendants overlook, however, that they *already* admitted that they engaged in off-label marketing and made payments "to obtain business or to gain special advantage" when they reported the findings of the Audit Committee's investigation. Together with the details of the settlement and confidential witnesses, the SAC adequately pleads claims under the Securities Act and the Exchange Act.

Defendants' motion to dismiss should be denied in full.

## STATEMENT OF FACTS

The Court is familiar with the facts of the First Amended Complaint ("FAC," Dkt. No. 21). *See* Order dated March 24, 2021 (the "Order"), Dkt. No. 50 at 2-4. Plaintiffs incorporate by reference the Statement of Facts section of their previously-

filed opposition to Defendants motions to dismiss the FAC. *See* Dkt. No. 35. The SAC's new allegations will be addressed *infra* as appropriate.

<strong>ARGUMENT</strong>

**I.    The SAC Adequately Alleges A Section 11 Claim**

**A.    Plaintiffs Face A Minimal Pleading Burden**

To state a *prima facie* claim under § 11, a plaintiff need only plead that he acquired a security pursuant to a registration statement that: (1) contained an untrue statement of fact; (2) omitted a material fact required to be stated therein; *or* (3) omitted a material fact necessary to make the statements made not misleading. 15 U.S.C. § 77k. A fact is material when a "*reasonable* investor would have viewed the nondisclosed information as having significantly altered the total mix of information made available." *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 44 (2011).[2] When a material misstatement or omission is shown, "[l]iability against the issuer of a security is virtually absolute, even for innocent misstatements." *Herman & MacLean v. Huddleston*, 459 U.S. 375, 382 (1983). Thus, a "buyer need not prove (as he must to establish certain other securities offenses) that the defendant acted with any intent to deceive or defraud." *Omnicare Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175, 179 (2015).

Since fraud is not an element of a Section 11 claim, the permissive notice pleading standards of Rule 8(a) applies. *Knollenberg v. Harmonic, Inc.*, 152 F. App'x 674, 683 (9th Cir. 2005) (Rule 9(b) applies only if the claims "sound in fraud"); *In re Violin Memory Sec. Litig.*, 2014 WL 5525946, at *7-8 (N.D. Cal. Oct. 31, 2014) (suffices to provide short and plain statement giving fair notice of the claim and the grounds upon which it rests).

Other than merely asserting that "where, as here, a claim sounds in fraud," Defendants offer no basis to depart from the general rule that Section 11 claims are

---

[2] Unless otherwise stated, all internal citations and quotations are omitted.

subject to Rule 8(a) permissive notice pleading standard. Def. Br. at 4. As such, the Court should apply Rule 8 to Plaintiffs' Section 11 claims.[3]

### B. Plaintiffs Adequately Allege They Purchased Shares Pursuant Or Traceable To The IPO

#### 1. The SAC Cures The Deficiencies Identified By The Order

Defendants inaccurately claim that "[t]he Court held that Plaintiffs could not trace their shares . . . because they did not purchase their shares in the IPO, but rather bought their shares four months after the IPO in a polluted aftermarket pool of stock that included unregistered, non-IPO shares." Def. Br. at 5.[4] In the Order, the Court only found that Plaintiffs had not met their pleading burden because "they allege no other facts in support of the conclusory allegations that Derr and Shoemaker purchased their shares 'pursuant and/or traceable to the Registration Statement in connection with the Company's IPO.'" Order at 17 (quoting FAC).

The SAC adds ample additional detail to allege traceability because the only shares in the public market at the time of Plaintiffs' purchases were those issued in connection with the IPO. ¶¶ 46-52; *see also In re Century Aluminum Co. Sec. Litig.*, 729 F.3d 1104, 1107 (9th Cir. 2013) (factual specificity required to allege traceability depends on context). When the IPO closed, there were 12,689,251 shares of common stock outstanding: 4.485 million had been issued in connection with the Registration Statement, and the remaining 8,204,251 shares were restricted securities according to Rule 144 of the Securities Act ("Rule 144"). ¶ 47. Defendants acknowledge that approximately 7.8 million of the restricted shares could not have entered the market before Plaintiffs purchased shares in February 2019 because they are subject to lock-up agreements and could only be sold, if at all, after March 27, 2019 at the earliest.

---

[3] Even if any category of alleged misstatements sounds in fraud (they do not), the SAC alleges material misrepresentations or omissions sufficient to meet Rule 9(b).

[4] Not only is this description of the Order inaccurate, Defendants' characterization lacks factual support and thus should be viewed skeptically. *See* § I.B.2., *infra.*

---

*See* Def. Br. at 6-7; *see also* ¶¶ 21-22 (Plaintiffs' trading history); ¶¶ 47-48 (describing lock-up).

As to the remaining 316,431 restricted shares, Plaintiffs allege that 151,071 shares did not enter the market prior to Plaintiffs' February 2019 purchases (based on a conversation between Plaintiffs' counsel and the holder of such shares) and some unregistered shares appear to have entered the market on April 11, 2019 at the earliest (based on a review of publicly available information such as Form 4s and Form 144s filed with the SEC). ¶¶ 49-51. Therefore, Plaintiffs allege that publicly available information suggests that no non-IPO shares entered the market prior to Plaintiffs' purchases in February 2019, which will be confirmed during discovery. ¶ 52. *Welgus v. TriNet Grp., Inc.*, 2017 WL 6466264, at \*25 (N.D. Cal. Dec. 17, 2017) (traceability alleged because "[t]he SAC now specifically alleges that the TriNet shares Plaintiff purchased after the IPO were the only shares in the market," citing lock-up agreements).

