Robert V. Prongay (SBN 270796)
Joseph D. Cohen (SBN 155601)
Casey E. Sadler (SBN 274241)
Pavithra Rajesh (SBN 323055)
**GLANCY PRONGAY & MURRAY LLP**
1925 Century Park East, Suite 2100
Los Angeles, California 90067
Telephone: (310) 201-9150
Email: rprongay@glancylaw.com
Email: jcohen@glancylaw.com
Email: csadler@glancylaw.com
Email: prajesh@glancylaw.com

*Counsel for Lead Plaintiffs Ervin Derr
and Peter Shoemaker and for the
Settlement Class*

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ERVIN DERR, and PETER SHOEMAKER, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>RA MEDICAL SYSTEMS, INC., DEAN IRWIN, ANDREW JACKSON, MELISSA BURSTEIN, MARTIN BURSTEIN, RICHARD HEYMANN, MAURICE BUCHBINDER, MARTIN COLOMBATTO, RICHARD MEJIA, JR., MARK E. SAAD, and WILLIAM ENQUIST, JR.,<br><br>Defendants. | Case No. 3:19-cv-01079-LAB-AHG<br><br>**DECLARATION OF CASEY E. SADLER IN SUPPORT OF (I) LEAD PLAINTIFFS' MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT AND PLAN OF ALLOCATION; AND (II) LEAD COUNSEL'S MOTION FOR AN AWARD OF ATTORNEYS' FEES AND REIMBURSEMENT OF LITIGATION EXPENSES**<br><br>Judge:  Larry Alan Burns |

# **TABLE OF CONTENTS**

TABLE OF EXHIBITS TO DECLARATION ........................................................ iii

I. INTRODUCTION ....................................................................................2

II. PROSECUTION OF THE ACTION ........................................................5

    A. Background...........................................................................................5

    B. Commencement Of The Action............................................................6

    C. The Comprehensive Pre-Filing Investigation, Preparation Of The FAC.......................................................................................................6

    D. Defendants' Motions To Dismiss The FAC And The Parties' Responses Thereto ...............................................................................8

    E. The Court's Partial Denial Of Defendants' Motions To Dismiss...........9

    F. Lead Plaintiffs' Filing Of The Complaint And Defendants' Motion To Dismiss The Complaint ......................................................................10

    G. Mediation Efforts, Settlement Negotiations, And The Settlement's Preliminary Approval .........................................................................12

III. THE RISKS OF CONTINUED LITIGATION .......................................13

    A. Risks To Maintaining The Securities Act Claims ...............................13

    B. Risks To Proving Liability..................................................................14

    C. Risks To Proving Loss Causation And Damages ................................14

    D. Risks Faced In Obtaining And Maintaining Class Certification ..........15

    E. Other Risks ........................................................................................16

    F. The Settlement Is Reasonable In Light Of The Potential Recovery In The Action ........................................................................................17

IV. LEAD PLAINTIFFS' COMPLIANCE WITH THE COURT'S PRELIMINARY APPROVAL ORDER REQUIRING ISSUANCE OF NOTICE ...............................................................................................19

V. ALLOCATION OF THE PROCEEDS OF THE SETTLEMENT ...........21

VI. THE FEE AND LITIGATION EXPENSE APPLICATION ....................23

    A. The Fee Application ...........................................................................24

        1. The Work And Experience Of Lead Counsel ............................25

        2. Standing And Caliber Of Defendants' Counsel ........................26

3. The Risks Of Litigation And The Need To Ensure The Availability Of Competent Counsel In High-Risk Contingent Securities Cases ............................................................27

4. The Reaction Of The Settlement Class To The Fee Application .......................................................................28

5. Lead Plaintiffs Support The Fee Application ...........................29

B. The Litigation Expense Application .......................................................29

VII. CONCLUSION ............................................................................................32

## **TABLE OF EXHIBITS TO DECLARATION**

| EX. | TITLE |
|---|---|
| 1 | Declaration of Melissa Mejia Regarding: (A) Mailing Of The Notice And Proof Of Claim; (B) Publication Of The Summary Notice; And (C) Report On Requests For Exclusion Received To Date |
| 2 | Excerpts from Janeen McIntosh and Svetlana Starykh, Recent Trends in Securities Class Action Litigation: 2021 Full-Year Review (NERA Jan. 25, 2022) |
| 3 | GPM Lodestar Report From Inception Through April 29, 2022 |
| 4 | GPM Expense Report From Inception Through April 26, 2022 |
| 5 | Table Of Peer Plaintiff And Defense Law Firm Billing Rates |
| 6 | Firm Resume of Glancy Prongay & Murray LLP ("GPM") |
| 7 | Declaration of Lead Plaintiff Peter Shoemaker |
| 8 | Declaration of Lead Plaintiff Ervin Derr |
| 9 | Excerpts from *Securities Class Action Filings: 2020 Year in Review* (Cornerstone Research 2021) |
| 10 | *In re Novatel Wireless Sec. Litig.*, No. 08-cv-01689-AJB-RBB, slip op. (ECF No. 520) (S.D. Cal. June 23, 2014) |
| 11 | *NECA-IBEW Pension Trust Fund et al. v. Precision Castparts Corp., et al.*, No. 16-cv-01756-YY, slip op. (ECF No. 169) (D. Or. May 7, 2021) |
| 12 | *Turocy v. El Pollo Loco Holdings, Inc.*, No. 8:15-cv-01343-DOC-KES, slip op. (ECF No. 219) (C.D. Cal. Aug. 27, 2019) |
| 13 | *In re Allied Nevada Gold Corp. Sec. Litig.*, No. 3:14-cv-00175-LRH-WGC, slip op. (ECF No. 215) (D. Nev. Nov. 16, 2020) |
| 14 | *Stanley v. Safeskin Corp.*, No. 99CV454 BTM (LSP), slip op. (ECF No. 244) (S.D. Cal. Apr. 2, 2003) |

I, Casey E. Sadler, declare as follows:

1. I am an attorney admitted to practice before this Court. I am a partner at the law firm Glancy Prongay & Murray LLP ("GPM"), the Court-appointed Lead Counsel in this Action.[1] GPM represents the Court-appointed Lead Plaintiffs Ervin Derr and Peter Shoemaker (together, "Lead Plaintiffs"). I have personal knowledge of the matters set forth herein based on my participation in the prosecution and settlement of the claims asserted in the Action.

2. I respectfully submit this Declaration in support of Lead Plaintiffs' Motion for Final Approval of Class Action Settlement and Plan of Allocation and the concurrently filed memorandum in support thereof ("Final Approval Memorandum"). As set forth in the Final Approval Memorandum, Lead Plaintiffs seek final approval of the $10,000,000 Settlement for the benefit of the Settlement Class, as well as of the proposed plan for allocating the proceeds of the Net Settlement Fund to eligible Settlement Class Members (the "Plan of Allocation").

3. I also respectfully submit this Declaration in support of Lead Counsel's Motion for an Award of Attorneys' Fees and Reimbursement of Litigation Expenses and the concurrently filed memorandum in support thereof (the "Fee Memorandum"). As set forth in the Fee Memorandum, Lead Counsel seeks an award of attorneys' fees in the amount of 27.5% of the Settlement Fund (which, by definition, includes interest accrued thereon); and reimbursement of Litigation Expenses in the total amount of $53,131.77, which includes Lead Counsel's total out-of-pocket litigation costs of $43,131.77 and $5,000 to each Lead Plaintiff pursuant to the Private Securities Litigation Reform Act of 1995 ("PSLRA") for costs related to their representation of the Settlement Class.

---

[1] All capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the Stipulation and Agreement of Settlement dated November 12, 2021 (the "Stipulation," ECF No. 73-2).