### 2. Defendants' Unsubstantiated Assertion That Non-IPO Shares Entered The Market Must Be Rejected

Defendants assert that there is no presumption of traceability because Plaintiffs purchased from an aftermarket polluted with non-IPO shares. Def. Br. at 7-8. But this assumes that non-IPO shares entered the market at all, and there is no basis before the Court to suggest that this is true.

Defendants rely on the Registration Statement, which states that 316,431 restricted shares will be eligible for sale pursuant to Rule 144 on December 26, 2018. Def. Br. at 7. However, this does not mean that such shares actually entered the market—as Plaintiffs have already proven. In their motion to dismiss the FAC, Defendants claimed that **7%** of Ra Medical's shares in the market were non-IPO shares. Dkt. No. 30 at 7. When Plaintiffs disputed this, arguing that shares "eligible for sale" does not mean they were actually sold, Defendants claimed that they were improperly saddled with Plaintiffs' pleading burden. Dkt. Nos. 35 at 11-12; 37 at 3-

4. In a proposed sur-reply, Plaintiffs stated that Defendants' speculative argument (that non-IPO shares *could* have entered the market) is disingenuous: they know whether unregistered shares were actually sold because Rule 144 requires the holder to first seek permission from the issuer (*i.e.*, Ra Medical) to remove the restrictive legends. Dkt. No. 40-2 at 2-3. The Order found that Plaintiffs had raised facts in briefing that should have been alleged in the FAC. Order at 17. These details are now in the SAC. ¶¶ 46-52.

In response to the proposed sur-reply, Ra Medical voluntarily produced to Plaintiffs an opinion letter dated January 3, 2019, authorizing the transfer agent to reissue 151,071 restricted shares without the restrictive legends, thereby permitting the holder to sell those shares. ¶ 50; *see* Declaration of Robert V. Prongay ("Prongay Decl."), Ex. 1. But, based on a conversation between Plaintiffs' counsel and the shareholder identified in the letter, those 151,071 shares were not sold prior to February 8, 2019, by which point both Plaintiffs had purchased Ra Medical stock. ¶¶ 46, 50. Moving the goalpost for Plaintiffs' pleading burden, Defendants now claim that *4%* of Ra Medical's shares in the market were non-IPO shares. Def. Br. at 8.

The Court must be skeptical of Defendants' argument: in their prior motion, Defendants claimed that "316,431 [shares] became eligible for sale in the open market on December 26, 2018," which was false because they produced a letter proving that half of these shares were not actually eligible for sale until more than a week later. Dkt. No. 30 at 7. Now, Defendants claim that 165,360 shares that were "eligible for trading" on February 6, 2019 were non-IPO shares. Def. Br. at 8. As with the prior motion, Defendants make this argument while in possession of information obtainable during discovery that shows if shares actually entered the market.

If *any* of these 165,360 shares entered the market before Plaintiffs' purchases, Defendants would know because Ra Medical must consent to the removal of the restrictive legends to permit the sale of those shares. ¶ 49. Yet they offer nothing to the Court to support their contention that any of these shares entered the market at all,

and they outright refused Plaintiffs' request to produce opinion letters (if any existed) showing that holder(s) of the 165,360 shares sought to sell them. *See* Prongay Decl., Exs. 2-3. In response to the pending motion, Plaintiffs sent a letter to counsel for Ra Medical, seeking information as to whether any of the holders of the 165,360 shares had requested permission to remove the restrictive legends prior to February 6, 2019 (the date of Plaintiffs' earliest purchase). Prongay Decl., Ex. 2. Plaintiffs reasoned that Defendants' argument against traceability is premised on an inherent factual representation that the restrictive legends on the 165,360 shares had been removed by December 26, 2018. *Id.* Demonstrating that their argument relies on evidence and thus is inappropriate for this motion, Defendants refused the request, claiming that they did not make any factual representations. Prongay Decl., Ex. 3.

In sum, Defendants are claiming that, without discovery, Plaintiffs must produce documents that are only within Defendants' control to demonstrate traceability. This is absurd and completely ignores the pleading standard and discovery stay in effect.  As such, Defendants' speculative argument must be rejected. *In re Ubiquiti Networks, Inc. Sec. Litig.*, 33 F. Supp. 3d 1107, 1119 (N.D. Cal. 2014) (rejecting standing challenge where holders of "some 26,000 shares . . . could dispose of their shares 'if they received permission to do so'" because defendants could not "represent how many, if any, exceptions were granted"), *rev'd on other grounds*, 699 F. App'x 878 (9th Cir. 2016).[5]

> **3.    If Plaintiffs Must Prove That The 165,360 Shares Did Not Enter The Market Prior To Plaintiffs' Purchases, The PSLRA Discovery Stay Must Be Lifted**

If the Court considers Defendants' argument that there is no tracing because shares entered the market (in which case, the Company would have received notice

---

[5] Defendants' citation to a decades-old case that involved an actually polluted market of shares is inapposite. *See Abbey v. Computer Memories, Inc.*, 634 F. Supp. 870, 874-75 (N.D. Cal. 1986) (could not trace to secondary offering when 9 million shares from prior offering already traded).

from shareholders), Defendants' motion to dismiss should be held in abeyance and the PSLRA discovery stay should be lifted for the limited purpose of seeking information regarding the ownership of the 165,360 shares and when they were sold (if at all). 15 U.S.C. § 77z-1(b)(1) (allowing "particularized discovery").

Unfortunately, as the Ninth Circuit has noted, there is a "concerning pattern in securities cases" in which defendants are "exploiting these procedures [of judicial notice and incorporation-by-reference] improperly to defeat what would otherwise constitute adequately stated claims at the pleading stage." *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 998 (9th Cir. 2018). This is essentially what Defendants are trying to do here: bring in facts outside of the complaint to defeat Plaintiffs' claims. However, the situation here is even more egregious than in *Khoja* because Defendants are not even attempting to submit any basis through judicial notice or other potentially legitimate means to support their factual assertion that non-IPO shares entered the market. They concoct a pleading deficiency by asking the Court to accept their version of events as true without even bothering to supply evidence, which in itself would be improper.