4. The Court preliminarily approved the proposed Settlement by Order dated February 11, 2022 (the "Preliminary Approval Order") and thereby directed notice of the Settlement to be disseminated to the Settlement Class. *See* ECF No. 81. Pursuant to the Preliminary Approval Order, Epiq Class Action & Claims Solutions, Inc. ("Epiq"), the Court-approved Claims Administrator, implemented a comprehensive notice program under the direction of Lead Counsel, whereby notice was given to potential Settlement Class Members by mail and by publication.

5. In total, more than 4,376 copies of the Notice Packet have been disseminated to potential Settlement Class Members and nominees, and thus far no requests for exclusion and no objections have been received.

## I. INTRODUCTION

6. This is a class action that asserted claims pursuant to Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), and Rule 10b-5 promulgated thereunder by the U.S. Securities and Exchange Commission ("SEC"), against Defendants Ra Medical Systems, Inc. ("Ra Medical" or the "Company"), Dean Irwin ("Irwin"), and Andrew Jackson ("Jackson"), and claims pursuant to Sections 11 and 15 of the Securities Act of 1933 (the "Securities Act") against Ra Medical and the Individual Defendants.[2] The Second Amended Complaint ("Complaint") alleged that Defendants made materially false and misleading statements and/or failed to disclose material facts about the manufacturing problems that caused DABRA catheters to fail to calibrate, the recall of DABRA product, and the resulting financial impact, as well as the Company's off-label marketing of DABRA and improper payments to physicians.

---

[2] The Individual Defendants are, collectively, Irwin, Jackson, Melissa Burstein, Martin Burstein, Richard Heymann ("Heymann"), Maurice Buchbinder ("Buchbinder"), Martin Colombatto ("Colombatto"), Richard Mejia, Jr. ("Mejia"), Mark E. Saad ("Saad"), and William Enquist Jr. ("Enquist").

7. The proposed Settlement provides for the resolution of all claims in the Action in exchange for a cash payment of $10,000,000 (the "Settlement Amount") for the benefit of the Settlement Class. As detailed herein, Lead Plaintiffs and Lead Counsel submit that the proposed Settlement represents a highly favorable result for the Settlement Class considering the significant risks of continued litigation. Though the Court found that Lead Plaintiffs sufficiently pled certain of their fraud claims, it also found that Lead Plaintiffs had not adequately alleged that they could trace their shares to the IPO, resulting in the dismissal of the Securities Act claims and much of the Exchange Act claims in the First Amended Complaint ("FAC"). While Lead Plaintiffs filed the Complaint attempting to cure these pleading deficiencies, Defendants filed motions to dismiss arguing that the additional allegations were still insufficient to plead standing and the remaining theories of liability. If these arguments were accepted, Lead Plaintiffs' potential recovery would have been substantially reduced or completely eliminated.

8. Additionally, the Settlement Amount is within the range of reasonableness under the circumstances to warrant final approval of the Settlement. Depending on whether the Securities Act claims were successfully maintained and whether Plaintiffs fully prevailed at summary judgment and trial, damages could have ranged from $17.3 million to approximately $63 million. Thus, the $10,000,000 Settlement Amount represents about 58% of the $17.3 million in damages (if only the Exchange Act claims were proven) and approximately 15.9% of $63 million (if the Securities Act and the Exchange Act claims were proven) in total maximum damages potentially recoverable in this Action.

9. The proposed Settlement is the result of Lead Counsel's extensive efforts, which included, among other things: (a) conducting a comprehensive investigation into the alleged claims, assisted by an investigator who interviewed numerous former Ra Medical employees; (ii) drafting the highly detailed 121-page FAC based on the investigation; (iii) fully briefing Defendants' motions to dismiss

the FAC; (iv) successfully defeating Defendants' motions to dismiss in part; (v) drafting the 108-page Complaint, plus exhibits, based on additional investigation; (vi) fully briefing Defendants' motion to dismiss the Complaint; and (vii) negotiating at arms'-length to reach a potential resolution, including the drafting of a mediation statement and participating at an all-day mediation session with Jed D. Melnick, Esq. of JAMS on September 28, 2021; and (viii) negotiating and executing the Stipulation and its exhibits.

10. Based on the foregoing efforts, Lead Plaintiffs and Lead Counsel are well aware of the strengths and weaknesses of the claims and defenses in the Action, and believe the Settlement represents a highly favorable outcome for the Settlement Class and is in the best interests of its members. For all the reasons set forth herein and in the accompanying memoranda and declarations, Lead Plaintiffs and Lead Counsel respectfully submit that the Settlement is "fair, reasonable, and adequate" in all respects and that the Court should grant final approval pursuant to Rule 23(e) of the Federal Rules of Civil Procedure.

11. In addition, Lead Plaintiffs seek approval of the proposed Plan of Allocation as fair and reasonable. As discussed in further detail below, Lead Counsel developed the Plan of Allocation with the assistance of Lead Plaintiffs' damages consultant. The Plan of Allocation provides for the distribution of the Net Settlement Fund to each Authorized Claimant on a *pro rata* basis based on their Recognized Loss amounts.

12. Finally, Lead Counsel seeks approval of the request for attorneys' fees and reimbursement of Litigation Expenses as set forth in the Fee Memorandum. As discussed in detail in the accompanying Fee Memorandum, the requested 27.5% fee is within the range of percentage awards granted by courts in comparable securities class actions. Additionally, the fairness and reasonableness of the request is confirmed by a lodestar cross-check and warranted in light of the extent and quality of the work performed and the substantial result achieved. Likewise, the requested

out-of-pocket litigation costs of $43,131.77 and the requested PSLRA award of $5,000 to each Lead Plaintiff is also fair and reasonable. Accordingly, for the reasons set forth in the Fee Memorandum and for the additional reasons set forth herein, Lead Counsel respectfully submits that the request for attorneys' fees and reimbursement of Litigation Expenses be approved.

## II. PROSECUTION OF THE ACTION

### A. Background

13. Ra Medical is a medical device manufacturer. In September 2018, the Company completed its IPO and sold 4,485,000 shares of common stock for $17.00 per share, raising $67.6 million in proceeds.

14. When the Company completed its IPO, its DABRA laser system and catheter, which dissolve plaque in vascular blockages, positioned Ra Medical for a steady stream of recurring revenue. DABRA was approved by the U.S. Food and Drug Administration ("FDA") in ablating a channel in occlusive peripheral vascular disease. However, Ra Medical planned to seek expanded indications, including for atherectomy.

15. Lead Plaintiffs alleged that Defendants failed to disclose that Ra Medical suffered a manufacturing issue whereby DABRA catheters failed to calibrate, leading to inconsistent performance, and that they engaged in a covert product recall while they attempted to fix the defect. However, the Company continued to produce defective catheters, deteriorating Ra Medical's financial performance.

16. Lead Plaintiffs further alleged that Ra Medical engaged in off-label marketing by characterizing DABRA as an atherectomy device, despite the fact that the Company had not yet obtained FDA approval for that indication, and that Defendants paid kickbacks to physicians to increase sales. Defendants failed to disclose the foregoing acts and the resulting risk of regulatory scrutiny.

17. These allegations were based, in part, on the Company's own admissions, following an investigation by Ra Medical's Audit Committee, that: (i)

DABRA catheters frequently failed to calibrate and occasionally overheated, posing a risk of injury to physicians and patients; (ii) this inconsistent performance had adversely affected multiple quarters' financials; and (iii) the Company systematically replaced catheters for customers without disclosing the product recall to the FDA or the investing public.

18.    Lead Plaintiffs alleged that the price of Ra Medical's common stock was artificially inflated as a result of Defendants' materially false and misleading statements and omissions and that the price declined as the truth slowly emerged.  By November 29, 2019, Ra Medical's common stock closed at $1.27 per share, or down 92.53% from the IPO price.

### B.    Commencement Of The Action

19.    On June 7, 2019, Lead Plaintiff Ervin Derr filed a class action complaint in the United States District Court for the Southern District of California, styled *Derr v. Ra Medical Systems, Inc., et al.*, Case No. 3:19-CV-01079-LAB-AHG. ECF No. 1. The complaint alleged violations of the Securities Act against the Company and nearly all of the Individual Defendants.