If the Court considers Defendants' bald assertion that 165,360 shares polluted the market, then it is accepting matters outside the complaint, and Defendants' motion to dismiss must be converted to a motion for summary judgment on this issue. Fed. R. Civ. P. 12(d).[6] In that case, Plaintiffs require discovery to obtain relevant information regarding the ownership and any sale of the 165,360 shares at issue. *Id.* ("All parties must be given a reasonable opportunity to present all the material that is

---

[6] "There are two exceptions to this rule: the incorporation-by-reference doctrine, and judicial notice." *Khoja*, 899 F.3d at 998. Neither exception applies here because Defendants do not offer any documents supporting their factual assertion. *See* Def. Br. at 6. To the extent Defendants rely on the Registration Statement, it was filed by September 27, 2018, so it has no bearing on whether non-IPO shares existed in the market **four months later** in February 2019 at the time of Plaintiffs' purchases. ¶ 90.

---

pertinent to the motion."); *Napoto v. DHL Exp. (USA), Inc.*, 2009 WL 1974412, at *3 (N.D. Cal. July 2, 2009) (converting motion to dismiss to a motion for summary judgment but allowing limited discovery to establish standing). Limited discovery on this issue would be straightforward and discrete to identify the holder(s) of the 165,360 shares at the close of the IPO; whether they sought to remove the restrictive legends and if so when; and whether they sold their shares after removing the restrictive legends and if so when. These shares may be held by a single shareholder, just as one investor held the 151,071 shares subject to Rule 144 (who, as Plaintiffs confirmed, did not sell prior to Plaintiffs' first purchases of Ra Medical stock despite obtaining consent to remove the restrictive legends on January 3, 2019).

Otherwise, Defendants will be using the discovery stay as both a sword and a shield: claiming public information is insufficient[7] but refusing to produce relevant information within their exclusive possession. *See Ubiquiti*, 33 F. Supp. 3d at 1119 ("Under *Century Aluminum*, however, the bar plaintiffs must clear to plead their claim is set only as high as 'plausibility,' not, as defendants would have it, certain knowledge."). Though Defendants claim that these 165,360 shares were eligible for sale as of December 26, 2018, in fact, these shares ***could have been*** eligible for sale as of that date ***only if*** Ra Medical consented to remove the restrictive legends ***provided that*** other conditions of Rule 144 were met;[8] Defendants' failure to produce any such request as to the 165,360 shares suggests that Ra Medical did not receive one. They

---

[7] For example, Defendants argue that Plaintiffs' review of Form 4s and Form 144s would only show sales by company insiders or affiliates. Def. Br. at 7.

[8] Thus, Defendants' cases, in which unregistered shares were actually sold and not merely eligible for sale, are inapplicable. *See In re Atossa Genetics, Inc. Sec. Litig.*, 2014 WL 4983551, at *5 (W.D. Wash. Oct. 6, 2014) (uncontested that "one million unregistered shares came onto the market"); *Lilley v. Charren*, 936 F. Supp. 708, 716 (N.D. Cal. 1996) ("80,000 unregistered shares of common stock entered the market"); *In re Quarterdeck Office Sys., Inc. Sec. Litig.*, 1993 WL 623310, at *2 n.1 (C.D. Cal. Sept. 30, 1993) (undisputed "thousands of unregistered shares were on the market").

did not attempt to attach any evidence to their motion, much less produce it in response to Plaintiffs' request. Given that Ra Medical volunteered one such opinion letter when it thought beneficial to its own position, Defendants concede that this request is not burdensome.

Defendants should not be permitted to selectively provide relevant information when they believe beneficial to their position and conceal the whole picture from the Court. Under these circumstances, the Court should reject Defendants' unsubstantiated arguments and instead find that the SAC adequately alleges Plaintiffs' standing.

**C.      The Court Already Found That The Registration Statement Was Misleading And Omitted To Disclose Material Facts**

In its Order, the Court held that the Registration Statement was misleading. Order at 11. The Registration Statement stated risks of "*unforeseen* situations in the manufacturing and assembly of [Ra's] products" and that "a voluntary product recall . . . *could occur* because of . . . quality-related issues such as manufacturing errors or design or labeling defects." *Id.* These statements were misleading because they "fail[ed] to mention that manufacturing issues had arisen and a recall was already underway." *Id.* Because Plaintiffs have standing to bring a Section 11 claim, and the Court has already found the Registration Statement to be misleading, Plaintiffs have sufficiently alleged violations of Section 11 of the Securities Act.

**D.      The Registration Statement Failed To Disclose Additional Material Facts**

The Registration Statement failed to disclose additional material facts about Ra Medical's off-label marketing of DABRA, improper payments to physicians, and unreported injuries associated with use of DABRA.

**1.      The Registration Statement Failed To Disclose That The FDA Warned Ra Medical That Its Practices Constituted Off-Label Marketing**

The Order found that alleged statements about Ra Medical's marketing of DABRA "for the non-indicated use of atherectomy" was not misleading because a

reasonable investor would infer that the Company "believed it could legally encourage physicians to use the DABRA system for atherectomy without marketing DABRA for that purpose" and "risking regulatory scrutiny as a result." Order at 13. The FAC alleged that at the time of the IPO, the FDA had already directed the Company not to mention atherectomy in its marketing materials, but Ra Medical continued to refer to DABRA as an atherectomy device. FAC at ¶ 105. District courts recently found that such a failure to disclose the FDA's position rendered statements misleading. *Rosi v. Aclaris Therapeutics, Inc.*, 2021 WL 1177505, at *17 (S.D.N.Y. Mar. 29, 2021) ("The omitted information—of the position that the FDA had taken and the Company's decision to proceed notwithstanding that position—was necessary to make what was said not materially misleading, regardless of whether the FDA's position ultimately would prevail."); *Gordon v. Vanda Pharm. Inc.*, 2021 WL 911755, at *3 (E.D.N.Y. Mar. 10, 2021) (similar).