20.    On August 9, 2019, Lead Plaintiffs Ervin Derr and Peter Shoemaker filed a motion pursuant to the PSLRA to be appointed lead plaintiffs in the Action.  ECF No. 4.  Their motion was unopposed.  ECF No. 7.

21.    By Order dated September 5, 2019, the Court appointed Ervin Derr and Peter Shoemaker as Lead Plaintiffs for the Action; and approved Lead Plaintiffs' selection of Glancy Prongay & Murray LLP as Lead Counsel for the putative class. ECF No. 9.

### C.    The Comprehensive Pre-Filing Investigation, Preparation Of The FAC

22.    Following Lead Counsel's appointment, counsel conducted a comprehensive investigation into Defendants' allegedly wrongful acts, which included, among other things: (i) reviewing and analyzing (a) Ra Medical's filings

with the SEC, (b) public reports, blog posts, research reports prepared by securities and financial analysts, and news articles concerning Ra Medical, (c) Ra Medical's investor call transcripts, and (d) court filings and other publicly available material related to Ra Medical; and (ii) retaining and working with a private investigator who conducted an investigation that involved, *inter alia*, numerous interviews of former Company employees and other sources of relevant information. Lead Counsel also consulted with damages and loss causation experts.

23. On January 13, 2020, Lead Plaintiffs filed and served the FAC asserting claims against the Company, Irwin and Jackson under Section 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder, against Irwin and Jackson under Section 20(a) of the Exchange Act, against Defendants and Underwriters under Section 11 of the Securities Act, and against Individual Defendants under Section 15 of the Securities Act. Among other things, the FAC alleged that Defendants made materially false and misleading statements and/or failed to disclose material facts about the manufacturing problems that caused DABRA catheters to fail to calibrate, the recall of DABRA product, and the resulting financial impact. The FAC further alleged that Defendants failed to disclose that the Company engaged in off-label marketing by characterizing DABRA as an atherectomy device and that Ra Medical made improper payments to physicians. Additionally, the FAC alleged that the prices of Ra Medical's publicly-traded securities were artificially inflated as a result of Defendants' materially false and misleading statements and omissions, and declined when the truth was revealed.

24. Prior to Defendants filing the motions to dismiss the FAC, Lead Plaintiffs and Underwriters negotiated and entered into a confidential agreement tolling the statute of limitations and the statute of repose (the "Tolling Agreement"). Pursuant to the Tolling Agreement, Lead Plaintiffs voluntarily dismissed the Underwriters without prejudice, while preserving Lead Plaintiffs' right to assert all

claims that they may have had against Underwriters arising from or relating to the facts, acts, and/or occurrences in the Action.

**D. Defendants' Motions To Dismiss The FAC And The Parties' Responses Thereto**

25. On March 13, 2020, defendants Ra Medical, Jackson, Heymann, Buchbinder, Colombatto, Mejia, Saad, and Enquist filed and served a motion to dismiss the FAC (ECF No. 30) and a request for judicial notice (ECF No. 31), and defendants Irwin, Melissa Burstein, and Martin Burstein filed and served a separate motion to dismiss the FAC (ECF No. 29) and a separate request for judicial notice (ECF No. 29-2). Defendants challenged standing, falsity, and scienter. Specifically, they argued that: (i) Lead Plaintiffs lacked standing to pursue the Securities Act claims because they had not traced their shares to the IPO, but purchased in a purportedly mixed market of registered and unregistered common stock; (ii) the FAC did not sufficiently allege that any of the alleged issues existed at the time of the IPO, and that Defendants confronted and accurately disclosed a series of business challenges; and (iii) Irwin and Jackson did not knowingly issue misleading statements, as they did not engage in "unusual" or "suspicious" stock sales, and the core operations doctrine did not apply.

26. On April 27, 2020, Lead Plaintiffs filed and served their omnibus opposition to Defendants' motions to dismiss and an opposition to Defendants' requests for judicial notice. ECF Nos. 35-36. Specifically, Lead Plaintiffs argued there was no mixed market when they purchased their shares because, among other things, publicly available information did not suggest unregistered shares "eligible for sale" actually entered the open market. As to falsity, Lead Plaintiffs relied on, among other things, a recall notice acknowledging the recall began months prior to the IPO, but was not disclosed, and on confidential witnesses who recounted that sales representatives had been trained to market DABRA as an atherectomy device against warnings from the FDA. Lead Plaintiffs also argued that Irwin's termination in

connection with the Audit Committee investigation, Irwin's and Jackson's presence at sales trainings, and SEC and Department of Justice ("DOJ") investigations into the same matters supported a strong inference of scienter.

27. On May 27, 2020, Defendants served their reply papers in support of the motions to dismiss and requests for judicial notice. ECF Nos. 37-39.

28. On June 23, 2020, Lead Plaintiffs filed and served an *ex parte* application for leave to file a sur-reply to Defendants reply papers in support of the motions to dismiss and requests for judicial notice. ECF No. 40. Lead Plaintiffs sought to respond to Defendants' arguments raised on reply that the publicly available information regarding unregistered stock was incomplete. Specifically, Lead Plaintiffs sought to submit a sur-reply arguing that Defendants asked the Court to dismiss based on speculation that unregistered shares were sold prior to Lead Plaintiffs' purchases, when Ra Medical knows in fact whether and when such unregistered shares entered the market. On June 25, 2020, defendants Ra Medical, Jackson, Heymann, Buchbinder, Colombatto, Mejia, Saad, and Enquist filed their response in opposition to Plaintiffs' *ex parte* motion for leave to file a sur-reply. ECF No. 41.

29. On January 12, 2021, Lead Plaintiffs filed a notice of related case (ECF No. 45) to which defendants Ra Medical, Jackson, Heymann, Buchbinder, Colombatto, Mejia, Saad, and Enquist responded on February 3, 2021 (ECF No. 48).

30. On January 28, 2021, defendants Ra Medical, Jackson, Heymann, Buchbinder, Colombatto, Mejia, Saad, and Enquist filed a notice of recent authority (ECF No. 46) to which Plaintiffs replied on February 1, 2021 (ECF No. 47).

31. On March 18, 2021, Lead Plaintiffs filed a notice of recent authority. ECF No. 49.

**E.     The Court's Partial Denial Of Defendants' Motions To Dismiss**

32. On March 24, 2021, the Court granted in part, and denied in part, Defendants' motions to dismiss and requests for judicial notice and granted Lead

Plaintiffs' motion for leave to file a sur-reply. *Derr v. Ra Medical Systems, Inc.*, 2021 WL 1117309 (S.D. Cal. Mar. 24, 2021). The Court found that statements made in connection with the IPO and during the class period were misleading because "[d]isclosing 'unforeseen' manufacturing issues and the risk that a recall 'could occur' is misleading when failing to mention that manufacturing issues had arisen and a recall was already underway." *Id.* at *6. These statements were made with the requisite scienter because, among other things, Irwin and Jackson together held five senior management positions such that it would be "absurd" to suggest they were ignorant of the situation. *Id.* at *7.

33. However, the Court dismissed the remaining theories of liability. Though it found that statements subject to the Securities Act were misleading, the Court held that Lead Plaintiffs had not alleged that all of Ra Medical's shares were issued pursuant to the IPO documents, rather they asserted this in their briefing, so they lacked standing for the Securities Act claims. *Id.* at *8-9.