Relying on former employees' accounts, the SAC further alleges that Defendant Burstein, who was responsible for marketing materials until January 2019, was aware of the FDA's warning "not to market DABRA as an atherectomy system because that was not the approved indication for the product," a warning which was issued after the agency reviewed Ra Medical's marketing materials used in connection with a tradeshow held September 21 – 25, 2018, before the IPO. ¶¶ 44, 77. The SAC also alleges that the DOJ settlement for claims of off-label marketing concerned conduct "during the period from May 1, 2017 through October 31, 2019," *i.e.* a period encompassing the IPO. ¶ 79. Collectively, these allegations show that, at the time of the IPO, the Company engaged in off-label marketing, that the FDA had already warned Ra Medical not to do so, and that, by continuing to market DABRA for the non-indicated use of atherectomy, the Company was likely to face regulatory scrutiny—all of which was undisclosed. *In re Atossa Genetics Inc. Sec. Litig.*, 868 F.3d 784, 798 (9th Cir. 2017) (Form 8-K misleading where it "studiously avoided disclosing" that FDA "expressly said that the ForeCYTE Test was not FDA-cleared").

Defendants claim that they statements included cautionary language that adequately disclosed the risk of regulatory scrutiny. Def. Br. at 11-12. But "[d]ismissal on the pleadings under the bespeaks caution doctrine . . . requires a stringent showing: There must be sufficient cautionary language or risk disclosure such that reasonable minds could not disagree that the challenged statements were not misleading." *Livid Holdings Ltd. v. Salomon Smith Barney, Inc.*, 416 F.3d 940, 947 (9th Cir. 2005). For example, in *Atossa*, the Ninth Circuit found that the company's statement, which disclosed receipt of a letter from the FDA regarding concerns about modifications to an approved product but omitted to disclose that the FDA also raised concerns regarding clearance for the ForeCYTE test, was misleading. 868 F.3d at 797-98. The "broad warning" that "[u]ntil [the issues in the letter] are resolved Atossa may be subject to additional regulatory action by the FDA" was insufficient because it "obscures the issue of concern to reasonable investors" that the Company improperly characterized the ForeCYTE Test as "FDA Cleared," which could force a product recall. *Id.* So too, here. Regardless of where the FDA's gentle reminder falls in the hierarchy of warnings (as Defendants claim, Def. Br. at 12), the Registration Statement implied that the FDA had not already expressed an opinion as to the propriety of Ra Medical's promotion of DABRA for atherectomy. ¶¶ 77, 197, 199. The omission of the FDA's warning creates a misleading impression that the Company believed it could legally market DABRA for atherectomy (but the FDA *could* disagree with Ra Medical). In fact, Defendants knew at the time of the IPO that the FDA disagreed. *Simon v. Abiomed, Inc.*, 37 F. Supp. 3d 499, 518 (D. Mass. 2014) ("the FDA . . . could disagree" insufficient where "company persisted in improper practices even after it received multiple cautions or warnings from the FDA").

Defendants' reliance on *Lovallo v. Pacira Pharm., Inc.* does not support a contrary result. Def. Br. at 13. There, investors knew of the company's drug's approved indications and efficacy and that the company's aggressive marketing beyond those limitations put the company at risk of regulatory action. 2015 WL

7300492, at *8-11 (D.N.J. Nov. 18, 2015) (truth on the market defense). Here, the Registration Statement stated that Ra Medical believed it could promote DABRA for atherectomy truthfully and legally, but the reasonableness of that belief is belied by the undisclsoed fact that the FDA already warned that its practices were improper.[9] *See Rosi*, 2021 WL 1177505, at *16 (misleading to market sole product after FDA notification that its promotion contained misrepresentations about product's risks).

Defendants argue that the recent settlement of off-label marketing claims adds no new details and, in any event, Ra Medical did not admit any liability in connection with the settlement. Def. Br. at 13-14. They are mistaken on both counts. First, the settlement reveals that the DOJ's investigation concerned conduct "during the period from May 1, 2017 through October 31, 2019," *i.e.* encompassing the IPO. ¶ 79. It also requires Ra Medical to develop policies regarding, among other things, "the selling, marketing, advertising, promoting, or branding of Government Reimbursed Products" such as DABRA, to comply with "all applicable FDA requirements." SAC, Ex. 5. This implies that the Company had lacked such controls. Second, Plaintiffs need not show that Ra Medical "admitted [liability] or [had] been convicted" because "the misleading nature of the omission [of the FDA's warning] stands apart from the question of whether [Ra Medical] actually was violating the law."[10] *Rosi*, 2021 WL 1177505, at *17.

Moreover, even if Ra Medical did not admit liability in connection with the settlement, the Company had ***already admitted*** to off-label marketing in a press

---

[9] Defendants' other authority on this point is likewise unavailing. *In re Infonet Servs. Corp. Sec. Litig.*, 310 F. Supp. 2d 1080, 1089-92 (C.D. Cal. 2003) (expectations of new agreements adequately disclosed risks in transitioning users to new network).