**F. Lead Plaintiffs' Filing Of The Complaint And Defendants' Motion To Dismiss The Complaint**

34. On April 19, 2021, Lead Plaintiffs filed and served the Complaint. ECF No. 53. The Complaint, like the FAC, asserted claims against the Company, Irwin and Jackson under Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, against Irwin and Jackson under Section 20(a) of the Exchange Act, against Defendants under Section 11 of the Securities Act and against Individual Defendants under Section 15 of the Securities Act. The Complaint alleged claims substantially similar to those alleged in the FAC, but omitted allegations regarding Ra Medical's sales personnel and training, and added allegations regarding Lead Plaintiffs' standing to pursue their claim under Section 11 of the Securities Act, the Company's alleged off-label marketing of DABRA, and the Company's settlement with the DOJ.

35. As to standing, the Complaint attempted to cure the deficiencies identified by the Court with respect to the Securities Act claims. Based on information and belief, Lead Plaintiffs alleged that the only shares in the public market at the time of their purchases were the shares registered for the IPO. Unregistered shares could only be sold with permission from the Company, and while Ra Medical provided a letter granting such permission to the holder of a significant portion of unregistered stock, the Complaint alleged, based on conversations between Lead Counsel and the identified shareholder, that the holder did not sell those shares prior to Lead Plaintiffs' purchases.

36. On June 10, 2021, defendants Ra Medical, Jackson, Heymann, Buchbinder, Colombatto, Mejia, Saad, and Enquist filed and served a motion to dismiss the Complaint (ECF No. 60) and a request for judicial notice (ECF No. 61), which defendants Irwin, Melissa Burstein, and Martin Burstein joined (ECF No. 62). They renewed many of the arguments raised in their prior motions as to the remaining allegedly false and misleading statements. As to standing, they argued that Lead Plaintiffs failed to allege that the non-IPO shares did not enter the market.

37. On July 26, 2021, Lead Plaintiffs filed and served their papers in opposition to the motion to dismiss and request for judicial notice. ECF Nos. 66-67. They argued that the additional allegations in the Complaint sufficiently showed that statements about off-label marketing were misleading, including because warning that the FDA may disagree with the legality of Company's approach were misleading when the agency had already notified Ra Medical that its practices constituted off-label marketing. With respect to standing, Lead Plaintiffs argued that Defendants were advocating for an insurmountable pleading burden, claiming that, without discovery, they must produce documents only within Defendants' control to demonstrate traceability.

38. On August 25, 2021, defendants Ra Medical, Jackson, Heymann, Buchbinder, Colombatto, Mejia, Saad, and Enquist filed and served their reply papers

(ECF Nos. 68-69), which defendants Irwin, Melissa Burstein, and Martin Burstein joined (ECF Nos. 70-71).

### G. Mediation Efforts, Settlement Negotiations, And The Settlement's Preliminary Approval

39. On September 28, 2021, Lead Counsel and Defendants' Counsel participated in a full-day mediation session before Jed D. Melnick, Esq. of JAMS. In advance of that session, the Parties exchanged, and provided to Mr. Melnick, detailed mediation statements, which addressed the issues of both liability and damages. The session culminated in a recommendation by Mr. Melnick to settle the Action for a cash payment of $10,000,000. The Parties accepted the mediator's recommendation.

40. Over the course of the next several days, the Parties negotiated, and on October 1, 2021 executed, a confidential term sheet (the "Term Sheet") which memorialized, among other things, the Parties' agreement to settle and release all claims asserted against Defendants in the Action in return for a non-reversionary cash payment by or on behalf of Defendants of $10,000,000 for the benefit of the Settlement Class, subject to certain terms and conditions and the execution of a customary "long form" stipulation and agreement of settlement and related papers.

41. The Parties subsequently negotiated the terms of the Stipulation, including exhibits, and the Stipulation was executed on November 12, 2021.

42. On November 15, 2021, Lead Plaintiffs filed their Unopposed Motion for Preliminary Approval of Class Action Settlement. ECF No. 73.

43. On February 11, 2022, the Court issued its Preliminary Approval Order. ECF No. 81.

44. Pursuant to the Preliminary Approval Order, Lead Counsel instructed Epiq, the Court-approved Claims Administrator, to begin disseminating copies of the Notice Pocket and to publish the Summary Notice. Contemporaneously with the mailing of the Notice Packet, Lead Counsel instructed Epiq to post downloadable copies of the Stipulation, Notice and Claim Form online at

www.RaMedicalSecuritiesLitigation.com, the settlement website created for the Settlement ("Settlement Website").

## III. THE RISKS OF CONTINUED LITIGATION

45. The Settlement provides an immediate and certain benefit to the Settlement Class in the form of a non-reversionary cash payment of $10,000,000. As explained more fully below, there were significant risks that the Settlement Class might recover substantially less than the Settlement Amount—or nothing at all—if the case were to proceed through additional litigation to a jury trial, followed by the inevitable appeals. Prior to contemplating a potential trial and likely appeal, the most immediate risk faced by the Settlement Class was the procedural posture of the case— the Court had already dismissed the Securities Act claims for lack of standing and could have concluded that the Complaint did not cure these deficiencies, eliminating approximately 70% of the alleged damages. Thus, there was no guarantee that Lead Plaintiff and the Settlement Class would later achieve any recovery, let alone one greater than $10,000,000.

### A. Risks To Maintaining The Securities Act Claims

46. As discussed above, Defendants contested whether Lead Plaintiffs adequately alleged standing for the strict liability claims under the Securities Act. Though the Court found that statements made in connection with the IPO and subject to the Securities Act were misleading, it dismissed those claims in the FAC for lack of standing and could do so again. Even if the Court found that Lead Plaintiffs adequately *pled* standing, there was a significant risk that discovery would reveal unregistered shares entered the market prior to Lead Plaintiffs' purchases of Ra Medical stock. Lead Plaintiffs would then face the nearly impossible task of tracing the chain of title for their shares back to the IPO to establish standing for the Securities Act claims. If Lead Plaintiffs did not have a class representative with standing for the Securities Act claims, then the Settlement Class's class-wide damages would have been greatly reduced.

## B. Risks To Proving Liability

47. Lead Plaintiffs and Lead Counsel recognized that this Action presented a number of substantial risks to establishing liability.

48. Defendants forcefully argued in their motions to dismiss, and undoubtedly would continue to argue at summary judgment and trial, that the alleged misstatements and omissions were not actionable because the recall notice related to servicing lasers was resolved prior to the IPO, whereas the catheter-related manufacturing defect was a different, evolving issue that arose after the IPO and was accurately disclosed. Defendants continued to argue that Ra Medical believed it could legally encourage physicians to use DABRA for atherectomy, even though that was not an indication approved by the FDA. Though Lead Plaintiffs alleged that the Company had already been warned its practices were improper, the Court dismissed these allegations in the FAC, so there was a risk that it would do so again, despite the Company's settlement with the DOJ for allegations of off-label marketing.

49. Indeed, despite believing that this Action is meritorious, Lead Plaintiffs and Lead Counsel were well aware of the high hurdle they would have to surmount in order to successfully prove that Defendants acted with the requisite mental state of scienter—*i.e.*, an intent to deceive or extreme recklessness—to ultimately prove Defendants' liability under the federal securities laws. Defendants insisted that their Settlement Class Period statements concerning the product defect were made in good faith, in particular because they reflected an evolving understanding of the issue. Although Lead Plaintiffs believe that they had strong counter-arguments to Defendants' assertions, there is no guarantee that the trier of fact would have found these arguments more persuasive than Defendants' explanation of events.

## C. Risks To Proving Loss Causation And Damages

50. Even assuming that Lead Plaintiffs overcame the risk of establishing Defendants' liability, Lead Plaintiffs would have confronted considerable challenges in establishing loss causation and class-wide damages.

51.    Moreover, pursuant to *Dura Pharmaceuticals, Inc. v. Broudo*, 544 U.S. 336 (2005), it is Lead Plaintiffs' burden to **prove** loss causation and damages. This would require Lead Plaintiffs to proffer expert testimony as to: (i) what the "true value" of Ra Medical's common stock would have been had there been no alleged material misstatements or omissions; (ii) the amount by which Ra Medical's shares were inflated by the alleged material misstatement and omissions; and (iii) the amount of artificial inflation removed by the purported corrective disclosures. Defendants almost certainly would have presented their own damages expert(s) to present conflicting conclusions and theories as to the reasons for Ra Medical's share price declines on the alleged disclosure dates, requiring a jury to decide the "battle of the experts"—an expensive and intrinsically unpredictable process.