[10] Defendants attempt to distinguish from *Glazer Capital Mgmt., LP v. Magistri*, which found that admissions in a settlement did not give rise to executive's *scienter*. 549 F.3d 736, 748-49 (9th Cir. 2008). Here, Defendants do not contest scienter as to the Section 10(b) claim regarding off-label marketing, and there is no scienter element for a Section 11 claim.

release issued on October 31, 2019. ¶ 104 ("the Company's salespeople were instructed to characterize DABRA as performing atherectomy"). Defendants argue that this press release "never states that this guidance was issued prior to the IPO." Def. Br. at 14 n.10. However, the Company's admission together with the period underlying the settlement with the DOJ leads to the reasonable inference that, at the time of the IPO, Ra Medical engaged in off-label marketing.

Defendants dispute the relevance of the CWs because they do not describe "what specifically the materials mentioned regarding atherectomy." Def. Br. at 14. But it is reasonable to infer that if the FDA, the relevant regulatory authority, instructed "not to mention atherectomy in marketing materials any longer," then the Company had likely engaged in off-label marketing. ¶ 77. Moreover, the FDA's warning was unqualified: the agency "instructed Ra Medical not to mention atherectomy in marketing materials any longer" and "not to market DABRA as an atherectomy device." *Id.* Therefore, the Company could not plausibly refer to atherectomy in a manner that was "truthful, non-misleading and non-promotional" without engaging in what the FDA deemed to be off-label marketing. *See Rosi*, 2021 WL 1177505, at *16-17.

### 2. The Registration Statement Failed To Disclose That Ra Medical Tracked Physicians To Target With Improper Renumeration

The Order did not specifically address the FAC's allegations of improper payments to physicians or the lack of proper documentation of payments to physicians. *See* Order at 12-14. The Company already admitted that it "lack[ed] documentation of sufficient detail and specificity to support certain payments to physicians," leading to payments "which could be perceived as an improper attempt to obtain business or gain special advantage." ¶¶ 106, 154. Relying on the Ra Medical's recent settlement with the DOJ, the SAC further alleges that, during a period encompassing the IPO, Ra Medical specifically targeted physicians with improper renumeration. ¶¶ 184-85 (Ra Medical "tracked utilization of its high-volume

physician customers using ***an internal document titled 'Who Deserve[] Love,' which was used to identify physicians that [Ra Medical] should target with offers of improper renumeration.***"); *see Mauss v. NuVasive, Inc.*, 2016 WL 3681831, at \*12 (S.D. Cal. July 12, 2016) (falsity supported by "newly acquired information alleged by Plaintiff as a result of the DOJ settlement and the unsealing of the *qui tam* action").

The omission of this practice of targeting physicians with improper renumeration renders the Registration Statement misleading because it presented as hypothetical the risks of regulatory scrutiny related to anti-kickbacks, when in reality, the Company was actively engaged in practices likely considered improper. *Siracusano v. Matrixx Initiatives, Inc.*, 585 F.3d 1167, 1181 (9th Cir. 2009) ("risks of product liability claims in the abstract" were misleading where there was "no indication that the risk may already have come to fruition").

Defendants argue that the Company's admission in October 31, 2019 does not mean that the improper payments occurred at the time of the IPO. Def. Br. at 20. However, the Company's settlement with the DOJ states that "during the period from May 1, 2017 through October 31, 2019 . . . [the Company] us[ed] an internal document titled 'Who Deserve[] Love,'" to identify physicians to target with "improper renumeration." ¶ 185. This period encompasses the IPO, and the existence of the "Who Deserve[] Love" document at the time of the IPO implies that the improper payments had occurred at least before the IPO. According to the DOJ settlement, the improper renumeration "consisted of cash payments and fees paid in connection with purported training events and consulting services," which corroborates Ra Medical's admission that the improper payments were "ostensibly for training and consulting services." ¶¶ 106, 185.

The SAC also sufficiently alleges that the Company lacked adequate documentation of expenses at the time of the IPO. As part of the settlement, the Company entered into a Corporate Integrity Agreement, which, among other things, requires Ra Medical to implement "appropriate ways to conduct Covered Functions

[which includes contracting with physicians for consulting services] in compliance with . . . the Federal Anti-Kickback Statute," among other federal statutes. SAC, Ex. 5. By this point, the Company had admitted that "an inappropriate 'tone at the top'" led to material weaknesses related to payments to physicians "to obtain business or to gain special advantage" and, as a result, terminated senior executives including Defendants Irwin and Burstein. ¶¶ 131, 144, 148. The requirement to implement such policies together with "house-cleaning" of senior management for related weaknesses implies that, at the time of the IPO, Ra Medical lacked a system to ensure proper documentation of expenses and payments to physicians. ¶ 100; *see In re Sipex Corp. Sec. Litig.*, 2005 WL 3096178, at *1 (N.D. Cal. Nov. 17, 2005) ("Such house-cleaning and reforms do not follow innocent mistakes. Rather, they customarily, even if not invariably, follow systemic and fraudulent abuse of internal financial controls."); *see also Luna v. Marvell Tech. Grp.*, 2017 WL 2171273, at *5 (N.D. Cal. May 17, 2017) (termination of CEO combined with new training programs support knowledge of improper revenue recognition); *Mild v. PPG Indus., Inc.*, 2018 WL 6787351, at *7 (C.D. Cal. Dec. 21, 2018) (similar). Confirming this, CW 2 stated that until May or June 2019, expenses were not reviewed until months later when not much could be done to confirm expenses or obtain additional documentation. ¶ 107; *see* ¶ 44 (CW 2 submitted expenses for Defendant Burstein from several months before the IPO through October 2019).