52.    Moreover, expert testimony can often rest on many assumptions, any of which risks being rejected by a jury. A jury's reaction to such expert testimony is highly unpredictable, and Lead Plaintiffs recognize that, in a such a battle, there is the possibility that a jury could be swayed by Defendants' expert(s) and could find that only a fraction of the amount of damages Lead Plaintiffs contended were suffered by the Settlement Class.

53.    Thus, the amount of damages that the Settlement Class would actually recover at trial, even if successful on liability issues, was uncertain. Similarly, there was no assurance that Lead Plaintiffs' key evidence and testimony relating to liability and damages would be admitted as evidence by the Court at trial. These issues could have seriously affected Lead Plaintiffs' ability to successfully prosecute this Action.

54.    In sum, had any of Defendants' loss causation and damages arguments been accepted at summary judgment or trial, they could have dramatically limited— if not eliminated—any potential recovery by the Settlement Class.

### D.    Risks Faced In Obtaining And Maintaining Class Certification

55.    Defendants likely would have argued against class certification. While Lead Counsel analyzed the class question and are confident that all of the Rule 23

requirements would have been met, and that the Court would have certified the proposed class, Lead Plaintiffs bear the burden of proof on class certification, and Defendants would have undoubtedly raised arguments challenging the propriety of class certification. Moreover, even if Lead Plaintiffs successfully obtained class certification, Defendants could have sought permission from the Ninth Circuit to appeal any class certification order under Federal Rule of Civil Procedure 23(f), further delaying or precluding any potential recovery. Class certification was, by no means, a forgone conclusion.

56. Additionally, a recent ruling by the United States Supreme Court has made obtaining class certification for Lead Plaintiffs more difficult and could potentially provide additional challenges should the litigation against Defendants proceed. In *Goldman Sachs Grp. v. AR Teacher Ret.*, 141 S. Ct. 1951 (2021), the Supreme Court held, in part, that when defendants are seeking to rebut the presumption of reliance established under *Basic Inc. v. Levinson*, 485 U.S. 224 (1988), as modified by *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258 (2014), courts may consider the generic nature of an alleged misrepresentation as evidence of lack of price impact. Accordingly, courts are now permitted to assess materiality of an alleged misstatement and consider "all evidence relevant to price impact" at the class certification stage. On the plus side for Lead Plaintiffs, the Supreme Court did clarify that defendants bear the burden of persuasion of showing a lack of price impact by a preponderance of the evidence.

**E.    Other Risks**

57. In addition, any future recovery would require Lead Plaintiffs to prevail at several later stages of the litigation, each of which presents significant risks in complex class actions such as this. For example, Lead Plaintiffs would have to complete substantial fact and expert discovery, which would entail, among other things, document production, review and analysis of documents produced by Defendants and third parties, taking and/or defending percipient and expert

depositions, propounding and responding to interrogatories and requests for admission, and defending the two Lead Plaintiffs' depositions. The costs of each of these tasks would assuredly be high, and the fruits of each endeavor would be highly uncertain. Furthermore, Lead Plaintiffs would have to successfully navigate and prevail against Defendants' anticipated motion(s) for summary judgment, as well as at trial. And finally, even if Lead Plaintiffs prevailed on all of those stages, they would have to succeed on any appeals that would surely follow. This process could extend for years and might ultimately lead to a smaller recovery, or no recovery at all. Indeed, even prevailing at trial would not guarantee a recovery larger than the $10,000,000 Settlement.[3]

### F. The Settlement Is Reasonable In Light Of The Potential Recovery In The Action

58. In addition to the attendant risks of litigation discussed above, the Settlement is also fair and reasonable in light of the potential recovery of available damages. *If* Lead Plaintiffs were able to demonstrate that they could trace their shares to the IPO and thus revive the Securities Act claims, *if* they had fully prevailed in each of their claims at both summary judgment and after a jury trial, *if* the Court certified the same class period as the Settlement Class Period, *and if* the Court and jury accepted Lead Plaintiffs' damages theory, including proof of loss causation as to each of the stock price drop dates alleged in this case—*i.e.*, Lead Plaintiffs' best-case scenario—estimated total maximum damages are approximately $63 million. However, the Court has already dismissed the Securities Act claims for lack of standing and could do so again; if only the Exchange Act claims were successful, the

---

[3] *See also Robbins v. Koger Props., Inc.*, 116 F.3d 1441 (11th Cir. 1997) (reversing jury verdict of $81 million for plaintiffs); *In re BankAtlantic Bancorp, Inc. Sec. Litig.*, 2011 WL 1585605 (S.D. Fla. Apr. 25, 2011) (granting defendants' motion for judgment as a matter of law following plaintiffs' verdict); *In re Apple Computer Sec. Litig.*, 1991 WL 238298 (N.D. Cal. Sept. 6, 1991) (overturning jury verdict for plaintiffs after extended trial).

damages are approximately $17.3 million.

59. If Plaintiffs successfully proved loss causation for all of the alleged dates, the damages would be approximately $17.3 million for the Exchange Act claims. If Plaintiffs also successfully maintained the Securities Act claims, the total damages would be approximately $63 million.[4] Thus, the $10,000,000 Settlement Amount represents about 58% of the $17.3 million in damages (if only the Exchange Act claims were proven) and approximately 15.9% of $63 million (if the Securities Act and the Exchange Act claims were proven). This amount compares favorably to other securities class action settlements, and indeed, is an excellent recovery for the Settlement Class. *See, e.g.*, Exhibit 2 attached hereto (Janeen McIntosh and Svetlana Starykh, Recent Trends in Securities Class Action Litigation: 2021 Full-Year Review (NERA Jan. 25, 2022) at 24, Fig. 22 (median recovery in securities class actions in 2021 was approximately 1.8% of estimated damages)).

60. Moreover, the estimated damages for each of these scenarios assumes that Lead Plaintiffs are given full credit for each of the respective drops and does not take into account any disaggregation arguments that Defendants may have raised. Even if Lead Plaintiffs were able to establish that at least some portion of the stock price drop on each of the alleged corrective disclosure dates were attributable to the fraud, Defendants likely would have raised arguments concerning the release of other, non-fraud related information on those dates, which could have decreased the amount of recoverable damages even further. In that light, the Settlement amount is even more reasonable.

61. In sum, having evaluated the relative strengths and weaknesses of the Action in light of Defendants' arguments, and having considered the very real risks presented by the significant hurdles of class certification, summary judgment, trial

---

[4] If Defendants successfully argued a defense of negative causation, this amount would be greatly reduced.

and any eventual appeals that lie ahead, it is the informed judgment of Lead Counsel, based upon all of the proceedings to date and their extensive experience in litigating class actions under the federal securities laws, that the proposed Settlement is fair, reasonable, and adequate and in the best interests of the Settlement Class.

## IV. LEAD PLAINTIFFS' COMPLIANCE WITH THE COURT'S PRELIMINARY APPROVAL ORDER REQUIRING ISSUANCE OF NOTICE

62. The Court's Preliminary Approval Order found Lead Plaintiffs' proposed method of notice to be adequate, and directed that the Notice Packet be disseminated to all Settlement Class Members who could be identified with reasonable effort, as well as brokerage firms and other nominees. Dkt. No. 81 at ¶¶ 8-9. The Preliminary Approval Order also found the contents of Notice to be adequate because it set forth the ability and process for Settlement Class Members to submit objections to the Settlement, Plan of Allocation and/or the Fee and Expense Application or to request exclusion from the Settlement Class. The Preliminary Approval Order also set the deadline for both objections and exclusion for May 23, 2022 and set a final fairness hearing date of June 13, 2022. Dkt. No. 81 at ¶¶ 5, 14, 19.