Defendants point to a disclosed weakness related to revenue recognition and insufficient accounting and finance staff as well as efforts to remediate them, Def. Br. at 15, 19-20, but investors were not on notice of the deficiencies related to payments to physicians or that the Company would face regulatory scrutiny as a result. *See Mulderrig v. Amyris, Inc.*, 492 F. Supp. 3d 999, 1024 (N.D. Cal. Oct. 5, 2020) (similar representations left misleading impression that "no new concerns needed to be disclosed"). As the Company acknowledged on November 29, 2019, Ra Medical had had a material weakness that led to the improper payments to physicians, which

(according to the settlement) occurred during a period that encompassed the IPO. ¶ 148.[11]

### 3.    Item 303 Violations

"Item 303 requires disclosure of 'any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues for income from continuing operations.'" *Violin Memory*, 2014 WL 5525946, at *15 (quoting 17 C.F.R. § 229.303(a)(3)(ii)). For the reasons in the preceding sections, the off-label marketing of DABRA and improper payments to physicians existed at the time of the IPO. These practices were improper but had materially increased the Company's revenue, and therefore should have been disclosed. *Simon*, 37 F. Supp. 3d at 519 ("[W]hile the actual impact of off-label marketing on defendants' revenue growth is unknown, plaintiffs have plausibly contended that it was material."). Defendants also do not deny that the calibration issue, which the Court already found existed at the time of the IPO but was not disclosed, is an uncertainty giving rise to Item 303 liability. Def. Br. at 22 n.13.

### E.    Control Person Liability

Control person liability under Section 15 of the Securities Act requires (a) a primary violation of the federal securities laws and (b) that the defendant exercised actual power or control over the primary violator. *See In re Portal Software, Inc. Sec. Litig.*, 2006 WL 2385250, at *5 (N.D. Cal. Aug. 17, 2006). Defendants do not dispute that the Securities Act Individual Defendants were control persons for purposes of Section 15 of the Securities Act. *See* Def. Br. at 9 n.5. Thus, having adequately pled

---

[11] As to unreported injuries, CW1 is the whistleblower who prompted the Company's own investigation leading to Ra Medical's admissions, so CW1 is credible. CW1 states that Defendant Irwin was informed of an injury caused to a patient during the pivotal study that was not reported to the FDA. ¶ 182. Defendants argue that the failure to report an injury from the DABRA pivotal study is not itself misleading, Def Br. at 17-19, but if the injury should have been reported to the FDA but was not, Ra Medical could be found to have fraudulently obtained marketing clearance.

a primary violation under Section 11, Plaintiffs have also established control person liability under Section 15.

## II.     There Are Additional Misleading Statements During The Class Period

### A.     The Applicable Legal Standard

To state a claim under § 10(b) of the Securities Exchange Act of 1934, a plaintiff must allege: (1) a material misrepresentation or omission (*i.e.*, "falsity"); (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance; (5) economic loss; and (6) loss causation. *Matrixx Initiatives*, 563 U.S. at 37-38.[12] When ruling on a "Rule 12(b)(6) motion to dismiss a § 10(b) action, courts must . . . accept all factual allegations in the complaint as true[,]" *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007), and "construe them in the light most favorable to the nonmoving party," *Bruce v. Suntech Power Holdings Co. Ltd*., 64 F. Supp. 3d 1365, 1369-70 (N.D. Cal. 2014). To satisfy Rule 9(b)'s heightened pleading requirement for a securities fraud claim, Plaintiffs must "identify the who, what, when, where, and how of the misconduct charged, as well as what was false or misleading about the purportedly fraudulent statement, and why it was false." *See Salameh v. Tarsadia Hotel*, 726 F.3d 1124, 1133 (9th Cir. 2013).

While Plaintiffs must meet a heightened pleading standard under Rule 9(b) and the PSLRA, "it is only under extraordinary circumstances that dismissal is proper under Rule 12(b)(6)." *In re China Educ. Alliance Sec. Litig.*, 2011 WL 4978483, at *3 (C.D. Cal. Oct. 11, 2011). "[S]o long as the plaintiff alleges facts to support a theory that is not facially implausible, the court's skepticism is best reserved for later stages of the proceedings." *In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049, 1057 (9th Cir. 2008).

---

[12] Defendants challenge only falsity, conceding the remaining factors.

**B.     The Court Already Found That The Exchange Act Defendants Knowingly Issued Materially Misleading Statements**

In its Order, the Court found that statements issued during the Class Period were misleading because they failed to disclose that DABRA's catheters were defective, that this manufacturing issue had persisted for over a year, and that a recall was underway as a result. Order at 11-12. The Court also found that Defendants Ra Medical, Irwin, and Jackson issued the misleading statements with the requisite scienter. Order at 15-16. Therefore, Plaintiffs have already stated claims for violations of Sections 10(b) and 20(a) of the Exchange Act. Order at 16.

**C.     Defendants Ra Medical, Irwin, And Jackson Issued Additional Materially Misleading Statements**

Defendants do not challenge scienter as to any of the following categories of misstatements. *See generally* Def. Br. Therefore, if the Court finds that the Defendants Ra Medical, Irwin, and Jackson issued materially misleading statements during the Class Period, they did so knowingly.[13]

**1.     Despite The FDA's Warning, The Company Continued To Engage In Off-Label Marketing Surreptitiously**

Defendants represent that the "Company would not mention atherectomy in them [i.e., marketing materials] going forward, indicating compliance with the FDA's guidance, not fraud," but this is patently false.[14] Def. Br. at 14. After the IPO and after

---

[13] Even if roadshow materials cannot provide a basis for Section 11 liability, as Defendants claim, they can still give rise to liability under Section 10(b). Def. Br. at 9-10; *see, e.g.*, *Sec. & Exch. Comm'n v. Hurgin*, 484 F. Supp. 3d 98, 107, 110-12 (S.D.N.Y. 2020).