63. Pursuant to the Preliminary Approval Order, Lead Counsel instructed Epiq, the Court-approved Claims Administrator, to begin disseminating copies of the Notice Pocket and to publish the Summary Notice. Contemporaneously with the mailing of the Notice Packet, Lead Counsel instructed Epiq to post downloadable copies of the Stipulation, Notice and Claim Form online on the Settlement Website. Upon request, Epiq will mail copies of the Notice and/or Claim Form to Settlement Class Members and will continue to do so until the deadline to submit a Claim Form has passed. The Notice contains, among other things, a description of the Action; the definition of the Settlement Class; a summary of the terms of the Settlement and the proposed Plan of Allocation; and a description of Settlement Class Members' rights to participate in the Settlement, object to the Settlement, the Plan of Allocation and/or

the Fee and Expense Application or exclude themselves from the Settlement Class. The Notice (and Notice Packet) also informed Settlement Class Members of Lead Counsel's intent to apply for an award of attorneys' fees in an amount not to exceed 33⅓% of the Settlement Fund, and for reimbursement of Litigation Expenses in an amount not to exceed $85,000.

64. To disseminate the Notice Packet, Epiq obtained from Ra Medical's transfer agent the names and addresses of 182 potential Settlement Class Members. On March 11, 2022, Epiq disseminated copies of the Notice Packet to each of these potential Settlement Class Members by first-class mail. *See* Exhibit 1 attached hereto (Declaration of Melissa Mejia Regarding: (A) Mailing Of The Notice And Proof Of Claim; (B) Publication Of The Summary Notice; And (C) Report On Requests For Exclusion Received To Date ("Mailing Declaration")) at ¶3.

65. In addition, Epiq maintains a proprietary list with names and addresses of known broker firms, dealers, banks, and other institutions involving publicly-traded securities (the "Broker Database") that, at the time of the initial mailing, contained 1,082 mailing records. *See id.* at ¶4. On March 11, 2022, Epiq mailed copies of the Notice Packet to the 1,082 mailing records in the Broker Database. *See id.*

66. As of April 28, 2022, Epiq has disseminated 4,376 Notice Packets. *See id.* at ¶8.

67. On March 21, 2022, in accordance with the Preliminary Approval Order, Epiq caused the Summary Notice to be published in *Investor's Business Daily* and to be transmitted once over the *PR Newswire*. *See id.* at ¶9.

68. Lead Counsel also caused Epiq to establish the Settlement Website to provide potential Settlement Class Members with information concerning the Settlement, allow for the submission of a claim online, download copies of the Notice and the Claim Form, as well as copies of the Stipulation, Complaint, Order Granting

In Part Defendants' Motion to Dismiss First Amended Complaint, and Preliminary Approval Order. *Id.* at ¶14.

69. The deadline for Settlement Class Members to file objections to the Settlement, Plan of Allocation and/or the Fee and Expense Application, or to request exclusion from the Settlement Class is May 23, 2022. To date, no requests for exclusion has been received. *Id.* at ¶ 15. Epiq will submit a supplemental affidavit after the May 23 deadline addressing any additional requests for exclusion received. To date, no objections to the Settlement, the Plan of Allocation or the maximum amounts listed in the Notice that Lead Counsel would seek for an award for attorneys' fee and reimbursement of Litigation Expenses have been received. Lead Counsel will file reply papers on June 6, 2022, that will address any requests for exclusion and any objections that may be received.

## V. ALLOCATION OF THE PROCEEDS OF THE SETTLEMENT

70. Pursuant to the Preliminary Approval Order, and as set forth in the Notice, all Settlement Class Members who want to participate in the distribution of the Net Settlement Fund (*i.e.*, the $10,000,000 million Settlement Amount, plus interest earned thereon less: (i) any Taxes; (ii) any Notice and Administration Costs; (iii) any Litigation Expenses awarded by the Court; and (iv) any attorneys' fees awarded by the Court) must submit a valid Claim Form with all required information postmarked no later than July 9, 2022. *See* Notice, attached as Exhibit A to the Mailing Decl., at ¶¶50-67. As set forth in the Notice, the Net Settlement Fund will be distributed among Settlement Class Members according to the plan of allocation approved by the Court.

71. The proposed Plan of Allocation is detailed in the long-form Notice. *See* Notice, ¶¶50-67. The full Notice is posted on the Settlement Website, is downloadable, and upon request, will be mailed to any potential Settlement Class Members. The Plan of Allocation's objective is to equitably distribute the Net Settlement Fund to those Settlement Class Members who suffered economic losses as

a proximate result of the alleged violations of the Securities Act and/or Exchange Act as opposed to losses caused by market, industry, or Company-specific factors or factors unrelated to the alleged violations of law, and takes into consideration when each Authorized Claimant purchased and/or sold shares of Ra Medical common stock. *Id.* at ¶¶51-53. As described in the Notice, calculations under the Plan of Allocation are not intended to be estimates of, nor indicative of, the amounts that Settlement Class Members might have been able to recover after a trial or estimates of the amounts that will be paid to Authorized Claimants pursuant to the Settlement. Instead, the calculations under the Plan of Allocation are a method to weigh the claims of Settlement Class Members against one another for the purposes of making an equitable allocation of the Net Settlement Fund. *Id.* at ¶51.

72. Under the Plan of Allocation, the Claims Administrator will calculate a Recognized Loss amount for each Settlement Class Member's purchases of Ra Medical common stock during the Settlement Class Period for which adequate documentation is provided. *Id.* For those Settlement Class Members that purchased Ra Medical common stock pursuant or traceable to the IPO, the Recognized Loss will be the maximum of the Settlement Class Member's Recognized Loss under Section 10(b) of the Exchange Act or the statutory damages provided under Section 11(e) of the Securities Act. *See id.* at ¶¶53-54.

73. Under the proposed Plan of Allocation, each Authorized Claimant will receive his, her, or its pro rata share of the Net Settlement Fund. Specifically, an Authorized Claimant's pro rata share shall be the Authorized Claimant's Recognized Claim divided by the total of Recognized Claims of all Authorized Claimants, multiplied by the total amount in the Net Settlement Fund. *Id.* at ¶64.

74. An individual Claimant's recovery under the Plan of Allocation will depend on a number of factors, including the number of valid claims filed by other Claimants and how many shares of Ra Medical common stock the Claimant purchased, acquired, or sold during the Settlement Class Period and when that

Claimant bought, acquired, or sold the shares. If a Claimant has an overall market gain with respect to his, her, or its overall transactions in Ra Medical stock during the Settlement Class Period, or if the Claimant purchased shares during the Settlement Class Period, but did not hold any of those shares through at least one of the alleged corrective disclosures, the Claimant's recovery under the Plan of Allocation will be zero, as any loss suffered would not have been caused by the revelation of the alleged fraud. *Id.* at ¶¶53, 62-63. Lead Counsel believes that the Plan of Allocation will result in a fair and equitable distribution of the Net Settlement Fund among Settlement Class Members who submit valid claims.

75. In sum, the Plan of Allocation was designed to allocate the proceeds of the Net Settlement Fund among Settlement Class Members based on the losses they suffered on transactions in Ra Medical common stock that were attributable to the conduct alleged in the Complaint. Accordingly, Lead Counsel respectfully submits that the Plan of Allocation is fair and reasonable and should be approved by the Court.

76. As noted above, as of April 28, 2022, 4,376 copies of the Notice Packet, which directs Settlement Class Members to the settlement website containing the Plan of Allocation and advises Settlement Class Members of their right to object to the proposed Plan of Allocation, have been sent to potential Settlement Class Members. *See* Mailing Decl. at ¶8 . To date, no objections to the proposed Plan of Allocation have been received or filed on the Court's docket.