[14] To the extent Defendants suggest that the FDA's warning was merely to remove atherectomy references from marketing materials, rather than to remove the reference from its marketing generally, this is a difference without a distinction. The only plausible reason for the FDA's warning is that Ra Medical improperly marketed DABRA for the off-label use of atherectomy, as confirmed by the fact that the Company's continued marketing practices led to a federal investigation and settlement for off-label marketing.

---

receiving the FDA's warning to remove references to atherectomy from marketing materials, Ra Medical continued to surreptitiously market DABRA for atherectomy. Defendants were "careful with the information they put in writing," but continued to "order[] the sales representatives to 'stay on message' and advise their accounts to bill the DABRA product as an atherectomy system." ¶ 78. Multiple former employees corroborate that Defendant Burstein, who was aware of the FDA's warning, conducted sales trainings focused on "how to mention atherectomies to doctors" and "how to 'walk around' the fact that the device did not have an atherectomy indication." ¶¶ 77, 168-70. Sales representatives were also instructed to focus on outpatient facilities, which have less oversight than hospitals, in an effort to keep the off-label marketing from becoming known. ¶ 172. Notably, the Company admitted on October 31, 2019 that "salespeople were instructed to characterize DABRA as performing atherectomy," a non-indicated use. ¶ 154.

Defendants protest that the CWs do not provide details about "how, or when, the Company continued to direct sales representatives for atherectomy." Def. Br. at 14. But the FDA's position is that it was improper to refer to atherectomy at all, as the agency indicated in its warning, and the Company itself admitted that it improperly instructed sales representatives to refer to DABRA as an atherectomy device. ¶¶ 77, 155. The admission in October 2019 (near the close of the Class Period) combined with Ra Medical's settlement with the DOJ of off-label marketing claims (covering a period from before the IPO through the date of the Company's admission), corroborated by former employees' accounts of sales training to market DABRA for atherectomy (who worked during the IPO through at least part of the Class Period), shows that Ra Medical engaged in off-label marketing during the Class Period. ¶¶ 154, 166-74, 183-86. As a result, statements during the Class Period were misleading because they presented a risk of regulatory scrutiny for off-label marketing without disclosing the material fact that the Company knowingly and improperly engaged in off-label marketing. ¶¶ 219-20, 223-262, 249-56, 273-76; *Viswanath v. Imperva, Inc.*,

2016 WL 2851859 at *8 (N.D. Cal. May 16, 2016) (statement misleading in part because "nothing alerts the reader that some of these risks may already have come to fruition").

Defendants mischaracterize Plaintiffs' allegations as to the falsity of Defendant Irwin's statements in third and fourth quarter 2018 statements regarding atherectomy and reimbursements. Def. Br. at 15. Even if his statements accurately described how DABRA worked and that physicians could seek reimbursement using atherectomy codes, Defendant Irwin's statements were misleading because they failed to disclose that physicians used DABRA for atherectomy at least in part because the Company improperly promoted the product for such off-label use.  ¶¶ 219-20, 249-52.

### 2.   The Company Continued To Target Physicians With Improper Renumeration

Class Period statements warned of the risks of regulatory investigations *if* the Company violated the federal Anti-Kickback Statute. *E.g.* ¶ 233. However, unbeknownst to investors but as confirmed by the Company's own admission and its later settlement, Ra Medical maintained a document called "Who Deserve[] Love" throughout much of the Class Period to identify physicians to target with "improper renumeration" and its "determinations to direct potentially valuable benefits and opportunities to doctors were informed in part by sales prospects." ¶¶ 154, 185.

As to Ra Medical's Code of Ethics, Defendants cite a case where the company's purportedly "high standards of ethics and compliance," omitting CEO's improper personal relationship and subsequent cover-up, were not misleading because the statements were not "objectively verifiable." *Retail Wholesale & Dep't Store Union Local 338 Ret. Fund v. Hewlett-Packard Co.*, 845 F.3d 1268, 1275-76 (9th Cir. 2017). Here, the Code of Ethics claimed, among other things, that records "must be maintained in reasonable detail, must appropriately reflect the transactions and matters to which they relate," but Ra Medical admitted that its documentation of payments to physicians was deficient. ¶¶ 106, 215.

### 3.     SOX Certifications Were Materially Misleading

The SOX Certifications are misleading for two independent reasons: (1) they attested that the Defendants Irwin and Jackson were not aware of any undisclosed material facts, when in fact they were aware of the calibration issues with catheters (as the Order found) and of the Company's off-label marketing of DABRA as an atherectomy device; and (2) they failed to disclose the material weaknesses that Ra Medical later admitted existed.

The SOX certifications are misleading because they attest that, based on the declarant's knowledge, the report does not "omit to state a material fact necessary to make the statements made . . . not misleading" yet the reports failed to disclose calibration issues and off-label marketing. *E.g.* ¶ 263; *City of Roseville Emps.' Ret. Sys. v. Horizon Lines, Inc.*, 686 F. Supp. 2d 404, 419-20 (D. Del. 2009) (liable for SOX certifications if officers were "aware or should have been aware of the rate-fixing scheme at the time those certifications were made"). Here, the Court already found that Defendants Irwin and Jackson knowingly issued statements that omitted the calibration issue with DABRA catheters, rendering statements issued in connection with fourth quarter 2018 and first quarter 2019 misleading. Order at 11-13. Therefore, the SOX certifications are misleading. *Alberici v. Recro Pharma, Inc.*, 2021 WL 798299, at *9 (E.D. Penn. Mar. 1, 2021) (SOX certification actionable where statements about manufacturing oversight were misleading and executive had scienter). Moreover, the fourth quarter 2018 and first quarter 2019 reports failed to disclose that Ra Medical knowingly engaged in off-label marketing, likewise rendering the SOX certifications misleading. *See* § II.C.1, *supra*; *Zhengyu He v. China Zenix Auto Int'l Ltd.*, 2020 WL 3169506, at *7-8 (D.N.J. June 12, 2020) (annual report failed to disclose that company knew trading practices under investigation had in fact occurred; corresponding SOX certification misleading). Defendants incorrectly state that the SAC fails to explain Defendant Irwin's knowledge of the off-label marketing; the SAC alleges that he attended the sales trainings conducted by his wife who

instructed representatives to market DABRA for atherectomy even though she knew the FDA had directed her otherwise. ¶¶ 77, 173, 264.