## VI.   THE FEE AND LITIGATION EXPENSE APPLICATION

77. In addition to seeking final approval of the Settlement and Plan of Allocation, Lead Counsel are applying to the Court for an award of attorneys' fees of 27.5% of the Settlement Fund (or $2,750,000, plus interest earned at the same rate as the Settlement Fund). Lead Counsel are also requesting reimbursement of out-of-pocket expenses that Lead Counsel incurred in connection with the prosecution of the Action from the Settlement Fund in the amount of $44,131.77. Finally, pursuant to 15 U.S.C. § 78u-4(a)(4), Lead Counsel are requesting reimbursement to Lead

Plaintiffs in the total amount of $5,000 for costs, including lost wages, incurred in representing the Settlement Class. The legal authorities supporting the requested fee and reimbursement of Litigation Expenses are set forth in the concurrently-filed Fee Memorandum. The primary factual bases for the requested fee and reimbursement of Litigation Expenses are summarized below.

### A. The Fee Application

78. For their efforts on behalf of the Settlement Class, Lead Counsel are applying for a percentage of the common fund fee award to compensate them for the services they have rendered on behalf of the Settlement Class. As set forth in the accompanying Fee Memorandum, the percentage method is the best method for determining a fair attorneys' fee award in common fund cases like this one because, unlike the lodestar method, it aligns the lawyers' interest with that of the Settlement Class. The lawyers are motivated to achieve maximum recovery in the shortest amount of time required under the circumstances. This paradigm minimizes unnecessary drain on the Court's resources. Notably, the percentage-of-the-fund method has been recognized as appropriate by the Supreme Court and Ninth Circuit for cases of this nature.

79. Based on the quality of the result achieved, the extent and quality of the work performed, the significant risks of the litigation, and the fully contingent nature of the representation, Lead Counsel respectfully submits that the requested fee award is fair and reasonable and should be approved. As discussed in the Fee Memorandum, a 27.5% award is well within the range of percentages awarded in securities class actions with comparable settlements in this Circuit and, indeed, it is only a modest increase from the Ninth Circuit's 25% "benchmark award." Moreover, the requested fee award was approved by each of the Lead Plaintiffs.

### 1. The Work And Experience Of Lead Counsel

80. GPM's total lodestar is $734,062.50,[5] consisting of $702,140.00 for attorney time and $31,922.50 for professional support staff time. Ex. 3 ("The Lodestar Chart").

81. The Lodestar Chart sets forth the amount of time GPM attorneys and professional support staff billed from inception of the Action through and including April 29, 2022, and the lodestar calculation for those individuals based on GPM's current billing rates.

82. GPM's attorneys and professional support staff rates have recently been accepted as reasonable by other courts when performing a lodestar cross-check, including Courts in the Ninth Circuit. *See Lea v. Tal Education Group*, 2021 WL 5578665, at *12 (S.D.N.Y. Nov. 30, 2021) (finding GPM's rates "comparable to peer plaintiffs and defense-side law firms litigating matters of similar magnitude." (citation omitted)); *Yaron v. Intersect ENT, Inc.*, 2021 WL 5150051, at *2 (N.D. Cal. Nov. 5, 2021); *In re K12 Inc. Sec. Litig.*, 2019 WL 3766420, at *2 (N.D. Cal. July 10, 2019).[6] Additionally, when determining the market rate by looking at fees awarded in similar cases, the rates billed by Lead Counsel (ranging from $450-$625 per hour for non-partners and $750-$1,075 per hour for partners) are comparable to peer plaintiff and defense firms litigating matters of similar magnitude. *See* Ex. 5 attached hereto (table of peer plaintiff and defense law firm billing rates).

83. The Lodestar Chart was prepared from contemporaneous daily time records regularly prepared and maintained by GPM. Time expended on the Fee and Expense Application has not been included in this request. Nor does the lodestar

---

[5] The lodestar figure contains only the time of GPM attorneys and professional staff that billed more than five hours to the Action.

[6] As stated in the Fee Memorandum, GPM's rates are substantially the same as rates that have been accepted by other courts in the Ninth Circuit in similar complex litigation.

include any of the time that will spent preparing for and attending the final approval hearing, overseeing the claims administration process, responding to Settlement Class Members inquiries, and briefing the Motion for Class Distribution Order.

84. The requested fee of 27.5% of the Settlement Fund represents $2,750,000 (plus interest), which equates to a multiplier of 3.75 on this lodestar. The 3.75 multiplier is fair and reasonable based on the risks of the litigation, the quality of the representation, and the results obtained. As discussed in further detail in the Fee Memorandum, the requested multiplier is within the range of fee multipliers often awarded in comparable securities class actions and in other complex litigation involving significant contingency fee risk in this Circuit.

85. As demonstrated by the firm résumé attached as Exhibit 6 hereto, Lead Counsel are experienced in the securities litigation field, with a long and successful track record representing investors in such cases. GPM has successfully prosecuted securities class action cases and complex litigation in federal and state courts throughout the country. I respectfully submit that the Settlement (and its quality) was due to counsel's hard work, persistence, and skill—and that their diligence and the results achieved both fully merit the requested fee.

### 2. Standing And Caliber Of Defendants' Counsel

86. The quality of the work performed by Lead Counsel in attaining the Settlement should also be evaluated in light of the quality of the opposition. Here, Defendants were represented primarily by Wilson Sonsini Goodrich & Rosati, which is a capable and well-respected law firm that vigorously represented the interests of their clients throughout this Action. In the face of this experienced and formidable opposition, Lead Counsel were nonetheless able to persuade Defendants to settle the case on terms that I believe are favorable to the Settlement Class.

### 3. The Risks Of Litigation And The Need To Ensure The Availability Of Competent Counsel In High-Risk Contingent Securities Cases

87. This Action was undertaken by Lead Counsel on an entirely contingent-fee basis. From the outset, Lead Counsel understood that they were embarking on a complex, expensive, and lengthy litigation with no guarantee of ever being compensated for the substantial investment of time and money the case would require. In undertaking that responsibility, Lead Counsel were obligated to ensure that sufficient resources were dedicated to the prosecution of the Action, to ensure that funds were available to compensate attorneys and staff, and to cover the considerable litigation costs required by a case like this.

88. With an average lag time of many years for complex cases like this to conclude, the financial burden on contingent-fee counsel is far greater than on a firm that is paid on an ongoing basis. Indeed, Lead Counsel received no compensation during the course of the Action and incurred $43,131.77 in out-of-pocket litigation-related expenses in prosecuting the Action.

89. Lead Counsel also bore the risk that no recovery would be achieved. As discussed above, from the outset, this case presented multiple risks and uncertainties that could have prevented any recovery whatsoever. Lead Counsel know from personal experience that despite the most vigorous and competent of efforts, success in contingent litigation is never assured. In fact, GPM recently lost a six-week antitrust jury trial in the Northern District of California after five years of litigation, which included many overseas depositions, the expenditure of millions of dollars of attorney and paralegal time, and the expenditure of more than a million dollars in hard costs. *See In re: Korean Ramen Antitrust Litigation*, Case No. 3:13-cv-04115 (N.D. Cal.).

90. Lead Counsel also litigated a securities class action in the Southern District of New York for approximately five years and, after surviving a motion to dismiss, successfully obtaining class certification and undertaking significant

discovery efforts, which included depositions throughout the U.S. and in the U.K. and substantial document review, summary judgment was entered for defendants, and the judgment was affirmed on alternative grounds on appeal to the Second Circuit. *Gross v. GFI Grp., Inc.*, 784 F. App'x 27, 29 (2d Cir. 2019). Put another way, complex litigation is uncertain, and success in cases like this one is never guaranteed.