The Order found that SOX certifications are not an unqualified certification of effective controls and procedures and that the FAC lacks allegations that the executives "were aware of a material weakness in Ra's controls and procedures at the time of the SOX certifications." Order at 13-14. However, the SAC alleges that Ra Medical admitted the material weakness results from "behavior that was inconsistent with our Code of Ethics and Conduct and related policies involving certain former executive officers," which could plausibly refer to Defendant Irwin (who was terminated two months prior) and his wife Defendant Burstein (who was terminated earlier the same month). ¶¶ 131, 144, 148. Defendant Irwin's own conduct led to the material weakness, so it is plausible that he was aware of it. Furthermore, the material weakness resulted in the fourth quarter 2018 and first quarter 2019 statements, which the Court already found were misleading for failure to disclose calibration problems and that Defendants Ra Medical, Irwin, and Jackson knew of the misleading nature. ¶ 148; Order at 11-12. Therefore, Defendants Irwin and Jackson knew of the material weaknesses but failed to disclose them in the SOX certifications. *Mulderrig*, 492 F. Supp. 3d at 1024 (SOX misleading where executives omitted, but "were aware of pre-existing material weaknesses as well as additional, then-existing material weaknesses in Amyris's internal control over financial reporting"); *Limantour v. Cray Inc.*, 432 F. Supp. 2d 1129, 1160 (W.D. Wash. 2006) (SOX certifications misleading based on later disclosure that material weaknesses had existed).

Defendants cite cases where it was unclear that a weakness existed at all. *Rok v. Identiv, Inc.*, 2017 WL 35496, at *9 (N.D. Cal. Jan. 4, 2017) ("not clear that the alleged Entity Level Controls Weakness existed"); *In re Tibco Software Inc.*, 2006 WL 1469654, at *25 (N.D. Cal. May 25, 2006) (no suggestion that company lacked internal controls or was improperly recognizing revenue). And in *Wanca v. Super Micro Computer, Inc.*, the later-discovered inaccuracy in financial statements was

found insufficient, but here, the Court already found that Defendants Irwin and Jackson knew of the calibration issue and Defendants do not dispute knowledge of the off-label marketing at the time the reports were issued. 2018 WL 3145649, at *6 (N.D. Cal. June 27, 2018).

### 4. Voluntary Recall Notice Was Materially Misleading

Defendants attempt to distinguish the Recall Notice, which stated that since February 2018 the Company sent technicians for "lasers/catheters [that] did not calibrate," from the recall reported in September 2019, where the Company relabeled catheters with a two-month shelf life expiration. Def. Br. at 21-22 & n.13. But the Court already found that the two purportedly different events are the same, or at least related: in its Order, the Court found that the Registration Statement issued in September 2018 (during the period between the two recall notices) failed to disclose that "a recall was already underway." *See* Order at 11. This is because both the February 2018 recall and the September 2019 recall relate to the same issue—the catheters failed to calibrate—and the issue "persisted for over a year," leading to the plausible inference that they are part of the same recall effort. Order at 12; ¶¶ 180, 285. Even if the September 2019 recall is somehow different from the February 2018 recall as Defendants claim, the September 27, 2019 statements are still misleading for failing to disclose that Ra Medical had "engaged in efforts . . . as early as February 2018" that led to a product recall. ¶ 286.

### III.  CONCLUSION

For the foregoing reasons, Plaintiffs request that the Court deny Defendants' motion to dismiss in its entirety. Alternatively, if the Court grants any part of Defendants' motion, Plaintiffs request leave to amend. *See* Fed. R. Civ. P. 15(a) ("The Court should freely give leave to amend when justice so requires."); *Eminence Capital, LLC v. Aspeon, Inc.*, 316 F.3d 1048, 1053 (9th Cir. 2003) (leave to amend appropriate where allegations were not frivolous and plaintiffs could have successfully stated a claim if given an opportunity).

DATED:  July 26, 2021

Respectfully submitted,

**GLANCY PRONGAY & MURRAY LLP**

By:  */s/ Robert V. Prongay*

Robert V. Prongay
Pavithra Rajesh
1925 Century Park East, Suite 2100
Los Angeles, California 90067
Telephone:  (310) 201-9150
Facsimile:  (310) 201-9160
Email:  info@glancylaw.com

*Counsel for Lead Plaintiffs Ervin Derr and Peter Shoemaker and Lead Counsel for the Class*

**LAW OFFICES OF HOWARD G. SMITH**
Howard G. Smith
3070 Bristol Pike, Suite 112
Bensalem, PA 19020
Telephone: (215) 638-4847
Facsimile: (215) 638-4867

*Additional Counsel*

## PROOF OF SERVICE BY ELECTRONIC POSTING

I, the undersigned, say:

I am not a party to the above case and am over eighteen years old. On July 26, 2021, I served true and correct copies of the foregoing document, by posting the document electronically to the ECF website of the United States District Court for the Southern District of California, for receipt electronically by the parties listed on the Court's Service List.

I affirm under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on July 26, 2021, at Los Angeles, California.

*/s/ Robert V. Prongay*
Robert V. Prongay

---

LEAD PLAINTIFFS' OPPOSITION TO MOTION TO DISMISS SAC
Case No. 3:19-cv-01079-LAB-AHG