91. Moreover, courts have repeatedly recognized that it is in the public interest to have experienced and able counsel enforce the securities laws and regulations pertaining to the duties of officers and directors of public companies. *See Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 320 n.4 (2007) ("[P]rivate securities litigation is an indispensable tool with which defrauded investors can recover their losses – a matter crucial to the integrity of domestic capital markets[.]") (internal quotation marks omitted). As recognized by Congress through the passage of the PSLRA, vigorous private enforcement of the federal securities laws can only occur if private investors take an active role in protecting the interests of shareholders. If this important public policy is to be carried out, courts should award fees that adequately compensate plaintiffs' counsel, taking into account the risks undertaken in prosecuting a securities class action.

92. Lead Counsel's extensive efforts in the face of substantial risks and uncertainties have resulted in a significant recovery for the benefit of the Settlement Class. In circumstances such as these, and in consideration of the hard work and the result achieved, I respectfully submit that the requested fee is reasonable and should be approved.

### 4. The Reaction Of The Settlement Class To The Fee Application

93. As noted above, as of April 28, 2022, 4,376 Notice Packets have been mailed advising Settlement Class Members that Lead Counsel would apply for an award of attorneys' fees in an amount not to exceed 33⅓% of the Settlement Fund.

*See* Mailing Decl. Ex. 1.[7]  In addition, the Court-approved Summary Notice has been published in *Investor's Business Daily* and transmitted over the *PR Newswire*.  *Id.* at ¶9 & Ex. B (confirmation of publication of Summary Notice).  To date, no objections to the attorneys' fees maximum have been received.  Any objections received after the date of this filing will be addressed in Lead Counsel's reply in support of Final Approval Motion to be filed by June 6, 2022.

94.　In sum, Lead Counsel accepted this case on a contingency basis, committed significant resources to it, and prosecuted it without any compensation or guarantee of success.  Based on the result obtained, the quality of the work performed, the risks of the Action, and the contingent nature of the representation, Lead Counsel respectfully submit that a fee award of 27.5%, resulting in a multiplier of 3.75, is fair and reasonable, and is supported by the fee awards courts have granted in other comparable cases.

### 5.　Lead Plaintiffs Support The Fee Application

95.　As set forth in the declarations submitted by the Lead Plaintiffs, Lead Plaintiffs have concluded that Lead Counsel's requested fee is fair and reasonable based on the work performed, the recovery obtained for the Settlement Class, and the risks of the Action.  *See* Ex. 7 (Declaration of Ervin Derr) at ¶9; Ex. 8 (Declaration of Peter Shoemaker) at ¶9.  Lead Plaintiffs have been involved in this case since its early stages, and their endorsement of Lead Counsel's fee request supports the reasonableness of the request and should be given weight in the Court's consideration of the fee award.

### B.　The Litigation Expense Application

96.　Lead Counsel seek a total of $53,131.77 in Litigation Expenses to be paid from the Settlement Fund.  This amount includes $43,131.77 in out-of-pocket

---

[7] The Notice Packet also referred Settlement Class Members to the Settlement Website and the Notice, which also contained this information.

costs and expenses reasonably and necessarily incurred by Lead Counsel in connection with commencing, litigating, and settling the claims asserted in the Action and $5,000 in costs, including lost wages, incurred by Lead Plaintiffs.

97. Lead Counsel are seeking reimbursement of a total of $43,131.77 in out-of-pocket costs and expenses. *See* Ex. 4 ("Expense Chart").

98. As stated above, Lead Plaintiffs seek reimbursement, pursuant to 15 U.S.C. §§ 77z-1(a)(4), 78u-4(a)(4), of their reasonable costs (including lost wages) directly incurred in connection with their representation of the Settlement Class, in the amount of $5,000 for each Lead Plaintiff. *See* Ex. 7 (Declaration of Ervin Derr) at ¶¶11-12; Ex. 8 (Declaration of Peter Shoemaker) at ¶¶10-11. As outlined in their declarations, each of the Lead Plaintiffs were active in this litigation and spent substantial time on the Action. Based on my understanding of the work they performed on behalf of the Settlement Class, I believe that the requested awards are justified.

99. The Notice informed potential Settlement Class Members that Lead Counsel would be seeking reimbursement of expenses, including reimbursement to the Plaintiffs, in an amount not to exceed $85,000. The total amount requested by Lead Counsel and Lead Plaintiffs, $53,131.77, is substantially below the $85,000 that Settlement Class Members were advised could be sought. To date, no objections have been raised as to the maximum amount of expenses set forth in the Notice. If any objection to the request for reimbursement of Litigation Expenses is made after the date of this filing, Lead Counsel will address it in their reply papers.

100. From the beginning of the case, Lead Counsel were aware that they might not recover any of their expenses, and, even in the event of a recovery, would not recover any of their out-of-pocket expenditures until such time as the Action might be successfully resolved. Lead Counsel also understood that, even assuming that the case was ultimately successful, reimbursement for expenses would not compensate them for the lost use of the funds advanced by them to prosecute the Action.

Accordingly, Lead Counsel were motivated to, and did, take appropriate steps to avoid incurring unnecessary expenses and to minimize costs without compromising the vigorous and efficient prosecution of the case.

101. Of the total amount of Lead Counsel's out-of-pocket costs and expenses, $16,850.00 or 39%, was expended on Lead Plaintiffs' experts. Lead Plaintiffs retained an experts in the fields of loss causation and damages to assist in the prosecution of the Action. Beyond assisting in the development of Lead Plaintiffs' theories of the case and drafting of the complaints, Lead Plaintiffs' expert on damages and loss causation assisted Lead Counsel during the mediation and settlement negotiations with the Defendants, and also developed the proposed Plan of Allocation in consultation with Lead Counsel.

102. Additionally, Lead Counsel paid $8,750.58 for their share of the mediation fees owed to JAMS for the services of Jed D. Melnick and his team, which is 20.2% of Lead Counsel's total expenses. Another substantial component of Lead Counsel's out-of-pocket costs and expenses was for the services of private investigators, which included conducting numerous fact interviews with former Ra Medical employees and other relevant third parties in connection with Lead Counsel's investigation. The charges for the private investigators' services amounted to $12,705.55, or approximately 29.5% of Lead Counsel's out-of-pocket costs and expenses.

103. Another significant component Lead Counsel's out-of-pocket costs and expenses was for online legal and factual research, which was necessary to prepare the complaints and research the law pertaining to the claims asserted in the Action. The charges for on-line research amounted to $3,732.63, or 8.6% of the total amount of out-of-pocket expenses.

104. The other litigation expenses for which Lead Counsel seek reimbursement are the types of expenses that are necessarily incurred in litigation and

routinely charged to clients billed by the hour. These include, among others, court fees, copying costs, and postage and delivery expenses.

105. In my opinion, the Litigation Expenses incurred by Lead Counsel and Plaintiffs were reasonable and necessary to represent the Settlement Class and achieve the Settlement. Accordingly, Lead Counsel respectfully submits that the Litigation Expenses should be reimbursed in full from the Settlement Fund.

## VII. CONCLUSION

106. For all the reasons set forth above, I respectfully submit that the Settlement and the Plan of Allocation should be approved as fair, reasonable, and adequate. I further submit that the requested fee in the amount of 27.5% of the Settlement Fund should be approved as fair and reasonable, and the request for reimbursement of total Litigation Expenses in the amount of $53,131.77 (which includes $5,000 for each of the Lead Plaintiffs' costs) should also be approved.

I affirm under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on May 2, 2022, at Los Angeles, California.

 *s/ Casey E. Sadler*  
Casey E. Sadler

## **PROOF OF SERVICE BY ELECTRONIC POSTING**

I, the undersigned, say:

I am not a party to the above case and am over eighteen years old. On May 2, 2022, I served true and correct copies of the foregoing document, by posting the document electronically to the ECF website of the United States District Court for the Southern District of California, for receipt electronically by the parties listed on the Court's Service List.

I affirm under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on May 2, 2022, at Los Angeles, California.

 *s/ Casey E. Sadler*
Casey E. Sadler